**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **NATIONAL AUSTRALIA BANK LIMITED,** | |
| **Plaintiff,** | **Civil Action No. 99-690 C** |
| **v.** | **Judge Bruggink** |
| **THE UNITED STATES,** | |
| **Defendant.** | |

# PLAINTIFF NATIONAL AUSTRALIA BANK'S PRE-TRIAL BRIEF

WILLIAMS & CONNOLLY LLP

Paul Martin Wolff
Ryan T. Scarborough
725 Twelfth Street, N.W.
Washington, DC 20005
202-434-5000

*Counsel for Plaintiff*
*National Australia Bank Limited*

January 10, 2007

## TABLE OF CONTENTS


I. THE HISTORY OF THE NEGOTIATIONS ........ 3

A. Pre-September 1994 ........ 3

B. Early- to Mid-September ........ 5

C. The Government's September 20th Memo ........ 7

D. September 21st – September 28th ........ 8

E. September 29th ........ 10

II. THE HISTORY OF THE GOVERNMENT'S EVOLVING SHARING ARGUMENTS ........ 13

A. The Government's Pre-Appeal 50% Theories ........ 15

1. Section 2.5 (SRLY NOLs) ........ 15

2. Section 2.6(f)(iii) (Schedule of Payments Resulting from Decrease in Other Tax Benefit Items) ........ 16

3. Section 2.4(c) (Tax Sharing for the First Nine Months of 1994) ........ 17

4. Section 2.1(a)(viii) ($7 Million Lump Sum Payment) ........ 18

5. Reformation of the Assistance Agreement ........ 18

B. Post-Remand Theories ........ 19

1. James Meyer (Lead Negotiator) ........ 20

2. Stephan Lower (Chief of the FSLIC Resolution Fund Tax Unit) ........ 22

3. Lars Viitala (FSLIC Tax Unit Accountant) ........ 23

III. CONCLUSION ........ 26

Appendix A (Termination Agreement Sharing Percentages)

Appendix B (Deposition of Lawrence L. Gladchun, Nov. 28, 2006)

Appendix C (Deposition of James A. Meyer, Nov. 14, 2006)

Appendix D (Deposition of Stephan J. Lower, Nov. 15, 2006)

Appendix E (Deposition of Lars Viitala, Nov. 16, 2006)

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **NATIONAL AUSTRALIA BANK LTD.,** <br> **Plaintiff,** <br> **v.** <br> **THE UNITED STATES,** <br> **Defendant.** | **Civil Action No. 99-690 C** <br> **Judge Bruggink** |

**PLAINTIFF NATIONAL AUSTRALIA BANK'S PRE-TRIAL BRIEF**

The Court of Appeals remanded this case for the determination of one issue: "the true intentions of the parties in drafting § 8.4, including the question whether any provision of the Termination Agreement can be or should be construed to provide for a ratio of damage sharing other than a 75/25 split." *National Australia Bank v. United States*, 452 F.3d 1321, 1329 (Fed. Cir. 2006). The facts developed through discovery, and that will be adduced at trial, unmistakably show that Michigan National rejected 50% sharing for Guarini recoveries and instead insisted on preserving all Guarini rights it had prior to the Termination Agreement. Specifically, NAB will prove at trial that:

1. Government negotiators from the beginning pressured Michigan National to waive its right to sue under Guarini, but Michigan National refused to do so.

2. The Government then offered Michigan National "tag-along" Guarini rights with an explicit and unambiguous 50% sharing rate. It took the position in the first draft of the Termination Agreement (and every subsequent *draft* prior to the day the Termination Agreement was executed) that Michigan National could only initiate a lawsuit if some other acquirer

successfully sued to recover Guarini damages, and that any recovery would be shared 50/50 with the Government. Michigan National refused to accept either limitation.

3. On the last day of negotiations (September 29, 1994), Michigan National's lead negotiator, Larry Gladchun, told his FDIC counterpart, James Meyer, that Michigan National would not agree to any limitation on its Guarini rights or recoveries. Meyer completely caved in to Gladchun's demands. Not only did he agree that Michigan National could retain full Guarini rights, he also dropped his insistence that Michigan National share any recovery at 50%. The parties instead agreed that Michigan National would have whatever Guarini rights it had prior to entering into the Termination Agreement and that those rights would be unaffected by the Termination Agreement.

4. Section 8.4 was rewritten to delete any reference to a specific sharing percentage. Gladchun agreed to accept language that referenced either the Assistance Agreement *or* the Termination Agreement because he viewed the language of § 8.4 as not putting any "collar" on Michigan National's rights or recovery.

5. Meyer accepted the language in § 8.4, but did not disclose to Gladchun (or any other Michigan National representative) that he planned on asking a court to reform the Assistance Agreement sharing formula if Michigan National ever tried to recover more than 50% of its covered asset losses in a Guarini claim. He never discussed with Gladchun any reservation of rights to seek reformation of the Assistance Agreement.

6. There was no overarching agreement that all tax benefits going forward would be shared at 50%. The parties negotiated the Termination Agreement on an issue-by-issue basis and agreed to a variety of different sharing (or repayment) rates – not just 50%.

7. No other provision of the Termination Agreement governs sharing of a litigated Guarini recovery. One other section – § 2.6(f)(vi) – that would have required 50% sharing for *any* increase in covered asset losses was rewritten in the final days to carve out litigated recoveries and to apply only to increases due to actions by the IRS, Congress, or the FDIC.

* * *

This Court originally read § 8.4 to require only 25% sharing. The Court got it right the first time. Now that the parties have had an opportunity to conduct discovery, the evidence proves even more strongly the correctness of this Court's original decision.

## I. THE HISTORY OF THE NEGOTIATIONS

### A. Pre-September 1994

Ernie Antczak, Michigan National's Tax Director, spearheaded early exploratory discussions to terminate the Assistance Agreement in the summer of 1994.[1] Gladchun Tr. at 43:20-21 (Appendix B). Michigan National wanted to terminate the Assistance Agreement because investors "didn't understand the transaction and the relationship that the Assistance Agreement represented" and it therefore "devalu[ed] Michigan National as an entity in the market" at a time when Michigan National was trying to make itself more appealing to potential acquirers. *Id.* at 69:7-22. Antczak dealt with James Meyer, the lead negotiator for the FDIC who had been involved in earlier attempts to terminate the Assistance Agreement.[2] Meyer saw value in terminating the Assistance Agreement as well because "Congress mandated that all of

---

[1] This was not the first time the parties had tried to terminate the Assistance Agreement. Plaintiff's Exhibit ("PX") 2 at 11-12. Several earlier attempts had foundered and the "RTC concluded that we weren't going to reach an agreement with Michigan National, and they declared the '88 deal renegotiations finished." Meyer Tr. at 20:8-13 (Appendix C).

[2] Meyer was assisted by Stephan Lower, who was the Chief of the FSLIC Resolution Fund Tax Unit, and Lower's subordinate, Lars Viitala.

the 1988 deals be reviewed and possibly renegotiated," Meyer Tr. at 12:8-12 (Appendix C), and he viewed a negotiated resolution as "more cost effective than litigating the issues" that had arisen over the years, *id.* at 22:15-17.

The parties exchanged proposals and it became immediately clear that the major stumbling block to terminating the Assistance Agreement was Michigan National's insistence on preserving its Guarini rights. Specifically, Michigan National's June 17, 1994 proposal did not limit its Guarini rights in any way:

> MNC/IOBC expressly reserves any and all claims, including breach of contract claims, it may have with respect to the benefits o[r] losses specifically covered by the provisions of Section 13224 of the Revenue Reconciliation Bill of 1993, and *nothing done in connection with the termination of the Assistance Agreement will in any way be construed to eliminate or diminish in any way its rights to such claim.*

PX 9 at C126 (emphasis added).

Conversely, the Government's July 11, 1994 counter-proposal required Michigan National to waive its Guarini rights:

> MNC/IOBC retains *no rights* against the FDIC with respect to the Section 13224 of the Revenue Reconciliation Bill of 1993.

PX 10 at C128 (emphasis added). While the Government's highest ranking negotiator – Meyer – emphatically denied that the Government ever tried to pressure Michigan National to waive its Guarini rights, his recollection is clearly wrong.[3] It is belied both by this document and the

[3] Meyer testified that it was his recollection that "we had a lot of internal discussions in the FDIC that we weren't going to take any positions that would be perceived as, as taking away somebody's right to, to sue if they feel they'd been wronged, so we were real sensitive to the issue." Meyer Tr. at 42:22 – 43:5. He further testified that it was his recollection that he had "no objection to Michigan National suing under Gaurini and that Michigan National itself offered to give up those rights." *Id.* at 47:4-14.

recollection of Michigan National's representatives, who testified that the Government pressured Michigan National to give up its Guarini rights.

Antczak "took exception" to the Government's counter-proposal. *See* PX 11. In a white paper detailing his objections, Antczak stated unequivocally that "MNC is unwilling to relinquish its rights to seek relief from the FDIC, unless it is adequately compensated for its losses." PX 11 at CMI021 0028.

The parties made substantial progress during the ensuing weeks in agreeing upon a framework for termination. As those discussions began to look more promising, Larry Gladchun, Michigan National's General Counsel, stepped into the role of lead negotiator. Gladchun took responsibility for concluding the negotiations and memorializing the parties' agreement. Gladchun Tr. at 41:17-21 ("At the end when it appeared as though we might be able to negotiate the resolution of all elements of the Assistance Agreement, I was basically responsible for the negotiation and the completion of the transaction."). Notwithstanding the progress that was being made on other issues, Michigan National's insistence on keeping its Guarini rights proved to be the major sticking point.[4]

**B. Early- to Mid-September**

The Government's proposed solution to Michigan National's refusal to waive its Guarini rights was to offer Michigan National half a loaf. Instead of offering full, unfettered Guarini

[4] Meyer recalls early on that "we shook hands on a tentative deal where they were going to give up their right to, to file a Guarini claim. And then they changed their mind…." Meyer Tr. at 17:4-8. But by the time the first draft of the Termination Agreement was exchanged on September 1st, it was clear that Michigan National was unwilling to walk away from its Guarini claims.

rights, Meyer offered Michigan National "tag-along" rights plus an explicit 50% sharing arrangement. The very first draft of the Termination Agreement, dated September 1st, provided:

> Neither MNC nor any of its subsidiaries shall take a position on any of its Tax Returns that is inconsistent with the provisions of Section 13224 of the Revenue Reconciliation Act of 1993, *nor shall any such entity make any claim or file any cause of action against the United States of America or any agency or instrumentality thereof*, including, but not limited to, the IRS, the FDIC and the OTS, relating in any way to such Section; provided, however, that *if a court or other competent tribunal having jurisdiction over a similarly situated taxpayer determines in a final decision* that such Section does not bar such similarly situated taxpayer from reflecting the losses referred to in such Section on its federal or state tax return, or *that such similarly situated taxpayer is entitled to damages as a result of the enactment of such Section, MNC or any of its subsidiaries may take such action as is necessary to obtain the identical result and shall*, within thirty (30) days after it receives any cash payments, or files a tax return upon which it realizes any tax benefit as a result of such action, *pay fifty percent (50%) of the amount* of such cash, including interest earned thereon, or tax benefit, including interest earned thereon, *to the FDIC Manager*.

PX 12 at 0053 – 0054 (emphasis in italics added).

There was enormous internal pressure on Gladchun to get a deal done. Terminating the Assistance Agreement "was a top priority of the company, one of about four or five…This company was going to be sold, and it had a number of things that detracted from its market value, one of which was this Assistance Agreement, and it needed to be cleaned up…In that context, the preservation of the Guarini claims was not given a high priority" by Michigan National. Gladchun Tr. at 63:1-15.

But Gladchun viewed the preservation of Michigan National's Guarini rights through a different lens. After all, he had helped negotiate the original Assistance Agreement and felt betrayed by the Government's subsequent elimination of covered asset loss deductions.

Gladchun "personally put a great deal of value" on keeping Michigan National's Guarini rights. *Id.* at 54:17-18. His solution was to adopt a negotiating strategy that set that issue to the side until the end of the negotiations when all other issues had been resolved.

> We went though a very specific strategy if you will to compartmentalize and to separate this issue from all of the other issues…We reserved that issue until the very last moment of the discussions…We did not want it to impact any other element of the transaction, and yet we were very jealous about giving up our rights to sue and all of the benefits that we would have been entitled to but for the Termination Agreement…

Gladchun Tr. at 51:11 – 52:4. The idea was to "reserve it to the last moment…to be sure that this issue wasn't affecting the transaction" with the hope that "it could be overcome in the heat of the negotiations at the tail end of the negotiations, and that's exactly what happened." Gladchun Tr. at 64:21 – 65:5.

Thus, when Michigan National sent a revised draft of the Termination Agreement to the Government on September 16, 1994, it noted its disagreement with the proposed language in § 8.4 by bracketing the language in the section – which still provided for tag-along rights and outright 50% sharing – and adding a footnote stating, "This section is being revised." PX 1 at 0064 – 0065.

**C. The Government's September 20th Memo**

On September 20th, the Government's lead negotiator, Meyer, wrote a memo to the Committee on Loans, Liquidations and Purchases of Assets seeking authority to terminate Michigan National's Assistance Agreement and describing the contours of the deal as he understood it at the time. Meyer discussed the flawed sharing formula in the Assistance Agreement but told the Committee that "[s]ettlement of the remaining tax benefit sharing obligations *moots the issue of reforming the formula in the Agreement that determines when tax*

*benefit sharing shifts from 25% to 50%.*" PX 2 at 0092 (emphasis added). Thus, the Government dropped any attempt to rewrite the formula in the Assistance Agreement.

Inexplicably, Meyer also told the Committee that Michigan National had agreed to waive its Guarini rights completely.

> Since the FRF is proposing to settle its right to receive future tax sharing payments as part of this early termination, *MNC has agreed not to initiate a lawsuit against the federal government as a result of Section 13224 of the Revenue Reconciliation Act of 1993,* which prohibits the deduction of losses (after March 4, 1991) to the extent that federal financial assistance has been received for such loss.

PX 2 at 0093 (emphasis added); *see also* Meyer Tr. at 60:12-17. According to Meyer, "at the point in time that we authored this memo, this is what our belief was that the deal was, and we didn't have any indication that it was anything different." Meyer Tr. at 66:19-22. Be that as it may, Meyer neglected to mention to his superiors that every single draft prior to September 20th included a provision (§ 8.4) that would have given Michigan National tag-along rights and imposed a 50% sharing obligation.[5] He also did not tell the Committee that Michigan National had expressed dissatisfaction with this provision in the September 16th draft Termination Agreement. Nor did he tell them that Michigan National previously had demanded full Guarini litigation rights.

**D. September 21st – September 28th**

Contrary to the view expressed by Meyer in his September 20th memo, Michigan National had not agreed to waive its Guarini rights. But any misapprehension that Meyer may have been operating under was dispelled after September 20th when Michigan National resumed

[5] Meyer acknowledged during his deposition that nothing in his memo discussed tag-along rights or the provision of § 8.4 as it was set forth in the September 16th draft. Meyer Tr. at 72:9-17.

its push to have full Guarini rights. Other than this issue, all substantive disputes had been resolved by this time. All witnesses have testified that after the September 16th draft, there were no substantive changes made except those relating in some way to Michigan National's rights under § 8.4. As Meyer put it, "[b]ased on my memory, when we got down to the end, the final days, this was really the only remaining issue." Meyer Tr. at 81:9-11.

On September 28th, a revised version of the Termination Agreement was circulated. Section 8.4 still recited the same language providing tag-along rights and 50% sharing, but continued to be bracketed and this time included a note, "To be discussed." PX 3 at A666 – A667.

The biggest change from the September 16th draft was that the September 28th version began to carve out litigated recoveries of covered asset losses from what had been, to that point, an unqualified 50% sharing requirement in § 2.6(f)(vi). The September 16th draft introduced the concept of "adjustments" and what payments needed to be made if there was an unexpected increase or decrease in the amount of a particular tax benefit in the future. For example, § 2.6(f)(v),[6] which governed "Adjustments to 1989-1993 Other Tax Benefit Items,"[7] required Michigan National to "pay to the FDIC an amount equal to fifty percent (50%) of the tax benefits arising" from any "permanent increase in the amount of Other Tax Benefit Items." PX 1 at 0046. Lest there be any doubt about the catch-all nature of this provision, § 2.6(a) of the September 16th draft had defined "adjustment" to include any act by a "judicial authority…that has the effect of increasing…any…deduction…" PX 1 at 0032. Thus, if the September 16th

[6] In the final version of the Termination Agreement, this section became § 2.6(f)(vi).

[7] "Other Tax Benefit Items" were defined to include "Covered Asset Losses." PX 4 at 0029.

draft had been the final version of the Termination Agreement, both § 2.6(f)(v) and § 8.4 would have reinforced each other and required 50% sharing for any litigated recovery of covered asset loss deductions. But this was not to be.

Michigan National recognized this linkage and took steps to uncouple the two provisions and carve out litigated recoveries from § 2.6.[8] Accordingly, the September 28th draft includes a revised § 2.6(f)(v). No longer would it apply to *any* increase in the amount of Other Tax Benefit Items. Instead, application of § 2.6(f)(v)'s 50% sharing requirement was limited to increases stemming from two narrow circumstances: action of the IRS or Congress, or action of the FDIC Manager or the FDIC OIG that resulted in an increase in Other Tax Benefit Items. PX 3 at A640 & A634.[9] This de-linking ensured that there would be no conflict between §2.6(f)(vi) and whatever resolution was ultimately reached in § 8.4. This now left § 8.4 as the only provision in the Termination Agreement that covered Guarini litigation.

**E. September 29th**

Section 8.4 was the last issue decided on September 29th. The negotiations went up to the proverbial eleventh hour and fifty-ninth minute before an agreement was reached. Meyer Tr. at 29:3-6 & 78:1-3.

Gladchun told the Government negotiators that any restriction on Michigan National's Guarini rights – whether it related to its right to sue or the amount of any recovery – was a deal-breaker. Meyer insisted that Michigan National either had to abandon its Guarini rights

---

[8] Antczak pointed out the linkage between § 2.6(f)(v) and § 8.4 in an internal draft dated September 15, 1994. *See* PX 13 at 28.

[9] The expansive definition of "adjustment" – which encompassed adjustments due to judicial action – was also deleted from the final version of the Termination Agreement the next day. PX 4 at 0018.

completely or accept tag-along rights with 50% sharing. Gladchun remained steadfast in his insistence that Michigan National would not give up any right to sue and would not agree to any post-hoc collar on its damages recovery. His goal was to have the same Guarini rights after executing the Termination Agreement as Michigan National had before entering into the Termination Agreement. Gladchun threatened to walk away from the deal if he did not get what he wanted. Gladchun Tr. at 52:21 – 53:2.

Gladchun convinced Meyer that this issue was a deal-breaker. Meyer testified that "it became very clear to us that there was going to be no settlement unless they had the right to sue." Meyer Tr. at 88:19-21. Meyer gave in to Gladchun's demands, although he was clearly unhappy about it. In fact, he told Gladchun after he capitulated that Michigan National could have the right to sue but that it didn't matter because Michigan National "had a snowball's chance in hell" of winning any lawsuit.[10] For his part, Gladchun testified that "[w]e looked at it as success, as we had prevailed on this issue…[W]e had gotten what we wanted, which was a preservation of our claims, period. We hadn't given ground….That's the way we read it, and that's why we accepted it, and we were very happy that that point was accepted." Gladchun Tr. at 62:3-13.

Gladchun's negotiating strategy had paid off. Michigan National maintained full, unfettered rights to bring whatever Guarini claims it could imagine against anybody it wanted (other than the FDIC Manager). As Gladchun testified, "We wanted an unaffected right to sue, and that's what we have." *Id.* at 99:13-14. Likewise, Michigan National avoided any new restrictions that might limit its damages. Michigan National flatly rejected a 50% sharing rate

---

[10] Meyer does not specifically recall using those words, but conceded that he "may have said it to other people in the FDIC [because] I probably thought that, sure." Meyer Tr. at 92:6-8 & 15-17.

for litigated recoveries and instead insisted that it remain free to pursue whatever damages it might be entitled to recover. As Gladchun explained,

> We were going to get whatever we could get. That's what was on my mind. If we are going to pursue litigation, we would get whatever we were entitled to in, in the context of the Assistance Agreement, and that's all that was in my mind. I mean, we weren't being denied any claims whatsoever. We weren't being collared. The terms of the agreement weren't being changed. Nothing was being done, period…We had achieved everything we wanted to. I was very happy with the settlement.

*Id.* at 100:16 – 101:11. "We didn't want to collar our claims in any way. We didn't want to take less than we were entitled to under the Assistance Agreement, period, whatever that means." *Id.* at 107:15-19.

Accordingly, § 8.4 was rewritten to give Michigan National maximum rights and maximum flexibility to assert those rights. As Meyer conceded:

> Q. So am I not correct that Section (b) of 8.4 as it existed on the 28th was totally rewritten?
>
> A. It's very clear that the section was totally rewritten in the final agreement, absolutely.
>
> Q. The tag-along right provision was eliminated and replaced with different language, is that not correct?
>
> A. Yes, that's right.
>
> Q. And the 50 percent outright sharing language was also replaced with different language?
>
> A. That's right.

Meyer Tr. at 84:6-16. The final version of § 8.4 thus represented total vindication of Michigan National's negotiating position. Entitled "Section 13224 Claims," it provided that:

> If MNC and Independence One assert a claim or claims ("Claims") against a party other than the FDIC Manager for damages and for refunds of federal and state taxes and/or for the redetermination of liability for federal and state taxes for the taxable years 1989 and thereafter, and such Claims arise out of or relate to the enactment

> of Section 13224 of the Revenue Reconciliation Act of 1993 ("Section 13224") or the application of Section 13224 to MNC, then the amount of damages or refunds sought in such Claims shall not include the amount that would have accrued to the benefit of the FDIC Manager under the Assistance Agreement or that would accrue to the benefit of the FDIC Manager under this Agreement…

PX 4 at 0057-0058.[11]

Other than Michigan National's explicit rejection of 50% sharing, neither side thought about or discussed particular sharing percentages relating to a Guarini recovery. Gladchun testified that he "didn't get to that level of analysis" because his goal was simply to avoid "confin[ing] our claims, period." Gladchun Tr. at 102:4-14. Likewise, Meyer candidly acknowledged that he did not "remember in the heat of those discussions, talking, talking about really and focusing in on the sharing percentage." Meyer Tr. at 83:18-21. A meeting of the minds occurred, but not – as the Government contends – as to any particular sharing percentage. Instead, the understanding at the end of the day – and what was meant to be reflected in § 8.4 – was that Michigan National would continue to have the same Guarini rights after termination that it had before termination. It had unfettered rights to sue and likewise the opportunity to assert any damage theory it could prove.

## II. THE HISTORY OF THE GOVERNMENT'S EVOLVING SHARING ARGUMENTS

The Government started this case by insisting that the parties always intended for Michigan National to share any recovery at 50%. It pointed to myriad sections of the

[11] As discussed above, the only other provision of the Termination Agreement that was changed to address Michigan National's Guarini rights was § 2.6(f)(vi). That provision, which had originally required 50% sharing for *any* increase in Other Tax Benefit Items (including covered asset losses), was limited to two discrete scenarios that do not apply to litigated recoveries. No other section of the Termination Agreement was rewritten or changed in any way from its pre-September 20th substance to address Michigan National's Guarini rights under § 8.4.

Termination Agreement that supposedly established this right and proffered declarations from Meyer, Lower and Viitala stating that there was an across-the-board sharing requirement of 50%. Although the Government's counsel acknowledged during summary judgment oral argument that "[t]here is no specific provision that is so well crafted that says any covered asset loss tax benefits going forward are shared at 50 percent," he still insisted that "the intention of the parties was that going forward tax benefits were shared at 50 percent. That's reflected in the termination agreement." 12/9/04 Tr. at 60:17-22.

This Court considered each provision in the Termination Agreement cited by the Government and rejected the Government's assertion that they required 50% sharing here, observing: "Unfortunately, if the intent of the parties was to make permanent a comprehensive 50/50 ratio, they neglected to capture it in the Termination Agreement. Read literally, there is nothing that establishes this ratio with respect to the current claim." *National Australia Bank v. United States*, No. 99-690C, 63 Fed. Cl. 352, 362 (Dec. 29, 2004). On appeal, the Federal Circuit also rejected the Government's argument that other sections beyond § 8.4 required 50% sharing, concluding that they did not apply to tax benefits flowing from covered asset losses recovered through litigation.

We now know that the drafting history of § 8.4 reveals that Michigan National categorically rejected 50% sharing for litigated Guarini recoveries and that the Government's original theory is simply wrong. Section 8.4 and only § 8.4 covered Guarini litigation rights. No language in any other section speaks to this issue. Confronted with the fact that the negotiating and drafting history makes this point indisputably clear, the Government, through its three principal witnesses, now puts forth three different and wholly new arguments for 50% sharing.

Although each is unique, they share one common trait: they are try to get the Government the same deal that Michigan National previously rejected.

**A. The Government's Pre-Appeal 50% Theories**

**1. Section 2.5 (SRLY NOLs)**

Sections 2.5(a) and (b) provide for 50% sharing for any federal or state tax benefits attributable to SRLY NOLs. PX 4 at 0014-0015. During summary judgment, the Government argued that "[t]he dispute regarding the FDIC's sharing percentage of the tax benefits was resolved in the Termination Agreement with the FDIC obtaining 50 percent of the tax benefits after 1994. The resolution is reflected in Sections 2.5(a) and (b) of the Termination Agreement." Defendant's Opposition to Plaintiff's Motion for Summary Judgment on Damages and Cross-Motion for Summary Judgment on Damages, June 7, 2004, at 30-31. Thus, the Government argued, this section required 50% sharing here.

The most obvious flaw with this argument is a definitional one. A SRLY NOL is a net operating loss that was recognized by a thrift *prior to acquisition* and which is carried forward into future tax years (with the limitation that it can only be used to offset income generated by the thrift and not all entities in the consolidated tax group). Meyer Tr. at 122:6-12. By definition, a SRLY NOL does not include covered asset losses because those built-in losses were not recognized until *after* the date of acquisition. *See* Lower Tr. at 104:9-20 (Appendix D). Because they are recognized after the date of acquisition, covered asset losses are not subject to SRLY limitations.[12]

[12] Many of the Government's own witnesses concede that § 2.5 does not apply to Guarini claims. Lower testified that "covered asset losses recovered through litigation…are different than SRLY NOLs." Lower Tr. at 103:13-16. Meyer testified that there is no reference to Guarini, litigation,

Both this Court and the Federal Circuit rejected the Government's contention that § 2.5(a) or (b) requires 50% sharing here. The Federal Circuit explicitly pointed out the obvious inapplicability of § 2.5:

> The Termination Agreement provides for a 50/50 sharing ratio in several scenarios, but the government is unable to identify any provision of that agreement that requires such a ratio for benefits accruing from the losses at issue in NAB's claim – covered asset losses. It admits that the provision on which it relies most heavily, § 2.5, applies by its terms to net operating loss carryovers and does not "explicitly mention[ ]" covered asset losses.

*National Australia Bank*, 452 F.3d at 1328.

Now that NAB has had an opportunity to conduct discovery concerning this issue, it is clear that the Government's reliance on § 2.5 is even weaker than it was the first time around. Specifically, § 2.5 was written prior to September 20th at a time when the Government professed its belief that Michigan National had agreed to give up its Guarini rights. When the Government subsequently realized that Michigan National would not give up these rights, it did not make any change to § 2.5 to deal with Guarini. At this point in the litigation, the Government's continued insistence that § 2.5 requires 50% sharing of litigated Guarini recoveries borders on the frivolous.

**2. Section 2.6(f)(iii) (Schedule of Payments Resulting from Decrease in Other Tax Benefit Items)**

Section 2.6(f)(iii) provides a schedule of payments to be made by the FDIC to Michigan National in the event that there is a permanent decrease in the amount of Other Tax Benefit Items. PX 4 at 0030. The Government points out that the first tranche in that schedule is

---

or covered asset losses in § 2.5. Meyer Tr. at 123:2-4, 123:15-17, 133:16-20. Only Viitala continues to insist that this section requires 50% sharing.

premised on 50% sharing, and argues from that premise that "[i]f there had not been an agreement that the FDIC was to receive a 50 percent sharing percentage for the tax benefits to be received after 1994 (1993 with respect to post-acquisition NOLs and tax credits), then the FDIC would not have been willing to reimburse Beverly Hills at the 50 percent tax sharing rate…in the event of an IRS audit disallowing tax benefits for which the FDIC had been paid." Brief for Defendant-Appellant, The United States, No. 05-5072, June 24, 2005, at 55 (quoting Viitala Declaration at 7).

This section is inapplicable to the situation here. This Court previously considered and rejected the Government's reliance on § 2.6(f)(iii), calling it "inapplicable" because it governs payments from the FDIC to Michigan National. *National Australia Bank*, 63 Fed. Cl. at 362. Furthermore, while the Government blithely points to the implicit 50% sharing in the first tranche of this inapplicable section, it studiously ignores the next six tranches that include sharing percentages ranging from 16.35% to 28.6%. There was, in short, no agreement to an across-the-board sharing percentage. The parties simply negotiated on an issue-by-issue basis and agreed to numbers that they found acceptable to get the deal done.

**3. Section 2.4(c) (Tax Sharing for the First Nine Months of 1994)**

Section 2.4(c) provides for 43.75% sharing for tax benefits stemming from "costs, expenses, and losses" incurred between "January 1, 1994 through September 30, 1994" that were "debited to the SRA during such period." The Government argued to this Court and the Federal Circuit that § 2.4(c) proves there was a 50% sharing requirement because this supposedly shows that there was a transition between 25% and 50%. *See, e.g.*, Brief for Defendant-Appellant, The United States, No. 05-5072, June 24, 2005, at 52 & n.14. Both Courts rejected this argument, properly recognizing that it was inapplicable given that covered asset losses recovered through

litigation neither arose between January 1, 1994 and September 30, 1994, nor were debited to the SRA during that period. And now that testimony has been taken, it is clear that no such overarching sharing agreement existed.

**4. Section 2.1(a)(viii) ($7 Million Lump Sum Payment)**

Section 2.1(a)(viii) notes that the parties had a "number of disputes as to the rights and obligations of the parties under the Assistance Agreement and the Note" and provides for a lump sum payment of $7 million from Michigan National to the FDIC to "terminate the Assistance Agreement, and resolve all disputes thereunder." PX 4 at 0008. The Government contends that its willingness to accept $7 million was predicated on an internal present value computation performed during the summer of 1994 that utilized 50% sharing. The Government raised, and lost, this argument before. The Government's renewed reliance on this section is equally unavailing. This section does not cover Michigan National's Guarini rights, nor was it intended to do so. Seven million dollars was a negotiated number encompassing many different issues and was not the product of a sterile 50% computation. Michigan National wanted to pay less; the Government wanted it to pay more; and they settled on $7 million. Michigan National's Guarini rights and recoveries were exempted from this calculation. *See* PX 4 at 0060-0061.

**5. Reformation of the Assistance Agreement**

The Government repeatedly insisted that it would have brought suit to reform the sharing formula in the Assistance Agreement if Michigan National tried to recover more than 50% of any future tax benefits, and its chief negotiator, Meyer, continues to press this point. This Court previously rejected that argument, holding that "[e]ven if we were to interpret defendant's argument as a request that the formula be reformed by this court, we would be unable to grant relief because doing so would not reflect the parties' intent as evidenced by the Termination

Agreement. Here, the Termination Agreement reflects a clear willingness to rely on the original formula in the Assistance Agreement." *National Australia Bank*, 63 Fed. Cl. at 363.

The Federal Circuit unambiguously endorsed this conclusion:

> We agree that reformation of the Assistance Agreement is inappropriate. As the government concedes in its brief, the flaw in the Assistance Agreement has already been remedied by the parties in the Termination Agreement, which, according to the government's brief, "cured the flaw in the Assistance Agreement concerning the tax benefit sharing formula." Whatever its other ambiguities, the Termination Agreement clearly contemplates the continued use of the known-to-be-flawed Assistance Agreement formula in at least some circumstances. To reform the Assistance Agreement would undermine the parties' clear intent in drafting the Termination Agreement, and would deny NAB the benefit of its bargain. This we decline to do.

*National Australia Bank,* 452 F.3d at 1330. At this point, reformation of the Assistance Agreement is not an option.

**B. Post-Remand Theories**

Discovery has revealed an unheard of approach to litigation. The Government has presented, not alternative legal theories, but alternative and inconsistent factual stories, with the apparent hope that this Court will buy into one of them.

NAB deposed all three government negotiators – the chief negotiator James Meyer; the Chief of the FSLIC Resolution Fund Tax Unit, Stephan Lower; and Mr. Lower's assistant, Lars Viitala. Their testimony was consistently inconsistent. Each offered a new theory on why the sharing should be 50%. Meyer contended that if NAB tried to recover more than 50% of the Guarini covered asset loss tax benefits through litigation, he would ask the court, *at that time*, to reform the Assistance Agreement and limit the recovery to 50%. Lower took a very simplistic approach. Without any ability to point to any provision of the Termination Agreement to support

his view, he baldly asserted that the parties intended to share all future tax benefits at 50%. Lastly, Viitala took the opposite tack. He chose a convoluted approach to rewrite § 8.4 to provide for 75% sharing up to September 29, 1994 and 50% thereafter. None of them embraced the others' theories, and all are at odds with the common understanding held by Michigan National's representatives.

### 1. James Meyer (Lead Negotiator)

As the lead negotiator for the Government, Meyer's understanding is most pertinent to the question of what § 8.4 means. Meyer conceded five key facts during his deposition that doom the Government's case.

First, he admitted that sharing would remain at 25% under an unreformed formula. Meyer Tr. at 117:15-20. The parties knew this going into the Termination Agreement negotiations.

Second, Meyer acknowledged that the parties never reformed the sharing formula in the original Assistance Agreement. *Id.* at 145:16 – 146:9. The need to do this was "moot[ed]" because the parties had agreed to resolve sharing questions on an issue-by-issue basis.

Third, he conceded that he gave in to Michigan National's demands on September 29th that it have full Guarini rights, including an unfettered right to sue and no fixed sharing percentage that might limit its recovery. Meyer viewed this as a small concession to get the deal done given his belief that Michigan National did not have a snowball's chance in hell of succeeding. *Id.* at 84:3-16, 92:2-17.

Fourth, Meyer testified that he may have left the language in § 8.4 "a little vague" and that he believed (*but did not disclose to Michigan National*) that he could get a court to reform

the Assistance Agreement in the unlikely event that Michigan National managed to recover more than 50% on its Guarini claim. As he put it,

> There needed to be a little bit of vagueness in that in that, and because the court would then have to figure it out after all this stuff was sorted out…[T]he language…in that 8.4 I think for probably that reason was left perhaps a little vague.

*Id.* at 97:14-17, 98:3-6. Meyer did not misspeak. He went on to testify later in his deposition that:

> the way I thought this was going to work is that the courts would have to go in and see, you know, they'll have to go back and pretend basically that the Assistance Agreement was still in place and determine the appropriate sharing percentage. And they would have, necessarily have to go in there and infer a reformation of that messed-up formula…"

*Id.* at 115:15 – 116:2.

Fifth, Meyer never sought to reserve any rights to seek reformation of the Assistance Agreement's sharing formula. To the contrary, he entered into a general release. Meyer testified that publicly he gave in to Gladchun's demand, but privately believed he could seek reformation of the Assistance Agreement if things ever got to that point.

Meyer's testimony raises the question whether the parties intended that the Government have the right, under the Termination Agreement, to seek reformation of the Assistance Agreement sharing formula if Michigan National recovered more than 50% on its Guarini claim. The short answer is no. The Government did not reserve any rights to reform the Assistance Agreement sharing formula when it entered into the Termination Agreement, nor did it communicate a desire to do so to Michigan National. Meyer never put Gladchun on notice that he contemplated seeking reformation of the sharing formula in the event that Michigan National recovered more than 50% on its Guarini claims.

As both this Court and the Federal Circuit found, there was no basis before to reform the Assistance Agreement and rewrite the sharing formula. And there is no basis now to revisit the issue and give the Government a different sharing arrangement.

First, this would amount to reformation of the sharing formula in the Assistance Agreement, something that has been expressly rejected by the Federal Circuit.

Second, the Termination Agreement is fully integrated.[13] It is black-letter law that when a contract has an integration clause, no new terms can be added to the contract and parol evidence is limited to interpreting the existing provisions of that contract, not adding to them. *See, e.g.*, *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1375-76 (Fed. Cir. 2004) (parol evidence rule "prohibits the use of external evidence to add to or otherwise modify the terms of a written agreement in instances where the written agreement has been adopted by the parties as an expression of their final understanding"); *McAbee Constr. Inc. v. United States*, 97 F.3d 1431, 1434 (Fed. Cir. 1996) ("When a document is completely integrated, no additional terms may be added, whether consistent or inconsistent, through parol evidence.").

Finally, reformation is available only to correct a *mutual* mistake. It is inappropriate here because the parties never agreed that the Government could reserve any right to reform the Assistance Agreement in the first place.

### 2. Stephan Lower (Chief of the FSLIC Resolution Fund Tax Unit)

Lower has no specific recollections concerning the negotiations after September 20th. He had no recollection that the last issue resolved prior to signing the Termination Agreement

[13] Section 11.9, entitled "Entire Agreement," provides that "[t]his Agreement and the Exhibits hereto embody the entire agreement among the parties hereto relating to the subject matters herein, and supersede all prior agreements and understandings among the parties, oral or written, relating to such matters." PX 4 at 0072 – 0073.

was the scope of Michigan National's Guarini rights and the sharing that would apply to those rights. Lower Tr. at 74:16 – 75:16. Indeed, until the day before his deposition in November 2006, Lower believed that Michigan National had given up its right to sue. As he explained, "I knew they had told us early on that they weren't going to sue, and I didn't know they had ever changed their position on that." *Id.* at 70:2-4.

> Q. [Y]ou have no recollection that they did change their mind to insist on full Guarini rights or whatever they could recover?
>
> A. Until yesterday, no, I didn't.
>
> Q. And yesterday, that was the day you met with the government lawyer and reviewed the final Termination Agreement?
>
> A. These documents, yes.

*Id.* at 72:2-9. In short, Lower does not offer any meaningful insight into the parties' intent because he does not recall the negotiations on the last day, the resolution that was reached, or even if he were present. *Id.* at 86:20 – 88-1.

While Lower insisted that the parties agreed to share all future tax benefits at 50%, he was at a loss to reconcile his recollection with Michigan National's rejection of the 50% sharing rate in § 8.4 or the presence of other sharing percentages in the Termination Agreement. Lower conceded that he "can't say it's in 8.4," *id.* at 93:18, and admitted that there is no other provision that governs what sharing rate should apply to a litigated recovery under Guarini, *id.* at 92:21 – 93:5. Lower's 50% testimony – which the Government touted so highly in its summary judgment briefs and on appeal – falls far short and must be rejected.

### 3. Lars Viitala (FSLIC Tax Unit Accountant)

The last of the Government's three main witnesses is Lars Viitala, a former tax accountant of the FSLIC Tax Unit who now makes his living as a litigation consultant to the Department of Justice and FDIC. Almost all of his earned income over the past five years stems

from two litigation contracts with the Government, including over $60,000 assisting the Government's defense in this case – yet he purports to appear as a fact witness in this case.[14] Viitala Tr. at 51:17-21, 53:17 – 54:1 (Appendix E).

Viitala claims that the Government agreed to the language in § 8.4 because this section provided that the Assistance Agreement would govern sharing of Guarini tax benefits realized prior to the date of termination (September 29, 1994) and the Termination Agreement would govern sharing of Guarini tax benefits realized after the date of termination. *Id.* at 141:10-16. His interpretation is wrong.

First, § 8.4 is written in the disjunctive, not the conjunctive. It refers to the damages that would accrue under the Assistance Agreement "*or*" the Termination Agreement. Under Viitala's theory, § 8.4 should refer to both agreements in the conjunctive because, according to him, the Assistance Agreement was to govern sharing prior to September 29, 1994 *and* the Termination Agreement was to govern sharing after September 29, 1994. Thus, the first problem with Viitala's interpretation is that it would require reformation from the disjunctive to the conjunctive.

Second, Viitala's proffered interpretation depends on there being a sharing provision in the Termination Agreement that would require 50% sharing for Guarini recoveries. However, nothing in the Termination Agreement establishes a 50% sharing rate for Guarini damages. It is not in §§ 2.1, 2.4, 2.5 or 2.6. Neither Viitala nor any other Government witness can point to any provision of the Termination Agreement that governs this situation. Nor did the parties agree to

[14] By contrast, neither Gladchun nor Antczak have any stake in this litigation. They are not presently employed by Michigan National or NAB and have only been reimbursed a small amount for their time to prepare for and give their depositions.

an overarching 50% sharing rate in the Termination Agreement. As can be seen on the attached chart, the Termination Agreement utilizes a wide variety of built-in sharing and repayment rates. *See* Appendix A.

Third, Viitala's interpretation is out of character with the rest of the Termination Agreement. Had the parties agreed to share tax benefits at a 25% rate prior to termination and at a 50% rate thereafter, as Viitala contends, it would have been very simple for the parties to specify that 25% sharing applied to Guarini recoveries realized prior to September 29, 1994 and 50% sharing applied to recoveries realized thereafter. The rest of the Termination Agreement shows that the parties knew how to be precise when they wanted to be – they had, after all, spelled out exact sharing rates for multiple possible scenarios. That they did not similarly set forth precise language in § 8.4 demonstrates that they did not reach the agreement championed by Viitala.

Fourth, Viitala's proffered interpretation is inconsistent with the release language of § 9.2. Under Viitala's theory, § 9.2 should have released all claims under the Assistance Agreement to the extent they were realized after the date of termination. But § 9.2 did no such thing. It provides that "nothing contained herein shall release or discharge…in any way any claim (including without limitation any claim arising out of or relating to the enactment or application of Section 13224…)." Michigan National did not agree to release any rights under the Assistance Agreement at all – much less rights after September 29, 1994 – and the language of § 9.2 is fully consistent with that understanding.

Fifth, both Gladchun and Antczak have expressly disavowed the understanding put forward by Viitala. They viewed the language in § 8.4 as leaving them with the same rights at the end of the day that they had before they started negotiating the Termination Agreement. It is

no less important to note that neither Meyer nor Lower has embraced Viitala's theory. Thus, there clearly was no meeting of the minds on Viitala's theory, not even on the Government's side (let alone with Michigan National).[15]

## III. CONCLUSION

The Government clearly pressured Michigan National to give up its Guarini rights. When that did not work, the Government offered Michigan National something less – tag-along rights with a 50% cap on any damages recovery. Gladchun was not willing to accept these limitations, but decided that the best approach from a strategic standpoint was to note Michigan National's disagreement and table the issue until all other issues had been resolved. The Government continued to insist that Michigan National have nothing more than tag-along rights and 50% sharing.

On September 29, 1994, after all other issues had been finalized, Gladchun told Meyer that Michigan National would not agree to any collar on its Guarini rights. He told Meyer in no uncertain terms that tag-along rights were unacceptable and that a 50% sharing requirement was a non-starter. In essence, he told the Government negotiators that he intended to walk out of the negotiations with the same Guarini rights that Michigan National had before entering the Termination Agreement or the deal would be off.

---

[15] The Government argues that NAB should recover only $17,054,381 because, under Viitala's view, tax benefits that accrued at a 25% sharing rate were not realized until a 50% sharing year. Not only is this argument premised on an agreement that never existed (*i.e.*, 25% sharing for tax benefits realized prior to termination, and 50% sharing for tax benefits realized after termination), it also ignores the fact that the parties tracked alternative minimum tax credits relating to other tax benefit items in a deferred account on a dollar-for-dollar basis (and without regard to the sharing rate that might have been in effect in later years).

The Government completely caved. Meyer agreed to rewrite § 8.4 to meet Michigan National's demands. Meyer also agreed to eliminate any reference to any particular sharing percentage. Meyer was not happy about making these concessions, but he did so because he believed that Michigan National had almost no chance of succeeding on its damages claim and thus perceived very little risk in this concession.

It is clear that there was a meeting of the minds on that last day. The meeting of the minds was that Michigan National would not limit its rights in any way and, instead, would have the same Guarini rights after it signed the Termination Agreement as it had before. It could bring any lawsuit under any theory, either under the Assistance Agreement or the Termination Agreement, and seek any form of damages it desired. There were no limits on its rights – no collars, no parameters – only the assurance that a court would pass on the merits of Michigan National's claims.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

s/Ryan Scarborough____________________
Paul Martin Wolff
Ryan T. Scarborough
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000

*Attorneys for Plaintiff*
*National Australia Bank Ltd.*

January 10, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that true and correct copies of Plaintiff National Australia Bank's Pre-Trial Brief were served electronically and by hand this 10th day of January, 2007, upon:

Scott D. Austin, Esq.
Trial Attorney
U.S. Department of Justice
Commercial Litigation Branch
Civil Division
1100 L Street, N.W., Room 7044
Washington, DC 20530

Attorney for Defendant

s/Ryan Scarborough____________________
Ryan T. Scarborough