IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - -x

NATIONAL AUSTRALIA BANK, :

Plaintiff, :

vs. : No. 99-690C

UNITED STATES OF AMERICA, : (Senior Judge Bruggink)

Defendant. :

- - - - - - - - - - - - - - - -x

Washington, D.C.

Tuesday, November 28, 2006

Videotaped deposition of LAWRENCE L. GLADCHUN, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the District of Columbia, taken at the offices of Williams & Connolly LLP, 725 Twelfth Street, N.W., Washington, D.C. 20005, at 9:02 a.m., Tuesday, November 28, 2006, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

APPEARANCES:
On behalf of the Plaintiff:
RYAN T. SCARBOROUGH, ESQ.
PAUL MARTIN WOLFF, ESQ.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202)434-5173

On behalf of the Defendant:
JEFFERY T. INFELISE, ESQ.
BRIAN A. MIZOGUCHI, ESQ.
Trial Attorneys
Commercial Litigation Branch
United States Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202)307-0282

--Continued--



APPEARANCES: (Continued)
On behalf of the Defendant: (Continued)
THOMAS BAHLO, ESQ.
Counsel, Legal Division
Federal Deposit Insurance Corporation
3501 Fairfax Drive, Room D-7120
Arlington, Virginia 22226
(703)562-2388

ALSO PRESENT:
RAYMOND HEER, III
Videographer



CONTENTS


| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFF | DEFENDANT |
|---|---|---|
| LAWRENCE L. GLADCHUN | | |
| By Mr. Infelise | 6 | |


EXHIBITS


| GLADCHUN EXHIBIT NO. | | PAGE NO. |
|---|---|---|
| 1 | Assistance Agreement | 27 |
| 2 | Ltr dtd 11/15/91 to Viitala fr Orians | 36 |
| 3 | Termination Agreement | 48 |
| 4 | Draft Termination Agreement | 72 |
| 5 | Response to Interrogatories | 87 |




PROCEEDINGS

THE VIDEOGRAPHER: This is in the United States Court of Federal Claims.

The Plaintiff is National Australia Bank.

The Defendant is the United States of America.

Today's date is November 28th, 2006. This is the Case No. 99-690C.

The witness is Lawrence L. Gladchun. The location of the deposition is 725 12th Street, Northwest, Washington, D.C.

Appearing on behalf of the Plaintiff is Ryan T. Scarborough and Paul Mr. Wolff of Williams & Connolly.

Calling the deposition on behalf of the Defendant is Jeffery Infelise and Brian Mizogouchi of the United States Department of Justice, Civil Division, and Thomas C. Bahlo of the Federal Deposit Insurance Corporation.

The officer before him this videotaped deposition is taken and sworn by is Kathy Boyd.

Page 6

The video camera operator is Raymond Heer representing Alderson Reporting Company, 1111 14th Street, Northwest, Suite 400, Washington, D.C. 20005.

This videotaped deposition commenced at 9:02:01.

Please swear in the witness.

Whereupon,

LAWRENCE L. GLADCHUN,

was called as a witness by counsel for Defendant, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. INFELISE:

Q. Good morning, Mr. Gladchun.
A. Good morning.
Q. As I indicated, I'm Jeff Infelise representing the Department of Justice today.

I read through your previous deposition.

I understand you've been deposed on many occasions, so I'm not going to go through a

Page 7

complete recitation as I normally do, but I'd just like to cover a couple of the ground rules.

As you know, I'll be asking you a series of questions while you're under oath.

If you answer my question, I'm going to assume you understand it.

If you have any questions, please ask me to explain or amplify. I'll be happy to do that.

As you know, only one person can speak at a time so the court reporter can get a record.

I'll try to remember that. I'll try not to talk over you, and I just ask that you try and do the same thing during the deposition.

As you know, counsel will be posing objections to any questions I have, and as you know, unless he instructs you not to answer, you still answer the question. All right.

My experience in these cases, especially when we're talking about events that occurred many years ago, is that when I ask you a question about an event that occurred maybe ten

Page 8

years ago, you may not recall it right away.

That's fine, but I've also found that as we go through this deposition, if I ask you other questions, sometimes it will trigger your memory about something I asked before.

If that happens, I encourage you to go ahead and, you know, go back to the answer if you recall something and answer the previous question if anything that comes to mind.

A. I will.
Q. Okay? All right. Now let me define a few terms that I'm going to use to make sure we're both working off the same page.

First of all, when I talk about the Assistance Agreement, I'm going to talk about the Assistance Agreement that was entered into on I think it was December 31st of 1988, okay?
A. Yes.
Q. And Termination Agreement, I'll be referring to the final Termination Agreement unless I say otherwise that was entered on September 29th, 1994.

Page 9

Do you understand what I would refer to when I talk about a covered asset?
A. Yes.
Q. Okay. How about the Guarini legislation?
A. Yes.
Q. All right. Those are, those terms I think will probably be used several times during the deposition.

Let me get a little bit about your background.

Sir, are you presently employed?
A. Yes. I currently am in the private practice of law in Bloomfield Hills, Michigan, and I own a small manufacturing company that treats plastic fuel components for vapor barrier.
Q. You say you have a private practice?
A. Yes.
Q. Are you a sole practitioner?
A. Yes.
Q. Any particular type of law that you specialize in?





ea18ab3e-3662-426b-b747-fa14cd120595

Page 10

A. Corporate law, mainly financial transactions, bank-type RONs, that type of thing.
Q. Do you have any banks that are customers or clients?
A. No. No. That's --
Q. Okay. As I understand it, you left Michigan National Corporation in May of 1999, is that accurate?
A. I think that's accurate.
Q. And do you have any continuing relationship with, and I'll -- Michigan National Corporation or MNC?
A. Yes. With MNC?
Q. Yes.
A. MNC no longer exists.
Q. Okay.
A. You know.
Q. So the successor of MNC, do you have any continuing relationship?
A. Not a business relationship; I have lots of personal relationships with people that are at the bank, but not, not a business or

Page 11

professional relationship.
Q. Are you talking about say friends that --
A. Yes.
Q. Work there? Okay. I know at one point in time, you had a consulting agreement with was it Michigan National Corporation?
A. Yes.
Q. Is that still in existence?
A. No.
Q. When did that terminate?
A. That would have terminated -- it was a one-year contract that started when I left, basically for one year.
Q. Okay. So that would have terminated some time in 2000?
A. Probably, yes.
Q. Do you have any ongoing agreement with Michigan -- excuse me -- the successor to Michigan National concerning assisting in this litigation?
A. No.

Page 12

Q. So you're not receiving any compensation for any work that you've done involving this litigation?
A. I am being compensated on a, I'm being compensated to come to this deposition as an example, so I'm being compensated for the time I spend involved with giving testimony to you.
Q. And at what rate?
A. $350.00 an hour.
Q. What about reviewing any documents in preparation for the deposition?
Did you engage in any preparation for this deposition?
A. Yes.
Q. Did you review any documents?
A. I did.
Q. And the time you spent in reviewing the documents, are you compensated for that?
A. Yes.
Q. At the same rate, $350.00 an hour?
A. Correct.
Q. Let me go back just for a moment to the

Page 13

consult or consulting relationship you had you said for a year?
A. Um-hm.
Q. What was that? What were you compensated, at what rate for that?
A. Oh, it was not, it was not an hourly rate.
I honestly don't recall what the -- it was -- I don't recall the specific amount.
Q. So you don't recall how much you were actually paid under that agreement?
A. That's correct.
Q. Other than the agreement that compensates you for the time in reviewing documents and preparation for the deposition, and in your presentation of the deposition, are you serving any other compensation?
MR. SCARBOROUGH: Objection to form.
THE WITNESS: No.
BY MR. INFELISE:
Q. Is your compensation in any way dependent on the outcome of this litigation?

Page 14

A. No.
Q. Now did you meet with counsel for Michigan National or National Australia Bank prior to this deposition?
A. Yes.
Q. When was that?
A. I met with, I met on two occasions.
Q. Okay.
A. I can't give you a specific date, but probably three weeks ago or so was the first meeting, and then yesterday.
Q. And how much time did you spend meeting with counsel?
A. Oh, I spent several hours in the first meeting, which was in my office in Bloomfield Hills, Michigan, and I spent the better part of yesterday here.
Q. Now you indicated that you did review some documents in preparation for deposition?
A. Yes.
Q. Could you tell me which documents those were?

Page 15

A. Yes. I looked at, I looked at some drafts of the Termination Agreement that's dated in September of '94.
I looked at -- and those drafts included several drafts, drafts dated September 16th, I believe the 28th and 29th of September, '94.
I looked at a summary of information provided by Mr. Meyers I believe to a committee of resolutions or something to that effect of the FSLIC.
Q. Do you recall the date on that summary?
A. It would have been in late September I believe. I don't recall specifically.
That's pretty much it I think.
Q. What about did you review the Assistance Agreement?
A. No.
Q. And what about the final Termination Agreement?
A. Yes.
Q. Okay. And the three drafts I think you

Page 16

mentioned were one dated September 16th, September 28th, September 29th?
A. Right.
Q. Do you recall any others?
A. I may have looked at a, I may have looked at a September 1st draft as well, but that would be it.
Q. All right. And you also mentioned a summary of information put together by Mr. Meyer, Mr. James Meyer?
A. Yes.
Q. Had you ever seen that before?
A. No.
Q. Did you review the declarations by any individuals?
A. No.
Q. How about depositions by anyone in this case?
A. No.
Q. Did you review any pleadings that were filed in this case?
A. No.

Page 17

Q. How about any of the opinions of the court in this case?
A. No.
Q. Did you have any discussions with anyone other than counsel in preparing for the deposition?
A. No.
Q. I believe your last deposition in this case was in September of 2002 approximately.
Between that date and before the discussions you had with counsel, did you have any other discussions with anyone concerning this case?
A. No, sir.
Q. What about you said you do have some people, personal relationships at I guess NAB?
A. Well, let me be clear. The Michigan National Bank or Corporation that I think of is no longer NAB.
It is part of a ABN AMRO and their Midwest Bank in Michigan, so it is that entity with which and with whom I have relationships.





ea18ab3e-3662-426b-b747-fa14cd120595

Page 18

Q. Okay.
A. Not really National Australia Bank.
Q. Okay. You said that you did not review any of the pleadings or opinions in this case in preparation for the deposition.
Have you ever reviewed the pleadings that were filed by either party or the opinions of the court in this case?
A. When you say review, no. I have never made a conscious study or even read through any of the pleadings or opinions of the court.
I have been offered information by various people saying, you know, this is the progress of litigation.
Q. I see.
A. But I really haven't had any interest or focus on it.
Q. Okay. It's my understanding that when you were at Michigan National, you were general counsel?
A. That's correct.
Q. Could you give me a sort of a general

Page 19

description of what your duties involved in that position?
A. I can. I can do that over -- the career was 23 years with Michigan National.
Q. All right.
A. Is there --
Q. Let's focus on the period of time say from 1988 until you left in 1999.
A. Yes. In 1988, I was, in the first part of the year, I was serving as the Chairman of a group of banks within Michigan National Corporation.
It was headquartered in Lansing, Michigan.
The, the bank, meaning Michigan National Corporation, was taking a, a new approach, and they were looking for acquisitions.
We had studied the bank. We had gotten the bank on a good, solid financial footing, and we were looking to become an acquirer.
At that time, I was asked to come back to the holding company from this bank role.

Page 20

It was a, it was a position that was a non-holding company position.
It was a position with respect to individual subsidiaries within the company.
I was asked to come back to, to take the general counsel's role, again with the expectation that we would be doing acquisitions.
In fact, that was a reason I went out into the banks was to gain operating experience and hopefully benefit from that in acquisitions.
So we, I came back that year to the role of general counsel with a specific focus to concentrate on mergers and acquisitions, and I performed that role as a general counsel would.
I, generally speaking, I worked with the senior-most executives of the company and looked at various opportunities and functioned, functioned -- I don't know how to express it other than the fact that I provided legal counsel to the Chairman, President, and the Board.
I hired outside counsel to represent the company in lots of different areas, both M&A

Page 21

work as well as, you know, any other type of litigation that the company might be involved in.
Q. You say M&A. You mean mergers and acquisitions?
A. Yes.
Q. Thank you.
A. That's pretty much it.
Q. Okay. And did that role or responsibilities change at all between 1988 and 1999 when you left, or with respect that pretty much the function that you performed?
A. Yes. As the general counsel at Michigan National Corporation, I was involved at the highest levels of the company in terms of policy-making.
There was a five-person Executive Committee. I was a member of that committee through the acquisition of the bank by National Australia Bank, so 1995ish.
Things changed significantly then. I maintained, I continued in the role as general counsel, but the executive policy-making





ea18ab3e-3662-426b-b747-fa14cd120595

responsibilities were or influence that I might have was diminished as a result of that merger.
Q. Okay. And as I understand it, you also served as the Secretary for the corporation?
A. Yes. That's correct.
Q. And that continued up through 1999 when you left?
A. It did.
Q. Okay. As I understand it, you joined Michigan National Corporation in 1978?
A. That's correct.
Q. Okay. And did you have any involvement in the acquisition of Beverly Hills Savings Bank?
A. Yes.
Q. When did you become involved, do you recall?
A. I do. When I came back from the regional role, I was told that the company was, was focusing on acquisitions, and it was really kind of an exciting time because the first week I came back as general counsel, there were three or four significant transactions that were being



considered by Michigan National Corporation, one of which was Beverly Hills Business Bank. Well, it was Beverly Hills at that time, Beverly Hills Savings Bank, but it was one of three or four.
It was the lowest item on the, on the list. I looked at the situation, and my reaction to it was I'd like to sort of spearhead this one, I like this one.
Everybody said no, no, this one is dead, this one can't be done, we're not on the same wavelength with, with the government on this, so we're going to let it pass.
And I said well, let me, let me see if I can do something about that, and so I sort of spearheaded a re-evaluation of the terms.
By the time I came back, there was a term sheet, and it was enough to understand what the general proposition was, and I basically picked that up and said let me go talk to the people involved.
And I don't remember all the people by any stretch, but came to Washington. I



acquainted myself with the representatives of FSLIC, and we started to resuscitate earlier negotiations, and basically we worked until we completed a transaction on December 31st of 1998.
Q. Do you recall approximately when you started working on that, when you say resuscitating the transaction?
A. Yeah. It was, to the best of my recollection now, it was over a period of about two months, eight weeks to ten weeks, something like that.
Q. Now ultimately, there was an Assistance Agreement entered into?
A. Correct.
Q. Did you have any, play any part or any role in drafting any portion of that Assistance Agreement?
A. Well, drafting -- we negotiated the contract.
Did we draft it? You know, I think the term did we control the document, did we proffer the document? No.



We reacted to the document. We negotiated specific terms of the document over a period of quite some time, probably four weeks or so.
Q. Did you ever propose any specific terms to be included in the Assistance Agreement?
A. I'm certain I did.
Q. Do you recall what they were?
A. Well, the only, the only provision that I, that I recall having lots of discussion about -- well, there were a number, but the indemnity provision was one that we focused a lot of time and attention on.
We were concerned about its breadth or I should say its narrowness at the beginning, and we spent a great deal of time talking about that.
But my recollection is is that, that it was the standard indemnity agreement and couldn't be touched, but in the end, we negotiated some changes to that specific provision.
Lots of issues with respect to the currency if you will which were tax benefits; I

Page 26

was in a, in a role of not being a tax practitioner, although I had some background in taxation, didn't consider myself to be able independently to make judgments about the tax provisions.

We spent a great deal of time on those both with -- with two separate lawyers, a lawyer that was a transaction lawyer and a tax practitioner, and then we hired special tax counsel to deal with it.

Q. Who were the tax counsel that you hired?

A. The tax counsel that backed up the initial advice was, was Tom, well, started with Arnold & Porter.

Arnold & porter was a firm that we had a long-term relationship with, and ultimately we hired and took advice from Tom Dwyer at Arnold & Porter.

Q. You mentioned an initial opinion. Who was, who provided that?

A. I'm struggling with the name. First

Page 27

name is Berry.

Q. Taff?

A. Berry Taff, yes. Yes.

Q. Do you recall the provision in the Assistance Agreement that spelled out how any tax benefits that were realized would be shared?

A. I don't have a recollection of anything specific about that.

I know that there was a sharing provision.

Q. Okay. Let's make it a little bit easier.

Please mark this as Gladchun Exhibit No. 1, please.

(Gladchun Exhibit No. 1 was marked for identification.)

THE WITNESS: Excuse me one minute. I'm going to get my glasses.

MR. INFELISE: That's fine.

(There was a pause in the proceeding.)

THE WITNESS: I can read without them,

Page 28

but not for any extended period.

Okay.

BY MR. INFELISE:

Q. All right. What's been marked as Gladchun Exhibit No. 1 is entitled, "Assistance Agreement Among the Federal Savings and Loan Insurance Corporation, Michigan National Corporation and Beverly Hills Federal Savings Bank, Beverly Hills, California"?

A. Right.

Q. And if you would look, I believe you'll see the very last page are the signatures?

A. Yes.

Q. Okay. And I would represent that this is a complete copy as far as we know at this point.

If you would turn, sir, to page 52 of the Assistance Agreement?

A. I'm there.

Q. Yes. And this is, I think it's Section 9(f) says applicable percentage?

A. Yes.

Page 29

Q. Now is this, do you -- to your recollection, is this the provision that spelled out how any tax benefits that would be realized as a result of, realized by Michigan National would be shared among the parties?

A. I honestly can't answer that right now. I mean I can read the --

Q. Okay.

A. The words here, but I don't have any way to fix the context.

Q. All right. So you don't have any recollection of whether or not this was what Michigan National agreed to other than what you see in, on the document?

A. That's correct.

Q. All right. Do you have any recollection of why there was a provision for some one period to be 25 percent and apparently for another period, 50 percent?

A. Do, do I know why?

Q. Yes.

A. I have a general recollection of why,





ea18ab3e-3662-426b-b747-fa14cd120595

yes.
I know this was a. I know that there was a two-step kind of sharing arrangement. and that it. and that it. and that it relates to the Net Investment Account.
That's about it.
Q. Okay. When you say it relates to the Net Investment Account. what do you mean, in your understanding?
A. To the best of my recollection. we. we were to receive a return on our investment at a. at a level, and. and when we recaptured. when we -- you know. I don't want to speculate.
I know that there was. there was a different sharing arrangement linked to that Net Investment Account. and that's about all I can recall.
Q. All right. So it's your recollection that there were two specific sharing provisions that were dependent upon. in some fashion, the extent to which Michigan National recouped its investment?



A. And a return.
Q. And a return?
A. Yeah.
Q. All right. So for one period, it was 25 percent and then at some point in time, it transitioned to 50 percent?
MR. SCARBOROUGH: Objection.
THE WITNESS: Well, are you, are you asking me to interpret this document? Or maybe I should ask you to clarify the question because I've got a conflict in my mind.
BY MR. INFELISE:
Q. Sure. What was your understanding, based on your involvement in negotiating this agreement, of why there were two specific percentages provided for in the Assistance Agreement for tax sharing or sharing of tax benefits?
A. Again. I have, I have a recollection of having a two-step, a two-step sharing of tax benefits related to the Net Investment Account, and that's about all I can really say now, and I



don't have any further recollection of it.
Q. Well. was it the intent of Michigan National and the parties at the time that under some circumstances or under some given circumstances or set of facts. the sharing percentage would change from 25 to 50 percent?
A. I would say it could change.
Q. It could change?
A. Yes.
Q. Based on. as you said. whether or not Michigan National recouped its investment and some return on top of that?
A. I don't know. I don't know what the mechanics were. but I know that there was a scenario that was set up that it could change. that it could change, yes.
Q. Okay. Now at any point in time. were you made aware after -- let me rephrase that.
After the Assistance Agreement was entered into, were you made aware at any point in time that there was a flaw in the provisions of the Assistance Agreement with respect to sharing



of tax benefits?
A. Yes.
Q. Do you recall when that was?
A. In terms of time, just broadly. I know that one of the tax people at Michigan National came to me one day and said help me with this, I can't make this work, and tell me if I'm doing it right, and I walked. he walked me through his analysis, and I said basically that's, that's interesting, It's very interesting.
And all I know is that that preceded -- I don't remember exactly when that was, but it was. it was some time between the time we executed the document in December of '88 and, and September of 1994. and I -- that's all I know.
MR. INFELISE: Okay. Mark this as --
(There was a pause in the proceedings.)
BY MR. INFELISE:
Q. Now let me ask you this. At some point in time, did anyone from the tax department come to you and say that the literal language of the Assistance Agreement would preclude there ever





ea18ab3e-3662-426b-b747-fa14cd120595

Page 34

being a change from 25 to 50 percent sharing?
A. Yes.
Q. All right. So you were made aware of that at some point?
A. Yes. That was, that was the interpretation of -- the internal interpretation.
Q. Internal?
A. Of that document, yes.
Q. That, that interpretation would have been inconsistent with what the intent of Michigan National was in the Assistance Agreement, is that correct?
A. That I don't know. I couldn't offer that opinion directly, only because it requires you to get into the bowels of the document.
I mean I, I would tell you I was surprised.
Q. You say you were surprised?
A. Yeah. Yeah, I was.
Q. Well, as I --
A. Under no circumstances, let me put it that way.

Page 35

Q. As I understand what you said, you understood the section 9(f) to be a provision where the sharing percentage could change?
A. Could, yes.
Q. Could?
A. Right.
Q. But as I understand now, the interpretation that was made known to you would have made it impossible for it to change?
A. Yes, I believe that was right, and that's why I was surprised.
Q. So that would be inconsistent with the intent of Section 9(f), wouldn't it?
A. I don't know. I assume so. I mean under no circumstances, and again, I, I'm not sure I ever concluded that under no circumstances could it change, but that it was suggested that that was the case.
Q. Was that a position that Michigan National ever took with the FSLIC or the FDIC? And let me --
A. I don't, I don't know. I don't know.

Page 36

Q. Do you recall ever taking that position with the FSLIC or the FDIC?
A. That it could never change?
Q. Yes.
A. I don't.
Q. Do you recall whether or not Michigan National ever informed the FDIC of the potential flaw in the Assistance Agreement with respect to the tax sharing?
A. I don't have any specific recollection of that, no.
MR. INFELISE: Okay. Could we mark this, I think it will be Gladchun Exhibit No. 2?
(Gladchun Exhibit No. 2 was marked for identification.)
BY MR. INFELISE:
Q. And I've handed you I believe it's a letter dated November 15th, 1991, addressed to Mr. Lars S. Viitala, and the signature block, although this copy is unsigned, is Timothy J., is it Orians?

Page 37

A. Orians, yes.
Q. Orians?
A. Um-hm.
MR. WOLFF: O r i a n s.
MR. INFELISE: Thank you.
BY MR. INFELISE:
Q. Now Mr. Gladchun, you can take your time and read through all of it if you'd like.
I'd like to direct your attention to the third page.
At the bottom, there's a note, and it says the computation set forth above follows the specific provisions of Section 1(kk) of the Assistance Agreement. The computation of the Net Investment Account as provided in the Agreement for years subsequent to the Initial Year appears to be logically incorrect."
A. Um-hm.
Q. First of all, who was Mr. Orians?
A. He is, he was the person that brought this to my attention, as I mentioned earlier.
Q. I see.





ea18ab3e-3662-426b-b747-fa14cd120595

A. He is a tax practitioner, a, a non lawyer, an accountant in the tax department at Michigan National.
Q. All right. Am I correct that this note appears to be notifying the, in this case, I guess it's still the Resolution Trust Corporation that in fact there is a logical flaw in the Assistance Agreement?
A. Yes.
Q. And that would have to do with the sharing of the tax benefits?
A. Yes. Well, it relates to the Net Investment Account I believe, but yes.
Q. Okay. As I understand it then, Mr. Gladchun, any tax benefits that Michigan National would realize were dependent upon the terms of the Assistance Agreement?
MR. SCARBOROUGH: Objection.
THE WITNESS: Yeah, I'd like you to repeat that question if you could.
BY MR. INFELISE:
Q. Certainly. Am I correct that any tax



benefits that Michigan National expected to realize as a result of the Beverly Hills acquisition were dependent upon the terms of the Assistance Agreement?
MR. SCARBOROUGH: Let me note my objection that the issue is with regard to what timeframe we're talking about, if you want to clarify?
MR. INFELISE: Okay.
THE WITNESS: If we're using tax benefits under the Assistance Agreement itself --
BY MR. INFELISE:
Q. Yes.
A. I would say yes, but tax benefits in general can come from general operation of, of the entity which may or may not derive, I mean it's --
Q. Okay.
A. There's a different definition of --
Q. Good point. Let me be more specific.
A. Okay.
Q. Tax benefits, any tax benefits that



Michigan National expected to realize as a result of covered assets losses would be dependent upon the terms of the Assistance Agreement?
A. Yes, I believe so.
MR. SCARBOROUGH: Objection -- vague.
THE WITNESS: That's correct.
BY MR. INFELISE:
Q. Okay. Now at some point, obviously Michigan National and the FDIC entered into negotiations to terminate the Assistance Agreement, am I correct?
A. That's correct.
Q. Did you have any role in those negotiations?
A. Yes.
Q. And what was your role?
A. My role in the end was to negotiate completed transaction, to terminate the Assistance Agreement, and to basically resolve all open issues with respect to that agreement.
Q. You say in the end?
A. Yes.



Q. What do you mean by that?
A. I say in the end because there were early explorations of whether we could find a, we could find a mutually acceptable way to terminate the Assistance Agreement and wrap the whole thing up.
In other words, we were willing to accelerate the, the payment of the negative net worth note and just essentially unwind all elements of the Assistance Agreement.
Q. Um-hm.
A. So there were early explorations between our tax department and individuals within the RTC or the FSLIC to unwind that transaction.
I was not involved in early discussions.
At the end when it appeared as though we might be able to negotiate the resolution of all elements of the Assistance Agreement, I was basically responsible for the negotiation and the completion of the transaction.
Q. Could you give me a estimate of the





ea18ab3e-3662-426b-b747-fa14cd120595

time period when you became involved?
A. Other than to say summer or fall of is 1994, that would be my best approximation.
Q. Okay. And do I understand your testimony that prior to that time, there had been ongoing discussions between Michigan National and the FDIC?
A. There were exploratory discussions about how if we were going to do this, how could we do it? Could we find a common ground?
And those were largely technical discussions over open issues with respect to the Assistance Agreement and then just how could we do this?
Concepts batted back and forth. I would receive term sheets or general synopses of where we were, but it wasn't a negotiation that was going on at that time. It was general exploration.
When things developed to the point where we felt that a transaction could be achieved, then I became involved.



It actually rose to the level where these discussions occurred at the Board level of the company, and at that time, it was said it was, it was a corporate priority to resolve the Assistance Agreement at the time.
It was a very high priority actually, and when it rose to that level, then I became involved and was actually asked to see if we could get this, get this done.
Q. All right. So in the summer or fall of 1994, what role did you assume with respect to the negotiations?
A. I was the head negotiator.
Q. Okay. Was there anybody else who assisted you or worked with you in the negotiations?
A. Yes, most definitely. Ernie Antczak as, the task director of the company, was intimately involved.
He would have conducted the early exploratory discussions.
The treasurer of the company, executive



vice president I believe, Joe Whiteside, was involved.
Robert Mylod, the Chairman of the company, was involved.
Both Joe and Bob Mylod were sort of in and out. They were, they looked to me to keep them apprised of what was going on, what the conditions of the negotiations were, what the status was, and to, you know, just keep their, their hand in it so to speak.
It was one of five or six key initiatives that the company was pursuing at the time, so they were, kept very, very much up to date as things were progressing.
That's pretty much the team now. Tim Orians had a support role to Ernie Antczak, but it was, it was basically a support role.
He would, he would perform calculations. He would work the numbers so to speak to determine -- he had, he had a model for the various elements of the Termination Agreement.



Q. Was there anybody else involved in the actual negotiations other than the individuals that you've named on the part of Michigan National or representing Michigan National?
A. Actual negotiations?
Q. Yes.
MR. SCARBOROUGH: I'm just going to pose an objection, but go ahead.
THE WITNESS: Not the way I would characterize it.
The only person that, that we looked to for advice was Tom Dwyer at Arnold & porter, but I wouldn't characterize him as being actively negotiating on our part.
He was supporting our efforts, though.
BY MR. INFELISE:
Q. In September of 1994, was there a series of negotiations concerning the Termination Agreement?
A. Yes.
Q. And did Mr. Dwyer attend those sessions?





ea18ab3e-3662-426b-b747-fa14cd120595

A. I honestly don't recall.
Q. Did you attend those sessions?
A. Well, I attended sessions in that period of time.
I would have been involved in any meaningful negotiation during that time period I think.
That was my role. I was responsible for developing the, the agreement with the government. But whether I was at all of the meetings or not, I don't know.
Q. That's what I was going to ask you. Do you recall whether or not there were any sessions that you were unable to attend or that you missed?
A. I, I don't know.
Q. With respect to -- well, let me ask you this.
Were there tax issues involved in the negotiation of the Termination Agreement?
A. Yes.
Q. And was there anyone who specifically



had primary responsibility for those tax issues for Michigan National Corporation during the negotiations?
A. Well, I looked to Ernie Antczak for technical advice on tax issues, and Ernie used Tom Dwyer to sort of backstop his thinking on tax issues.
Q. Okay. The provisions in the Termination Agreement which specifically addressed tax issues, do you recall who from Michigan National would have been involved in either drafting or editing or making suggestions for changes in those provisions?
MR. SCARBOROUGH: Objection to form.
THE WITNESS: The tax team that I just described of Antczak and Dwyer would be normal.
I mean that would be the three of us. The three of us would have discussed tax issues.
BY MR. INFELISE:
Q. Would you have had any responsibility personally for drafting any of the provisions in the Termination Agreement that addressed tax



issues?
MR. SCARBOROUGH: Same objection -- vague.
THE WITNESS: Yeah. I accepted responsibility for the entire document.
BY MR. INFELISE:
Q. You did?
A. I did.
Q. All right. Do you recall the provisions in the Termination Agreement, the final one, Section 8.4, which talked about tax benefits as a result of litigation?
A. Did you say the Termination Agreement?
Q. Yes. I'm sorry. If I said Assistance Agreement, I misspoke -- Termination Agreement.
A. Do I recall it?
Q. Yes.
A. I do.
Q. Okay.
MR. INFELISE: Mark this as Gladchun Exhibit No. 3.
(Gladchun Exhibit No. 3



was marked for identification.)
BY MR. INFELISE:
Q. Now this Gladchun Exhibit No. 3 is entitled, "Termination Agreement By and Among Federal Deposit Insurance Corporation, As Manager of the FSLIC Resolution Fund, Michigan National Corporation and Independence One Bank of California, FSB" dated as of September 29th, 1994?
A. Yes.
Q. Now if you would look at page -- let me find it fast.
I believe it is page 56 of this document.
A. Yes.
Q. Section 8.4 is entitled, "Section 13224 Claims"?
A. Yes.
Q. And Section 13224 claims refers to claims arising from the enactment of the Guarini legislation.

Page 50

Is that your understanding?
A. Yeah. Well, yes.
Q. Okay.
A. Tax benefits that were, that were denied as a result of that legislation.
Q. All right. Looking at this provision, do you have a recollection of whether or not you actually drafted any portion of the language contained in it?
A. No.
Q. Do you know -- you have no recollection of it?
A. No.
Q. Do you have any recollection of who may have been involved in drafting that language?
A. The only -- having looked at this language and fitting it into the thinking that went on and the time, that went on with respect to this, it's my belief without a specific recollection that the, the government would have offered this language to us, but I don't specifically know.

Page 51

Q. Why do you believe it would have been the government that offered this specific language in Section 8.4?
A. Well, the -- 8.4 goes to the preservation of rights to pursue claims under the OBRA or Guarini legislation.
Q. Yes.
A. It was a very important issue for Michigan National in these negotiations, and so it had a very, very clear focus with me and with Ernie Antczak in these negotiations, and we went through a very specific strategy if you will to compartmentalize and to separate this issue from all of the other issues, all of the other economic issues associated with this Termination Agreement, and we reserved, through the negotiations, we reserved that issue until the very last moment of the discussions, the negotiations.
We did that for, for specific reasons. I mean it, we did not want it to impact any other economic element of the transaction, and yet we

Page 52

were very jealous about giving up our rights to sue and all of the benefits that we would have been entitled to but for the Termination Agreement, so --
Q. I'm not sure. I'm still not sure I got an answer.
I was asking really -- and I appreciate the explanation of what occurred, but what I was trying to pin down is why do you believe that this language as presently worded in the final termination was --
A. Yes.
Q. Proposed by the government as opposed to Michigan National?
A. Well, I understand the question. I was trying to explain why I felt that it was proffered by the government, because essentially at the very end of the discussions, there was a lot of pressure if you will to overcome this last issue, and there was a lot of frustration.
I remember walking out of the room and, you know, and it was a, at least at a point in

Page 53

time, it was a deal breaker-type of an issue, and we were looking for relief.
Both sides were trying to find a way to come over this relatively straightforward issue from both sides' perspective I believe.
And I just -- the atmospherics of the time is what leads me to believe that this was offered by, by the government as a way to overcome this last impediment.
Q. Now you said -- I'm sorry. Go ahead.
A. It's, it's not language that, that would, that we would have offered as a solution.
It would really surprise me if, if, if the language had its genesis from our team, let me put it that way.
Q. All right. Now you said that the issue surrounding this section was a deal breaker?
A. Um-hm.
Q. Can we just be specific? What issue are you talking about?
Is it American National Corporation's ability to bring suit for a breach of the Guarini





ea18ab3e-3662-426b-b747-fa14cd120595

legislation?
A. Michigan National wanted to -- well, in particular, Ernie Antczak in particular, and therefore, the Michigan National's position was we wanted to preserve our right to sue, and we wanted all of the rights essentially that we had with respect to the Assistance Agreement, whatever they may be.
And that was, that was our, our position, and we consciously, deliberately and -- focused on that.
I have to tell you, though, that it was a negotiation, it was a negotiating position that we established, and there was a, it was an element that we had a, a great deal of latitude to deal with as the negotiating team.
In other words, while I personally put a great deal of value in it, it wasn't necessarily shared by the corporation if you will, and, and thus the approach to isolate it, thus the approach to not have an impact, the economics of, of the Termination Agreement



independent of this issue.
Do you understand what I'm trying to describe to you?
Q. I think so.
A. Okay.
Q. All right. Well, let me go back. You said there were two things that was important to you and Mr. Antczak.
One was preserving Michigan National's right to sue --
A. Correct.
Q. For breach I guess or based on the Guarini legislation, and two was preserve all your rights under the Assistance Agreement?
A. Yes. Stated simply, we didn't want to give any ground on the issue, period.
Q. All right. So with respect to rights under the Assistance Agreement, do you mean those rights which was the intent of Michigan National to establish as part of the Assistance Agreement?
MR. SCARBOROUGH: Objection to form.
THE WITNESS: Whatever the Assistance



Agreement said, that's what we were protecting.
BY MR. INFELISE:
Q. Well, let me ask you were you protecting the intent of the Assistance Agreement?
A. Arguably yes. I mean --
Q. You said that you were surprised, you'd be surprised based on the language actually contained in Section 8.4 if it was proposed by anyone from Michigan National?
A. Yes.
Q. Okay. Why do you say that?
A. Just the, the nature of the language itself; it -- and the atmospherics at the time.
I don't have any other reason to conclude that.
Q. Is there any specific language or phrases in Section 8.4 which you're basing that conclusion on?
A. It just strikes me that the language that ultimately was concluded here is awkward against the, against the other provisions of the



agreement.
It, it strikes me as a obvious attempt to overcome an issue that both sides wanted to get over, and its integration into the full document is awkward and therefore, evidences that.
It's, it doesn't have a level of precision that many, many of the other provisions entail, and that's why I conclude that.
It's a subjective judgment on my part, but it, it's drawn from the nature of the negotiations and what was going on at the time.
That's all I can tell you.
Q. Can you point me to any specific phrase or term in Section 8.4 that you're basing your conclusion on?
A. Well, first of all, there was a great deal of discussion about what do we mean by the government in terms of, of we want to preserve our claims against the government.
And, and the, the term FDIC manager, I believe we had discussions about well, what does





ea18ab3e-3662-426b-b747-fa14cd120595

that mean?
If we're talking about the FDIC and its position and role as manager of the, of this Assistance Agreement, it's a whole different thing than releasing the FDIC in a general context.
And we had discussions about that and whether or not that would satisfy the preservation of claims or whether that would disadvantage Michigan National Corporation as an acquirer vis-a-vis every other acquirer.
So that's, that's one element of it, and as I recall, Jim Meyers suggested that was one way to get over that element of our concern.
And we internally debated and discussed whether that would be a way that we could reach a compromise, and it's here.
And therefore, you know, I assume we, I know we accepted that, and it points to, at least from my point of view, the government, the, our opposing negotiating team trying to find language that would satisfy our needs and that they could



live with.
Q. Are you saying that that term, the FDIC manager, is ambiguous with respect to whether or not that's, you preserved your rights to sue?
A. No. I'm saying the concept of referring to the FDIC not in a general context, but as manager was a concept that was offered by the government's negotiating team to us as a way of getting over our concerns about giving away our claims or not preserving our claims under Guarini.
Q. Okay.
A. And that term is here, and, and so that is, that is language that was discussed or that concept was discussed.
It was accepted by us. It was offered by Jim Meyers and his team as a way -- he said I have to protect the FDIC as the manager, but I don't have to protect the government in general, and that's where the concept started from.
And we said we think we can work with that, and we went back and we talked about it,



and, and Jim's concept of just excising the FDIC manager was accepted.
That, that, beyond that, they were on and off discussions, but we largely. We largely just said look, let's just deal with all of the other elements of the Termination Agreement, and then let's visit this at the end, and everyone was in agreement to that.
And so to the best of my recollection, this language was written the night of the 29th at the table on the fly.
That would be, that's my recollection of what was done.
Q. Is there any other terms or phrases or sentences in Section 8.4 which you believe indicate that the government drafted this?
A. I really can't, I can't be that, any more precise -- just awkward language. That's all I can say.
We just tried to be more specific than that, and it just appears to me that it's not, it's not real specific and it's not the kind of



language we would have offered.
That's, beyond that, I don't know.
Q. Well, what would you have offered as opposed to what's actually contained in Section 8.4?
A. Oh, I think you can just be very plain about what we're trying to do.
Nothing with respect to this agreement would affect our rights in any way.
I mean it would be just fine, and quite honestly, I looked at this, at this language and, you know, it says you can't get them, but if you do, you give them back.
And I said from our perspective, we backed away from it and said we're getting what we wanted, we've excised the FDIC as manager and everything else is unaffected.
We haven't given ground. We consider this to be success. We're in agreement. Let's go forward.
Q. So all the other terms you were in agreement with in Section 8.4?





ea18ab3e-3662-426b-b747-fa14cd120595

Page 62

A. Oh, yeah. We looked at them as not giving ground, period.

We looked at it as success, as we had prevailed on this issue. We had reserved it until the very last moment.

We had discussed it in the heat of trying to close this agreement, and we had gotten what we wanted, which was a preservation of our claims, period.

We hadn't given ground. We had preserved is -- that's the way we read it, and that's why we accepted it, and we were very happy that that point was accepted.

Q. All right. Now you say that you reserved this issue to the very last moment?

A. Um-hm.

Q. Why was that?

A. For two reasons -- one was because internally, this issue was not valued the way I valued it, the way Ernie Antczak valued it.

Q. You mean internally by Michigan National?

Page 63

A. Right. Right. Michigan National valued terminating the agreement very, very highly. It was a top priority of the company, one of about four or five.

So it was, it was a very high -- to set the context, we were cleaning up issues within the company that would, would devalue Michigan National in the market.

This company was going to be sold, and it had a number of things that detracted from its market value, one of which was this Assistance Agreement, and it needed to be cleaned up. It was a high priority of the company.

In that context, the preservation of the Guarini claims was not given a high priority.

A. It was can we make, can we fit our negotiations within an acceptable cost to the company?

And we had a model and we had a bracket of economic values, and if it fell within that economic bracket, it was acceptable to the company, and I had authority basically to go

Page 64

forward.

The issue that we're talking about, the preservation of the claims, was valued by me and wasn't necessarily valued, it was not valued in any specific way in that, in that equation if you will.

So I had the ability basically to, to give up the claims, but -- and that's specifically why we excised the claims.

We reserved the claims, put them on the side. That's why we waited until the last moment, because we had to quantify the economic terms of the transaction, and we basically had a deal that we could accept.

We could have just said okay, we fold, remove the issue, let's sign the Termination Agreement, let's get done with it, so we positioned, we consciously positioned the negotiations to be in that state of condition.

That's not what we did. I mean we ultimately prevailed on the issue, and it was our strategy to reserve it to the last moment because

Page 65

we, I personally wanted to be sure that this issue wasn't affecting the transaction, and two, I thought it gave us an opportunity to prevail on the issue because I thought from both sides, this had become a fairly small issue.

I thought it could be overcome in the heat of the negotiations at the tail end of the negotiations, and that's exactly what happened.

Q. Now during the course of the negotiations, did you ever report to anyone at Michigan National concerning your progress?

A. Yes.

Q. To whom?

A. I would have informed Joe Whiteside and Bob Mylod.

Q. Do you recall ever making any presentations to the Board of Directors concerning the progress of the negotiations?

A. I don't recall that specifically. It was an issue that was at that level, but the rapidity of this and, and the, the opportunity for that type of report. I can't, I just can't





ea18ab3e-3662-426b-b747-fa14cd120595

Page 66

recall.
Q. Do you know whether or not Mr. Whiteside or anybody else made any presentations to the Board concerning your progress in the negotiations?
A. It would be the same situation; if there was an opportunity because of the timing of a Board meeting, it would be normal to report on the status.
Do we think it's going to be done? Will it achieve the financial objectives that we have established for it? That would be typical.
Whether that happened or not, I don't know.
Q. Okay.
A. Just because of the timing.
Q. All right. Do you recall who, and I'm referring you now to the September 1994 period of time, who negotiated on behalf of the FDIC?
A. Well, you know, Jim Meyers was involved.
And honestly, I don't recall the full

Page 67

complement of the team.
There were three or four people involved for the government side of things, and I don't recall who was in the room the evening of the discussions, quite honestly.
Q. Did you refresh your memory at all looking at the documents for this deposition as to who was involved?
A. To some degree; I know that Lower -- I don't know the first name.
Q. Steve Lower?
A. Steve Lower, Steve Lower, Lars Viitala is it? Lars is on here -- Viitala, "Vitt-al-a" is it?
Q. Viitala is correct?
A. Viitala is the correct pronunciation, yes, okay.
But there may have been others, that lawyers, other people playing roles, that those are the only people that I have refreshed my recollection were involved.
Whether they were in the room doing the

Page 68

final negotiations, I really don't know.
I know Jim was.
Q. Um-hm.
A. Because Jim was the point man, and he was the one we looked to to say yes or no, and that, that's the total of my recollection.
MR. INFELISE: Okay. We've been going about an hour and fifteen minutes.
Let's take about a ten-minute break. Is that all right?
MR. WOLFF: Sure.
THE VIDEOGRAPHER: This concludes Tape 1 in the deposition of Lawrence L. Gladchun.
Off the record at 10:16:17.
(A recess was taken.)
THE VIDEOGRAPHER: This begins Tape 2 in the deposition of Lawrence Gladchun.
On the record at 10:29:26.
BY MR. INFELISE:
Q. Mr. Gladchun, you had I think earlier described some of the reasons that Michigan National wanted to terminate the Assistance

Page 69

Agreement?
A. Yes.
Q. And correct me if I'm wrong. One of those was to simplify Michigan National's relationship with the FDIC?
MR. SCARBOROUGH: Objection.
THE WITNESS: If I said that, we wanted to basically unwind the entire transaction because the market didn't understand the transaction and the relationship that the Assistance Agreement represented, and Michigan National felt that because the market didn't understand it, it was devaluing Michigan National as an entity in the market.
BY MR. INFELISE:
Q. Okay.
A. It was a complication that was devaluing our stock in the market we felt, and in order for acquirers to be attracted to Michigan National Corporation, we needed to do a number of things, including unwinding the Assistance Agreement.





ea18ab3e-3662-426b-b747-fa14cd120595

Q. And did you refer to it as one of the key initiatives?
A. Yes.
Q. So it wasn't a non-event?
A. No. It was a very high priority event. It couldn't have been higher.
Q. Okay. What was Michigan National's intent with respect -- and I'm talking about the terminate agreement -- what was their intent with respect to the flawed provision of the Assistance Agreement concerning the sharing of tax benefits?
MR. SCARBOROUGH: Can you repeat that or -- I'm sorry.
BY MR. INFELISE:
Q. Did you understand it?
A. I think I did.
MR. SCARBOROUGH: Just for me; I missed it.
MR. INFELISE: Okay.
BY MR. INFELISE:
Q. With respect to the Termination Agreement, what was Michigan National's intent



concerning the flawed provision of the Assistance Agreement that addressed or concerned sharing tax benefits?
A. I don't have any recollection of that whatsoever.
Q. None at all?
A. None.
Q. You had, so Michigan National had no intent with respect to correcting that flaw?
A. I have no recollection of it.
Q. Was it, do you have any recollection of ever discussing that with anyone else at Michigan National?
A. No.
Q. Do you have any recollection of the, anyone from the FDIC discussing that with you during any of the negotiations?
A. No.
Q. Your best recollection, it was never brought up?
A. I don't have a recollection, yeah.
Q. All right. You had said I think



earlier that one of the drafts of the Termination Agreement that you reviewed was the one from September 16th, 1994?
A. Yes.
MR. INFELISE: All right. If we could mark this. I believe it's Gladchun Exhibit 4?
(Gladchun Exhibit No. 4 was marked for identification.)
BY MR. INFELISE:
Q. And sir, what's been marked as Gladchun Exhibit No. 4 is, it says, "Draft Termination Agreement By and Among Federal Deposit Insurance Corporation, As Manager of the FSLIC Resolution Fund, Michigan National Corporation and Independence One Bank of California, FSB Beverly Hills, California."
In the corner, it says, "Draft -- 9/16/94."
Is this the draft that you reviewed prior to this deposition?
A. I think so. I mean just, I didn't



examine the entire document, so --
(The witness reviewed the document.)
THE WITNESS: Yes, it is.
BY MR. INFELISE:
Q. It is?
A. Um-hm.
Q. You said you didn't review the entire document?
A. Right.
Q. Was there any specific portions you did review?
A. Yes.
Q. What portions were those?
A. I looked at several provisions. The ones that I recall looking at were the 2.6, the definition of adjustment.
Q. Okay.
A. And 8.4 and 9.1 and 9.2.
Q. Okay. All right. If you would look at Section 8.4, and I believe it's on page 48 --
A. Yes.
Q. And it says Section 8.4, tax matters,





ea18ab3e-3662-426b-b747-fa14cd120595

Page 74

and there is a footnote indicating. Footnote 2 of this section, as being revised?
A. Right.
Q. All right. Specifically if you would look at the second page -- excuse me -- page 49?
A. Um-hm. Yes.
Q. And towards the bottom of the section, Section 8.4, it talks about sharing of tax benefits?
A. Yes.
Q. Do you see that?
A. Yes, I do.
Q. And it says that I guess, as I understand it, to the extent Michigan National realizes any tax benefits as a result of any action involving the covered asset losses or any other tax benefit, they share 50 percent with the FDIC?
A. Well, claims, claims under the OBRA or Section 13224, tax benefits derived from that would be, would be shared 50/50.
Q. All right. So this provision provides

Page 75

for a 50/50 sharing of any tax benefits recovered as part of some suit?
A. On these claims.
Q. On these claims?
A. Correct.
Q. What was your reaction, Michigan National's reaction to that provision that provided for 50 percent sharing?
A. We, we took the position that we should isolate the entire, the entire issue, that is, the ability to bring the claim, and, and this provision to the extent that it confined or limited the economic value of those claims to us was viewed as unacceptable.
Q. What about the fact that the FDIC was asking for 50 percent of any recovered?
Didn't that, didn't that indicate to Michigan National that FDIC wanted 50 percent of any recovery of covered asset losses?
A. Again, through the claims?
Q. Yes.
A. Yeah, it did.

Page 76

Q. So they intended --
A. I believe this is their language.
Q. So they intended --
A. Yes.
Q. To obtain 50 percent of any type of recovery under OBRA?
A. They, as part of the negotiations, included this provision with the obvious intent of, as we viewed it, as limiting the, the claims or the value of the claims to Michigan National.
So yes, I -- they, they were looking, at least we interpreted it as okay, you're going to have this, what we talked internally about as tag-along rights.
You're going to have the rights to ride someone else's litigation, not bring independent action, and if you do recover, you're going to share 50/50 with the government.
That's, that's the way I interpret this.
Q. So you interpret that to mean that it was FDIC's intent to ensure they received

Page 77

50 percent of any recovery that you obtained as under your tag-along rights?
A. Yeah. I have trouble with this intent aspect of the question, but it clearly was their position they wanted 50/50 sharing of any tax benefits flowing from a successful claim under OBRA, and then --
Q. I'm sorry. Go ahead.
A. Again, a successful claim in this context as a tag-along and not as an independent plaintiff.
Q. Why are you having trouble with the term intend or intent?
A. Well, because it's a state of mind.
Q. Isn't the state of mind evidenced by the express language in this provision?
A. It can be, yeah, sure.
Q. Don't you think --
A. And in that sense, in that sense, I agree.
Q. Oh, okay. Thank you.
A. All right.





ea18ab3e-3662-426b-b747-fa14cd120595

Page 78

Q. All right.
A. I just I don't like reading people's minds.
Q. Did you have any understanding at the time you entered into the negotiations of the Termination Agreement of why the FDIC was interested in terminating the Assistance Agreement?
MR. WOLFF: Can I hear that back? I apologize. I was daydreaming.
THE REPORTER: Question: "Did you have any understanding at the time you entered into the negotiations of the Termination Agreement of why the FDIC was interested in terminating the Assistance Agreement?"
THE WITNESS: Is that what you wanted read back?
MR. WOLFF: Yeah.
THE WITNESS: No.
BY MR. INFELISE:
Q. None at all?
A. None.

Page 79

Q. Did anyone who was involved or representing the FDIC during its course of negotiation make any statements concerning why the FDIC wanted to terminate the Assistance Agreement?
A. Not that I have a recollection of.
Q. Did anyone who was representing the FDIC during the course of the negotiations make any statements concerning what they intended, wanted to achieve as a result of the Termination Agreement?
A. Again, not that I recall.
Q. So you don't have any recollection of anyone from the FDIC saying or indicating that one of the things they wanted to do as a result of the Termination Agreement was to correct the flaw concerning tax sharing in the Assistance Agreement?
A. No. I don't have any recollection of that at all.
Q. Did you say earlier that in reviewing the draft agreement September 16, 1994, you

Page 80

looked at 2.6?
A. If that's the adjustments definition provision, yes, I believe that's the case.
Q. Page 16 I think?
A. 2.6, that's correct. Page 16, yes.
Q. Did you, when you were reviewing this draft, review 2.5?
And again, I'm referring to the September 16th draft.
MR. SCARBOROUGH: Do you have a page number?
MR. INFELISE: Yes. Just one moment. It's a long section.
MR. SCARBOROUGH: Page 11 maybe.
THE WITNESS: It sure is long.
MR. INFELISE: There it is. Thank you. And that draft agreement is Gladchun Exhibit No. 4.
THE WITNESS: No.
BY MR. INFELISE:
Q. You did not?
A. No.

Page 81

Q. All right. Do you have any understanding of why 2.5 and 2.6 were included in the draft Termination Agreement of September 16, 1994?
MR. SCARBOROUGH: Before you ask that, can he look at the section?
MR. INFELISE: Absolutely.
(The witness reviewed the document.)
THE WITNESS: The question is?
BY MR. INFELISE:
Q. Do you have any recollection of why those sections were included in your Termination Agreement?
MR. SCARBOROUGH: And you're referring to 2.5 and 2.6?
MR. INFELISE: Yes, I am.
MR. SCARBOROUGH: The entire 2.5 and enter 2.6?
MR. INFELISE: Yes.
(The witness reviewed the document.)
THE WITNESS: These are pretty important provisions to unwinding the Assistance

Page 82

Agreement.
They would, they would be here because they're necessary to achieve the economic balance I guess that is attractive to both parties.
The government needed -- what the specific motivations of the government in wanting to unwind this were, I don't know, but I know that it had to be of economic benefit to them to do it or they wouldn't have entertained it, and these are provisions that go to the heart of an exchange of values, so to speak, so --
BY MR. INFELISE:
Q. All right. Well, isn't one of the reasons that these two sections are included was to ensure that the FDIC would receive 50 percent share of tax benefits as intended under the Assistance Agreement?
A. Oh, I don't know. I can't answer that question.
I mean this is a draft. I know that the language changed, and you know, when you ask me the question about 8.4 and why it read the way

Page 83

it read. I mean it was a position of the government's negotiating team that they wanted these things, and I assume that 2.5 and 2.6 were set forth for that very reason as well.
These are provisions that would have been acceptable to them.
They would not have reflected whether or not they were acceptable to Michigan National.
Q. I understand that. My question was with respect to the purpose for inclusion from the aspect of FDIC.
A. Um-hm.
Q. And you can look at the final Termination Agreement, which I believe is Exhibit No. 3.
I think if you look at 2.5, 2.6 if you would there, I think you'd mentioned that these changed somewhat?
A. Um-hm.
Q. And 2.5 begins on page 13.
A. Okay.
Q. And 2.6 begins on page 17.

Page 84

(The witness reviewed the document.)
MR. SCARBOROUGH: For the record, I mean 2.6 itself runs through page 36, so you're asking about the entire provision?
It's 20 pages.
MR. INFELISE: I am.
(The witness reviewed the document.)
THE WITNESS: And you mean are they different?
They are different.
BY MR. INFELISE:
Q. All right. Well, let's then focus on the final Termination Agreement, the signed version of 9/29.
A. Yeah. Exhibit 3?
Q. Yes.
A. Okay. All right.
Q. Again, don't these provisions evidence an intent to ensure that the FDIC would receive 50 percent of the tax benefits to which it was entitled as intended by the Assistance Agreement?
MR. SCARBOROUGH: Objection.

Page 85

THE WITNESS: I can't answer that question.
I don't, I don't have the ability to answer your, that question.
BY MR. INFELISE:
Q. All right. Without going into detail?
A. Well, I'm not sure I ever could answer that question.
I don't know what the specific motivations were for, for the government to negotiate the contract other than it had to have a benefit, it had to provide I would assume an economic benefit to the government was part and parcel of this transaction, or it wouldn't have been done.
Beyond that, I can't, I can't give you motivations.
Q. Okay. In this case, we've been provided responses to certain interrogatories that we posed.
Did you have any role in preparing these responses for those interrogatories?





ea18ab3e-3662-426b-b747-fa14cd120595

Page 86

A. No.
Q. Has anyone ever discussed the responses with you?
A. I saw one response.
Q. Which response was that, do you recall?
A. I saw the response of -- I don't know. even know whose response it was specifically, but the response with respect to --
MR. SCARBOROUGH: I can clarify if you'd like.
MR. INFELISE: Yeah. I mean that'd be fine.
MR. SCARBOROUGH: To the extent you're asking yesterday, I showed him the government's interrogatory responses in the post-appeal phase and our interrogatory responses in the post-appeal phase.
MR. INFELISE: All right. Thank you.
MR. SCARBOROUGH: Sure.
BY MR. INFELISE:
Q. Let me ask you was that the first time that you had seen those responses?

Page 87

A. I remember looking at one.
Q. Yesterday?
A. Yesterday.
Q. That's the first time you had seen them?
A. That's the only time, yes.
Q. So you had never seen them or discussed them prior to the time that they actually were, the response was prepared?
A. That's correct.
Q. All right.
(There was a pause in the proceedings.)
MR. INFELISE: Could we mark this as next, I think it's Gladchun Exhibit No. 5?
(Gladchun Exhibit No. 5 was marked for identification.)
BY MR. INFELISE:
Q. All right. And Gladchun Exhibit No. 5 is the Plaintiff's, Plaintiff National Australia Bank's response to Defendant's first set of interrogatories post-appeal?

Page 88

A. Um-hm.
Q. Sir, are these the responses that you had a chance at least to look at one of yesterday?
A. Yeah, I looked at this document yesterday.
Q. All right. Great. Now let me ask you, I'll go through a couple of the answers here and I want to ask you some questions about them.
A. Okay.
Q. On the first page, in response to our question identify all facts including but not limited to any documents, parens, by Bates numbering and any extrinsic evidence that indicate whether the parties in drafting, parens, and executing the Termination Agreement intended to agree, parens, or agreed, to a ratio of damage sharing of the tax benefits at issue in this litigation other than the 50/50 split.
Now in the response, you'll see at the bottom of the page, it starts for example?
That sentence, for example, Section

Page 89

2.4(c) incorporates a sharing of 43.75 percent of the deductible losses incurred between January 1st, 1994 through September 30th, 1994?
A. Okay.
Q. Then goes on.
A. Um-hm.
Q. Let me ask you this, sir. Do you know why Section 2.4(c) incorporated a 43.75 percent sharing rate?
A. Yeah. I think -- there was a compromise made with respect to a transition period. That's what I gather.
It was a sharing rate that -- you know, I know that it's a different rate for January 1, 1994 through September 30, 1994, than exists in the Assistance Agreement, and it appears to be a compromise rate.
That's what I gather.
Q. All right. If you look at Gladchun Exhibit No. 3, on page 10, which will be -- I'm sorry, sir.
That's the Termination Agreement.

Page 90

A. Three, ten?
Q. Yeah. That goes to Section 2.4(c).
A. Okay. Is this page 10?
Q. Yes.
A. Okay.
Q. 2.4(c)?
A. 1994 tax sharing?
Q. Right. So this specifically addressed the period of 1994?
A. Um-hm.
Q. And you indicated that it was a compromise for a specific period?
A. That's what it appears to be, um-hm.
Q. January 1st through September 30th, 1994?
A. Right.
Q. If you'll look on the next page, page 11?
A. Um-hm.
Q. What would have been the sharing -- excuse me.
Why was there a compromise with respect

Page 91

to this specific period of time?
A. I don't know.
Q. What would have been the sharing after that period of time?
A. Sharing of what?
Q. The tax benefits.
MR. SCARBOROUGH: Objection.
THE WITNESS: I don't know. You know, this was a very complicated arrangement, and simple questions like the one you just asked me in the context of this agreement are very complex.
They require time periods. They require definitions. They require issues that normally don't come into play when you're talking about trading dollars, but when you're dealing with tax benefits as a currency, I've learned the hard way that they are very, very difficult to deal with because you have potential appeal periods.
There's all sorts of moving parts that don't make for the exchange of value to be easily

Page 92

quantified.
So I, I can't specifically answer the question. I don't know, but I know it's complicated, and I know I have not chosen to venture into those areas because of that.
I mean I've never gotten personally a sufficient level of technical understanding to be able to quantify to my, quantify independently.
I've relied on our tax people and Tom Dwyer and his tax counsel for help in that regard, and so I've never got to that level of understanding.
BY MR. INFELISE:
Q. Okay. So the tax people you relied on, would that have been Mr. Antczak?
A. Yes, primarily.
Q. Okay.
A. Yeah, and his staff, which would include Tim Orians, but the person I really looked to was Ernie Antczak.
Q. Okay.
(There was a pause in the proceedings.)

Page 93

BY MR. INFELISE:
Q. I know, I think you indicated you weren't sure or you didn't recall this, Mr. Gladchun, but isn't it a reasonable or probable interpretation of 2.5 and 2.6 that they were included by the FDIC because they wanted to correct the flaw in the tax sharing provisions of the Assistance Agreement?
MR. SCARBOROUGH: Objection.
THE WITNESS: I can't answer the question.
BY MR. INFELISE:
Q. You can't answer?
A. I can't. I can't put myself in their shoes.
Q. No. I didn't ask you to. I asked reading the document, could that reasonable conclusion, could someone reach that conclusion?
MR. SCARBOROUGH: Objection.
THE WITNESS: I suppose. I can't draw the conclusion because I just haven't. I really haven't considered it.





ea18ab3e-3662-426b-b747-fa14cd120595

Page 94

BY MR. INFELISE:
Q. Okay. Now going back to the response to interrogatories --
A. Um-hm.
Q. Same page, page 2, indicates, it says I think the second sentence starts 2.5 (f) of the Termination Agreement incorporates a 25 percent sharing for tax benefits attributable to the carryback of 1989 to 1991 NOLs?
A. Um-hm.
Q. All right. Now if you'd look at page 17 of the Termination Agreement, and it's entitled (f), and I think that is 2.5 (f), refunds from carryback of 1989 to 1991 NOLs?
A. Okay.
Q. Can you recall why 25 percent sharing was used for these benefits?
A. No.
Q. Who would? Is there anyone who could tell us that?
A. Well, presumably Ernie Antczak could.
Q. Okay. Do you recall whether or not

Page 95

that 25 percent sharing for that period of time, 1989 to 1991, would, how that would correspond to the sharing rate for that same period for NOLs in the Assistance Agreement?
A. No. I haven't, I haven't studied that.
Q. Okay. Going on in page 2 of the responses, again, to the interrogatories?
A. Yes.
Q. The next sentence says Section 2.6(d) incorporates a 100.5 percent rate of adjustments to 1989, 19934 and indemnification tax benefits.
Do you have any recollection or understanding of why the sharing rate of 100.5 percent or adjustment of 100.5 percent was used for that period of time?
A. No.
Q. And would that be a question better posed to Mr. Antczak?
A. Yes.
Q. Okay. And the very next sentence, Section 2.6(e) equates to a 12.2 percent rate for increases or decreases to 1989, 1993 subsidiary

Page 96

tax benefits.
MR. SCARBOROUGH: It's Section 2.6(3).
BY MR. INFELISE:
Q. My question is similar to the other one.
Do you have any recollection or understanding of why a sharing rate of 12.2 percent was used for the, that period of time for subsidiary tax benefits?
A. I don't.
Q. Now the first sentence in the next paragraph on page 2 says, "With regard to sharing any litigated recovery of tax benefits associated with covered asset loss deductions, there was no agreement between the parties as to a specific sharing percentage."
Is that an accurate statement, sir?
A. I believe it to be accurate, yes. Um-hm.
Q. Okay. If you'd look back then at the Termination Agreement?
A. Okay.

Page 97

MR. SCARBOROUGH: The final version?
MR. INFELISE: The final version, yes.
BY MR. INFELISE:
Q. Section 8.4 on page 56.
A. Yes.
Q. And carried over to 57?
A. Yes.
Q. With respect to the very first sentence which starts on page 56 and goes on for quite some time on to 57?
A. Um-hm.
Q. I'm looking at the term -- well, let's look at the whole thing -- if MNC and Independence One assert a claim or claims against a party other than the FDIC manager for damages, and for refunds of federal and state taxes and/or for the redetermination of liabilities for federal and state taxes, the taxable years 1989 and thereafter, and such claims arise out of or relate to the enactment of Section 13224 of the Revenue Reconciliation Act of 1993, Section 13224, or the application of Section 13224 to





ea18ab3e-3662-426b-b747-fa14cd120595

Page 98

MNC, then the amount of damages or refunds sought in such claims shall not include the amount that would have accrued to the benefit of the FDIC manager under the Assistance Agreement or that would accrue to the benefit of the FDIC manager under this agreement.
A. Um-hm.
Q. Are you saying it's correct that that language was not intended, not intended to establish how any recovery for claims or damages under Section 13224 would be shared?
MR. SCARBOROUGH: Objection.
THE WITNESS: Yes, I am.
BY MR. INFELISE:
Q. It does not?
A. It does not.
Q. So that those terms are meaningless?
A. No. No, they're not.
Q. What do they mean?
A. Well, I can tell you what they meant to me.
Q. All right.

Page 99

A. They meant to me that Michigan National was not going to be denied its ability to bring the claims and was not going to have the amount of its recovery affected by -- it was not going to be affected. It was not going to be confined in any way.
So if we got the ability under the Assistance Agreement, we got the ability under the Assistance Agreement, and it didn't essentially retract our rights in any way under the Assistance Agreement is the way I looked at it, and said this is what we want.
We wanted it unaffected. We wanted an unaffected right to sue, and that's what we have.
Now that's very simplistic, but that's exactly the way we looked at it because it was at the tail end of the discussions, and the balloon was flown, and we looked at it and said we can live with that because it achieves our objectives.
And I don't want to restate again what those objectives were, but --

Page 100

Q. In your mind, based on your understanding of what Section 8.4 meant, if Michigan National did recover damages as a result of a suit based on Guarini legislation, how much --
A. Right.
Q. Of the recovery was FDIC entitled to receive?
MR. SCARBOROUGH: Are you asking in his mind today, or in his mind at that time --
MR. INFELISE: At that time.
MR. SCARBOROUGH: In 1994?
BY MR. INFELISE:
Q. Yeah, at the relevant time period in which you negotiated.
A. We were going to get whatever we could get. That's what was on my mind.
If we are going to pursue litigation, we would get whatever we were entitled to in, in the context of the Assistance Agreement, and that's all that was in my mind.
I mean we weren't being denied any

Page 101

claims whatsoever. We weren't being collared.
The terms of the agreement weren't being changed. Nothing was being done, period.
And that's the way I looked at it, and I said I can't be criticized for this. You know, we have preserved a claim.
We haven't affected the claim. We haven't affected the basic Termination Agreement in any way.
We had achieved everything we wanted to. I was very happy with the settlement.
Q. All right. Again, if as they did, Michigan National and National Australia Bank sued because of the enactment of Guarini legislation --
A. Right.
Q. At the time you negotiated this, what percentage did you believe FDIC was entitled to receive?
A. See, to me --
MR. SCARBOROUGH: Objection -- asked and answered.





ea18ab3e-3662-426b-b747-fa14cd120595

Page 102

MR. WOLFE: This is under the Assistance Agreement?
MR. INFELISE: I just asked him period.
THE WITNESS: Just broadly -- I didn't get to that level of analysis.
BY MR. INFELISE:
Q. You didn't?
A. No, sir.
Q. Well, who would you leave that up to then?
A. It was not a matter of what we wanted. It was what we negotiated, and anything we could -- we did not want to confine our claims period, period.
(There was a pause in the proceedings.)
BY MR. INFELISE:
Q. At any point in time during the negotiations with the FDIC, did you or any person representing Michigan National tell any of the FDIC negotiators that you had not reached any agreement concerning how any recoveries under a, under a claim based upon the Guarini legislation,

Page 103

how those benefits would be shared?
MR. SCARBOROUGH: Objection to form.
THE WITNESS: It's, that was a really difficult question to follow.
BY MR. INFELISE:
Q. Let me try it again.
A. Okay.
Q. I think you had testified that the statement in the response to interrogatories that with regard to sharing of any litigated recovery of tax benefits associated with the covered asset loss deductions, there was no agreement between the parties as specific sharing percentage?
A. That's correct.
Q. Did you ever during the negotiations, you or anyone for Michigan National, ever tell the FDIC negotiators that fact?
A. I don't recall. I don't have that specific a recollection.
I know this, that you can look at the documents. We, we framed the issue. We excised the issue, including the 50/50 sharing provision,

Page 104

and we excised it, and it wasn't -- it was because the sharing provisions are complicated. They're difficult.
You don't know if you're denying yourself value and why do you fool with a, with a provision when it can be stated simply?
And the simple statement was inartful, but it was satisfactory to me that you have what you're entitled to under the original documentation, and I was very happy with that.
That's all, that's all I can say.
Q. So you're saying that the sharing of any potential recovery was left open?
MR. SCARBOROUGH: Objection.
THE WITNESS: It was left to the, it was left to the initial documentation of the relationship and the Assistance Agreement.
BY MR. INFELISE:
Q. The intent of that agreement?
A. The agreement; you know, this intent, the document, it's the agreement.
I mean look, it's, it was very apparent

Page 105

to everybody that we had, as, as it turns out, I looked back at it and said well, we were very straightforward in bringing -- this is one thing we prided ourselves in is we were, we were up front. We approached everything in absolute good faith.
Told the government look, you've got a situation here that is, it causes a problem. It hasn't caused a problem, but could cause a problem.
You know, that was open komona so to speak. It was plain language. It was up front. It was honest and all that stuff.
So everybody knew there was an issue with it.
You know, was that a motivation for them to negotiate the agreement?
I have no idea, but they were cognizant of it, and this language was discussed in that context, and was it a political hot potato?
I don't know, but it seemed like all we had to do was get over this issue and we had an





ea18ab3e-3662-426b-b747-fa14cd120595

agreement, and that's what everybody strove to do, and we achieved that.
Q. And so the issue you're talking about that was up front, as you said, was the sharing provision, correct, how much of any claim or recovery would you share with the FDIC?
A. The issue I was addressing was that there was a potential glitch in the trigger, if you will, of the different sharing levels in the original Assistance Agreement.
I mean you showed me a document here that Tim Orians crafted that related that to Lars Viitala. It was a central focus. They understood it. They understood.
Whether they agreed with it or not, I really don't know, but they, they understood it, and it was in the face of that that this language was agreed to.
And I believe, and again, I can't give you a rhyme and verse why, but I believe this language was crafted by, by the government team because it -- for the reasons I stated earlier.



I view it as a very simple context -- hey, difficult issue, complicated issue, one that no one wants to really fool with. Let's get over this. Let's put this thing to bed. Let's close it off.
This is -- is this language acceptable to Michigan National?
We looked at it and said it is. It's what we asked for. It's a non-reduction of our claims. It's, it not discounting our claims in any way that we looked at it.
We're in agreement. Let's go forward.
Q. What do you mean by it wasn't discounting your claims?
A. Well, we didn't want to collar our claims in any way.
We didn't want to take less than we were entitled to under the Assistance Agreement, period, whatever that means.
And remember, we were sort of looking at this thing as though it's trading dollars, but it isn't trading dollars.



It's tax benefits, and tax benefits that are constantly moving. They're amorphous. They're, they're complicated.
And for a simple person that is not into all the detail, I looked at it and said, hey, I'm not giving up anything. I feel good about that. I'm willing to sign this up.
Q. Okay.
A. Very, very simple.
Q. Going back to the response to interrogatories, and specifically page 2 again, oh, about halfway down the second paragraph, it starts with Section 2.6 (f)?
A. Yes.
Q. 2.6 was written to require 50 percent sharing for some increases in other tax benefit items, but to carve out litigated recoveries from the 50/50 sharing required?
A. Yes.
Q. Is that accurate, to your recollection?
A. I don't know.
MR. SCARBOROUGH: Point him out where



2.(f) is.
MR. INFELISE: Yeah, we'll get there.
BY MR. INFELISE:
Q. If you look at page 28, 2.6 (f) starts there.
Now later in this response, it's indicated that the relevant section is 2.6 (f)(vi), which you'll find on page 33, but you feel free to look at the entire section.
MR. SCARBOROUGH: It actually starts on page 32, but the bulk of it's on page 33.
MR. INFELISE: Thank you.
(The witness reviewed the document.)
THE WITNESS: I'm not sure I'm with this.
We're looking at 2.6 (f)?
BY MR. INFELISE:
Q. Yes.
A. And it starts on page 32?
Q. Well, 2.6(f) itself starts on page 28?
A. Twenty-eight, okay.
MR. SCARBOROUGH: Subsection vi





ea18ab3e-3662-426b-b747-fa14cd120595

starts --
THE WITNESS: All right. All right. I'm with you. I'm with you.
(The witness reviewed the document.)
THE WITNESS: Okay.
BY MR. INFELISE:
Q. All right. And my question was in the response to interrogatory, it's stated that this section carves out litigated recoveries from the 50/50 sharing requirement.
Can you point me to this provision where litigation recoveries were carved out of that section?
A. Not without study; I couldn't do it without study.
Q. Do you see it in Section Six, Sub (vi)?
(The witness reviewed the document.)
THE WITNESS: I don't see any --
(The witness reviewed the document.)
THE WITNESS: Well --
(The witness reviewed the document.)
BY MR. INFELISE:



Q. Well, if you can't find it --
A. I can't.
Q. All right. Let me ask you this. Do you recall during the course of negotiations specifically negotiating a carve-out of litigation recoveries from Sections 2.6(f)?
A. I don't have that recollection.
Q. Okay. Okay. If you would go back then to the responses to the interrogatories, have those in front of you, page 3, midway through the first paragraph, it starts if it sued?
A. Um-hm.
Q. "If it sued under the Assistance Agreement or had certain rights under the Assistance Agreement, then that agreement or those rights would govern. Likewise, if it sued under the Termination Agreement or had certain rights under the Termination Agreement, then that agreement or those rights would govern. There was no discussion or agreement..." at any time... "...or any other time that the Assistance Agreement would govern sharing of litigated



recoveries in early years and the Termination Agreement would govern sharing in later years."
Do you see that?
A. Yes, I do.
Q. Is that accurate, to the best of your recollection?
A. Well, they're not my words. I viewed -- is it accurate?
I certainly agree that the first sentence is correct if we sued under the Assistance Agreement, the Assistance Agreement would govern.
If we sued under the Termination Agreement or had certain rights under the Termination Agreement, then that agreement and those rights would govern -- well, I agree with that I think. I mean I would have to agree with that.
There was no discussion or agreement at any time, at any other time, would govern -- yeah, I do agree with the third sentence as well because there wasn't -- that's the point that I



was making earlier, that we didn't confine ourselves to, we didn't strike a different deal in the Termination Agreement with respect to these claims.
Whatever the value was of the claims under the Assistance Agreement, at least I didn't view that we had done that, that we had valued them differently.
I viewed that they were just preserved if you will, so while these sentences knit together in a way that I wouldn't have done that, I agree with the three statements independently.
Q. All right.
A. They're correct statements as far as I know.
Q. Okay. Now Section 8.4 of the Termination Agreement specifically is titled Section 13224, claims, correct?
A. It is, yeah.
Q. Page 56?
A. Yes. Yes.
Q. All right. So this only addresses

Page 114

claims pursuant under the Guarini legislation?
A. Yes.
Q. All right.
A. Yes. And that's why -- yes. Yes.
Q. And I think as you testified earlier, you were attempting to preserve in your mind in negotiations the rights Michigan National had to sue under the Assistance Agreement for the breach caused by the Guarini legislation?
A. Generally speaking, that's correct. I just didn't want to impact the claims negatively, that's right.
Q. So any suit pursuant to this, what's covered by this section, Section 8.4, would have to have been based on the Assistance Agreement?
MR. SCARBOROUGH: Objection.
THE WITNESS: I want to make sure I understand that question.
BY MR. INFELISE:
Q. Sure.
A. Can you repeat it?
Q. Sure. Section 8.4, any suit to which

Page 115

this applied, Section 8.4, had to be a suit that was brought for breach of the Assistance Agreement?
MR. SCARBOROUGH: Same objection.
THE WITNESS: Oh, I can't reach that conclusion.
BY MR. INFELISE:
Q. You can't? Why not?
A. Because we hadn't formulated a theory of a claim that the claim could have been a contractual claim.
It could have been a tort claim. It could have been any number of different things.
Different theories for the claim against the government were considered, and I haven't thought about this in a long time, but I know it wasn't a simple, a simple analysis.
It wasn't just confined to a contractual analysis, which I think your question confined it to.
Q. Well, correct me if I'm wrong. I thought you testified that what you were trying

Page 116

to preserve was any rights you had under the Assistance Agreement.
MR. SCARBOROUGH: Objection.
THE WITNESS: I think, I think that's right. We were -- that's a correct statement, but that doesn't imply that the only way you preserve that value is to sue for violation, sue for a contractual, on a contractual claim.
We certainly wanted to preserve the value established by the Assistance Agreement, but the claims were not confined to -- the nature of the claims were not defined. Let's just leave it at that.
BY MR. INFELISE:
Q. Isn't it correct that the Assistance Agreement established Michigan National's right to covered asset loss assistance?
A. Yes.
Q. And isn't it true that that covered asset loss assistance was essential to also getting the tax benefit as a result of those covered asset losses?

Page 117

A. It's a key element of it, yes.
Q. So it was in fact any rights with respect to covered asset loss tax benefits were related to the Assistance Agreement?
MR. SCARBOROUGH: Objection.
THE WITNESS: Well, could I have that question read back?
THE REPORTER: Question: "So it was in fact any rights with respect to covered asset loss tax benefits were related to the Assistance Agreement?"
THE WITNESS: So it was in fact? I'm sorry. I tried to tried to focus on that question.
BY MR. INFELISE:
Q. Let me try another question. If Michigan National didn't have an Assistance Agreement --
A. Um-hm.
Q. It would have no entitlement to covered asset loss tax benefits?
A. Yes.





ea18ab3e-3662-426b-b747-fa14cd120595

Q. So in other words, without the Assistance Agreement, Michigan National had no basis for a suit for violation of the Guarini legislation, based on Guarini legislation?
MR. SCARBOROUGH: Objection.
THE WITNESS: I think that's true.
BY MR. INFELISE:
Q. Okay. Is there anything in the Termination Agreement, to your knowledge, that promised or guaranteed Michigan National that it could claim a tax deduction for covered asset losses?
A. Is there anything in?
Q. In the Termination Agreement that promised or guaranteed Michigan National that they could claim a tax deduction for covered asset losses?
A. I assume so, yes.
Q. There is?
A. Yeah, I would think so.
Q. Where would that be, sir?
A. That we -- let me make sure I



understand your question.
Do we have the benefit -- maybe you should restate the question.
Q. I will. Is there anything in the Termination Agreement that promises Michigan National that it can take a tax deduction for covered asset losses?
A. This isn't a, an agreement with the Treasury if you will, and in that sense, no.
Does it anticipate and does it provide, does it anticipate tax benefits from covered asset losses? Yes, but it's not an agreement with the government to allow Michigan National to take specific tax benefit, tax benefits or tax deductions.
Q. All right. And in fact, Guarini legislation had been passed before you entered into the Termination Agreement?
A. Yes.
Q. So in fact, no one could promise you, no one could promise you tax benefits that had already been denied by legislation, correct?



A. Correct. I'll leave that to you, but --
Q. Well, then, sir, could you explain to me in page 3 of the response to the interrogatories, the sentence that says likewise, if it sued under the Termination Agreement or had certain rights under the Termination Agreement, then the agreement or those rights would govern, could you explain to me how that could come into play with respect to a suit for denial of tax benefits associated with covered asset losses?
A. My, my reading of this sentence was that if there was a claim under the Termination Agreement, and it was against the government, that the terms would apply.
Connecting that statement to Guarini claims is another leap that I'm not sure that would be. I don't think that would be an accurate statement if you link it to Guarini claims.
Q. Okay. If you could go back to, I think it's, yeah, Exhibit No. 4, which is the 9/16/94 draft Termination Agreement, sir?



A. Yeah. I'm sorry. I'm still focused on --
Q. Okay.
A. On the last statement -- this is a, you know, there's an obscurity, as I view it at least, in Section 8.4, and it refers to this agreement, meaning the Termination Agreement.
Q. Yes.
A. Okay. By doing that, it suggests that that's a, a potential right to sue for Guarini claims under the Termination Agreement.
Q. Yes.
A. And in that limited sense, this knits together that you could have a Guarini claim that is covered by or at least preserved by or affected in some way by this Termination Agreement.
I looked at 8.4 very, very simplistically. Again, did it, did it change our rights with respect to the claims?
If it, if it didn't, and again, the only change I perceived was excising the FDIC as





ea18ab3e-3662-426b-b747-fa14cd120595

Page 122

manager, and thereby not releasing the government if you will, but -- and that's really the way I looked at it.

It wasn't confining, restricting, devaluing, discounting, however you want to express it, the claims we had, and, and that's the totality of my understanding of this.

And because of, you know, the nature of -- I mean that was our end objective, and we had achieved it.

So in that limited sense, this sentence makes sense, but it's not the, I wouldn't view the Termination Agreement as being critical to those claims in any way.

They weren't -- all they were doing was basically acknowledging the preservation of the claims.

Q. When you --

A. If that helps.

Q. I think it does. When you negotiated the Termination Agreement, can you explain to me what type of claims under the Termination

Page 123

Agreement did you believe you were preserving that was related to --

A. In 8.4?

Q. Yes, that was related to the Guarini legislation?

A. We were just preserving all claims.

Q. And those claims were the ones that flowed from the Assistance Agreement?

A. Just all claims, period; that's the whole, the nature of the -- I think the way this, this particular section was drafted, it said it doesn't matter. It refers to both. It doesn't matter.

I was looking personally at the Assistance Agreement, and so I looked at it and said rights are preserved. I'm happy, but it references both.

And I say well, fine. Great. It doesn't harm. Doesn't hurt. Doesn't, again, doesn't take us off our objective of not confining claims, so that's, that's the way I looked at it.

Page 124

Q. Can you, can you tell me at the time you negotiated the agreement any claim that you believed may have arisen under the Termination Agreement?

A. No.

Q. Not the Assistance Agreement -- Termination Agreement.

A. I understand your question. No, I can't.

Q. All right.

A. Because I wasn't focused there. I just haven't been focused there.

I've just been focused on preservation of the claim.

Q. All right. Again, let's take a quick look back at the draft dated 9/16/94, which is I think Exhibit No. 4.

A. What page are we?

Q. Well, we're looking at 8.4, which again, is on page 48 over to 49.

A. Okay. Yes.

Q. Under this provision, if someone other

Page 125

than Michigan National had challenged the Guarini legislation and prevailed --

A. Um-hm.

Q. And Michigan National was entitled to seek recovery of its lost tax benefits as a result according to this provision, what percentage or what percentage in the recovery would the FDIC receive?

A. Fifty percent.

Q. And that was regardless of what those tax benefits or what period that tax benefits applied to?

A. That's right.

Q. In other words --

A. That's right.

Q. So this is an expansion of the FDIC's rights under the Assistance Agreement?

MR. SCARBOROUGH: Objection. What does this refer to.

MR. INFELISE: I'm sorry -- the provision for 50 percent sharing in the Section 8.4.

Page 126

THE WITNESS: It could have been, it could have been, absolutely.
That's the way I looked at it.
BY MR. INFELISE:
Q. Was that acceptable to Michigan National?
A. No.
Q. So in other words, as written, this actually would have given the FDIC more sharing than it might have received had the Assistance Agreement been in place?
MR. SCARBOROUGH: Objection.
THE WITNESS: Yes.
BY MR. INFELISE:
Q. Let's take just about five minutes if we could.
A. Sure.
THE VIDEOGRAPHER: Off the record at 11:34:30.
(A recess was taken.)
THE VIDEOGRAPHER: On the record at 11:43:03.

Page 127

BY MR. INFELISE:
Q. Mr. Gladchun, just a couple more questions -- looking at the final Termination Agreement one last time, do you have that in front of you, Exhibit No. 3?
A. I do.
Q. All right. And turn to Section 8.4, page 56, 57.
A. Um-hm.
Q. All right. Could you explain to me at the time you negotiated this agreement, in the language which says on the page 57, it says the amount that would have accrued to the benefit of the FDIC manager under the Assistance Agreement or that would accrue to the benefit of the FDIC manager under this agreement --
A. Um-hm.
Q. Can you explain to me what situation or circumstances the provision or that would accrue to the benefit of the FDIC manager under this agreement would apply?
MR. SCARBOROUGH: Objection -- asked

Page 128

and answered.
THE WITNESS: No, I can't really. I can't give you a specific -- I didn't focus on it in that fashion.
I focused on it, again, in the fashion of does this remove our ability to, does this change our ability in any way to bring the claims?
Does it did devalue? Does it restrict? Does it -- and I concluded that it did not, and the analysis did not go, didn't get that precise.
It was global in its breadth.
Q. And as I understood your earlier testimony, you believe that this was, language was proposed by the FDIC?
A. I do. I do. Again, that's a subjective -- I don't have a specific recollection of that, but --
Q. Do you have any recollection of the FDIC explaining or discussing what they believe that term, or that would accrue to the benefit of the FDIC manager under this agreement, meant?

Page 129

A. No.
MR. INFELISE: I don't think I have any further questions at this time.
MR. SCARBOROUGH: Thank you. We're done.
THE VIDEOGRAPHER: This concludes the deposition of Lawrence L. Gladchun.
It consists of two videotapes. Off the record at 11:45:36.
(Whereupon, at 11:45 a.m., the taking of the instant deposition ceased.)

____________________
LAWRENCE L. GLADCHUN

SUBSCRIBED AND SWORN to before me this__________

day of____________________, 2006

____________________
NOTARY PUBLIC

My commission expires:

CERTIFICATE OF NOTARY PUBLIC

I, Catherine S. Boyd, the Notary Public before whom the proceeding occurred, pages 1 through 129, do hereby certify that the witness was duly sworn, that the testimony of said witness was taken by me and thereafter reduced to this typewritten transcript under my supervision, that said transcript is a true record of the testimony given by said witness, that I am neither counsel for, related to, nor employed by any of the parties to the proceeding, and further, that I am not a relative or an employee of any attorney or counsel employed by the parties thereto, or financially or otherwise interested in the outcome of the proceeding, or any action involved therewith.

Witness my signature and seal:

CATHERINE S. BOYD
Notary Public in and for
The District of Columbia

My commission expires: September 14, 2007





ea18ab3e-3662-426b-b747-fa14cd120595