IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - -x

NATIONAL AUSTRALIA BANK, :

Plaintiff, :

vs. : No. 99-690C

UNITED STATES OF AMERICA, : (Senior Judge Bruggink)

Defendant. :

- - - - - - - - - - - - - - - -x

Washington, D.C.

Tuesday, November 14, 2006

Deposition of JAMES A. MEYER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the District of Columbia, taken at the offices of the United States Department of Justice, 1100 L Street, N.W., Washington, D.C. 20530, at 8:36 a.m., Tuesday, November 14, 2006, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.



ed031dd5-056a-4408-9077-cf72ef7cd14f

APPEARANCES:
On behalf of the Plaintiff:
PAUL MARTIN WOLFF, ESQ.
RYAN T. SCARBOROUGH, ESQ.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202)434-5173

On behalf of the Defendant:
SCOTT D. AUSTIN, ESQ.
Trial Attorney
Commercial Litigation Branch
United States Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202)307-0290

--Continued--



APPEARANCES: (Continued)
THOMAS BAHLO, ESQ.
Counsel, Legal Division
Federal Deposit Insurance Corporation
3501 Fairfax Drive, Room D-7120
Arlington, Virginia 22226
(703)562-2388

ALSO PRESENT:
RICK SANBORN
Videographer



CONTENTS


| WITNESS | EXAMINATION BY COUNSEL FOR | |
|---|---|---|
| JAMES A. MEYER | PLAINTIFF | DEFENDANT |
| By Mr. Wolff | 6 | |
| By Mr. Austin | | 136 |
| By Mr. Wolff | 144 | |


EXHIBITS


| MEYER EXHIBIT NO. | | PAGE NO. |
|---|---|---|
| 1 | Draft Termination Agreement dtd 9/16/94 | 55 |
| 2 | Executive Summary Memorandum | 63 |
| 3 | Draft Termination Agreement dtd 9/28/94 | 79 |
| 4 | Termination Agreement | 102 |
| 5 | Meyer Declaration | 137 |




PROCEEDINGS

THE VIDEOGRAPHER: This is Videotape No. 1 in the deposition of James A. Meyer in the matter of National Australia Bank versus United States of America, Case No. 99-690C filed in the United States Court of Federal Claims

Today's date is November 14th, 2006. The time is 8:36 a.m.

The location of the deposition is the Office of the Department of Justice, 1100 L Street, Northwest, Washington, D.C.

The court reporter today is Kathy Boyd. The video camera operator is Rick Sanborn. Both are on behalf of Alderson Reporting Company.

This deposition was noticed by Williams & Connolly, counsel for the Plaintiff.

Will counsel please introduce themselves and state whom they represent?

MR. WOLFF: My name is Paul Wolff. I represent the Plaintiff.

MR. SCARBOROUGH: I'm Ryan Scarborough from Williams & Connolly, also on behalf of the

Plaintiff.
MR. AUSTIN: I'm Scott Austin. I'm here on behalf of the Defendant.
I'm with the United States Department of Justice.
MR. BAHLO: I'm Tom Bahlo. I'm here with Mr. Meyer, and I'm with the FDIC.
THE VIDEOGRAPHER: Please swear in the witness.
Whereupon,
JAMES A. MEYER,
was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:
EXAMINATION BY COUNSEL FOR PLAINTIFF
BY MR. WOLFF:
Q. Good morning, Mr. Meyer.
A. Good morning.
Q. First, let me ask you do you have any time constraints so we can work to your schedule?
A. I have a 5:15 flight this afternoon.
Q. 5:15?



A. Um-hm.
Q. From National?
A. From National.
Q. Okay. So we need to try to wrap up by four o'clock I would say?
A. That's right.
Q. Okay. If necessary, depending how we're progressing, we may have to work right through lunch if that's okay with you.
MR. AUSTIN: As long as we get done.
MR. WOLFF: I'd hate to have to bring you back, so let's try and move forward as quickly as possible.
(Comments were made off the record.)
BY MR. WOLFF:
Q. So we can move expeditiously, let me make sure we have some common understanding on some of the shorthand phrases and terms.
If I use the word NAB, that will be in reference to National Australia Bank, which is the Plaintiff in this case.
I may also use the term MNC, which is a



shorthand reference to Michigan National Corporation or the Michigan National Bank.
I'm sure you're familiar with those terms, but I want to make sure we don't have any confusion.
Is that okay with you, sir?
A. That's fine.
Q. And also we may well be referring I assume on multiple occasions to the Guarini litigation, which I'm sure you're very familiar with, am I correct?
A. Yes.
Q. And that's also known in the trade as Section 13224.
A. Okay.
Q. And so I may use either Guarini or 13224 interchangeably, but we have a common understanding of what I'll be talking about, is that correct, sir?
A. Sure. Yes.
Q. So we can move quickly, give me a brief summary of your education.



MR. AUSTIN: Hold on a second.
(A discussion was held off the record.)
BY MR. WOLFF:
Q. Give me a brief synopsis of your education, sir.
A. Business, a Bachelor of Science in business administration from the University of Missouri, Columbia, and I also have an MBA in finance from George Mason University.
Q. Have you taken any law courses?
A. No, I haven't.
Q. All right. Prior to your joining the FDIC, did you have any employment?
A. If you -- FDIC -- yes, I worked for the Federal Home Loan Bank Board.
Q. Okay. Before the Federal Home Loan Bank Board, after you got your MBA and before you joined the Home Loan Bank Board?
A. I received my MBA while I was working for the Federal Home Loan Bank Board, and prior to my employment with the Federal Home Loan Bank Board, I worked for a small period of time with

the Internal Revenue Service in the Service Center in Kansas City, Missouri, and prior to that, I was in college.
Q. Okay.
A. Getting my undergraduate degree.
Q. So it was college, Internal Revenue Service, Federal Home Loan Bank Board, concurrently getting an MBA, and then FDIC?
A. Yes, sir.
Q. Okay. And when did you come to Washington?
A. 1981.
Q. And in 1994, what was your position?
A. In 1994, I was a section chief in the Division of Resolutions in the FDIC.
Q. And how did it come about that at some time in that time period, you began to negotiate a Termination Agreement with MNB?
A. It kind of follows my career progression.
In approximately 1983, after I had moved to Washington, had been here in Washington



for a couple of years, I went to work for the Federal Savings and Loan Insurance Corporation, which was part of the Federal Home Loan Bank Board.
And more specifically, I went to work in the financial assistance division, financial assistance division of the Federal Savings and Loan Insurance Corporation, was responsible for the management of assistance deals after they went into place through the duration of the transactions.
In that capacity, I received a couple of promotions, and was basically a manager over the supervision of the deals, and then in 1989, when the Federal Home Loan Bank Board was abolished with FIRREA and we moved into the FDIC --
Q. Spell FIRREA for her.
A. F-I-R-R-E-A.
Q. All caps?
A. All caps.
Q. Go ahead.



A. We essentially maintained the same duties and responsibilities we had when we were with the Bank Board because we were still, you know, managing the deals, the '88 deals and before.
You know, the Assistance Agreements were still in place, you know, after 1989.
As part of the legislation that brought us to the FDIC, Congress mandated that all of the 1988 deals be reviewed and possibly renegotiated, and I was assigned to work on a team that actually did that.
So you know, a couple of years after FIRREA, I can't remember the exact, exact date, but during that progression, I began working on the renegotiation of '88 deals of which this was one of them, and as -- and my responsibilities was to basically lead renegotiations of '88 deals.
Q. And did you have any involvement in negotiating, drafting the Assistance Agreement with MNB?



A. I did not.
Q. So when it came time to negotiate or renegotiate the Assistance Agreement with MNB, you came fresh to the Assistance Agreement?
A. I became fresh to this particular Assistance Agreement, but I had a basic fundamental understanding of how these transactions worked and, you know, the customary terms in them and how they worked, but you know, each deal was customized to a particular acquisition so you had to sort of learn the peculiarities of a particular transaction at the time you start working on it, but I had fundamental understanding of how Assistance Agreements worked, and you know, and the provisions in them.
Q. But it's fair to say speaking colloquially that the Assistance Agreement with MNB didn't have your fingerprint on it in any place?
A. That's right.
Q. And when did you first see the





ed031dd5-056a-4408-9077-cf72ef7cd14f

Page 14

Assistance Agreement with MNB?
A. Well, I probably at this point, can't really pinpoint the exact date, but it was, was when I was, when I became assigned to work with the renegotiation of the '88 agreements, we needed to -- it was done under the direction of a RTC vice president, so RTC was given the responsibility for the renegotiation, the lead renegotiation of the Assistance Agreements.
And the RTC vice president then that I worked for, we essentially divided the pool of '88 deals, and I was given a subset of the pools that I, of those agreements that I would be responsible, and probably shortly thereafter, I would have started to become familiar with all the various transactions that I would be responsible for working on.
Q. And how many Assistance Agreements were in your basket?
A. Oh, gosh, at this point, I can't remember the exact number.
It was a, it was not a really large

Page 15

number, maybe a dozen of them or so.
And, and the way to characterize them is that we broke the agreements into three categories.
We broke them into the mega-Texas deals which I didn't have any responsibility for.
The large non-Texas agreements, those were the ones I had, and then all the others, which were a lot of small acquisitions with Assistance Agreements that I wasn't responsible for.
This one was in the group of large non-Texas agreements and they were, those were the ones I had responsibility for.
Q. And how many do you think were in that group?
A. I think there were about maybe a dozen. I mean that's the best I can recall.
Q. And did you work on them simultaneously or seriatim?
A. Usually one after the other. There's some overlap, but usually one after the other.

Page 16

Q. Do you recall when in time you got to the MNB Assistance Agreement?
A. My ability to recall, to the best of my knowledge right now, is, you know, I remember we had two or three starts with them and, and we couldn't reach agreement, and we kind of -- then it would just kind of die off for a while, and then it would, somebody would call somebody and it'd get started up again, and then it would die off a while.
I think, to my recall, we made two or three runs at it before we were able finally to, you know, reach an agreement with them.
Q. Let's talk about the first runs that were unsuccessful.
What were the points of contention that brought these early runs to a stop?
A. Valuation probably, valuation of the issues.
Q. Do you recall during your discussions with MNB, MNB making demands to bring Guarini litigation?

Page 17

A. No. In fact, quite the contrary. I think all the way up until we almost, I mean until the time -- I mean, you know, we, in the actual Termination Agreement that we had, we shook hands on a tentative deal where they were going to give up their right to, to file a Guarini claim.
And then they changed their mind between the time we shook hands on a tentative deal, and I had it written up and approved, and we went to close it. Then they changed their mind.
Q. Okay. With whom did you negotiate at MNB or on MNB's behalf?
A. You know, I was, I was just thinking about that in the last few days.
I spent a lot of time with Ernie Antczak. That's the main person I remember.
And then the other person that I remember, I can't recall his last name, but he was, my recall is is that where we broke the logjam was when we were able to, you know, kind





ed031dd5-056a-4408-9077-cf72ef7cd14f

Page 18

of have a meeting of the minds.
They got a new Chief Financial Officer in there that really was disinterested to the '88 deal, and just he wanted to get, you know, he was interested in getting something done and something done right, but he didn't have the emotional attachment to the '88 deal that some of the other people I was dealing with did, or he didn't seem to me.
And we were able to get a settlement, and I can't remember his name right at the moment, but if you said it, I'd know it. I could acknowledge it.
Q. Do you remember anybody else with whom you dealt who represented MNB?
A. Primarily, my recall was primarily I was, I was dealing through Ernie and attorneys.
That's predominantly what I remember.
Q. Do you remember the attorneys' names?
A. The firm was Arnold & Porter, and most specifically, we worked with an attorney named, I believe his name was Tom Dwyer.

Page 19

Q. And did Dwyer participate in the negotiations, or did he just attend them with Mr. Antczak?
A. I believe that he participated in them, the negotiations.
MR. WOLFF: Do you want to spell Antczak for the court reporter?
MR. SCARBOROUGH: Sure -- A-n-t-c-z-a-k, and Dwyer is D-w-y-e-r.
BY MR. WOLFF:
Q. When you were having the negotiations with MNB, were you the chief negotiator?
A. I was.
Q. And did you report on a daily or periodic basis to somebody above you?
A. Yes, I did. There was a period of time the way that this ultimately worked, and this was kind of a bureaucracy thing -- indulge me here for a minute -- there was a period of time when we were working on the Michigan National transaction, or the possible Michigan National transaction, and it was done under the umbrella

Page 20

of the RTC renegotiation of the '88 deals.
Okay. And at that point in time, I reported to an RTC vice president named Louis Wright.
He was the person that I reported to, and if I had a transaction that I wanted to recommend, that it went through Louis Wright.
At a point in time, and I believe it was mid-1993, the RTC -- and we hadn't reached an agreement with Michigan National -- RTC concluded that we weren't going to reach an agreement with Michigan National, and they declared the '88 deal renegotiations finished. Okay?
Once the RTC concluded that the '88 deal renegotiations were finished, I was returned to the FDIC to work in the Division of Resolutions in the FDIC.
Now we still had an Assistance Agreement with Michigan National once the RTC bowed out of the picture, and we still had a whole bunch of disputes and whole lot of issues that needed to be resolved in one way or another,

Page 21

so when we came back, when I came back to the FDIC, I still maintained responsibilities in the Division of Resolutions for resolving agreements with disputes.
So I continued essentially working on resolving agreements with disputes except I was reporting through the Division of Resolutions in the FDIC because the RTC deal renegotiations were officially declared done.
How about that?
Q. On September 20th of 1994, you wrote a memo outlining what you thought was the settlement of a Termination Agreement supplanting the Assistance Agreement with Michigan National, is that correct?
A. Yes.
Q. Now let me take the time period before that September 20th memo.
As you were negotiating with Mr. Antczak prior to September 20th, were you making periodic reports to any superiors about the progress of your talks?

Page 22

A. I don't recall written reports. I don't recall them, but we certainly had staff meetings and discussions, you know, in that context where we would talk about things like that.
Q. Were there any limitations at that pre-September 20th time period placed on your negotiation parameters?
A. The only parameter that I had really in the negotiation which at this point, you know, you know, once we got back to the FDIC, this wasn't really necessarily considered to be a renegotiation, but rather a dispute settlement, and so you know, really the only parameters I was operating under is the, you know, attempt to get the disputes resolved in a manner that's more cost effective than litigating the issues because that's what would have happened had we not been able to reach a settlement with Michigan National.
Q. There was an Assistance Agreement in effect, correct?

Page 23

A. That's right.
Q. Okay. And part of your mission was to replace in whole or in part that Assistance Agreement with a Termination Agreement, is that correct?
A. Well, I mean our mission was to resolve the issues.
At the point in 1994 when we were doing the settlement of the Assistance Agreement and the Termination Agreement, you know, most of the assistance, the outflow assistance, other than a few, other than a few items, a lot of it had been, had been paid out, so a lot of the things under the Assistance Agreement were basically we had a lot of interpretational disputes and issues that we needed to resolve, so -- and suffice it to say I believe that, you know, we probably had a desire in conjunction with settling those issues and disputes to try to terminate the relationship.
That's one thing overall I think both the RTC and the FDIC sought to accomplish when we

Page 24

went into, you know, working with assisted acquirers is to try to, in a manner that's cost effective to the government, or certainly no more expensive to the government, try to terminate those agreements and, and go our separate ways.
Q. As of September 20th, in reaching those goals, were you given any limitations in your negotiations such that you couldn't go above a certain number, you couldn't give certain rights?
A. No. We operated under delegated authority.
The only impact it had is that if, if the numbers were large enough, I had to write it up and send it forward to higher authority.
That's, and that's not, that's not a constraint as far as I was concerned.
Q. So prior to your September 20th memo, your goal and your powers were to get the best deal you could?
A. Exactly, yes.
Q. Then you wrote a September 20th memo to superiors outlining what you believed to be the

Page 25

resolution of outstanding issues with Michigan National, is that correct?
A. Right.
Q. Now did you write this memo to these people on an information basis, or were you seeking their sign-off on the agreement?
A. Seeking approval.
Q. And did you get approval in writing?
A. We got approval, yes, we did.
Q. In writing?
A. I believe -- the way they approve it in writing, it's a committee, and it's reflected in the committee minutes. Somewhere in the, in the official archives of the FDIC, it was approved.
Q. Okay. Now if the agreement changed from the way it existed on September 20th, did you need to go back and get further approval?
A. Well, in fact, the --
Q. Yes or no? Did you need to go back and get further approval?
A. It depended, it depended on the impact of the change.

Q. Okay. After September 20th and before the agreement was signed on September 29th, did you go back to any higher authorities and seek any further approval for your deal with Michigan National?
A. We had internal discussions, but we did not go back and seek additional authority from the committee that approved it in the first place.
We did not do that.
Q. And when you said you had internal discussions, did you have internal discussions with any of the people on the committee who had approved it?
A. No, I don't believe so.
Q. Now during this period of time from September 20th to September 29th, were you still the lead negotiator?
A. Yes, I was.
Q. And in that time period, who did most of the negotiations for Michigan National?
A. It's my recall it was Ernie Antczak and



the CFO that I'm trying to remember his name.
Those were the two.
Q. And who worked with you between those two dates, September 20th and September 29th?
A. You mean who were the FDIC -- clarify the question for me, please.
Q. Did you have any assistance in negotiations during this period of time?
A. Yes. We had a team of people that worked on the negotiations.
Q. And who was on your team?
A. The, the, we had, we were represented by outside counsel, a gentlemen by the name of Mike Duhl.
Q. How do you spell that?
A. D-u-h-l; I believe he was with Hopkins & Sutter in Chicago, Illinois at the time; Lars Viitala with the FDIC, who I think is on your deposition list; Steve Lower with the FDIC.
Steve Lower was a, was Lars Viitala's supervisor and worked, you know, with me. He might even have been my subordinate at the time.



And then we had I believe two internal FDIC attorneys that were working with us, Leslie Crawford and I think Janet Norcom. I think that's her name.
Q. Now were these people principally support for you, or did they also participate in the negotiations with Mr. Antczak?
A. Some participated in the negotiations -- virtually all of us I believe were, were in the negotiating sessions with Antczak and his boss.
I wouldn't call them support. I think they were members of the team, but I was definitely the team leader. There's no question about that.
Q. And nothing was done between this, these two dates that you didn't sign off on, is that correct?
A. That's correct. Absolutely.
Q. Now am I correct that between the 20th and the 29th of September 1994, there was significant negotiations with Michigan National?



A. Yes, that's right, over the terms of definitive agreements, yes.
Q. And am I correct that the negotiations went up to the proverbial eleventh hour, 59 minutes?
A. Yes, they did.
Q. In fact, they went very much late into the night?
A. I believe that's my recall, yes.
Q. And do you recall that there was a draft prepared by the FDIC on September 28th that was rejected by Michigan National?
A. I'm a little vague on the recall on the specific dates, but that doesn't surprise me.
MR. AUSTIN: His question was whether you recall it.
THE WITNESS: I don't recall that specifically, no.
BY MR. WOLFF:
Q. At any time on the 28th or 29th, did you make any contact with anybody superior to you at the FDIC to inform them about the negotiations





ed031dd5-056a-4408-9077-cf72ef7cd14f

Page 30

and ultimately to seek their approval for the final deal as signed?
A. Would you please repeat the question?
THE REPORTER: Question: "At any time on the 28th or 29th, did you make any contact with anybody superior to you at the FDIC to inform them about the negotiations and ultimately to seek their approval for the final deal as signed?"
THE WITNESS: I don't really recall during that time, you know, actually doing that. I just don't recall that.
I do recall having extensive discussions with, or you know, a fair amount of discussions with the, with my superiors about whether we had authority to move forward in light of the change with, you know, the Michigan National's position on the Guarini, but you know, once we worked that out internally, then I don't think I had any real conversations with my superiors until I was ready to present the final transaction form to sign I guess.

Page 31

BY MR. WOLFF:
Q. Is it your position that after September 20th, 1994, Michigan National had a change of position with respect to Guarini litigation?
A. Yes.
Q. Let me change subjects. How long have you been in Kansas City?
A. Since last summer.
Q. Before you moved to Kansas City and since you've been in Kansas City, have you been involved in any way in this litigation?
A. No.
Q. Has the government sought out your advice, your opinions, prior to the time your deposition was noticed in this case?
A. No.
Q. You know the government has filed various pleadings and a Motion for Summary Judgment, an opposition for, to our summary judgment, briefs in the Court of Claims, briefs in the Federal Circuit?

Page 32

Are you aware of that?
A. No, I'm not. I'm not aware of all the filings that have been made.
Q. Has the government showed you any of the pleadings it has filed in this case?
A. No. Not to my recall, no.
Q. Okay. Let me be specific. The government has answered various interrogatories submitted by the Plaintiff.
Did anybody acting on behalf of the government consult with you about what the answers to those interrogatories had been, should be?
A. No.
Q. Is it fair to say that prior to the notice of your deposition, you've seen none of the pleadings, none of the papers in that, in this case?
A. Prior to the -- no, no. Prior to the deposition and possibly trial, the only thing that I have seen since I've been in Kansas City is a few weeks ago, Scott sent me some

Page 33

transaction documents to look at.
That's about it. That's the only thing I've seen. And in that package contained the court decision.
Q. And those were sent to you because he informed you that you were going to be deposed?
A. That's right.
Q. Now over the last several weeks, have you read any of the pleadings filed by the government in this case?
A. No.
Q. Have you read the Court of Claims decision?
A. No.
Q. Have you read the Federal Circuit decision?
A. He sent me one of the two, and I can't recall which one it was, and I took a glance at it, but I didn't really read it in depth.
Q. Did you read and review your September 20th memorandum?
A. Yes.

Page 34

Q. Did you read and review any of the drafts that were discussed after September 20th and before the final agreement?
MR. AUSTIN: Just so you're clear, do you mean the drafts of the Termination Agreement?
MR. WOLFF: Yes.
MR. AUSTIN: Okay. Thank you.
THE WITNESS: I believe there was one or two drafts that were sent to me that I did look at them, yes.
BY MR. WOLFF:
Q. Did you look at the September 28th draft?
A. I can't remember if that was the, one of the drafts that was sent to me or not.
I can't remember right now.
(Plaintiff's counsel conferred.)
BY MR. WOLFF:
Q. Do you recall which post-September 20th draft or drafts you did see?
A. Right now, all I can remember is there was a couple of them in the package that Scott

Page 35

sent me, and I can't remember the dates in the upper right-hand corner. I just, it just doesn't --
Q. And have you reviewed the Termination Agreement?
A. Yes.
Q. Have you reviewed the Assistance Agreement?
A. No. I don't think I spent any time with the Assistance Agreement.
Q. Do you recall when was the last time you looked at the Assistance Agreement?
A. Probably back in, probably back in the '94 era.
Q. In preparing for this deposition, did you review any of the pre-September 20th drafts?
A. No, I don't believe so.
Q. Did you review a declaration you gave to the government to be attached to a pleading?
A. Yes.
Q. Okay. Did you write that declaration?
A. I may not have. I mean I don't believe

Page 36

that I actually wrote it, but I definitely reviewed it and concurred wholeheartedly with what it said.
And I, you know, I helped author, I provided pieces to it and -- but I definitely reviewed it and wouldn't have signed it if it wasn't true.
Q. And when you signed that declaration, were you shown at that time any pleadings in the case?
A. No. I don't believe I've seen any pleadings in the case, to my recall.
Q. Were you told for what purpose your declaration was being used?
A. I can't remember for what purpose it was being sought. I just can't remember when it was.
I may have been told. I may not have been told, but I don't recall because that was quite a while ago.
Q. And when did you come to Washington for this deposition?

Page 37

A. Yesterday.
Q. And did you meet with the government yesterday?
A. I did.
Q. And did you review documents?
A. We did.
Q. Which documents did you review?
A. I believe we reviewed the Termination Agreement.
We reviewed the recommendation memo that I had written.
We may have reviewed one or two of the, one of those draft agreements that were never signed I think in between the two dates, and I recall discussing, we had, you know, we reviewed --
MR. AUSTIN: Don't talk about what we discussed.
THE WITNESS: And I also reviewed the, that affidavit that I signed.
BY MR. WOLFF:
Q. The declaration?





ed031dd5-056a-4408-9077-cf72ef7cd14f

A. Declaration, yes.
Q. Let's focus on September 20th. On September 20th, you wrote a fairly lengthy memorandum to superiors discussing what you thought to be an agreement with Michigan National to supplant the Assistance Agreement and to enter into a new agreement to be called a Termination Agreement, is that correct?
A. Yes.
Q. And did you actually draft this memorandum of the 20th?
A. Yes, with lots of assistance.
Q. But you signed off on it?
A. You bet I did.
Q. And you had people review it?
A. Yes.
Q. Now as of the 20th, you thought you had a deal, right?
A. I did.
Q. You thought Mr. Antczak and you had reached an understanding?
A. An Antczak's boss, the CFO of Michigan



National.
Q. Did you have any Letter of Intent or term sheet that was signed by anybody indicating an agreement?
A. You know, we may have, but I don't really, I don't recall because it's been years since I've seen my workpapers.
We may have. I don't recall.
Q. But you felt confident that you had a deal?
A. Yes.
Q. And am I correct that prior to September 20th, you had been in the negotiations of the view that Michigan National should abandon or give up any rights to commence litigation because of the passage of the Guarini?
MR. AUSTIN: Counsel, can I ask you to rephrase that question because I think the way you've asked it, the word "should" could be interpreted a number of different ways.
I don't know what you mean by the word should.



BY MR. WOLFF:
Q. Let's try it again. As of September 20th, you had taken the position in your negotiations that Michigan National should give up, should be deprived, should not have in any agreement the right to sue because of the passage of the Guarini legislation, is that correct?
A. I don't like the way that the question was, was phrased, so I'm going to, you know, because I don't believe -- my recall is that there, as a part of the, the negotiations, they agreed to give up their claim.
I don't -- you make it sound like we made them give up their claim, and I don't recall it in that way.
I recall it as that they agreed to give up their claim.
Q. Let's go at it this way. Prior to September 20th, there was a realization on both sides, Michigan National's and the FDIC, that there existed the possibility that there could be



litigation over the passage of Guarini, is that correct?
A. That's right.
Q. Okay. And you saw that as a possibility, isn't that correct?
A. Sure. Absolutely, we saw that as a possibility.
Q. Okay. And Michigan National saw that as a possibility, too, isn't that correct?
A. If you say so, yes.
Q. Okay. And prior to September 20th, wasn't the topic of Guarini litigation discussed between you on the one hand and Michigan National on the other?
A. I suspect that it was discussed, sure.
Q. Okay. And to the best of your recollection, who raised the issue, you or Michigan National?
A. For the first time, I'm not really sure.
I can't speculate right now. I just don't remember who initially raised it.

Q. Do you have any recollection over whether in the negotiations Michigan National came to you and said in effect to get this deal done, we'll give up Guarini rights?

A. That sounds right. I mean I -- yeah. That would be a good characterization, that they, that they were going to give up the rights in conjunction with getting a settlement.

Q. Do you recall at any time that you said during the pre-September 20th discussions to Michigan National to get a deal done, you have to give up Guarini rights?

A. I don't remember saying that. I don't remember that.

And in fact, that's kind of contrary to the way that we've approached, you know, my recall at that particular time is that there hadn't been a lot of Guarini claims filed yet. It was kind of a new thing.

Maybe I'm wrong on that. It was kind of a new thing, but there were a lot of goodwill claims, and I know that we had a lot of internal



discussions in the FDIC that we weren't going to take any positions that would be perceived as, as taking away somebody's right to, to sue if they feel they'd been wronged, so we were real sensitive to the issue.

So in my recall, I don't, I don't believe I would have taken that position in a negotiation, to the best of my knowledge.

You know, the main thing is that they would have to, you know, reach that conclusion on their own.

Q. Do you recall prior to September 20th, either in conversations or in documents, offering Michigan National any type of rights to challenge the effect of Guarini on Michigan National?

A. I don't -- no, I don't. I don't recall.

Q. Do you recall or have an understanding of the term tag-along rights?

A. Yeah, I'm familiar with that term.

Q. And so we have an understanding, tag-along rights means that I may not have a



right, but if somebody else pursues the right and is entitled to the right, then I get it also, is that a fair --

A. Yeah, that's right. I mean our big thing with them was they weren't going to initiate, but you know, obviously I seem to have some vague recall now that if somebody else was successful and the Service backs down from it and they can claim it on their tax return, that that would be okay. I mean, you know, that we'd get our share.

Q. So you did, prior to September 20th, offer Michigan National tag-along rights, am I correct?

A. Well, again, the characterization we offered tag-along rights, I don't know.

I think the discussion about having tag-along rights was, was perhaps part of the discussion, and I don't know who was pushing it or not, but I don't like the characterization we offered them tag-along rights.

Again, I'm not trying -- I don't think



we were outwardly attempting in any way, shape or form to impose, you know, on somebody, you know, and perhaps, you know, in what sounds to me, you're characterizing it as a heavy-handed manner, trying to deprive somebody's right to sue.

Now if they come to that concord on their own and they're willing to say we're going to forego our right to sue to get a deal done, fine, but they're coming to that on their own accord.

I don't recall at any point in time depriving somebody's right to sue the United States over some taking issue because we were real sensitive to that issue at the FDIC at the time all this stuff was going on, this and the goodwill, everything.

Q. Let's make sure we have an understanding of how things existed prior to September 20th.

Are you saying that Michigan -- well, let me ask you this.





ed031dd5-056a-4408-9077-cf72ef7cd14f

As part of the negotiations, did you affirmatively state at any time to Michigan National that you wanted in the Termination Agreement an agreement by Michigan National not to initiate Guarini litigation?

A. I don't -- again, it sounds like you're saying that I'm attempting to impose something, and I don't recall that being the case.

Q. Do you recall whether you told Michigan National that the most you would give them in a Termination Agreement were Guarini tag-along rights?

MR. AUSTIN: Again, this is prior to September 20th?

MR. WOLFF: Correct.

MR. AUSTIN: Thank you.

THE WITNESS: Again, I don't remember that, you know, I don't recall having it characterized like that.

You know, I would, in my -- you know, that's just not the way that I felt that we operated at the time, so that the way that you're



characterizing it, that does not comport with what, my memory this far later, you know.

BY MR. WOLFF:

Q. So are you saying that you had no objection to Michigan National suing under Guarini and that Michigan National itself offered to give up those rights?

A. That's my recall of it, sure.

Q. And are you saying that Michigan National are the ones that asked for the tag-along rights rather than you saying that's all you're going to get?

A. That's, yeah, that's my recall. Sure, it is.

Q. And do you recall in whose draft the language involving the tag-along rights first appeared?

A. Gosh, you know, like I say, you know, I can't remember the exact dates and when.

You know, I just can't recall.

(There was a pause in the proceedings.)

THE WITNESS: Can you and I talk for a



second?

MR. AUSTIN: Um-hm.

MR. SCARBOROUGH: Should we take a break?

MR. WOLFF: Do you want to take a break?

MR. AUSTIN: No.

BY MR. WOLFF:

Q. Do you recall at any time prior to September 20th, either in a communication to Michigan National or an internal communication among your people, that you or anybody on your team said that there would be no deal unless Michigan National waived its rights to sue under Guarini?

A. No.

Q. Let's talk about the Assistance Agreement.

MR. AUSTIN: Excuse me one second. Did you want to talk to me about something?

THE WITNESS: Yeah.

MR. AUSTIN: Okay. Can we take a



little break?

MR. WOLFF: Okay.

THE VIDEOGRAPHER: Off the record at 9:26.

(A recess was taken.)

THE VIDEOGRAPHER: On the record at 9:31.

BY MR. WOLFF:

Q. Mr. Meyer, let's go back and focus again on September 20th, 1994, the day that your memorandum was sent to your superiors.

A. Okay.

Q. As of that date, you had reviewed the Assistance Agreement with Michigan National, had you not?

A. Yes. I was familiar with the Assistance Agreement on that date, sure.

Q. And you were familiar with the language involving covered asset losses?

A. Yes.

Q. And you understood that in the Assistance Agreement, the sharing of any monies





ed031dd5-056a-4408-9077-cf72ef7cd14f

Page 50

between Michigan National and the government or the FDIC would be on a 75 percent from Michigan National basis, 25 percent to the FDIC?
Was that your understanding?
MR. AUSTIN: Counsel, can I ask you, to be clear, when you're saying sharing the money, I assume you're referring to the sharing of the tax benefits?
MR. WOLFF: Yes.
MR. AUSTIN: Okay. Thank you.
BY MR. WOLFF:
Q. You understood that, did you not?
A. That we shared tax benefits at 75/25?
Q. Yes.
A. Well, until a certain point in time, yes.
Q. And at a certain point in time, the sharing of tax benefits would be on a 50/50 basis?
A. That's correct.
Q. And you're of the understanding that the switch from 75/25 to 50/50 by the language of

Page 51

the Assistance Agreement would never occur?
A. That's right, because the, because it was, the language was flawed as drafted.
Q. And you understood it to be flawed on the 20th of September?
A. Yes.
Q. And so to make sure we have some common ground, on September 20th, 1994, in your mind, under the Assistance Agreement, the switch from 75/25 to 50/50 could never occur?
A. Under the, the flawed language of the Assistance Agreement, that's correct.
Q. Now prior to September 20th, did you have any conversations that you recall with Mr. Antczak about what you considered to be a flaw?
A. I do remember talking to Ernie about this, yes.
Q. And what did you tell him?
A. That the Assistance Agreement, that the Assistance Agreement mechanics were flawed and that the formula was incorrectly drafted so the tax benefits sharing would never go to

Page 52

50 percent, yes.
Q. Did you ever send him any documents in which you or anybody working for you had rewritten the language so that the shift from 75/25 to 50/50 would in fact occur at some time?
A. I don't recall that.
Q. Now prior to September 20th, you sent to Mr. Antczak several drafts of a proposed Termination Agreement, is that correct?
A. Prior to September the 20th?
Q. Yes.
A. I don't, I don't remember. I don't recall.
Q. You don't recall any drafts of any Termination Agreements that existed prior to September 20th?
A. I really don't. I don't recall exchanging documents before we wrote it up.
Q. What? I'm sorry.
A. I don't remember exchanging any draft agreements before we wrote that thing up.
Q. Okay. Do you recall sending any

Page 53

memoranda, any letters, any document that was something less than a proposed agreement to Mr. Antczak before September 20th?
A. Well, at this point, my, my recall is I just can't remember.
It would seem like there would be some kind of exchange of some kind of, of letter of understanding because we have done that, you know, we did that in the past, but you know, but I don't remember it at the moment, no.
Q. Did you see yesterday or any time since the attorney for the government first contacted you about this deposition any document that was sent by you to Mr. Antczak prior to September 20th?
A. No.
Q. Did you look at or do you recall any internal memoranda that you or people working for you produced prior to September 20th that in any way discussed the negotiations with Michigan National?
A. My recall is is that prior to

September 20th, we had litigation risk analysis prepared on all the issues, including reforming that messed-up formula.
Q. And did you send any of these to Mr. Antczak or anybody on behalf of Michigan National?
A. No, I wouldn't have sent that to Antczak.
Q. Do you recall at any time prior to September 20th that Mr. Antczak told you either in a document or orally that Michigan National wanted the right to sue under Guarini?
A. I don't remember that, no. I don't believe so.
Q. Do you recall any internal documents on your side where you or anybody acting on behalf of the FDIC said that it was necessary to have an agreement that Michigan National waive any Guarini rights?
A. No. There was never that kind of, anything like that on the FDIC side, to my recall.



(Meyer Exhibit No. 1 was marked for identification.)
BY MR. WOLFF:
Q. I want to show you what's been marked as Exhibit 1.
This is a draft of a Termination Agreement between the FDIC and Michigan National, is it not, sir?
A. Yes, it is.
Q. Does that refresh your recollection that you have previously misspoke and that there were drafts submitted by the FDIC to Michigan National?
MR. AUSTIN: I'm going to object to that characterization.
I think the witness' testimony is about his recollection, not that there were or were not any drafts sent back and forth, but if you're trying to refresh his recollection, I have no objection to that.
BY MR. WOLFF:



Q. Do you see that document, sir?
A. I do.
Q. This is a draft. Is it not?
A. It is.
Q. Okay. And this is dated September 16th, correct?
A. It is. Yes, it is.
Q. And it indicates that there clearly had been an earlier draft of September 2nd, is that not correct?
A. I don't -- where, where does that say?
Q. I'm sorry. It's not September. September 20 blank. I'm sorry.
This is a draft of September 16th, is it not?
A. Yes.
Q. Okay. And at this stage, there were still open issues, weren't there?
A. I probably need to take a look at it. I would suspect so, yes.
Q. Why don't you look at the first sentence that's underlined on the first page?



A. Oh, okay. Yes. I'm sorry. Yes.
Q. Would you read that into the record?
A. "This draft is subject to further review and revision by MNC and the FDIC," yes.
Q. So this means as of September 16th, there had not been a meeting of minds?
A. That's right.
Q. Okay. And as of September 16th, in this draft, Michigan National had no Guarini rights except tag-along rights, is that correct, sir?
MR. AUSTIN: Do you want to direct him to a certain section?
Page 48?
MR. WOLFF: That is correct.
BY MR. WOLFF:
Q. Would you look at page 48?
A. Forty-eight.
Q. Section 8.4 is in brackets, right?
A. Yes, it is.
Q. Okay. And would you read that to yourself, please?





ed031dd5-056a-4408-9077-cf72ef7cd14f

Page 58

A. I will.
(The witness reviewed the document.)
BY MR. WOLFF:
Q. Have you read 8.4?
A. Almost.
Q. Okay. Tell me when you're done.
(The witness reviewed the document.)
THE WITNESS: I've read that, yes.
BY MR. WOLFF:
Q. Okay. So as of September 16th, the draft that was being circulated provided in 8.4 that Michigan National only had tag-along rights with respect to Guarini, is that correct?
A. Yes.
Q. And it further provided that if it had any tag-along rights and that these were in any way successful, it had to give 50 percent of anything it received to the FDIC, is that correct?
A. Fifty percent of the benefit, yes, tax benefit.
Q. Okay. But at page 48, there is a

Page 59

Footnote No. 2, correct?
A. Yes.
Q. And that says, "This section is being revised"?
A. That's what it says, yes.
Q. So that indicates that as of September 16th, the question of Guarini rights and sharing percentage was still an open issue, is that correct?
A. This, yeah, this provision was still -- I don't recall what was at this point, at this juncture, I can't recall what of this provision was, you know, we didn't have a meeting of the minds on, but clearly this provision was marked as, the section as being revised.
I don't know why, you know, what was at issue at that point in time.
I can't recall.
Q. So 8.4 as of September 16th was still an open issue, although you don't recall what particular language was still an open issue?
A. Whether it's a 50 percent or whether

Page 60

whatever, I don't know what was at issue.
Q. Part of it was an open issue?
A. Yeah.
Q. Okay. And am I correct you don't recall whether it was the 50 percent part?
A. Right.
Q. Or the tag-along part or both, is that correct?
A. The language, who knows? I mean I just don't know why it was still, why at that point it was bracketed, the disagreement at that point.
Q. Thank you. And as of September 20th, you believe notwithstanding this document, that you had reached an agreement and that Michigan National had agreed not to initiate any Guarini rights?
A. That's right.
Q. Okay. And am I correct you also believed as of that time that since Michigan National had agreed not to initiate any Guarini rights, that the need to correct the language of the 75/25 split was unnecessary?

Page 61

A. That's correct, except for the SRLY benefits that were, you know, still subject to tax benefit sharing. That had to be addressed.
Q. But as far as covered asset losses were concerned, because they had agreed in your mind, not to initiate Guarini litigation, that issue need not be addressed?
A. That's right.
MR. AUSTIN: You're referring to the post-Guarini, those covered asset losses affected by Guarini?
MR. WOLFF: Yes.
BY MR. WOLFF:
Q. You agreed that issue need not be addressed?
A. Post, with respect to post-acquisition tax benefits, whether the Guarinis, associated with promissory notes, whatever, post-acquisition NOLs, we didn't need to do anything with the formula because we were, we were present valuing the future tax benefits.
Q. Let me make sure we have a mutual

understanding.
As of September 20th, 1994, the Assistance Agreement by its language, which you considered to be flawed, never allowed the benefits for covered asset losses to shift from a 75/25 sharing to 50/50, is that correct?
A. That's right. Because of the flawed language, right, it would never happen.
Q. And that as of September 20th, because in your mind, Michigan National had agreed not to initiate any litigation, the need to rewrite this language was no longer necessary?
A. Right, especially since -- and if they prevailed as a result of the tag-along rights, we had 50 percent specified in the provision here.
Q. Let's do it one at a time.
A. All right.
Q. My question was the question of changing the language need not be addressed because the agreement not to initiate made it unnecessary?
A. Right.



Q. Okay. And you reached an agreement you thought is set forth in the September 16th draft that said but if they had the benefit of tag-along rights, it had to be shared 50/50?
A. Right.
Q. Now let's look at Exhibit 1, sir. I'm sorry. I'm sorry. Strike that.
I want to give you Exhibit 2.
(Meyer Exhibit No. 2 was marked for identification.)
THE WITNESS: Are we done with this one?
BY MR. WOLFF:
Q. Not quite yet. While I'm giving you Exhibit 2, am I correct that between September 16th and September 20th, there were no further drafts of a Termination Agreement?
A. Again, to the best of my recall, you know. I mean I don't recall drafts at this point in time, but if you pull out of your box a draft that's December 18th, I won't deny that it



exists.
Q. No. I have no others. The last one, sir, we could find --
A. Okay.
Q. Before the 20th was the 16th.
A. Okay.
Q. Okay. Which has the tag-along rights and the 50 percent sharing?
A. All right.
Q. Okay. Now let me show you Exhibit 2. You're familiar with this, sir, am I not correct?
A. I am very familiar with this, absolutely.
Q. Okay. And this is your memo or at least a memo that says it's from you, although you and others worked on it?
A. Yes.
Q. To Mr. Hartheimer, who is the Acting Director of Resolutions?
A. It's through them.
Q. What?
A. It's through them, through him; it's



really to the committee.
Q. And it's seeking through him their approval of what you believe to be the agreement, correct?
A. Yes.
Q. Okay. And if you find another draft, we can amend, but I'm saying to you we have found no other draft than September 16th before this memo.
A. And I certainly know of no other.
Q. Okay. So you're saying to him basically you're seeking his approval for what is set forth in the September 16th draft, is that correct?
A. I think that sounds like a fair characterization, sure.
Q. Because if you get his approval, you are hoping the September 16th draft would be signed?
A. Or something substantially similar to that, yes.
Q. Now did you at any time in your memo or





ed031dd5-056a-4408-9077-cf72ef7cd14f

Page 66

in subsequent conversations point out to anybody that there still were open issues on Section 8.4?
A. I don't --
MR. AUSTIN: Just for clarification, when you say anybody, you mean --
MR. WOLFF: On the FDIC side.
MR. AUSTIN: On the FDIC side or on the committee: specifically are you talking about anybody?
MR. WOLFF: Anybody.
MR. AUSTIN: Thank you.
BY MR. WOLFF:
Q. To whom you reported or with whom you discussed, did you ever say, you know, by the way, in addition to my memorandum, we still have not resolved 8.4?
A. Well, when I look at here, and I look at the bracket around the language in this, I, obviously at the point in time that we authored this memo, this is what our belief was that the deal was, and we didn't have any indication that it was anything different.

Page 67

You know, this language has got, this thing's got brackets around it, but I have, I still can't tell why it's got the brackets around it. I mean --
Q. It has a bracket because there's a footnote, isn't there?
And the footnote says this section is being revised?
A. Right. And I don't know if it's because it's, you know, somebody doesn't like the way the language is and they want it drafted with different language, or they want to tinker with it. I don't know why.
Sure, it's being rewritten, you know, sure.
Q. But as you sit here today, you don't know whether the problems with 8.4 were stylistic or substantive or both?
A. Yeah.
Q. Is that correct?
A. I'm not sure. As of this date, I believe the deal was that they had agreed not to

Page 68

sue the government on Guarini as of this date.
I didn't have anything, you know, even with refreshing my memory. I don't, I can't sit here and tell you that some time between here and here, you know, we, the thing started to change, and we just didn't tell these guys.
I'm not saying that because that's not true.
MR. AUSTIN: Just so the record is clear, when you said here to here, you're pointing to Exhibit 1 and Exhibit 2?
THE WITNESS: Yes.
BY MR. WOLFF:
Q. But let me --
A. Two dates.
Q. Make my point clear. Am I correct as you sit here today, with respect to Exhibit 1, you don't know whether the reference to 8.4 that this section is being revised is a substantive or stylistic or both reference?
Am I correct?
A. Yeah. Based on my recall right now,

Page 69

absolutely.
Q. Okay. And is the same true for the language at the top of the first page where it says this draft is subject to further review and revision by MNC and the FDIC?
As you sit here today, you don't know whether that reference is to stylistic differences, substantive differences, or both, am I correct?
A. That's right.
Q. Thank you. Let's look at Exhibit 2.
(Plaintiff's counsel conferred.)
BY MR. WOLFF:
Q. Would you look at page 12?
A. Page 12.
Q. Would you read the last two paragraphs, sir?
MR. AUSTIN: To himself?
MR. WOLFF: To yourself.
THE WITNESS: Okay.
(The witness reviewed the document.)
BY MR. WOLFF:





ed031dd5-056a-4408-9077-cf72ef7cd14f

Page 70

Q. Have you read that?
A. Yes. I've read them.
Q. Okay. Now would you go to page 14 and read the paragraph that begins at the bottom of the page and continues over, just for a little over two lines on page 15?
(The witness reviewed the document.)
THE WITNESS: Bottom of the 14, top of the 15?
BY MR. WOLFF:
Q. Yes.
A. Yes, I've read those.
Q. Okay. Now turn to page 20 and begin at the bottom of that page and read over to the completion of that paragraph on page 21.
(The witness reviewed the document.)
THE WITNESS: Okay -- bottom to top of 21?
BY MR. WOLFF:
Q. Yes.
A. Okay.
Q. And now read the last paragraph at the

Page 71

bottom of page 22.
(The witness reviewed the document.)
THE WITNESS: Okay -- bottom of page 22?
BY MR. WOLFF:
Q. Yes.
A. Okay.
Q. Okay. You've read those provisions?
A. I have.
Q. Okay. And it's your recollection or the refresh your recollection, am I not correct that as of September 20th, 1994, in a memo you wrote to the Committee on Loans, Liquidation and Purchase of Assets the following had been determined, that Michigan National would agree not to initiate any litigation against any part of the government for Guarini rights or challenging its losses under Guarini, is that correct?
A. That's right.
Q. And that the issue of reforming the Assistance Agreement to make the 50/50 number

Page 72

come into effect at some time had been mooted by the agreement not to initiate litigation?
A. That's right.
Q. So any language correcting the alleged flaw in the Assistance Agreement was not corrected because the issue had been mooted, is that correct?
A. Yes.
Q. Thank you. Now am I correct that nowhere in your September 20th memo, Exhibit 2, is there any discussion of tag-along rights or the provision of 8.4 as set forth in the September 16th draft?
A. No, it doesn't appear that detail was discussed, no.
Q. Not discussed?
A. No. In the memo, no.
Q. Okay. So at some time after September 20th, and let's not get in an argument about whether Michigan National changed its mind or didn't change its mind, at some time after September 20th, it became clear to you that

Page 73

tag-along rights were not sufficient to Michigan National?
A. That's right.
Q. Did Michigan National tell you orally or in writing that it was not sufficient that 8.4 only provide tag-along rights?
A. I can't recall definitively, but I believe that discussion was oral, to the best of my recall.
Q. And at some time, they told you that they wanted in fact to initiate, to have the right to initiate Guarini litigation, is that correct?
A. Right. They wanted to preserve the right to sue.
They hadn't sued yet. They wanted to preserve the right to sue the government over Guarini.
Q. And who told you this?
A. I believe it was some, you know, it would have been one of three people.
It would have been Tom Dwyer. It would

Page 74

have been Antczak, or it would have been the CFO there.
Q. But you don't recall?
A. I don't recall specifically.
Q. Could have been one or any of them?
A. Sure.
Q. Or all?
A. Yeah. I mean, you know, those were the three principals that we were dealing with.
Q. And --
A. Whether it came from the lawyers on behalf of their clients or directly from the clients, I don't recall.
Q. And Michigan National am I correct was adamant about preserving Guarini rights?
A. Well, I wouldn't use the term, I mean I don't recall the word adamant, but they wanted to preserve their rights, yes.
Q. Am I not correct that up until the end as late as September 28th, you were only offering tag-along rights?
Am I correct?

Page 75

A. I can't recall the exact time in which we agreed to allow them to sue, you know, that we agreed to, you know, allow them to put this new language in.
I just don't remember the exact time along the spectrum that we agreed to it.
You know, I believe the actual language started coming in fairly towards the end, but I don't, I don't recall the point in time where, you know, we agreed to go ahead and move forward based on, you know, the way they wanted to change it.
Q. Well, let me see if I can refresh your recollection, or let me approach it from another angle.
The last issue resolved, am I not correct, was whether Michigan National would be limited to Guarini rights or have its own right to sue under Guarini, is that correct?
MR. AUSTIN: The last issue in the whole Termination Agreement?
BY MR. WOLFF:

Page 76

Q. The last issue in the whole Termination Agreement, the last open issue was whether Michigan National would get tag-along rights or Guarini rights?
That was the last issue?
A. I believe that was the last, it was the last issue.
That's my recall, and just to add to that, we had a lot of internal, I do recall a lot of internal discussions that I had with my bosses and FDIC attorneys as to whether or not we, you know, we had a lot of internal discussions as to whether or not we had to take it back to the committee to get, you know, to get the revised transaction approved or whether or not we had sufficient authority to close it under our delegated authority.
Q. And associated with the issue of whether Michigan National got tag-along rights or let's call it open rights to sue under Guarini was what would be the sharing percentage with the government, is that correct?

Page 77

MR. AUSTIN: I'm going to object to that on grounds of vagueness.
I don't know what associated means, but you can answer the question.
THE WITNESS: I don't recall, what I don't recall right now thinking about it -- obviously I remember it was, the, the tag-along versus right to sue was obviously the last, and the associated language and everything, I recall that was the last issue resolved, but sitting here right now, I can't recall whether or not it went to the last second over the, just the notion of, you know, whether they have the right to do that after we thought we had a deal where they were going those rights, or whether we were arguing over what the sharing would be if they win.
I just don't remember, you know, what the issue was that pushed up to the last second. I mean --
BY MR. WOLFF:
Q. Without deciding which of the two





ed031dd5-056a-4408-9077-cf72ef7cd14f

Page 78

issues, am I correct that the last section decided was 8.4?
A. Yes. I'll agree with that.
Q. And 8.4 had two parts, whether they had tag-along rights or primary rights, and secondly, what was the sharing percentage, is that correct?
A. Well, it had, it had -- I think the agreement language really just addressed what, the fact that they had the right to sue the government.
I don't believe that the 8.4 really definitively addressed the sharing percentage at all.
Q. As of the 28th, the government's position was tag-along rights and 50 percent sharing, is that correct?
A. Yeah. Our, our basic belief is that if, our basic belief has always been if there's a, any kind of recapture of the tax benefits lost by the Guarini, that it would, that we would share it on a 50/50 basis.
Q. And that was your language on the 28th,

Page 79

correct?
MR. AUSTIN: Don't worry about them. Answer the question.
THE WITNESS: I, to the best of my recall, that was, that was probably language that we put in the agreement I believe.
(Meyer Exhibit No. 3 was marked for identification.)
BY MR. WOLFF:
Q. Let me show you Exhibit 3. This is a draft of September 28th, is that correct, sir?
A. Yes, it is.
Q. Would you turn to page 54? Okay. Do you see Section 8.4?
Do you see Section 8.4?
A. I see it, yes.
Q. And it's bracketed?
A. Okay.
Q. Okay. And there's a footnote, correct?
A. "To be discussed," yes.
Q. Okay. So as of September 28th, the day

Page 80

before the agreement was finally signed, the issue of Guarini rights was still an open issue, is that correct?
A. Yes.
Q. Okay. And all other issues in the entire agreement had been resolved, is that correct?
A. To my recall, the other issues in the agreement, yeah.
I mean I don't think we had any issue on the other issues.
Q. Why don't you quickly look through the agreement and tell me?
A. Okay. Everything else, everything here, as I flip through it just generally, well, here is a, here's some doo-dads here on page 27. Maybe --
Q. And those are all stylistic, aren't they?
A. It looks like it.
Q. Okay. Do you see any other substantive problem as of the 28th other than Guarini rights?

Page 81

MR. AUSTIN: You want him to check through the whole agreement, all the handwriting?
MR. WOLFF: I want him to check his memory and tell me what he recalls as of the September 28th.
MR. AUSTIN: All right. He wants you not based on your review of the document, but to tell him based upon your memory, what you recall.
THE WITNESS: Based on my memory, when we got down to the end, the final days, this was really the only remaining issue.
That's my recall.
BY MR. WOLFF:
Q. And it says also on the front that this draft is still subject to further review and revision, is that correct?
A. Yes.
Q. And that's the day before the final?
A. Yes.
Q. Okay. Now in 8.4 on September 28th, as set forth in this exhibit, No. 3, the Guarini rights are limited to tag-along rights and a





ed031dd5-056a-4408-9077-cf72ef7cd14f

50 percent sharing, is that correct?
A. Yeah, but it looks like there's another section in there, (a), that I don't recall seeing before.
Q. Okay. I'm talking about Guarini rights, sir.
A. Okay. On the (b), (b) portion of that?
Q. Yes. That's what covers Guarini rights, is it not correct?
A. Yeah, that's what it looks like.
Q. And it's tag-along rights and 50 percent sharing, correct?
(The witness reviewed the document.)
THE WITNESS: Yes, it is.
BY MR. WOLFF:
Q. Okay.
A. Yes. That's what it is.
Q. Okay. Now as of the 28th, would you point to me, is there any other provision in this agreement as of the 28th that relates to the Guarini rights and the sharing of Guarini rights other than 8.4?



(The witness reviewed the document.)
THE WITNESS: I don't, I don't see any. No, I mean just based on flipping through this.
BY MR. WOLFF:
Q. So the issue of Guarini rights and the sharing of Guarini rights is in 8.4, is that correct?
A. Yes, it is.
Q. And either Mr. Antczak or somebody or several people representing Michigan National told you between the September 28th draft and the final deal that, one, tag-along rights were insufficient, didn't they?
A. Oh, oh. I lost my mike. At some point along there, yes. Yes, they told us that.
Q. Okay. And they told you that a flat 50 percent sharing was also not acceptable?
A. I don't remember. I don't remember in the heat of those discussions, talking, talking about really and focusing in on the sharing percentage.
I don't recall that, but I do recognize



that they wanted the right to sue over the Guarini matters.
Q. So am I not correct that Section (b) of 8.4 as it existed on the 28th was totally rewritten?
A. It's very clear that the section was totally rewritten in the final agreement, absolutely.
Q. The tag-along right provision was eliminated and replaced with different language, is that not correct?
A. Yes, that's right.
Q. And the 50 percent outright sharing language was also replaced with different language?
A. That's right.
Q. Now between the 28th and the 29th, when the language with respect to Guarini and the sharing of Guarini was changed, were any other provisions, to the best of your recollection, changed to deal with the question of Guarini?
A. No, not to my, not to, not to my



recall, not to my recall.
Q. And in fact, all the other terms except 8.4, except for stylistic changes, didn't change since the September 16th draft, is that correct?
MR. AUSTIN: I'm going to have to -- I mean that's a fair question.
I don't have any problem with the question, but if you're going to ask that question, I think he needs an opportunity to review the document and look at all the handwriting changes, all the footnotes and everything else that's in this draft unless you just want it based solely on his recollection.
BY MR. WOLFF:
Q. Do you recall between the 16th draft and the 29th, which sections were in any way changed to deal with Guarini or Michigan National's rights under Guarini?
A. I don't recall their being any other section but this one, 8.4.
(There was a pause in the proceedings.)
BY MR. WOLFF:

Page 86

Q. So to make sure I understand it, except for 8.4, none of the other sections were amended or changed to deal with the ultimate agreement regarding Michigan National's rights under Guarini?
A. Not to my recall.
Q. Okay.
(Plaintiff's counsel conferred.)
BY MR. WOLFF:
Q. Do you recall who initially drafted the new language that became the final language of Section 8.4?
A. I don't recall. I can get it down to one of two people.
Q. Who, who were the one of two people?
A. Either Mike Duhl or Tom Dwyer.
Q. And Mike Duhl is your lawyer and Tom Dwyer is their lawyer?
A. That's right.
Q. And am I correct you don't know who took a crack at the first draft or who edited and who went back and forth?

Page 87

A. I just don't remember. No, I don't.
Q. Do you remember these last hours on the 28th and 29th, conversations with Mr. Antczak about 8.4?
A. I don't specifically recall the conversation.
You know, we were with Antczak during those last final times and along with the CFO there, and but I just can't recall specific conversations in the last hours.
I don't know at that point we were going lawyer to lawyer or, or what.
You know, I just can't recall.
Q. Let me see if I can refresh your recollection.
Do you recall Mr. Antczak telling you that the tag-along rights were insufficient and that it was a deal breaker unless the rights were expanded?
MR. AUSTIN: Just so we're clear, Paul, you're again referring to this same timeframe of September 28th, September 29th?

Page 88

MR. WOLFF: Yes. I said in the last hours.
MR. AUSTIN: Well, you said that in the previous question.
BY MR. WOLFF:
Q. Okay. Right now, I'm focusing on the last hours.
Does it refresh your recollection that after the 28th draft was circulated, that Mr. Antczak told you that if their rights were going to be limited to tag-along rights, there was going to be no deal?
A. I don't have any reason to, you know, given the progression of this, I don't really have a lot of specific recall about having a lot of conversations with them at that point in time, and again, whether we were going directly to them or whether the message was be conveyed by the attorneys, I can't really recall, but it became very clear to us that there was going to be no settlement unless they had the right to sue.
I mean, you know, I'll give you that.

Page 89

Q. Okay. And do you recall Mr. Antczak saying they wanted the right to sue under Guarini and they wanted it in every imaginable way, not simply covered assets, but any way they could conjure up a theory?
They wanted a total open right to bring any Guarini action they wanted, whether it succeeded or not?
They wanted open season to bring Guarini lawsuits?
A. I don't remember it being described quite as, as lengthy as you just described it, but they clearly wanted the right to pursue their claims for covered asset losses under Guarini, yeah.
Q. Okay. And am I correct did you not at one time say to Mr. Antczak okay, I don't care who you sue, as long as you don't sue the FDIC, you can do whatever you damn well please?
Didn't you say words to that extent, sir?
MR. AUSTIN: Just so we're clear again,



Alderson Reporting Company
1-800-FOR-DEPO

ed031dd5-056a-4408-9077-cf72ef7cd14f

you said at any time.
You're still referring to September 28th?
MR. WOLFF: Yes.
MR. AUSTIN: And September 29th?
MR. WOLFF: Yes.
BY MR. WOLFF:
Q. Didn't you say at that time ultimately to Mr. Antczak, look, we'll give you any rights you want to sue, sue anybody you want, as long as it's not the FDIC?
A. I don't specifically recall saying that, but I'm not going to deny it because we routinely, because it comports with other things I've worked on like on goodwill and because we've had -- you know, I told you I was involved in a lot of renegotiation deals and I had to work around claims against the United States, and we routinely wanted the FDIC released from those, so that clearly is something that we probably would have, that's in line with what we would have wanted.



Q. And did you not also say to Mr. Antczak at this time, the waning hours the 28th and the 29th, look, you can bring any suit you want, as long as it's not against the FDIC, because I've got to tell you, Mr. Antczak or Ernie, however you addressed him, these Guarini cases don't have, quote, a snowball's chance in hell, quote of succeeding?
Didn't you say that to him?
A. Again, I don't, I don't remember specifically saying those words to Ernie.
I just don't recall saying those specific words to Ernie, but I do, I will give you the fact that we wanted the FDIC released because of the claims are not against the FDIC.
They're against something the government did, not the FDIC.
Q. And didn't you ultimately agree to give them more than tag-along rights because at that time, 28th and 29th, you personally believed a Guarini lawsuit had no value?
A. I, I will -- I don't recall saying what



you said I said to Ernie.
As for my personal belief, yeah, I didn't -- I believed that, that they wouldn't prevail in a Guarini claim.
That was my belief, sure.
Q. And doesn't snowball's chance in hell sound like something you would have said?
A. I don't recall.
MR. AUSTIN: I'm going to object to that as speculation.
THE WITNESS: I just don't recall saying that. I really don't, especially to him.
BY MR. WOLFF:
Q. But that's what you thought?
A. I may have said it to other people in the FDIC, but I, yeah, I probably thought that, sure.
Q. Now let's turn to the second part of the change in 8.4, and that is the flat-out 50 percent sharing agreement of the 28th.
That language was totally changed, correct, sir?



A. Yes.
Q. And the language was changed to eliminate any reference to a percentage, is that correct?
A. That's right.
Q. And am I not correct that the understanding was that Michigan National would take their chances?
If they sued under Guarini, under the Termination Agreement, they got Termination Agreement percentages, if they sued under the Assistance Agreement, they got Assistance Agreement percentages, is that correct?
MR. AUSTIN: I'll object to that as compound.
Object to the form.
BY MR. WOLFF:
Q. I'm asking is that correct?
A. Would you repeat the question, please?
THE REPORTER: Question: "And am I not correct that the understanding was that Michigan National would take their chances?

Page 94

If they sued under Guarini, under the Termination Agreement, they got Termination Agreement percentages, if they sued under the Assistance Agreement, they got Assistance Agreement percentages, is that correct?"

THE WITNESS: No, I don't have that recall.

BY MR. WOLFF:

Q. Okay. Tell me what you recall as to why the 50 percent language was dropped and replaced by different language.

A. Well, this tax stuff is extremely complicated.

I have a, maybe a little bit better than a layman's understanding.

I'm not a tax accountant, but my layman's understanding of the tax benefit subject to Guarini claim was simply the fact that, you know, why we really, you know, perhaps why we couldn't have a specific hard percentage in it is that, you know, under the, under the, you know, first of all, they were going to pursue their

Page 95

claim directly in the anticipation that we had or our intent was is that they were going to net their claim of anything they would have rebated to us under the old Assistance Agreement, that that would have been taken care of, so they would have had to have, would have, you know, if they won their claim, they were going to have to prove their damages, you know, in the, in that court, in that court of jurisdiction.

The FDIC really wouldn't have any part of that, but the basic understanding and reason why you really couldn't have a hard percentage was is that, my layman's understanding of the, of the economic impact of losing the Guarini claims is that it simply adds NOLs on to the end.

The reason for that is, is that when you, when you, you know, when you look at your damages, you know, under the, the Assistance Agreement reformed, under, you know, when you take a look at the Assistance Agreement the way it was intended to work, the Assistance Agreement formulas, it was '95, you know, was the first

Page 96

full year where the benefits would have been shared 50 percent under the Assistance Agreements, you know, had it have been performed, and before then, it would have been in 25 percent.

My basic understanding, my basic layman's understanding is that most, if not all of the Guarini claims would have simply have resulted in adding NOLs to the end because they had enough other tax benefits unaffected by the Guarini legislation to wipe out any tax benefits, so the 25 percent years, you know, wouldn't, there wouldn't have been any additional tax liability that they saved during those earlier years, so it would have clipped NOLs on to the end.

Therefore, when they went in and calculated what the net damages are, it would have been reduced by 50 percent, which was, would have been our share '95 going forward under a reformed Assistance Agreement, you know, if we would have reformed the Assistance Agreement, but

Page 97

I wasn't sure of that.

I mean, you know, gosh, there's Alternative Minimum Tax credit and BURP adjustments and all kinds of terminology running around that I didn't really understand.

So you know, the bottom line is is that when you go in and prove damages, if there were additional tax benefits on the margin generated from the Guarini in the years prior to '95, you know, they needed the language of sharing 25 percent, but if, but you know, for the effect of that adding NOLs to the end, then it would have been 50 percent.

So, so you know, there needed to be a little bit of vagueness in that in that, and because the court would then have to figure it out after all this stuff was sorted out.

Heck, by, you know, by the time we put this provision in the agreement, they hadn't even filed a claim yet, so you know, there's just, there's a lot of road ahead, and so you know, we really couldn't hard code, you know, anything in

Page 98

there, because, you know, the, perhaps the effect would have been pre-'95 and post-'95.

So you know, we, so you know, the language, you know, in that 8.4 I think for probably that reason was left perhaps a little vague.

But it was, it's always been my basic layman's understanding or advanced layman's understanding, whatever you want to call it, that the effect of Guarini is really to tack on NOLs to the end.

Just expands the pool of NOLs because those losses would have been used, the Guarini losses would have been used had they had them available, which would have then freed up other tax assistance items for future years.

And therefore, when we did the termination settlement, we would have present valued in a larger number representing the future tax benefits, and we would have settled, and based on that present valuing, we took into account reformation of the Assistance Agreement.

Page 99

It's kind of a long-winded way of explaining it, but that's kind of my recall of why we couldn't have a hard coded percentage in there.

Q. And am I correct not one word of what you just said was said to Mr. Antczak by you on either of the 28th or the 29th?

A. No, I don't believe so. I don't believe I said -- I don't, I don't recall, but that's, you know, we may have had that conversations with my tax accountants who's, you know, who, you know, who I presume you're going to talk to, and he knows a lot about AMT and some of the other.

There's just so much stuff in this tax stuff that when you push here, you just don't know the impact of it until you sit down there and calculate it through.

And we just, we couldn't do that in the hypothetical case of filing a Guarini claim and winning.

We just couldn't do it.

Page 100

Q. Now let me repeat not one word of your answer was said by you in substance to Mr. Antczak on either the 28th or the 29th, is that correct?

A. Sure. That's true. That's true. That would have been discussions we had inside of our own house.

Q. Thank you. So on the 28th and 29th, to go back, we had two issues open under 8.4, whether Guarini rights were tag-along or whether they could be initiated.

That was resolved by giving MNB, Michigan National, the right to initiate, correct?

A. Right.

Q. And then the language of 8.4 that said under Guarini rights, you have to share 50 percent, that was changed, too, correct?

A. That's right.

Q. Okay. And Mr. Antczak said to you if he has to sue you to get the money, he's not going to give you 50 percent of what he has to

Page 101

sue for?

Didn't he tell you that?

MR. AUSTIN: That's a new question.

MR. WOLFF: Of course it's a new question.

THE WITNESS: I don't remember him saying that.

BY MR. WOLFF:

Q. Do you recall any discussion of Michigan National raising the issue that if they were to sue under Guarini, they needed to factor into what they were willing to share with the government the fact that they had to pay lawyers and that they had a risk of not winning?

A. No. There was no discussion like that out of him.

Probably, probably discussions he had with his own lawyers.

MR. AUSTIN: Don't speculate.

THE WITNESS: I'm sorry.

MR. AUSTIN: Just answer the question.

THE WITNESS: No, he never said that to





ed031dd5-056a-4408-9077-cf72ef7cd14f

me.

BY MR. WOLFF:

Q. Now tell me who initiated the change, not who drafted it, but who initiated the change from 50 percent to the language as it existed.

Aren't I correct, sir, that Mr. Antczak told you that the flat-out 50 percent sharing of 8.4 as drafted on the 28th was unacceptable?

A. I don't recall him saying that, but obviously, it was unacceptable.

Q. Okay.

(Plaintiff's counsel conferred.)

BY MR. WOLFF:

Q. Let's turn to the Termination Agreement, sir.

(Meyer Exhibit No. 4 was marked for identification.)

MR. AUSTIN: This is what, 4?

THE WITNESS: Exhibit 4.

MR. SCARBOROUGH: Yes, it is.

BY MR. WOLFF:



Q. Let's go to page 56, the Section 8.4, sir.

A. Okay.

Q. And what is it called?

A. Section 13224 claims.

Q. And that's Guarini, isn't it?

A. Yes, it is.

Q. And let's turn to the fifth line, and let me read to you "If MNC and Independence One received any damages or refunds that include the amount that would have accrued to the benefit of the FDIC Manager under the Assistance Agreement or that would accrue to the benefit of the FDIC Manager under this Agreement, then MNC and Independence One shall pay such amount to the FDIC Manager no later than thirty...days following the date in which such damages or refunds were received."

Do you see that?

A. Yes, I do.

Q. Okay. Now at the top of the page, that is also echoed in the following language, is it



not, in talking about bringing Guarini litigation --

A. Where are you now?

Q. Top of 57; it says if Guarini litigation is brought, "...then the amount of damages or refunds sought in such claims shall not include the amount that would have accrued to the benefit of the FDIC Manager under the Assistance Agreement or that would accrue to the benefit of the FDIC Manager under this agreement," correct?

A. Right.

Q. Okay.

A. That's what that says.

Q. So am I not correct that 8.4 was changed from the draft of the 28th to first include rights to initiate Guarini litigation?

Is that correct?

A. Yes.

Q. And then the way damages would be sought was also changed, is that not correct?

A. That's right.



Q. And Michigan National agreed if they sued, they would take out of their claim any amount that would accrue to the benefit of the FDIC manager under the Assistance Agreement or that would accrue to the benefit of the FDIC manager under this, meaning the Termination Agreement, correct?

A. That's what that language says, yes.

Q. Okay. And if by chance MNC actually got money, the same rules applied, is that correct?

They had to share the money under either the Assistance Agreement or the Termination Agreement, is that correct?

A. Yes. That's what this says.

Q. Okay. And both of those clauses are written in the disjunctive, not the conjunctive, is that correct?

A. You'll have to explain that. I don't know what you mean.

Q. It says the claim shall not include amounts under the Assistance Agreement or the

Page 106

Termination Agreement.
It doesn't say amounts under the Assistance Agreement and Termination Agreement. It's one or the other, is that correct?
A. I see the word "or" in the language.
Q. Or means one or the other, doesn't it?
A. Well, I don't know. I guess I'm -- I haven't really read that.
I thought it was up -- I read that to the point of they're choosing -- the Claims Court would have to decide that, you know, in the damage claims.
Q. Whether Michigan National is entitled to a claim under the Assistance Agreement or under the Termination Agreement, is that correct, sir?
A. Again, you know, I just hadn't really thought that it -- you know, my understanding of the way this worked, I just didn't, it doesn't comport with my kind of general understanding of it all.
MR. WOLFF: Let's take a break here so

Page 107

he can change the tape.
THE VIDEOGRAPHER: This is the end of Tape 1 of the deposition of James Meyer.
Off the record at 10:39.
(A recess was taken.)
THE VIDEOGRAPHER: This begins Tape 2 in the deposition of James Meyer.
On the record at 10:50.
BY MR. WOLFF:
Q. Okay. Let me just go back briefly to September 20th, your memo.
You specifically stated that the need to reform the sharing arrangement under the Assistance Agreement had been mooted by the fact that MNC, Michigan National, had agreed not to initiate Guarini litigation, is that correct?
A. Well, I mean --
Q. That's what your memo said?
MR. AUSTIN: Do you want to show him the specific clause, Paul?
BY MR. WOLFF:
Q. Page 21, let me read into the record --

Page 108

settlement of the remaining tax benefit sharing obligation moots the issue of reforming the formula in the agreement that determines when tax benefits sharing shifts from 25 percent to 50 percent.
Did I read that correctly, sir?
A. Yes, you did.
Q. Okay. Am I correct in my earlier statement that you told your superiors that the need to reform the Assistance Agreement from 75/25 to 50/50 was mooted by the agreement not to initiate Guarini litigation?
A. Had nothing to do with Guarini litigation.
Q. Okay. What mooted the issue of changing the Assistance Agreement?
A. The fact that we were present valuing and settling assistance or tax benefits that had not been realized by Michigan National in the future.
Q. Okay. So as of September 20th, the Assistance Agreement had not been reformed, correct?

Page 109

A. The Assistance Agreement was being terminated.
Q. The language dealing with the, the switch from 75/25 to 50/50 was not changed as of September 20th, is that correct?
A. That's right.
Q. Because it was mooted, correct, to use your word?
A. Yes. The need to change it was mooted because we weren't going to have an Assistance Agreement going forward because we were settling the future obligations under that Assistance Agreement as it existed at the time of the settlement, and this did not have anything to do with Guarini whatsoever.
Q. Okay. So on September 20th, let's get it straight, there was no language in the September 16th draft that reformed the language of the Assistance Agreement dealing with the shift from 75/25 to 50/50?
A. Which draft?

Q. The September 16th draft, the last draft before your September 20th memo, okay?
A. Yes.
Q. Contains no language reforming the language of the Assistance Agreement because the matter had been mooted, is that correct?
A. Yes, it did not have, it didn't correct the Assistance Agreement because the Assistance Agreement was being terminated, right.
You didn't need to correct it because we weren't going to be collecting obligations under the Assistance Agreement.
Q. And then on the final agreement, Michigan National was given the right to bring Guarini rights, correct?
A. Yes.
Q. And they were allowed to bring Guarini rights and seek the benefits that they would have gotten under the Assistance Agreement, isn't that correct?
A. Or the Termination Agreement.
Q. Or the Termination Agreement, right.



Okay.
So as of the 29th, Michigan National had the right to sue for Guarini rights under either the Assistance Agreement or the Termination Agreement, is that correct, sir?
A. Well --
Q. Is that correct?
A. No. That's not, that's not my recall of how that works.
Q. Okay. Okay. Now under 8.4, it says that one of two things with respect to the Assistance Agreement.
If MNC sues for Guarini rights under the Assistance Agreement, it has to drop from its claim the amount that would accrue to the benefit of the FDIC, is that correct?
Is that correct, sir?
A. If the -- my recall of the provision is that they, they need to net from their claim anything that they would have otherwise have been required to pay us under the Assistance Agreement.



Q. Or any amount they would have to pay you under the Termination Agreement, correct?
A. Again, I'm not -- my recall is, you know, my, the way you're using the one or the other is, is, doesn't really kind of comport with my understanding of how all this is going to work.
But the basic premise that I will give you is that the intent here was to net the amount that would have otherwise have been payable to us for tax benefits from their claim.
Q. Okay. Sir, what part of the word "or" don't you understand?
MR. AUSTIN: I'm going to object to that question.
THE WITNESS: I'm just telling -- I mean I understand or, but it's just not my understanding of how this was supposed to work.
BY MR. WOLFF:
Q. Is it your understanding that "or" should be "and"?
Is that your understanding?



A. Well, it's, it's, it's whichever is applicable, and that's not going to be determined until way in the future when and if they filed a claim and if they won and if this and if that.
You know, I mean that's so far in the future.
Q. Okay. So if the court determines that the Assistance Agreement is applicable to the Guarini claim, then the amount that would accrue to the benefit of the FDIC under the Assistance Agreement must be dropped from the claim or the judgment, is that correct?
MR. AUSTIN: Objection. Calls for a legal conclusion.
BY MR. WOLFF:
Q. Is that your understanding?
A. Repeat the question again.
MR. WOLFF: Please.
THE REPORTER: Question: "So if the court determines that the Assistance Agreement is applicable to the Guarini claim, then the amount that would accrue to the benefit of the FDIC

under the Assistance Agreement must be dropped from the claim or the judgment, is that correct?"
MR. AUSTIN: Same objection.
THE WITNESS: I'm going to say yes.
BY MR. WOLFF:
Q. Okay. Thank you. You saved me a lot of time. Okay.
Now have you seen the lawsuit brought by Michigan National?
A. I have not.
Q. Has anybody told you that Michigan National sued under the Assistance Agreement?
A. Nobody has told me that, no.
Q. Okay. Has anybody told you to the contrary?
A. Nobody's told me to the contrary, either.
Q. And under the Assistance Agreement, you agree it was never reformed, is that correct?
A. The Assistance Agreement was never reformed because we didn't need to reform it because it was terminated.



Q. So tell me, sir, if the court determined that the money sought by Michigan National is money that would have accrued under the Assistance Agreement, what is the sharing arrangement under the Assistance Agreement between Michigan National and the government?
MR. AUSTIN: Objection. Calls for a legal conclusion.
BY MR. WOLFF:
Q. I'm asking what you thought it was.
A. Okay. To the best of my recall, the way I thought it was going to work, and in my layman's understanding and reading of all this stuff -- I haven't seen any lawsuits or anything -- the way I thought this was going to work is that the courts would have to go in and see, you know, they'll have to go back and pretend basically that the Assistance Agreement was still in place and determine the appropriate sharing percentage.
And they would have, necessarily have to go in there and infer a reformation of that



messed-up formula that Michigan National agreed was messed up as well.
Therefore, if the economic benefit that Michigan National got from the, from the winning of the Guarini claims was realized prior to 1995, they would have got, you know, they would have got 75 percent of the benefit, and if it was after then, it would have been 50 percent of the benefit.
And, and my layman's understanding of that is that by and large, that would have meant a 50/50 sharing because the economic impact of adding Guarini NOLs would be just to expand their pool of NOLs and make that pool of NOLs bigger that would be used in the, in the years under the Assistance Agreement that would have been 50 percent.
MR. WOLFF: Would you please read back that answer to me?
I'll tell you when I've got enough, but start reading it back.
THE REPORTER: Answer: "Okay. To the



best of my recall, the way I thought it was going to work, and in my layman's understanding and reading of all this stuff -- I haven't seen any lawsuits or anything -- the way I thought this was going to work is that the courts would have to go in and see, you know, they'll have to go back and pretend basically that the Assistance Agreement was still in place and determine the appropriate sharing percentage.
"And they would have necessarily have to go in there and infer a reformation of that messed-up formula that Michigan National agreed was messed up as well..."
BY MR. WOLFF:
Q. So as I understand your answer, sir, if the court does not infer a reformation of the Assistance Agreement, then it stays in its so-called, as you put it, flawed fashion at 75/25, correct?
A. If -- yes.
Q. Thank you.
(Plaintiff's counsel conferred.)





ed031dd5-056a-4408-9077-cf72ef7cd14f

BY MR. WOLFF:
Q. Now while we're still on Exhibit 4, as we got into the waning hours prior to the signing of the agreement, and we rewrote 8.4, do you recall whether any other sections were in any way changed or rewritten to deal with the changes in 8.4?
A. I don't recall.
Q. Over the last several weeks or as recently as yesterday, have you read the Termination Agreement?
A. I have refreshed myself on the Termination Agreement, yes.
Q. And with your refreshed recollection, am I correct that you don't recall any other provisions being changed to deal with the changes in 8.4?
A. No. I don't have any recollection of that, no.
Q. Do you recall in looking at 8.4 whether after September 16th, any changes in any sections other than stylistic changes were made to deal



with the issue of Michigan National's demand for Guarini rights?
A. I don't recall, no. I don't believe so. I don't recall.
I don't remember without having to go through it all and look at it.
I don't remember.
(There was a pause in the proceedings.)
BY MR. WOLFF:
Q. When you were dealing with the Termination Agreement, do you recall whether your counsel at any time discussed with you the issue of what it means to have integrated contract?
MR. AUSTIN: Let me just state for the record I think some of these attorney-client issues are difficult, but --
MR. WOLFF: I just asked for a yes or no.
MR. AUSTIN: All right.
MR. WOLFF: I'm not going beyond that, so rest assured.
MR. AUSTIN: Well, but even



answering -- can you repeat that question?
THE REPORTER: Question: "When you were dealing with the Termination Agreement, do you recall whether your counsel at any time discussed with you the issue of what it means to have integrated contract?"
MR. AUSTIN: I think that probably invades it, but I won't object on that basis, but to the extent I'm not objecting, I want it understood that it's a limited waiver to the extent there's any waiver at all for purposes of this question.
MR. WOLFF: This question only.
MR. AUSTIN: Okay.
THE WITNESS: I don't have any recall.
BY MR. WOLFF:
Q. Okay. Do you recall having any discussions with Ernie Antczak or anybody at Michigan National about what it meant to have an integrated contract?
A. I don't have a recall on that, either.
Q. At the time, did you have any



understanding of what the term integrated contract meant?
A. I'm, I'm just drawing a blank on that right at the moment.
I'm just drawing a blank.
Q. I think I asked you this once before, but I want to be a little more specific.
At any time during the course of this litigation, even though you may not have been consulted by the government on pleadings filed and representations it made, did the government ever send you after the fact, after the documents had been filed, copies of pleadings?
A. Not that I recall.
Q. So am I correct you haven't read any of the pleadings in this case other than your declaration, which is attached to one?
A. Other than my declaration, no.
(There was a pause in the proceedings.)
BY MR. WOLFF:
Q. Let's go back to the Termination Agreement for a second, sir.

Look at page 13.
A. Okay.
Q. Do you see the phrase SRLY, S-R-L-Y?
A. Yes.
Q. What is a SRLY, sir?
A. My understanding of a SRLY is that this was, this is a, a net operating loss carry-forward that was an NOL prior to the acquisition, and the significance of SRLY NOLs is that they can only be used to offset income generated by the thrift and not all entities in the consolidated tax group.
Q. And would you look at 2.5, sir? Tell me when you're finished.
A. How deep do you want me to get into this stuff?
Q. I don't want to get into the detail. I just want you to look at it so you have an understanding of it.
A. Okay.
(The witness reviewed the document.)
THE WITNESS: Okay.



BY MR. WOLFF:
Q. There's no reference in this section to Guarini, is there?
A. No, there isn't.
Q. And there's no reference -- I mean strike that.
It talks about Independence One and MNC paying to the FDIC, is that correct?
A. That's right.
Q. And it doesn't talk about deducting any monies from claims?
It's talking about actual cash payments, correct?
A. That's right.
Q. Okay. And there's no reference at any place in 2.5 to litigation, is there?
A. No, there's not, not that I see.
Q. Now let me go back briefly to 8.4, sir. That's page 56.
A. Okay.
Q. Read up until you get to then the amount of damage or refund sought.



(The witness reviewed the document.)
THE WITNESS: Okay -- then the amount, okay.
BY MR. WOLFF:
Q. Okay, because beginning then the amount of damages deals with how much they're going to either deduct or how much they're going to pay over, and we've been through that.
A. Okay.
Q. I want to focus on the type of claims that Michigan National can bring under 8.4, okay?
A. Okay.
Q. There the type of claims is conjunctive. There's an and, and there's two requirements for the claims that Michigan National can bring, is that not correct, sir?
(The witness reviewed the document.)
THE WITNESS: For damages and for refunds of state, federal taxes, and/or, is that what you're talking about?
BY MR. WOLFF:
Q. Keep going. And such claims arise out



of or relate to the enactment of Section 13224.
A. Right. Right.
Q. Okay. So it talks about a claim or claims against anybody other than the FDIC, correct?
A. Yes.
Q. So under 8.4, Michigan National can sue anybody in the world other than the FDIC manager?
A. Right.
Q. Okay. And that can be for damages and for refunds of either federal or state taxes, correct, federal and state taxes, correct?
A. Yes.
Q. And/or meaning either they can do it or they can also do it, sue for damage, sue for the redetermination of liability for federal and state taxes for '89 and thereafter, correct?
A. Right.
Q. Okay. And such claims must be based on Guarini, is that correct?
A. Yes. That sounds right, yes.
Q. Okay. So am I not correct that what

Page 126

Michigan National sought in this section was the right to sue anybody in the world other than the FDIC for any type of tax claim they had so long as they based it on Guarini?

Is that correct, sir?

MR. AUSTIN: You're asking for his understanding?

MR. WOLFF: Yes, his understanding.

THE WITNESS: That's my understanding, yes.

MR. WOLFF: Thank you.

(There was a pause in the proceedings.)

BY MR. WOLFF:

Q. I want you to turn to page 32, the bottom Subsection Roman Numeral Six (vi).

Do you see that, sir?

A. Roman Numeral Six says Independence One payment?

Q. Correct.

A. Starts with that? Okay.

Q. Correct. And read down to (g), please.

(The witness reviewed the document.)

Page 127

THE WITNESS: Down to penalties? Is that where you want me to stop?

BY MR. WOLFF:

Q. Yes, down to penalties, I want you to stop right there.

A. What is this? What does this apply to? Get into this detailed stuff.

Q. It goes all the way back to (f)(i), other tax benefit items, on page 28, other tax benefit items?

A. Yeah.

Q. And then it has FDIC management payments, if either?

Do you see that?

A. Yeah.

Q. Then it goes to page 32, Independence One payments, if either, okay?

Tell me when you've read that.

(The witness reviewed the document.)

THE WITNESS: I've read it.

BY MR. WOLFF:

Q. So if the IRS or Congress increases the

Page 128

tax benefits for Michigan National, or the FDIC or the FDIC Office of Inspector General increases the amount of other tax benefits to Michigan National, then Michigan National has to give what amounts to, after you calculate all this, 50 percent of any of the money received, is that correct, sir?

A. I'm having a little trouble kind of pulling this particular provision out of context and where it really kind of fits in.

I just don't have a lot of recall without really getting into this, and this is all Lars' stuff anyway, but I mean --

Q. Do you recall a discussion about a provision that said if in fact Michigan National was given after the Termination Agreement, new benefits either by an action of the IRS, by an action of Congress, or by an action of the FDC, they had to share those new benefits with the government, with the FDIC?

MR. AUSTIN: His question is your recollection.

Page 129

BY MR. WOLFF:

Q. Do you recall that?

A. To my recollection, yeah. I mean this is included in a laundry list a lot of other provisions to deal with, with any, any potential whatever to come up as a result of the issues we were settling, so --

Q. But wasn't one of the discussions if for any reason Guarini was repealed, then there was covered, a sharing arrangement for covered asset losses?

A. I don't remember that. I just don't remember that.

Q. Do you remember when, if at any time, this Subsection (vi) on page 32 and 33 was drafted or redrafted in any way?

A. I don't remember that.

Q. Did you have any involvement, to the best of your recollection, in any changes that may have been made in this subsection?

MR. AUSTIN: When you use the word changes, that implies it was originally one way





ed031dd5-056a-4408-9077-cf72ef7cd14f

and --
MR. WOLFF: Any changes, changes of any type.
MR. AUSTIN: If any occurred at any time.
THE WITNESS: When I look at these provisions in the agreement, you know, we kind of worked together as a team, tax accountants, that they were responsible for this portion of the agreement.
And my recollection, my basic position would be to have them tell me whether they're satisfied that it does what they want it to do.
I mean this is very, very mechanical stuff to deal with tax return issues of which I don't have a lot of familiarity with.
BY MR. WOLFF:
Q. Do you have any recollection regarding the drafting of this Subsection (vi)?
A. I don't have any recollection of that at all.
Q. Do you have any recollection of any



conversations where Mr. Antczak or anybody on behalf of Michigan National said to you that this section had to be changed so as to accommodate Section 8.4?
A. I don't have that, any recall of that at all.
Right now, I don't have any recall of that.
Q. Do you have any recollection of anybody saying to you on the 28th or the 29th that this Section (vi) needed to be changed so that it was in no way inconsistent or contradictory to Section 8.4?
A. I don't really recall any discussion about this particular section at all.
Q. Whom do you think we should turn to to find out who would best recall any changes, if any, made in this section in conjunction with the drafting of 8.4?
A. Mr. Viitala.
Q. Have you talked to him in the last month or so?



A. No.
Q. Do you intend to talk to him before his deposition?
A. I do not.
(There was a pause in the proceedings.)
BY MR. WOLFF:
Q. I want you to turn, sir, to page 13, 2.5, and again, look at that and tell me when you have looked at it.
(The witness reviewed the document.)
THE WITNESS: How far do you want me to go on it?
MR. WOLFF: I want you to go to page 17, 2.6.
(The witness reviewed the document.)
THE WITNESS: I hope I've reviewed it in enough detail.
I don't know, but go ahead.
BY MR. WOLFF:
Q. Okay. Do you see anything in there that relates in any way to the sharing arrangement or the reduction in amounts sued for



by Michigan National because of Guarini?
(The witness reviewed the document.)
THE WITNESS: The only thing that this does is it just demonstrates that beginning with 1994, you know, they're agreeing to pay 50 percent of benefits because that's, you know, what would have been a 50 percent year as they use these SRLYs or any other tax benefits going forward.
And these were the only go-forward tax benefits that were left that were subject to sharing because all the other ones known at the time were settled under the Termination Agreement.
BY MR. WOLFF:
Q. Do you see any mention here to covered asset losses?
(The witness reviewed the document.)
THE WITNESS: Just, you know, just kind of going through this, I don't believe so.
BY MR. WOLFF:
Q. Okay.

A. I don't believe so.
Q. And 2.5 was not a topic of dispute between you and Michigan National, was it?
A. No, not that -- I don't believe it ever was.
Q. And the draft of the 16th, except for some stylistic changes, was never altered substantively with respect to 2.5, was it?
A. Like I say, my recall is that there wasn't a lot of dispute over this particular part of the termination, no.
Q. And you never said to Michigan National at any time am I correct, sir, that if you're going to insist on Guarini rights, we're going to have to redraft 2.5?
A. No, I don't recall saying -- no, we did not have that conversation, to my knowledge.
Q. And am I correct, sir, that when they insisted on Guarini rights, it never was a topic of discussion that anything had to be done with 2.5, is that correct?
A. Not to my recall.



Q. Okay.
(There was a pause in the proceedings.)
MR. WOLFF: If you guys will step out of the room for about five minutes, we may be done.
THE VIDEOGRAPHER: Off the record at 11:29.
(A recess was taken.)
THE VIDEOGRAPHER: On the record at 11:37.
BY MR. WOLFF:
Q. You mentioned several times that your group did some present value valuations?
A. Yes.
Q. Now correct me if I'm wrong, but I think it's fair to say I've spent more time with these documents than you have.
I didn't see any memos indicating any present value valuations were done after September 20th.
Am I correct?
A. Yeah, that's probably correct.



Q. In fact, most all of them were done in the summer, in July and August?
A. I can't really prescribe the exact timing, but, but they would have been done prior to submission of the September 20th memo for sure.
Q. Okay. That's it.
THE VIDEOGRAPHER: Off the record at 11:37.
(There was a pause in the proceedings.)
THE VIDEOGRAPHER: On the record at 11:39.
EXAMINATION BY COUNSEL FOR DEFENDANT
BY MR. AUSTIN:
Q. Mr. Meyer, I believe in response to one or more than one of your questions, you made reference to a declaration that you filed in this case, is that right?
A. Yes. Yes.
MR. AUSTIN: Let me ask the court reporter to mark as Meyer Deposition Exhibit 5 a document that's entitled declaration of James A.



Meyer.
(Meyer Exhibit No. 5 was marked for identification.)
BY MR. AUSTIN:
Q. And Mr. Meyer, is this, is deposition Exhibit 5 the declaration that you were referring to?
A. Yes, it is.
Q. And it's dated February 25, 2004?
A. Yes, it is.
Q. And it has your signature on it?
A. Yes, it does.
Q. And you declared under penalty of perjury that the foregoing was true and correct?
A. Yes.
Q. And am I correct that in the time period before you signed the declaration, you had communications with Department of Justice counsel?
A. About this declaration, yes.
Q. Let me direct your attention to

paragraph 10 of your declaration.
If you could just take a moment to review that paragraph?
(The witness reviewed the document.)
THE WITNESS: Yes.
BY MR. AUSTIN:
Q. Could you also please read to yourself paragraph 11 of your declaration?
(The witness reviewed the document.)
THE WITNESS: Yes.
BY MR. AUSTIN:
Q. Now could you explain in your own words what you're communicating in paragraphs 10 and 11 of your declaration?
A. Well, I mean based on my recall and my understanding at being, you know, key to the negotiations of the transaction, my understanding is that, that were Michigan National to sue under the Guarini litigation, and win, the net effect of that would have been to expand the universe of tax benefit NOLs that would be utilized by the consolidated company to offset its, its taxable



income into the future.
And so the economic effect of that, it didn't increase Michigan National's profitability in the years for which they needed tax benefits to shelter.
Quite the contrary, it increased the amount of losses, tax losses in the early years by having the Guarini years.
So it wouldn't have had any impact, the Guarini thing wouldn't have had any impact during the time under the Assistance Agreement that the benefits were to be shared at 25 percent.
What would have happened is it would have expanded the pool of NOLs, that -- this is my understanding -- it would have expanded the pool of NOLs, you know, my layman's understanding, it would have expanded the pool of NOLs so that the effect of this would have been to add NOLs on to the end that would have been used in latter years, and those were the NOLs that we were present valuing and calculating, albeit it on a risk-adjusted basis, at



50 percent, that we believe that, you know, if, you know, playing the what-if games, had we not terminated the Assistance Agreement, had we stayed with the Assistance Agreement, we would have, one way or another, would have reformed that provision in that Assistance Agreement, and the realization of any Guarini benefits would have been 50/50.
Q. And what was your understanding as to how the tax benefits would be shared if they were to succeed in their Guarini claim after the Termination Agreement was agreed upon?
A. Well, my understanding is that the FDIC would not really be a part of it, that that share that would have otherwise have been paid to us hypothetically if the Assistance Agreement would have still been there and everything else, was just going to be netted out of their claim.
Q. What sharing ratio?
A. Fifty percent, you know, would have been -- assuming my understanding of, my recall of the understanding of the effect of that is



right, that it's really adding benefits in the latter years.
Q. Then when you left the Termination Agreement after you had signed it, what was your understanding as to what would be the effect on their Guarini claim in terms of the sharing aspect it?
A. It would be 50/50 based on my understanding that the economic impact of the loss of the tax benefits would have been to expand the pool of NOLs available to shelter future earnings.
Q. Now you also make reference in paragraph 10 to the approval that you had?
A. Yes.
Q. Okay. Now if hypothetically you had reached an agreement whereby the benefits would be shared under the Termination Agreement or under the Assistance Agreement, after you were done, that they succeeded on the Guarini claim and that the net result would be that they would be shared on a 75/25 basis as opposed to a 50/50

Page 142

basis, did you believe that you had authority to enter into that agreement?
A. No. And I'll turn it back on you and say had they insisted upon a specific provision in the agreement that brought it back to 75/25, I would not have agreed to it, and we would not have terminated the Assistance Agreement.
Q. Okay.
A. To the best of my recall.
Q. Okay. Well, if, for example, let's assume -- first of all, would you have recommended that they settle the, the, agree to the, would you recommend to the committee with respect to the Termination Agreement a 25/75 split on their Guarini claim?
A. No.
Q. You would not have recommended that?
A. No, based on my understanding that the tax benefits add tax benefits on the margin that are future years.
Q. Now assume hypothetically that you were of the understanding that you had agreed to a

Page 143

25/75 sharing arrangement or that you reached that agreement.
In your view, did you have authority to agree to that, or did you have to go back to the committee to get authority to agree to that?
A. I would have had to have gone back to the committee to get authority.
Q. Why did you believe that?
A. Because I had to satisfy myself that, that, you know, if -- I mean this is, this is something that's sort of hanging out there from, that we have to, in my mind, we had to sort of infer the old agreement and the intent on the old agreement there.
And in my mind, this would have been settled in a 50/50 issue.
We would have had to have had a 50, 50 percent.
Q. Okay, but if it was 25/75, why would you then, in your view, have needed to go back to the committee to get approval?
A. If I would have had tax benefits on the

Page 144

margin in the earlier years?
Q. If the overall agreement was 25/75 --
A. Sorry.
Q. Would that be a major change that you would have to go back to to see if it was accurate?
A. Yes, it would have been.
Q. Okay. And if it was a major change, you felt you needed to go back to the committee?
A. The committee, yes.
Q. And you would have regarded the 25/75 as a major change?
A. I would have, yes.
MR. AUSTIN: Okay. I have nothing further.
FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF
BY MR. WOLFF:
Q. Now when you answer, sir, just don't look at me. Look at the videographer.
I asked you earlier when you did present value numbering and made some present

Page 145

value conclusions.
This was all done before September 20th, is that correct, sir?
A. That's right.
Q. Okay. And when these present value determinations were made, you were operating under the assumption that Michigan National would not initiate any Guarini litigation, is that correct?
A. That's correct.
Q. So it follows then that when these present value numbers were reached, they did not factor in any Guarini litigation initiated by Michigan National, did they?
A. That's correct.
Q. Now you point out in your September 20th memo that you believed the Assistance Agreement was flawed with respect to the switch over from 75/25 to 50/50, is that correct?
A. Yes.
Q. But you tell the higher authorities



ed031dd5-056a-4408-9077-cf72ef7cd14f

that there's no need to do anything about it because the issue has been, to quote your memo, mooted, is that correct?
A. Right.
Q. Okay. And aren't I correct, sir, that at no time after September 20th was any language ever exchanged reforming the Assistance Agreement?
A. Not to my recall.
Q. Okay. And as you stated, under 8.4, if Michigan National sued under Guarini and sued under the Assistance Agreement, you assumed that the court, in determining damages, would reform the Assistance Agreement and remove the flaw?
Did you not say that?
MR. AUSTIN: Objection. Calls for a legal conclusion.
BY MR. WOLFF:
Q. Did you not say that?
A. I did say that, that that would be a necessary ingredient in establishing damages.
Q. Okay.



A. I believe that, yes.
Q. And that the court would do that by what you said, and I quote, inferring the intent of the old agreement, is that correct, sir?
A. That's correct. There would have to be some indication of what the intent of that was.
Q. Thank you.
MR. AUSTIN: Nothing further.
THE VIDEOGRAPHER: This videotaped deposition of James Meyer concludes at 11:51, and consists of two videotapes.
(Whereupon, at 11:51 p.m., the taking of the instant deposition ceased.)

____________________
JAMES A. MEYER

SUBSCRIBED AND SWORN to before me this__________

day of____________________, 2006

____________________
NOTARY PUBLIC

My commission expires:



CERTIFICATE OF NOTARY PUBLIC

I, Catherine S. Boyd, the Notary Public before whom the proceeding occurred, pages 1 through 147, do hereby certify that the witness was duly sworn, that the testimony of said witness was taken by me and thereafter reduced to this typewritten transcript under my supervision, that said transcript is a true record of the testimony given by said witness, that I am neither counsel for, related to, nor employed by any of the parties to the proceeding, and further, that I am not a relative or an employee of any attorney or counsel employed by the parties thereto, or financially or otherwise interested in the outcome of the proceeding, or any action involved therewith.

Witness my signature and seal:

CATHERINE S. BOYD
Notary Public in and for
The District of Columbia

My commission expires: September 14, 2007