IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - -x

NATIONAL AUSTRALIA BANK, :

Plaintiff, :

vs. : No. 99-690C

UNITED STATES OF AMERICA, : (Senior Judge Bruggink)

Defendant. :

- - - - - - - - - - - - - - - -x

Washington, D.C.

Wednesday, November 15, 2006

Deposition of STEPHAN J. LOWER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the District of Columbia, taken at the offices of the United States Department of Justice, 1100 L Street, N.W., Washington, D.C. 20530, at 9:04 a.m., Wednesday, November 15, 2006, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.



8bf654b0-6cb4-46b9-923c-b86ab973654

APPEARANCES:

On behalf of the Plaintiff:

PAUL MARTIN WOLFF, ESQ.
RYAN T. SCARBOROUGH, ESQ.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202)434-5173

On behalf of the Defendant:

BRIAN A. MIZOGUCHI, ESQ.
SCOTT D. AUSTIN, ESQ.
Trial Attorneys
Commercial Litigation Branch
United States Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202)305-3319

--Continued--



APPEARANCES: (Continued)

THOMAS BAHLO, ESQ.
Counsel, Legal Division
Federal Deposit Insurance Corporation
3501 Fairfax Drive, Room D-7120
Arlington, Virginia 22226
(703)562-2388

ALSO PRESENT:

ELLEN HEBERT
Videographer



CONTENTS


| WITNESS | EXAMINATION BY COUNSEL FOR | |
|---|---|---|
| STEPHAN J. LOWER | PLAINTIFF | DEFENDANT |
| By Mr. Scarborough | 6 | |


EXHIBITS


| LOWER EXHIBIT NO. | | PAGE NO. |
|---|---|---|
| 6 | Lower Declaration | 30 |
| 2 | Executive Summary Memo | 46 |
| 1 | Draft Termination Agreement dtd 9/16/94 | 58 |
| 4 | Termination Agreement | 72 |
| 3 | Draft Termination Agreement dtd 9/28/94 | 77 |




PROCEEDINGS

THE VIDEOGRAPHER: This is the video deposition of Stephan Lower taken by counsel for the Plaintiff in the matter of National Australia Bank versus United States of America in the United States Court of Federal Claims, Civil Action No. 99-690C, held in the offices of the Department of Justice at 1100 L Street, Northwest, Washington, D.C., on this date Wednesday, November 15th, 2006, at the time indicated on the video screen, 9:04 a.m.

My name is Ellen Hebert. I am the legal video specialist.

The court reporter is Kathy Boyd. We are employed by Alderson Reporting.

Counsel will now introduce themselves and the parties they represent, after which the court reporter will administer the oath to the witness.

MR. SCARBOROUGH: Hi. My name is Ryan Scarborough.

I represent National Australia Bank,

and I'm with Williams & Connolly.
MR. WOLFF: I'm with Mr. Scarborough. My name is Paul Wolff, also with the firm of Williams & Connolly, and also representing National Australia Bank.
MS. MIZOGUCHI: I'm Brian Mizoguchi with the Department of Justice, and I'm here on behalf of the witness.
And with me is Tom Bahlo from the FDIC.
Whereupon,
STEPHAN J. LOWER,
was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:
THE VIDEOGRAPHER: Please begin.
EXAMINATION BY COUNSEL FOR PLAINTIFF
BY MR. SCARBOROUGH:
Q. Good morning, Mr. Lower. My name is Ryan Scarborough.
A. Good morning.
Q. We didn't have a chance to really talk



before we went on the record since we just got in, but if you could just tell me where you're from right now?
A. I live in Reno, Nevada.
Q. Are you from there originally?
A. I was born in Albion, Michigan, and I lived in Arizona, Idaho, 25 years in Arlington, and now I'm living in Reno.
Q. What brought you out to Reno?
A. I did two years of graduate school at the University of Nevada at Reno, and it's close to where our families are.
We were brought up in the west end, so my wife and I and my son moved back there in 2001.
Q. Okay. You know we're here to talk about a Termination Agreement and an Assistance Agreement relating to Michigan National Corporation or Michigan National Bank?
A. Yes.
Q. Throughout the course of today's deposition, sometimes I may refer to Michigan



National Corporation or Michigan National Bank simply as Michigan National or MNC or MNB.
Does that pose any problem to you?
A. No.
Q. Okay. And we're also talking about some tax benefits that were denied relating to covered asset losses.
Do you know what a covered asset loss is?
A. Yes, I do.
Q. Okay. And just to make sure we have a common understanding, are you familiar with the fact that those covered asset loss deductions were denied by legislation that I sometimes refer to as the Guarini legislation?
A. Yes, I do.
Q. Okay. And the Guarini legislation may also be referred to by its particular section in the statute, Section 13224?
A. Yes.
Q. Do you also know that that's the Guarini legislation?



A. Yes, I do.
Q. Okay. So I'll probably use those terms interchangeably, but if you have a question or anything like that, just let me know.
A. Okay.
Q. Okay. Why don't we -- I have a sense of where you live right now in Reno, but if you could give me just a quick background, tell me about your educational background?
A. In 1966, I got my Bachelor of Arts Degree from Idaho State University in Pocatello, Idaho. Major was political science.
Q. Okay.
A. In 1972 to '74, I did graduate work at the University of Nevada in Reno, again, international relations as my major.
In 1974, I was hired in Reno by the Internal Revenue Service and moved to Bakersfield, California.
I worked for the IRS until 1976, at which time I was accepted for a position back here with the IRS in an overseas group where we





8bf654b0-6cb4-46b9-923c-b86ab9736545

would work overseas. That's the issues we worked. I worked with that group until 1982.

From 1982 to 1988, I worked with the Department of Defense Inspector General's office.

In 1988, I was hired by the Federal Home Loan Bank Board in their Inspector General's office.

Shortly after, the Bank Board was done away with and we were merged into the FDIC.

In 1991, in September I believe, I was hired as chief of the FSLIC Resolution Fund Tax Unit, and at first, we were in the RTC, and as that folded up, we were moved back into the FDIC, and that's where I was until I retired.

Q. Okay. During your time with the IRS, you said you worked with an overseas group?

A. Yes.

Q. Did that have anything to do with thrifts or savings and loans or anything like that?

A. It did not.

Q. And the time prior to that from '74 to



'76 when you were in Bakersfield, California, that didn't have anything to do with thrifts?

A. It did not.

Q. What were you principally focused on?

A. Individual tax returns.

Q. Okay.

A. Audits of individual tax returns.

Q. When you moved into the Department of Defense from '82 to '88, you said you were in the Office of Inspector General?

A. From September of '82 to the end of it, it was called Defense Audit Services, and in January of 1983, the same group was switched and called inspector, Office of Inspector General, and that we just did military-type audits.

Q. Okay. Tell me about when you started at the Federal Home Loan Bank Board in the Office of Inspector General.

What were you, what was your principal role at that time?

A. When I started with them, I believe it was March of '88, the Bank Board was involved in



doing these Assistance Agreements, and my job with the Inspector General's office was to work with a group of maybe four or five of us, and we issued contracts to accounting firms to do an audit. We called them initial audits.

It was a final period audit of the failed thrift, and we would monitor, we would hire a firm to do it, and we would monitor those contracts, get the reports.

Q. Okay. And in that, that function that you were performing, did that start pretty much when you started at the Federal Home Loan Bank Board in March of '88?

A. I think it actually started May of '88. I was put for a couple of months just with some ongoing audits that the Inspector General's office was doing, and I believe it was May of '88 we started really doing these initial audit programs, and that's when I started --

Q. Okay.

A. Doing that function.

Q. And how long did you perform that role



while you were at the Federal Home Loan Bank Board?

A. Well, I performed it at the Bank Board until the Bank Board was dissolved by Congress, and when we went into the FDIC, we continued that and I continued pretty much doing those until I went over to become chief of the FSLIC Resolution Fund Tax Unit.

Q. Now did you have any involvement in the initial audit for Michigan National when, or excuse me. Actually it would have been for Beverly Hills Savings and Loan, the thrift that Michigan National acquired?

A. I cannot specifically remember, but it was one of the cases, the -- there were two groups doing these initial audits, so either myself or the other group, one of those two groups would have done it if there was -- I assume there was one.

Q. I believe there was, and I believe it was contracted out to a third party accounting firm?





8bf654b0-6cb4-46b9-923c-b86ab9736545

Page 14

A. They all were.
Q. So your role if you had any involvement at all would have simply been overseeing the accounting firm that was performing the initial audit?
A. We would have asked for a Request for Proposal from several accounting firms.
We would have selected them, one to do the audit, given them their guidelines which they already had to do the proposal, and then we would have overseen it.
Q. Is it safe to say that you, you were not involved in the negotiation of the Assistance Agreement in which Michigan National acquired the savings and loan Beverly Hills?
A. Yes, that's true. I was not involved in it.
Q. Okay. There was, after the negotiation of the Assistance Agreement and the initial audit was performed or was being performed, there came a time when it was actually, when the Assistance Agreement was actually being implemented.

Page 15

From the government side of things, did you have any role in overseeing the implementation of the Assistance Agreement other than in doing the initial audit if you, if you even worked on that?
A. I'm not sure I understand the question.
Until '91, I would have only been involved with the initial audit that would, if our group did that.
After '91, when I was in the Tax Unit, then there would have come a time when Michigan National would have given us, provided us copies of their tax returns so we could determine that we were getting our share of the benefits.
Q. All right. Tell me when you became the chief of the Tax Unit for the FSLIC Resolution Fund, tell me a little bit more about what your day-to-day responsibilities were.
A. Much of it was administrative. I had tax accountants that worked for me.
I had to make sure that if we were going to audit or look at tax returns for one of

Page 16

the agreements, it was assigned to somebody.
We would talk. We were a small group. Maybe at first six or seven of us is all, and we'd talk about them, but mine was, I was the chief of it, so I mean I did everything from time slips like that to we had meetings to set up. I would go to meetings, things like that.
Q. Would your, would your Tax Unit have been responsible for overseeing the tax-related benefits for all the Assistance Agreements that had been negotiated by the government?
A. To the best of my recollection, yes. I'm trying to think of somewhere we may not have been.
Some of the agreements may not have had a tax benefit provision. Of course we wouldn't be involved with that, but other than that, that was what the Tax Unit was for was to do the Assistance Agreement tax benefits monitoring.
Q. And Michigan National's Assistance Agreement with the government would have fallen under your jurisdiction at that time?

Page 17

A. Yes, it would have. Yes.
Q. Do you, did you assign the Michigan National Assistance Agreement to a particular accountant in your Tax Unit?
A. I'm not sure if I assigned it. It was assigned to an accountant.
It may have been assigned before I got there, but there was just one tax accountant that did it, all of the work on that, the time I was there.
Q. I think I can guess who it is, but can you tell me his name or her name?
A. It's a he, and his name is Lars Viitala.
Q. Okay. Well, we'll be talking with him tomorrow, so I'll have a chance to talk to him about that.
A. Yes.
Q. How long did Mr. Viitala report to you?
A. Until I retired in '98. He was in the Tax Unit when I was brought over as chief, and he worked in the unit with me until I retired in

'98.
Q. Okay. Do you have any, sitting here today, do you have any specific recollection of tax-related issues that came up with regard to Michigan National's Assistance Agreement from the time you started as the chief of the Tax Unit leading up to the time of the Termination Agreement?
A. Yes.
Q. And tell me what -- I want to separate the time when we actually get to discussing the Termination Agreement and what you may recall about the negotiations, but prior to that time, do you have specific recollection?
A. I believe, and I can't tell you when, but some time during that period before the negotiations started for the termination, Mr. Viitala told me that he believed the formula that was set in the Assistance Agreement to determine our sharing in the benefits was flawed, that it wasn't going to work.
There was also some issues early on



about the function of how the bad debt reserve worked in the deductions.
I remember that, and I believe there was an issue of benefits related to the subsidiary issues of Beverly Hills.
That's the best I can give you off the top.
Q. Okay. Now in recalling these issues, are these things that you recall unrefreshed, or have you, in preparing for today's deposition, looked at documents that refreshed your recollection about these particular issues?
A. Two of them I knew about, and I recall without any problem the third one.
When I saw it yesterday, I remembered that we had that issue.
We had it with several people.
Q. It rang a bell?
A. It did.
Q. What was the two that you would have remembered anyway?
A. Clearly, the sharing, the formula for



sharing tax benefits did not work. That was the primary issue. That I remember with no problem.
Also that there was an issue with benefits related to the subs out at Beverly Hills, that was an issue that I had no need to be reminded of that. I remembered those.
Q. Okay. So long before, or strike that. Before the termination, the negotiations began that ultimately resulted in the Termination Agreement, you were aware and Mr. Viitala was aware that the sharing agreement -- excuse me -- the sharing formula and the Assistance Agreement was flawed, correct?
A. Yes. Yes, we were.
Q. And it was flawed in such a way that if you applied it literally, that sharing percentage would never flip from 75/25 to 50/50, am I correct?
A. That's right. We would always be at the 25 level for the FDIC.
Q. And when you began the negotiating process that ultimately resulted in the



Termination Agreement, you were aware of that fact, right?
A. Yes.
Q. Tell me -- let me shift gears slightly to focus on the actual termination agreement.
What was your role, how did you get involved in the negotiations that resulted in the Termination Agreement?
A. Because tax benefits were an issue, my group was part of the team, and Lars and myself were asked to be part of the negotiating team because part of it dealt with tax benefits.
We, when any issue or agreement dealt with tax benefits, we were generally involved with it.
Q. Okay. And well, let's, let me try it this way.
What was the cast of characters that were involved in negotiating the Termination Agreement from the government side?
A. Jim Meyer was my supervisor, and he was the man that negotiated or was the lead person

Page 22

from our side.
Myself, Lars Viitala. I believe Wes Crawford was there from Legal, and Mike Duhl was outside counsel.
Those are the ones, the best I can remember.
Q. Okay.
A. That were there from our side.
Q. And of that group that you named, that chief negotiator for the government was Mr. Meyer?
A. Yes.
Q. Were there meetings, were you at every meeting that occurred between the government and Michigan National or --
A. I can't say that I was. I just don't remember.
There may have been some I didn't even know about, but I just don't know that I was at every one.
I can't say for sure I was.
Q. Would it be reasonable to say you were

Page 23

at some, but you may not have been at all?
A. Oh, yeah. I was at some of them for sure.
Q. And I take it there were meetings that occurred just with the government representatives?
You attended some of those, but may not have attended all of them?
A. Yes.
Q. Would you have relied on -- in putting forward the government's position, who would you principally have relied on to do that with regard to Michigan National?
A. Well, the technical aspects, I would have relied on Lars Viitala.
Q. And what do you mean when you say technical aspects?
A. Well, he would be one that would explain the formula, how it did or did not work right.
Anything that would come to me then I would, of course, talk to Jim Meyer about.

Page 24

Q. Okay. So when you, when you talk about the technical aspects might be handled by Mr. Viitala, he would explain the formula and how it did or didn't work?
A. Yes.
Q. That's in reference to how the sharing formula and the Assistance Agreement was flawed and how it didn't, did not necessarily work to flip to 50/50?
A. That's right.
Q. What about the substantive non-technical aspects?
Who was principally responsible for communicating the government position on those issues?
A. Well, Jim Meyer was our lead person, so if I understand your question, he would be the one that we would have talked to, and he would then say, take our position. He would be the one that would discuss it.
Also, well, that's, that's -- he's the one that would have done it I believe.

Page 25

Q. So if something was going to be communicated to Michigan National or its representatives at the bargaining table, Mr. Meyer would have either done the communicating or would have been aware that the communication was taking place?
A. I would say yes.
(Plaintiff's counsel conferred.)
BY MR. SCARBOROUGH:
Q. Mr. Lower, were there times when -- let me ask it this way.
Did you ever have any communications with representatives from Michigan National at which Mr. Meyer was not present?
A. I do not think so. Certainly, I don't recall any meetings.
Somebody may have called and asked us something, you know, on the telephone, but did we sit down at meetings when Mr. Meyer wasn't there?
I don't think so, the best of my memory, twelve years ago, but I think Mr. Meyer would have been there.





8bf654b0-6cb4-46b9-923c-b86ab9736545

Q. I understand. Okay. So we sort of have the cast of characters from the government side.

Who do you recall participating and taking an active role in the negotiations for the Michigan National side?

A. The one, the most constant person that was there was a gentleman named Ernie Antczak.

Q. Okay.

A. I believe their counsel was Lars Gladchun, G-l-a-d-c-h-u-n, and the third person I believe was there most of the time was Tom Dwyer. He was outside counsel for them.

There were other people, but I do not remember their names.

Q. Okay. And if you had to characterize who was sort of the equivalent of Jim Meyer on the Michigan National side, i.e., the lead negotiator for Michigan National, who would you, who would you have thought that would have been?

A. Out of those three, I think there were other people there that may well have been, but



out of those three, I think Mr. Gladchun would have been the lead person, and Mr. Antczak was the technical person. He understood it.

Yes, that was my impression.

Q. So if we were putting it on a, just sort of balancing the players on each side, Mr. Antczak would sort of have been the equivalent to Mr. Viitala?

A. I would say yes.

Q. Okay. And Mr. Gladchun, he would have been the equivalent to Mr. Meyer?

A. If there wasn't anybody else there that I can't remember their name, then I would say yes.

There were other people there for them. I just don't recall them.

Q. Now Mr. Meyer, he was the lead negotiator for the government side?

A. Yes.

Q. Did he have to get authority or approval from, from any sort of supervisor or any sort of higher committee in order to enter into



this deal?

A. Yes. To finalize it, he would have had to proposed that we, the government, accept this through a memorandum or something to that effect to -- there was a committee. It had a long name, but basically it was a committee that looked at negotiations for terminations and that.

And he would have sent them a proposal through a memorandum that said this is the, the deal we're proposing, and they would have had the final say-so.

Q. And in setting forth in that proposal or that memorandum to the committee, he would have accurately set forth his understanding of the deal as it existed at that time?

MR. MIZOGUCHI: Objection. Calls for speculation.

BY MR. SCARBOROUGH:

Q. You can answer that question.

A. Okay.

Q. You can answer unless he tells you not to.



A. Okay. To the -- he would have, to the best of my knowledge, he would have put forth in that memorandum what he thought the deal was.

Q. Now you have given a declaration or an affidavit in part of this case.

Do you recall signing a declaration?

A. I do.

Q. And in that declaration, if I'm remembering correctly, I think you said you had involvement in preparing a memorandum, I think it was dated September 20th of 1994, that was seeking approval to go forward with the deal.

Do you remember that?

A. I do remember the declaration. My involvement would have been if Mr. Meyer would have asked me some tax items, and he would have prepared the memorandum, but if he had questions about some of the tax items, then he would have asked myself and my group.

Q. Okay. And so as you sit here today then, you don't, it sounds like you didn't have a specific recollection of whether you had direct

involvement in preparing that September 20th, 1994 memorandum?
A. To the best of my knowledge, I did not sit down with him and actually write out the memorandum.
If he needed information from me regarding the tax aspect, he would have asked and I would have provided it to him.
Q. Excuse me one second.
(There was a pause in the proceedings.)
MR. SCARBOROUGH: We stopped off yesterday at Meyer Exhibit No. 5, and since I'm going to try to use the same exhibit numbers for your deposition, I'm going to go ahead and mark your declaration as Lower Exhibit No. 6.
THE WITNESS: Okay.
(Lower Exhibit No. 6 was marked for identification.)
BY MR. SCARBOROUGH:
Q. And sir, is this the declaration that we were discussing earlier that you signed on



February 20th of 2004?
A. Yes, it is.
Q. Okay. Before I focus specifically on this, if you wouldn't mind giving me a sense of what you've done to prepare for today's deposition, that might help expedite things.
A. I've looked at this document and several other documents yesterday with counsel.
Q. Did you come from Reno, did you fly in yesterday?
A. I flew in Monday night.
Q. Okay. And yesterday when you met with counsel, did you meet with Mr. Mizoguchi?
A. Yes.
Q. What timeframe did you meet? Was it for the whole day, or just a portion of it?
A. I think I arrived or I got here yesterday at 9:30, and I left about three o'clock.
We had lunch.
Q. Right.
A. That's the framework anyway.



Q. I understand. Now you, prior to coming here, had anybody from the government side sent you any documents to review to start the process of preparing for today's deposition?
A. No.
Q. Had you seen any of the pleadings that had been filed in this case by the government at any point in time prior to today?
A. To the best of my memory, no.
Q. When you actually did this declaration, who did you work with from the government to prepare this declaration?
Was it anybody that's in the room today?
A. I think it was. I believe, I believe Brian.
If it wasn't, I don't remember who it was.
Q. There was another attorney who was also working on this case for the government named Brian Owsley.
Does that name ring a bell?



A. No.
Q. And what was your involvement? When you signed this declaration, did you yourself draft it, or did you review a draft that had been prepared and make sure that it was accurate before you signed it?
A. I know I got some guidelines from whoever it was that was asking me this, but I think I for the most part wrote it or at least, you know, they may have given me some points you've got to give us your background and what you remember and that, but I didn't just get a format and sign it.
I had what I thought I remembered about it.
Q. Is it possible that you had an initial draft that was based on conversations you had with the government attorney, and then to the extent you had additional changes, you would have made them and had it finalized?
A. Yes. I think that is possible.
Q. If you look specifically at paragraph

Page 34

6, and we can talk more about this declaration later, but just right now, at the beginning of paragraph 6, you say, "I worked with James Meyer on his September 20, 1994 memorandum to the FDIC Board of Directors' Committee on Loans, Liquidation and Purchases of Assets."

First of all, that long name there, is that the committee that Mr. Meyer would have needed to seek approval from to go forward with the deal?

A. Yes, it is.

Q. And here it seems to say that you actually had worked on that memorandum, but it sounds like from what you're saying today that you don't have a recollection of really working directly on the memorandum.

A. I don't. I don't remember working on the memorandum.

I remember Mr. Meyer asking me things or saying this is how I'm going to word this, and I'm giving my thoughts on it.

Worked with him to me meant when he

Page 35

needed information regarding the tax-related items, that I would work with him on those, but I didn't sit at his computer with him and actually type up the memorandum.

To the best of my knowledge, I didn't. He may be working on it and asked me does this sound right?

Q. So it sounds like you would have seen drafts of the memorandum at least before it was finalized and sent to the committee?

A. I think I would have. I don't remember honestly whether I did or not, but at least the parts that I helped him with, tax related, I would have thought I had seen them.

Q. Okay. Now the government wasn't just trying to terminate the Assistance Agreement with Michigan National.

I believe they were also trying to terminate a number of other Assistance Agreements that were ongoing at the time.

Does that comport with your recollection?

Page 36

A. Yes.

Q. Were you involved in the tax aspects of the terminating some of those other agreements as well?

A. Yes, I was.

Q. If you had to put a ballpark figure on how many Termination Agreements had your fingerprints on them so to speak, what would you say would be the number?

A. As long as we leave it a ballpark number.

Q. It's ballpark. I understand it's twelve years ago or longer.

A. There was probably fifteen of them at least.

When there was negotiations for a Termination Agreement, and there was a tax involvement area, generally, our group would be involved in it, the group I was the chief of.

Q. Okay. And were those, those, I take it those negotiations didn't all happen seriatim, one after the other, that there was some sort of

Page 37

overlap?

A. There would most likely have been ongoing negotiations with several different acquirers at one time.

Q. And do you remember the time period that the negotiations were taking place with regard to Michigan National and the, and the Termination Agreement?

A. Roughly, I believe they started in '93. They ended in September of '94 when we reached agreement, but I believe they had started at least a year earlier.

There were several starts and stops, as I recall.

Q. And so there were some unsuccessful efforts before we finally get to the timeframe in which we have the negotiations that resulted in the actual executed Termination Agreement?

A. Yes. I would say yes. There was times when for whatever reason, it just seemed to kind of go away for a while.

Q. And then it would be resurrected?





8bf654b0-6cb4-46b9-923c-b86ab9736545

A. Somebody would, yeah.
Q. Okay. Do you remember, do you have any specific recollection about the issues that stymied some of those early attempts to terminate the Assistance Agreement?
A. The best way I can answer that, I don't know if it really stymied it, but at first, there was several thoughts on how we could do the tax benefits, and that was the, really the only area I was involved in.
There could have been other issues related to something else, but whether we wanted to try to terminate everything regarding tax or carve the tax piece out, fix the formula, and just let it go on its way, those kind of issues.
Whether they by themselves would have stopped or halted negotiations, I can't say, but some of the issues we had for the tax side.
Q. Okay. Ultimately, though, there was a series of negotiations that resulted in the final agreement which is dated September 29th, 1994?
A. Yes.



Q. Do you have a recollection of how long the negotiations lasted that actually led up to the final agreement?
A. I believe they started early in the summer, May, June of '94.
That's the best timeframe I can give you, and we worked through that period of time.
Q. Okay. And the memo that Mr. Meyer wrote to seek approval to do this deal, do you remember the date of that memo?
A. I believe it was September 20th.
Q. And is that one of the documents that you saw when you were meeting with the government yesterday?
A. Yes.
Q. Before we talk specifically about that document, that memo, can you tell me what your, what the other documents were that you were looking at yesterday, or did you see any, did you see the final Termination Agreement?
A. Yes, I did. And I saw a draft Termination Agreement that was prior to the 20th



of September.
I think it was around the 14th of September.
Q. Okay. Okay. Were there other documents that you recall looking at?
Did you look at the Assistance Agreement yesterday?
A. If we did, it was just briefly. The four documents were the draft, the committee memo, my declaration, and the final Termination Agreement.
Q. So to the best of your recollection, there were probably four main documents that you focused on?
A. Yes.
Q. Was the draft of the Termination Agreement, you said you thought it might have been dated September 14th, was that a draft that, of the Termination Agreement that was produced at the deposition yesterday?
Do you have any understanding of that?
A. I don't follow. I don't understand



your question.
Q. There was a draft that we used at the deposition yesterday dated September 16th.
Is it possible that that was the draft you were looking at?
Do you have any --
A. I don't know. It's possible. You know, but I do not know that.
I may be wrong on the 14th date. I thought that was the date I saw, but it is possible it was another date.
Q. Okay. Let's go back to that memo of September 20th.
It's my recollection that while you didn't sit down at the computer obviously and write it up, that you think it was likely that you may have had some input into formulating that memorandum?
A. Yes.
Q. And to the extent that you did see it prior to the September 20th date it was finalized, you would have made sure that that





8bf654b0-6cb4-46b9-923c-b86ab9736545

accurately set forth your understanding at least of the tax benefit side of the deal?
A. Yes.
Q. And you have no reason to, to, you have no reason to think that Mr. Meyer didn't accurately September forth his understanding of the deal in that memorandum, either?
A. I have no reason to think he didn't.
Q. Do you recall in that memorandum that the issue of, that the sharing formula and the fact that it was flawed, that that was discussed in that memorandum?
A. Yes, I believe it was discussed. It was our, one of our major items that we had to resolve, so I believe it would have been discussed, and I think I saw something in there.
Q. Sitting here today, and I know you looked at it yesterday, and we'll look at it specifically in a minute, but just based on your recollection, what was the ultimate resolution with regard to that sharing formula and the flaw that was there?



How was that dealt with as of September, in the September 20th memorandum? What was --
A. I believe the way it was resolved was we didn't have to work with the formula because we agreed going forward we would get 50 percent, which made working with the formula not important.
We were to get 50 percent of the tax benefits, primarily the SRLY NOLs, and any or any recoveries, and that solved that problem.
Q. Now you've looked at the Termination Agreement, the final Termination Agreement?
A. Yes.
Q. Prior to yesterday, when was the last time you looked at that Termination Agreement?
A. I don't know. I honestly just don't know.
Q. Would you have had any reason to look at it prior, since it was essentially, since it was executed back in 1994?
A. The only time, we would have got a



copy, we had a copy of all those.
Would have I looked at it? Not necessarily.
My only hesitation was when I did the declaration, if I would have had any reason to see it.
I don't recall I did, but I don't, other than that, no, I would have no reason to see it.
Q. Okay. And it's your recollection that in that memorandum, that it specifically stated that there would be 50 percent sharing going forward particularly for SRLY NOLs?
A. Yes.
Q. As well as for any Guarini recoveries?
A. Yes.
Q. And I know I haven't shown you the memo yet, and we'll look through it in a second page by page, but is it your recollection that that memorandum specifically said that any Guarini recovery -- well, first of all, is it your recollection that that memo says that Michigan



National has a right to sue to recover under Guarini?
A. No. I don't remember the memo saying that. No, I don't.
It may have. I don't remember it saying that.
Q. Okay. I believe, and I believe the memo actually says that Michigan National has agreed not to initiate a lawsuit under Guarini.
Does that, does that comport with your recollection?
A. I can't recall that it's in the memo, but I do remember during the discussions that they said they were not going to sue the government. Their side told us that.
Q. Let's go ahead, since we're talking about it so much, let me give you a copy of it, and we can talk specifically about it.
A. Okay.
MR. SCARBOROUGH: I'm going to mark this as Lower Exhibit 2, so that matches up with the exhibit that we had yesterday with Mr. Meyer.





8bf654b0-6cb4-46b9-923c-b86ab9736545

Page 46

(Lower Exhibit No. 2
was marked for
identification.)
BY MR. SCARBOROUGH:
Q. Is that the memo that you were looking at yesterday?
A. Yes.
Q. And it's got Mr. Meyer's name on the from line?
A. Yes, it does.
Q. And he's seeking authority to prepay and essentially enter into the Termination Agreement?
A. Yes.
Q. After this memo was, was finalized and sent to the committee on September 20th, would you have, would you have gotten a copy or seen this memorandum?
A. I don't, I don't think so.
Q. Would it have been typical that you would have gotten it, or that wouldn't have been part of the normal course of business?

Page 47

A. Not unless it was just given to us to put in the file, you know, for a file thing, but would I have gotten it or looked at it?
It's certainly possible, but I don't recall that I did.
Q. Okay.
A. It's possible.
Q. Okay. If you look at, if you flip over to page 22, most of the way toward the back, do you see that last paragraph at the bottom of the page?
Would you read that paragraph to yourself?
It begins, "Since the FRF is proposing to settle..."
(The witness reviewed the document.)
THE WITNESS: Okay.
BY MR. SCARBOROUGH:
Q. You've read that?
A. Yes.
Q. Okay. So is it fair to say that as of September 20th, that at that point in time,

Page 48

Michigan National had agreed to give up any rights that it might have had under Guarini?
A. Yes.
Q. Why, what is your understanding about, if you have any, about why Michigan National at that time was willing to give up its rights to sue under Guarini?
A. They were selling the bank and they didn't want that kind of a conflict to sell a bank to a, an entity that was outside the United States.
Q. Okay. Did the government in negotiating with Michigan National take the position at any time that Michigan National needed to waive its rights to sue under Guarini?
A. I'm sorry. Can you repeat that?
Q. Sure. Let me try it a little bit differently.
Did -- there was a period of negotiations prior to September 20th, which is the date of this memo?
A. Right.

Page 49

Q. Correct? And then there's a period of negotiations about eight or nine days leading up to the final executed Termination Agreement?
A. Yes.
Q. Okay. So -- and we know as of September 20th, according to this memo, that Michigan National had agreed not to initiate a lawsuit to get under Guarini to get its tax deductions back?
A. Yes.
Q. Okay. So I'm talking about the time period prior to September 20th, okay?
In that time period, did the government ever take the position in the negotiations with Michigan National that Michigan National needed to give up its right to sue in order to get a deal done?
A. No, I do not believe they did.
Q. So it's your recollection as you sit here today that the government did not insist that Michigan National give up its rights to sue?
A. That is my recollection.

Page 50

Q. Are you -- if I use the, if I use the phrase tag-along rights in the context of the Termination Agreement negotiations, do you have any understanding of what that means?
A. I believe it means that if someone else was to sue and win, that they, somebody else, Michigan National in this case, would then have a right to also make that claim.
Q. Okay. And that's something, tag-along rights would be something somewhat less than the full right to initiate its own lawsuit I take it?
A. Our feeling was it was passive versus active.
Q. Okay. And was there any discussion about tag-along rights, to your recollection, prior to September 20th?
A. I don't recall them. No, I don't recall. I don't.
Q. Okay. Why, to the best of your understanding?
Is it simply that Michigan National wanted to waive its right to sue? Because I

Page 51

don't understand that.
Can you explain it to me again? Why would Michigan National just be willing to give up its right to sue if the government wasn't insisting on that?
A. The best of my recollection of these meetings was that Michigan National, I mean the concept of lawsuits about Guarini was just everywhere. It was just there.
Who would have first said something about it, I don't recall, but right away, I do remember Michigan National says we have no intention of filing a lawsuit on this area.
Q. And --
A. They, Michigan National I really believed was the one that brought that concept to the forefront.
Q. Okay. And you say right away. Do you mean at the outset of these negotiations, Michigan National said we just, we don't want to sue under Guarini?
A. No, I wouldn't say it was the outset.

Page 52

It was more during a meeting that somebody would have brought this up, and I can't tell you whose side did or anything because it was being discussed. It was discussed all the time at that time of the Guarini legislation, and whoever had mentioned that in a meeting or something to that effect, Michigan National indicated they had no plans or desire at that time to sue the government.
(Plaintiff's counsel conferred.)
BY MR. SCARBOROUGH:
Q. Was there an official position of the government, of the FDIC that they weren't going to pressure acquirers to give up any sort of Guarini right that they might have?
A. I don't know of any FDIC doctrine or whatever that would say you have to get these people not to sue the government.
No, I don't think there was.
Q. Okay, but coming back to this September 20th memorandum, it's clear that as of that date, Michigan National had agreed not to

Page 53

initiate a lawsuit, is that correct?
A. That seems right to me.
Q. Now --
MR. WOLFF: Can we take a quick break for a second?
THE VIDEOGRAPHER: Going off the record.
The time is 9:51:51.
(A recess was taken.)
THE VIDEOGRAPHER: Going back on record.
The time is 9:58:37.
BY MR. SCARBOROUGH:
Q. Sir, if I could direct your attention to the September 20th memorandum that Mr. Meyer wrote again?
A. Okay. All right.
Q. And we had talked earlier this morning that leading up to this time period, you were aware that the sharing formula in the Assistance Agreement was flawed, correct?
A. Yes.





8bf654b0-6cb4-46b9-923c-b86ab9736545

Q. And in fact, this particular memorandum points out to Mr. Meyer's supervisors, the committee on loans, that the sharing agreements -- excuse me -- the Assistance Agreement sharing formula was flawed?
A. Yes.
Q. Correct?
A. I believe, yes.
Q. Now as of this time, you -- I say you, I mean the government had not reformed the sharing formula in the Assistance Agreement, correct?
A. That's correct.
Q. And in fact, if you look at page 20 of this memorandum, it specifically says that there is no need to reform the sharing formula because that issue has been mooted?
Do you see the bottom of page 20, settlement of tax benefit sharing obligations and carrying over to the top of page 21?
A. Okay.
Q. Did you read that?



A. Yes, I did.
Q. And let me just read that into the record.
The second sentence, the second sentence, it says, settlement of the remaining tax benefit sharing obligations moots the issue of reforming the formula in the agreement that determines when tax benefits sharing shifts from 25 to 50 percent.
Did I read that correctly?
A. Yes, you did.
Q. So as of September 20th, the sharing formula had not been reformed?
A. That is correct.
Q. And the state of the negotiations at that time, according to what Mr. Meyer thought, rendered the need to reform it moot, correct?
A. That's correct. That's what it says, yes.
Q. Okay. Let me go back because I'm still troubled by the fact that it's your recollection that Michigan National willingly agreed to give



up a right to sue under Guarini.
That is your recollection as you sit here today?
A. That is my recollection. Yes, it is.
Q. Isn't it the case, sir, that back when these negotiations began in the summer of 1994, that the government insisted that Michigan National give up its rights to sue under Guarini?
A. Oh, I do not think that's correct. I do not recall that we ever insisted that they give up their right to sue.
Q. Isn't it correct, sir, that Mr. Antczak to you or to somebody else on the government side took the position that Michigan National wanted to keep the full panoply of rights that it had to sue under Guarini, but that the only reason that Michigan National, but that the government insisted that Michigan National give it up?
A. I don't -- I can't speak to if he talked to somebody else about that.
I do not recall that he ever mentioned that to me.



Q. Did anybody, to your recollection, from Michigan National's side ever tell you no, we don't want to give up our rights to sue under Guarini?
A. Nobody told me that from the Michigan National side.
Q. Was it your, did you ever have the understanding from hearing from anybody else on the government side that Michigan National representatives had told them that they did not want to give up the right to sue?
A. No. I don't, nobody told me that, that we had pressured them or said that we wanted them not to, we want them to give up their right to sue.
I don't know that that ever happened from the government side.
Q. So it's your testimony that the government never insisted on that Michigan National give up its right to sue under Guarini?
A. To my knowledge, we never did.
Q. And you are a hundred percent confident

of that?
A. I have no reason not to be. Yes, I am.
Q. Okay. Sir, let me mark as Exhibit Number, Lower Exhibit No. 1 a draft of the Termination Agreement.
A. Okay.
(Lower Exhibit No. 1 was marked for identification.)
BY MR. SCARBOROUGH:
Q. Give that to you. Do you have that with you?
MR. MIZOGUCHI: Is this Meyer Exhibit 1?
MR. SCARBOROUGH: Yes.
MR. MIZOGUCHI: Okay.
BY MR. SCARBOROUGH:
Q. Sir, do you see in the upper right-hand corner, there's a date there?
A. Yes, I do.
Q. What is that date?
A. September 16th, 1994.



Q. Okay. And am I correct that that is a draft of the Termination Agreement as of that date?
A. Yes, I believe it is.
Q. Okay. Do you see the top there, underlined it says, "This draft is subject to further review and revision by MNC and the FDIC"?
A. Yes, I do.
Q. Okay. Is this the draft of the Termination Agreement that you, Mr. Lower, that you reviewed yesterday?
A. I believe it is. I have no reason to think it's not.
I think it is.
Q. I'm not aware of a September 14th draft, and so that's the reason why I asked.
I know about a September 16th draft.
A. I could have had that date wrong. September 16th, it well could have been.
Q. Okay. Let me ask you to turn to page 48.
A. Okay.



Q. Do you see Section 8.4 there, tax matters?
A. Yes, I do.
Q. Before you read that, do you have any general recollection about Section 8.4 either from the time you were negotiating the Termination Agreement or from your review of documents yesterday?
A. I would have to look at it to see what it specifically related to to answer your question.
My recollection of the tax benefit issue at this time was that there was an agreement going forward that the FDIC and the FSLIC Resolution Fund would share in 50 percent of the tax benefits that went to Michigan National.
Q. Okay. And is that, is it your recollection that that agreement is set forth in Section 8.4?
Why don't you read that first, and then we'll talk about it?



A. Okay.
(The witness reviewed the document.)
THE WITNESS: Okay.
BY MR. SCARBOROUGH:
Q. Have you read that?
A. Yes, I have.
Q. Okay. First of all, the rights that are conveyed to sue under Guarini here are what I would describe as tag-along rights.
A. Okay.
Q. Does that, is that consistent with your recollection, that Michigan National did not have the right to, according to this draft, Michigan National would not have had the right to initiate its own lawsuit unless somebody else had prevailed, in which case it would tag along?
A. Yes, that's correct.
Q. And that's what is set forth in this draft of the Termination Agreement?
A. Yes.
Q. Okay. And this draft also specifically addresses what sharing right would arise if

Michigan National succeeded in recovering tax benefits through litigation, correct?
A. Yes, it does.
Q. And what's the rate that is specifically set forth there?
A. Fifty percent share.
Q. Spelled out specifically 50 percent, paren, 50 percent, right?
A. Yes, it is.
Q. So if this was the draft, there's no, if this was in the final agreement, there would be no doubt that 50 percent would be what would needed to be shared, correct?
MR. MIZOGUCHI: Objection.
THE WITNESS: To me, there is no doubt anyway. We get 50 percent, but if we can argue -- I mean to answer your question, if it was in the final, it would have been clearer.
BY MR. SCARBOROUGH:
Q. It would have been clear?
A. Yes, no doubt to me.
Q. Did you say clear or clearer?



A. Clear, it would be clear.
Q. Okay. Now Section 8.4 has brackets around it in this draft, correct?
A. Yes.
Q. And it also has a footnote there, Footnote 2?
A. Okay. Yes.
Q. At the beginning, do you see that?
A. Yes, I do.
Q. And that footnote says that this section, referring to Section 8.4, is being revised, correct?
A. Yes, it does.
Q. So as of September, as of this September 16th, 1994 draft, the tag-along rights and the 50 percent sharing were not acceptable to Michigan National, isn't that correct, sir?
A. I can't say that because I don't know what they were thinking about revising, so I can't answer that they weren't acceptable.
I can't say that they weren't.
Q. So --



A. It's my testimony that, that I, that they well may have been all a part of this acceptable to them.
I don't know what was not acceptable to them.
Q. So as you sit here today, this footnote which says this section is being revised, you don't have any recollection about what part of Section 8.4 was not acceptable, whether it was the scope of the rights to sue, whether it was the sharing percentage, or whether it was both?
A. I do not.
Q. And this is the draft that immediately predates the September 20th memorandum that Mr. Meyer wrote?
A. Yes, I believe it is.
Q. So as of September 16th at least, the language, the position that was set forth in Section 8.4 was not acceptable to Michigan National, and you just don't know what part of it wasn't acceptable?
MR. MIZOGUCHI: Objection.



THE WITNESS: Yeah. I don't know what part was.
This doesn't -- to me, this section is being revised, I don't know what was being revised in it, at whose request, whether it was Michigan National or the FDIC, and I don't know what part was not acceptable, if in fact any of it was not acceptable.
I just don't know that.
BY MR. SCARBOROUGH:
Q. And between this draft dated September 16th -- well, first of all, are you aware of any other draft between September 16th and September 20th?
A. I am not.
Q. Okay. From this draft on September 16th to the date that it was finally, the Termination Agreement was finally executed on September 29th, you're not aware of any other substantive changes that were made to the Termination Agreement other than those that might relate to Section 8.4, are you, sir?





8bf654b0-6cb4-46b9-923c-b86ab9736545

A. I am not.
Q. And on September 20th, in Mr. Meyer's memorandum, he took the position -- well, let me strike that.
It was Mr. Meyer's understanding on September 20th that Michigan National was going to completely give up its right to initiate a lawsuit under Guarini, correct?
A. I believe that's correct.
Q. And he was adamant that Michigan National was going to give up their rights?
A. I don't know that he was adamant. They told us they were.
Michigan National told us they weren't going to sue.
Q. Sir, if you look at the September 16th draft and that Section 8.4 there, it specifically says this section is being revised, meaning the tag-along rights and the 50 percent sharing, that that section was not acceptable as it was written?
MR. MIZOGUCHI: Objection.



THE WITNESS: I don't know what's not, what wasn't acceptable about it.
I don't know, I don't even know who was insisting that it be revised, which party. I just don't know.
The last, my best memory is that Michigan National had brought up this we're not going to sue the government.
MR. SCARBOROUGH: Okay.
(Plaintiff's counsel conferred.)
MR. SCARBOROUGH: Okay.
(Plaintiff's counsel conferred.)
BY MR. SCARBOROUGH:
Q. You just said that you didn't know if it was the government that wanted it revised or Michigan National, you just had no recollection as to who was wanting it revised?
A. That is correct.
Q. Tell me, assuming it was the government that wanted it revised, what problems did the government have with Section 8.4?
A. I don't know of any problems they had



with it.
It was, from our point of view, we got our 50 percent sharing, which we thought was the correct, the way it was intended to be from the Assistance Agreement.
One would -- I don't think we had any problem with Michigan National saying they intended not to file any lawsuits.
I don't know what the problem, why this section is being revised is even there because I wasn't aware of any intent to revise any of this.
I just don't know about that.
(Plaintiff's counsel conferred.)
BY MR. SCARBOROUGH:
Q. Maybe it will help expedite things because I don't want to drag this out, let me shift to a different timeframe, and then if we need to, we'll come back, but let's focus on the timeframe after the September 20th memorandum.
A. Okay.
Q. So between September 20th and the date that the Termination Agreement was finally



signed, September 29th --
A. Okay.
Q. All right. First of all, during -- were you present, do you have any specific recollection of being involved in negotiations, discussions between September 20th and September 29th?
A. I can't speak to the timeframe. I think we were, I was, I was involved, the Tax Unit, I'm speaking of the Tax Unit, I believe pretty close to when the final agreement was reached.
The dates in that, I remember some awful long meetings, but I can't tell you what dates they were.
Q. Okay. Didn't it become abundantly clear after September 20th that Michigan National was refusing to accept either no right to sue under Guarini or simply tag-along rights and 50 percent, that they were insisting that they have full unfettered rights to sue to get whatever they could recover?

Page 70

A. Not to me, that was not clear because I didn't know -- I knew they had told us early on that they weren't going to sue, and I didn't know they had ever changed their position on that.
Q. So, sir, just so I understand, it's your testimony that up until the date the Termination Agreement was signed, you always understood that Michigan National was willing to just give up the right to sue under Guarini?
A. I believe that's the last I had heard, that that was, that's their, that was their position.
That wouldn't have affected my area.
Q. Is it likely, sir, because you recognize, first of all, that the final Termination Agreement dated September 29th gives Michigan National a full, unfettered right to sue for whatever it can recover under Guarini, correct?
A. I do now, yes.
Q. Now? You didn't know that at the time?
A. I did not.

Page 71

Q. Did you read the Termination Agreement or the drafts of the Termination Agreement at the time, or were you only focused on some specific subset that didn't relate to 8.4?
A. I would have read 8.4. The reason the suing, whether they sue or not would not necessarily affect me is I had one thing in mind, and that was our 50 percent of the tax benefits.
If they recovered them by either tag-along or suing, we got 50 percent.
If neither of those things happened, then there were no benefits to share with us.
That was my area.
(Plaintiff's counsel conferred.)
BY MR. SCARBOROUGH:
Q. So as you sit here today, you just, you don't have any recollection about the fact that Michigan National changed its mind or why it changed its mind to insist on full Guarini rights and whatever it could recover?
A. I do not have any idea of why they, a recollection of why they might have done that.

Page 72

Q. And in fact not only why they would have done it, you have no recollection that they did change their mind to insist on full Guarini rights or whatever they could recover?
A. Until yesterday, no, I didn't.
Q. And yesterday, that was the day you met with the government lawyer and reviewed the final Termination Agreement?
A. These documents, yes.
Q. So prior to yesterday when you reviewed the final Termination Agreement, at that time, you had no idea, you had no idea that Michigan National had taken this position?
A. I don't recall that I did. I don't, I don't recall that I did.
Q. Okay. Let me --
(Plaintiff's counsel conferred.)
MR. SCARBOROUGH: Let me mark for you the final Termination Agreement.
We're going to mark this as Lower Exhibit 4, corresponding with Meyer 4.
(Lower Exhibit No. 4

Page 73

was marked for
identification.)
BY MR. SCARBOROUGH:
Q. And if I could ask you --
(Plaintiff's counsel conferred.)
BY MR. SCARBOROUGH:
Q. If I could ask you to turn to page 56, which is where Section 8.4 appears in the final executed Termination Agreement, do you see that, sir?
A. Yes, I do.
Q. Okay. Now I'm going to get you to read it in a minute, but let me set the scene.
A. Okay.
Q. Because this Termination Agreement was signed on September 29th, in fact it was signed late, late, late that night of September 29th.
A. Okay.
Q. Correct?
A. That's the date on it. I believe that's correct.
The timing, I know we had some very





8bf654b0-6cb4-46b9-923c-b86ab9736545

Page 74

late meetings with them, but when the final one hour-wise was signed, I can't address that, but it says the 29th. I believe that's correct.

Q. I get the sense from your testimony today that you don't recall whether you were even present on September 29th when this Termination Agreement was finalized and signed.

A. I can't remember the dates, but towards the end, we had two very late meetings like until two or three in the morning, and I was at those meetings.

Q. Okay.

A. I just don't remember what dates they were, but those meetings, I was at.

Q. Let's set the dates aside for a minute. It's my understanding that the last issue that was resolved prior to signing the Termination Agreement was the scope of Michigan National's rights to sue under Guarini and the sharing and the type of recovery sharing that would apply to that, would apply to those rights.

Is that consistent with your

Page 75

recollection?

A. I do not recollect, have recollection that those were the last issues.

The right to sue or not to sue really is not a tax benefit item.

What we were interested in from our point on the tax side was recoveries from whatever method they came from.

We got 50 percent of them going forward, and that I don't know if that was the last issue.

I thought that was pretty much agreed to up front, but that I was interested in, and to my recollection and honest belief, we never waivered or changed anything that said we don't get 50 percent of the SRLYs and recoveries.

(Plaintiff's counsel conferred.)

MR. SCARBOROUGH: I'm sorry. Can you read back that answer?

THE REPORTER: Answer: "I do not recollect, have recollection that those were the last issues.

Page 76

"The right to sue or not to sue really is not a tax benefit item.

"What we were interested in from our point on the tax side was recoveries from whatever method they came from.

"We got 50 percent of them going forward, and that I don't know if that was the last issue.

"I thought that was pretty much agreed to up front, but that I was interested in, and to my recollection and honest belief, we never waivered or changed anything that said we don't get 50 percent of the SRLYs and recoveries."

MR. SCARBOROUGH: Okay.

BY MR. SCARBOROUGH:

Q. Sir, you know, do you recall that from September -- excuse me -- that on September 28th and September 29th, the scope of Guarini rights, Michigan National's rights to sue under Guarini and the recoveries that would apply thereto, that that was the central focus of the last days, the last hours of the negotiations?

Page 77

A. I don't remember that they were the central focus of them, but if they were, we would have never waivered on the fact that we would have got the 50 percent.

I think the right to sue was more of a issue with the legal than with the tax benefits.

(Lower Exhibit No. 3 was marked for identification.)

BY MR. SCARBOROUGH:

Q. I'm going to hand you the draft Termination Agreement marked Exhibit 3.

Can you read the date that's listed on the top of that draft?

A. Draft September 28th, 1994.

Q. That's one day before the final agreement was signed, correct?

A. Yes.

Q. And if you'd turn to Section 8.4 on page 54?

A. Okay.

Q. Do you see -- are you there, sir?





8bf654b0-6cb4-46b9-923c-b86ab9736545

Page 78

A. Yes, I am.
Q. And if you look to Subsection (b), I believe it has pretty much identical language to the draft that we looked at on the 16th.
It has tag-along rights, and it specifically says 50 percent sharing, correct?
A. Yes.
Q. Now, sir, that Section 8.4 continues to be in brackets, doesn't it?
A. Yes, it does.
Q. And it still has a footnote, Footnote 2, up at the top, right?
A. Well, mine is at the bottom. It says, "To be discussed."
Q. Right, but the two is actually with regard to Section 8.4?
A. Yes, tax matters, yes.
Q. Right. So that indicates that as of September 28th, the day before the final agreement was signed, the scope of Michigan National's rights to sue and whatever sharing would apply was still not resolved, isn't that

Page 79

correct, sir?
A. I can't answer what was not resolved by the statement to be discussed.
At that time, and before that, to my recollection, and to my mind, it being part of this, there was never any proposal that the 50/50 sharing would be changed, and I don't recall that it was ever disagreed by either party that going forward, we would get 50 percent.
Q. So as of September 28th, you don't have any recollection that Michigan National was rejecting the tag-along rights and 50 percent and was insisting on something more?
That's just, you just don't remember that?
A. I just don't remember that. I do not.
Q. But looking at this document today -- by the way, I take it this is the first time you've seen this particular draft since your involvement in the negotiations twelve years ago?
A. I think that's correct.
Q. Looking at this particular draft, it's

Page 80

clear to you now, isn't it, sir, that somebody, whether it was Michigan National or the government, was rejecting the language, the 50 percent sharing and the tag-along rights that were covered by Section 8.4?
MR. MIZOGUCHI: Objection.
THE WITNESS: It's not clear to me they were rejecting the 50 percent.
That's the area I was in, the 50 percent sharing rights.
What the discussions were that led to this to be resolved, you know, I don't know, but there was never a question in my mind that this Termination Agreement would come about if we didn't get 50 percent going forward.
In my belief, to my understanding and remembrance of the time, if we didn't get our 50 percent going forward, this deal would have never been done, and that wasn't what the Tax Unit was involved in.
We were protecting money for the FRF fund. That was what our job was, and as long as

Page 81

we got our 50 percent, other people would handle other issues.
MR. SCARBOROUGH: Let's change the tape.
THE VIDEOGRAPHER: This marks the end of Tape 1 of the deposition of Stephan Lower.
Going off the record, the time is 10:26:41.
(There was a pause in the proceedings.)
THE VIDEOGRAPHER: This marks the beginning of Tape 2 of the deposition of Stephan Lower.
Going back on the record, the time is 10:29:33.
BY MR. SCARBOROUGH:
Q. Mr. Lower, just to, since we just took a brief break there, just to set the stage here, the September 28th draft which said to be, to be discussed, had provided at that time for tag-along rights and explicit 50 percent sharing of any recoveries, correct?
A. Yes, it did.

Q. Okay. Now I want you to look at the final executed Termination Agreement which was dated the next day, September 29th.
A. Okay.
Q. Do you see that?
A. Yes.
Q. And if you'd turn to page 56, you see that Section 8.4, Section 13224 claims?
It begins at the bottom of that page.
A. Yes, I do.
Q. And carries over to the middle of the following page?
A. Yes.
Q. I assume you reviewed it yesterday, but why don't you read through that again so that it's fresh in your mind today?
A. Okay.
(The witness reviewed the document.)
THE WITNESS: Okay. I've read it.
BY MR. SCARBOROUGH:
Q. Now the final version of 8.4 has been totally changed from the draft of just the



preceding day, correct?
A. It's been changed. I don't know about totally, but it's been changed.
Q. It's been entirely rewritten, hasn't it, sir?
A. It's been rewritten to -- it doesn't mention the 50 percent or the explanation of what we call the tag-along rights.
Q. Right. The two, the two principal issues that were at play from the September 16th draft and the September 28th draft are entirely different than what they were before?
A. Those two issues that we've talked about, yes, they are.
Q. Okay. And specifically, the tag-along rights have been totally dropped in favor of full, unfettered rights to sue under Guarini, isn't that correct, sir?
A. It appears, yes. They have changed the language from what was, we referred to the tag-along, to drop that out.
Q. And Michigan National now had whatever



rights it had under Guarini to sue?
However it wanted to sue, it could do it?
A. I believe that's what it says, yes.
Q. And with regard to the second point, the prior draft specifically said 50 percent sharing, correct?
A. It did.
Q. That 50 percent sharing reference has been dropped from the final version of the Termination Agreement, isn't that correct?
A. Yes, it has.
Q. And in fact it's been replaced with language that says if MNC and Independence One received any damages or refunds that include the amount that would have accrued to the benefit of the FDIC manager under the Assistance Agreement or that would accrue to the benefit of the FDIC manager under this agreement, then they shall make such payments, et cetera, et cetera?
A. That's -- yes.
Q. That's the language that has taken the



place of the explicit, what had heretofore been an explicit 50 percent sharing requirement, correct?
A. Yes.
Q. First of all, is there any other place in the Termination Agreement that addresses what sharing would apply to a litigated recovery under Guarini?
A. I can't point out one to you today without reading the whole thing.
I don't know.
Q. In your review of this document yesterday with the government, did you identify any other provision of the Termination Agreement that would have governed a covered, a litigated recovery of covered asset losses?
A. I can't remember. I can't recall that we did.
Q. Okay. Sir, when this language in Section 8.4 was changed to drop the tag-along rights and drop the explicit reference to 50 percent sharing in favor of the final language





8bf654b0-6cb4-46b9-923c-b86ab9736545

Page 86

that's here in 8.4, were you present during the negotiations at that time?
A. I don't know. I really doubt -- I was there for several of these long meetings.
Whether that was the exact time that somebody reached this language, I don't know that I was there.
I don't recall it, so --
Q. Okay. So you have no specific recollection of being present when the government and Michigan National agreed on the final language that would go in Section 8.4?
A. Not unless it was that meeting we were there, like I said, late in the evening.
That was the right timeframe, but I don't recall hearing somebody say okay, we're going to change this language to what we have here.
That I do not recall.
Q. And you don't, you don't recall, so first of all, you don't recall whether you were there?

Page 87

A. No.
Q. Okay.
A. I don't remember the dates. I was there a lot of meetings, but I don't remember the specific dates of those meetings.
Q. And you don't recall who proposed the change to this language as you sit here today?
A. I do not.
Q. And you don't recall who proposed the change to the 50 percent, what had heretofore been explicit reference to 50 percent, you don't recall who changed that?
A. I do not.
Q. And you don't recall who changed the language as to the scope of Michigan National's right to sue under Guarini?
A. I do not.
Q. And not only do you not recall who wanted to change those things, you don't recall who drafted it or any other details about this particular section, do you, sir?
A. I do not recall who drafted it or the

Page 88

details of it being drafted.
Q. And you don't recall in fact specifically when this language was even agreed to because it's your recollection as you sit here today that this was one of the earliest issues that was agreed to?
A. The 50 percent sharing was an early issue that was agreed to.
The litigation rights came up and were discussed during the course of the meeting.
My recollection is they were brought up by Michigan National, and -- but early on, if you'll, if I can use the term deal breaker, if we couldn't get to where we got our 50 percent sharing, which was always our belief the intent the agreement, Assistance Agreement was, then this was not going to happen.
Q. Isn't it the case, sir, that representatives of Michigan National informed the government that if they had to litigate to recover Guarini damages, that they didn't want to share those at 50 percent because they had to

Page 89

bear the cost and the risk of the litigation and they wanted whatever they could get under whatever agreement they sued under?
A. No. I don't recall that being a condition that they put on us about suing or not.
I don't recall that there was ever a discussion that we were going to get less than 50 percent going forward, the SRLYs, the Guarini recoveries, or anything.
My recollection is we got 50 percent of the benefits.
Q. Between, between September 20th and September 29th, do you have any specific recollection of a discussion with Michigan National representatives about what sharing percentage would apply to a litigated recovery?
A. I do not. Other than 50 percent, I do not have any.
Q. Well, hang on. I'm asking -- I know you have a general recollection that everything was at 50 percent going forward.
A. That's correct.





8bf654b0-6cb4-46b9-923c-b86ab9736545

Page 90

Q. But I'm talking about the timeframe from September 20th to September 29th.
In that last nine-day period, do you have any recollection about any discussion about having any discussion with Michigan National representatives about what sharing rate would apply to a litigated recovery under Guarini?
A. I do not have any recollection of that.
(Plaintiff's counsel conferred.)
BY MR. SCARBOROUGH:
Q. Sir, you a minute ago testified that 50 percent sharing going forward was a deal breaker issue, correct?
A. I believe it was, yes.
Q. So can you explain to me why the language that explicitly said 50 percent as of the September 28th draft was changed to drop that as of the final version of the Termination Agreement?
A. I cannot explain that. I don't know why it was dropped.
Q. But it was dropped?

Page 91

A. What it says here is what it says. It doesn't have the 50 percent in here.
I don't know why they took that out, but there was never any understanding on my part that it was anything but 50 percent.
I'm absolute on that.
(Plaintiff's counsel conferred.)
BY MR. SCARBOROUGH:
Q. Sir, when you saw that the 50 percent language was taken out of Section 8.4 in the final Termination Agreement, did you ever go and ask anybody why that language was dropped?
A. I did not.
(Plaintiff's counsel conferred.)
BY MR. SCARBOROUGH:
Q. So in the final version of Section 8.4, it no longer refers to 50 percent specifically?
A. That's correct.
Q. So where in this section does it specifically require Michigan National to share 50 percent?
A. I don't see the 50 percent number in

Page 92

there. It's not.
My understanding of th agreement, all the negotiations and that, that starting in '95 going forward, we will get 50 percent.
That's the best I can do on that.
Q. Okay, and I know, we know that the 50 percent number specifically has come out?
A. Yes, we do.
Q. Okay. And you just testified that when you read the final version of 8.4, you didn't go and ask anybody why it had come out at that time?
A. I did not.
Q. Okay. So is it your testimony, sir, that there's some language in Section 8.4 that still requires 50 percent sharing here?
A. My testimony is that we had, my understanding of the agreement was we would always get 50 percent going forward.
Q. I understand, but we're going by the final agreement that's set forth in here.
You've told me first of all, that there's no other provision in this, in the

Page 93

Termination Agreement that would govern what sharing should apply to a litigated recovery under Guarini, correct?
A. To the best of my knowledge, that's correct, yes.
Q. Okay. So we're focused then on Section 8.4 and what it requires.
And prior drafts of Section 8.4 specifically said 50 percent, right?
A. Yes, they did.
Q. The final draft does not say 50 percent, correct?
A. That's correct.
Q. So where in Section 8.4, if anywhere, does it set forth your understanding that we had to share, that Michigan National had to share at 50 percent?
A. I can't say it's in 8.4. My understanding came from the negotiations we had been in and all this, through this period of time that we would get the 50 percent going forward. From '95 going forward, we would get it.

And that's what, where my understanding came from.

Q. But you don't have any specific recollection of any discussion to that nature between September 20th and September 29th?

A. I don't have any recollection that the 50 percent number was ever to change.

That I don't recall.

(Plaintiff's counsel conferred.)

BY MR. SCARBOROUGH:

Q. So just, just so we're clear because we'll be back at trial, you know, in a few months in front of the judge, but just so we're clear and have common ground, as you sit here today, based on your review of the Termination Agreement with counsel yesterday and then briefly today, can you identify any, any other provision in this Termination Agreement that would require 50 percent sharing for a litigated recovery under Guarini?

A. I can't point out anything to you.

Q. And 8.4 itself does not specifically



require 50 percent sharing here, either?

A. It's not -- yeah, it does not.

Q. Okay.

(Plaintiff's counsel conferred.)

BY MR. SCARBOROUGH:

Q. Mr. Lower, do you have any recollection of having conversations with government representatives, in particular Mr. Meyer, about his view about the likelihood that Michigan National would succeed in any Guarini litigation?

A. I do not recall having any conversations like that with Mr. Meyer.

Q. Do you have, did you have an understanding about how Mister, Mr. Meyer viewed the likelihood that Michigan National would succeed if it litigated under Guarini?

A. No. I don't know if he had an opinion on that, and if he did, what it was.

I don't know.

Q. If Mr. Meyer told representatives of Michigan National that they could have the right to sue under Guarini, but that their lawsuit had



a snowball's chance in hell of succeeding, were you, first of all, were you present when that was said?

A. If it was said, I don't recall being present when it was said.

Q. And as you sit here today, you don't recall whether that was consistent with his understanding of the likelihood of success of these Guarini claims?

A. No. I don't recall that that was his position or his thoughts on what, whether they would be successful.

To us, this thing was more of a litigation-type matter as opposed to what we were concerned with, the tax-sharing aspects.

Q. And the litigation-type matters you wouldn't have focused on or concerned yourself with because that wouldn't have been your bailiwick?

A. Yeah. And it wouldn't have changed what we were interested.

Whether it was litigation progressively



done by Michigan National or tag-along, somebody else had done it and now they had a right to this, what we would get was the same for the FRF Tax Unit, which was our, our focus.

We would get half of whatever these numbers were.

That's where we really focused because that was what our job was, the FRF fund and the recovery of tax benefits.

Q. Were you ever present in a meeting with Mr. Meyer in which, just with the government representatives there in which Mr. Meyer said something in substance, even if it's not these exact words, you know, don't worry about it, if the government, if they win their Guarini lawsuit, we can always go to the judge and ask him to reform the sharing formula under the Assistance Agreement?

A. No, I don't recall being in a meeting where that was said.

Q. So if, if he said that, you, you either don't recall it or you weren't there at that

meeting?
A. Yeah, one or the other. I don't -- that to me. I would have thought I would have remembered it, but I don't recall him saying that.
Q. And it's clear to you, sir, as you sit here today, that the sharing formula under the Assistance Agreement was not ever reformed, correct?
A. It was not reformed because the agreement to go forward at 50 percent, we didn't need to change that path because we had solved the issue by agreeing to the 50 percent sharing thing.
Q. It was mooted, in other words?
A. Yeah. It wasn't necessary. The path to get there we changed by just agreeing in the negotiations to get the 50 percent, so there was no need to change the formula or reformulate it or whatever, because we had agreed to the sharing provision.
Q. I know you keep coming back to this we



agreed to get the 50 percent.
A. Right.
Q. Will you agree with me, sir, that there is no provision in the Termination Agreement that sets out an overarching 50 percent sharing rate?
A. Well, not having read the whole thing recently, if I can go to 8.4 here, there is no 50 percent in that.
Q. Okay.
A. I would agree with that.
Q. Essentially the Termination Agreement addressed things on an issue-by-issue basis, correct?
A. Yes.
Q. And some issues were resolved requiring a certain percentage like 50 percent, correct?
A. Yes.
Q. And some issues were resolved using a different sharing percentage, correct?
A. I recall -- I mean you're talking just about tax benefits if I understand?
Q. Well, I'm talking about that



principally this Termination Agreement deals with a lot of different things, and it deals with SRLY NOLs, right?
A. Yes, it does.
Q. It deals with all sorts of indemnifications, correct?
A. Yes.
Q. There could be indemnifications relating to subsidiaries?
There could be indemnifications relating to SYLYs?
A. Okay. I follow, yes.
Q. There could be indemnifications relating to other tax benefit items?
MR. MIZOGUCHI: Objection. If you're going to ask him about a specific item, why don't you refer to the item?
Otherwise you're calling for speculation when you ask could be.
BY MR. SCARBOROUGH:
Q. Sir, do you recall that there are indemnifications, there are a variety of



indemnifications?
A. Yes.
Q. Correct?
A. Various items not specifically related to just the Tax Unit that we've talked about, yes.
Q. And not all of those indemnifications required 50 percent sharing, correct, or used a 50 percent sharing ratio?
A. I don't really know. I would have only been involved with the tax side, I mean those things, but there were different things.
I think at one time, there was a, we got a hundred percent benefits from indemnifications and such.
But my understanding of the agreement, this was to take care of most, if not all the tax issues except the SYLYs and any recoverance based on the Guarini.
Q. And well, hang on, because we know that the SRLY NOLs, going forward, there was an agreement that they would be shared at





8bf654b0-6cb4-46b9-923c-b86ab9736545

50 percent?
A. Yes.
Q. Right. And if you look at the final version of the Termination Agreement, I believe that's set forth in Sections 2.5(a) and (b)?
I'll give you a page number here. If you look at pages 13 and 14?
(The witness reviewed the document.)
BY MR. SCARBOROUGH:
Q. Do you see Subsection (a) deals with federal SRLY payments?
A. Yes.
Q. And Subsection (b) on page 14 deals with state SRLY payments?
A. Yes.
Q. And they both specify that they are, there is going to be a 50 percent sharing rate that applies?
A. Yes.
Q. Correct?
A. Yes.
Q. And to the best of your knowledge, sir,



that was agreed on up front, correct?
A. Yes.
Q. And language in 2.5 did not substantively change from the earliest draft to the final executed version, correct?
It was always --
A. Fifty percent.
Q. At 50 percent?
A. I believe that's correct.
Q. And that's consistent with your recollection?
A. It is.
Q. Now covered asset losses recovered through litigation, those are different than SRLY NOLs, correct?
A. Yes.
Q. And that's why Section 2.5(a), Section 2.5(b), that those don't apply to the particular circumstance that we're dealing with here today, which are covered asset losses recovered through litigation?
MR. MIZOGUCHI: Objection.



BY MR. SCARBOROUGH:
Q. Correct?
A. To me, we are here today about tax benefits.
If that's agreed on, the SYLYs are all at 50 percent.
Q. Right, but let me, let's go back just so we're clear.
SRLY, the SRLY NOLs are not covered asset losses or covered asset loss deductions, correct?
Those are two separate things?
A. Yeah. The SYLYs are ones that were attached, I believe the way it worked, to the old institution, and they had to be used against their profits.
Q. Right. And those were losses that existed prior to the date of acquisition, correct?
A. Yes.
Q. And so 2.5(a) or (b) or any other part of 2.5 which deals with SYLYs or SRLY NOLs would



not govern the sharing that should apply to covered asset loss deductions recovered through litigation, correct?
A. Well, they're two different items. Whether the 50 percent, to me, the 50 percent SYLYs and the recoveries are the same, but there are different items, and I agree that there's no, seems to be no conflict about the sharing SYLYs at 50 percent.
Q. Okay. And there's no specific reference in 2.5 to covered asset losses, correct?
A. Yes, that's correct.
Q. And that's consistent with the fact that covered asset losses are different than SRLY NOLs, right?
A. Yes.
Q. Let's look, let me direct your attention to -- give me just a minute to find it.
(There was a pause in the proceedings.)
BY MR. SCARBOROUGH:
Q. Page 32, which is 2.6 (f), Subsection





8bf654b0-6cb4-46b9-923c-b86ab9736545

Page 106

(vi), V, little I, VI, Roman Numeral VI.
Are you there? Okay. If you look at the bottom of the page, it starts out Independence One payment?
A. Yep.
Q. If you read there, and then the top of the following page, it says (A) or (B)?
A. Yes.
Q. Okay. So it says under (A) if either an action of the IRS or Congress permanently increases other tax benefit items, or (B), an action of the FDIC manager or Office of Inspector General permanently increases other tax benefit items, then in either of those two situations, Michigan National has to pay an amount that works out to 50 percent, correct?
A. Yes.
Q. Because when you see that 17 and a half percent, that's 50 percent of the corporate tax rate of 35 percent, correct?
A. Yes.
Q. So first of all, it's consistent with

Page 107

your recollection, isn't it, sir, that covered asset losses were included as another, as other tax benefit items?
Do you recall that?
A. I'm not sure what you mean by other. Covered asset losses are a specific item of tax benefits. I agree with that.
Q. Let me direct your attention to page 28, which is the beginning of Subsection (f), 2.6(f).
A. Okay.
Q. And do you see there it says other tax benefit items under (i)?
A. Yes.
Q. And if you look under the list of items there, the second item listed as a, as another tax benefit item is covered asset losses, correct?
A. Yes.
Q. So covered asset losses are defined -- excuse me -- other tax benefit items are defined to include, among other things, covered asset

Page 108

losses, okay?
Now going back to page 33, which deals with Independence One payments, okay, if the IRS or Congress personally increased other tax benefit items or, i.e., covered asset lawsuits, or the FDIC did something to increase them such as by getting the legislation repealed, Michigan National had, would have had to share the recovery at 50 percent, correct.
A. I believe yes.
Q. Okay. Now this section does not apply to a litigated recovery of Guarini losses, correct, sir?
A. I, I can't say that is correct because it's, an action of the IRS or the U.S. Congress, to me, Congress did the Guarini thing, and it just follows through that if somebody didn't like it, they challenged them, that that follows suit with the covered asset losses, and I believe that would, would be a covered asset loss.
Q. Sir, do you have any recollection about how this language was drafted, that it was

Page 109

drafted to explicitly carve out litigation recoveries?
A. I do not.
Q. If it was in fact drafted to carve out litigation recoveries, you just would have no recollection about that?
A. Yeah. I don't recollect it. I do not.
Q. And is it possible, sir, that you would not have even had any involvement in that drafting because this wouldn't have been an issue that you were focused on?
A. It's possible. I would, I would have thought that I, or I do think I would have been involved, at least if the sharing items were going to change, I would have been involved.
The legal phraseology of it in that, I may not have been involved in.
(Plaintiff's counsel conferred.)
BY MR. SCARBOROUGH:
Q. Sir, in this Subsection (vi) that begins on page 32 and crosses over into 33, can you point to any place in this language where it





8bf654b0-6cb4-46b9-923c-b86ab9736545

Page 110

addresses what sharing rate should apply to litigation instituted by Michigan National to recover its Guarini claims?

(The witness reviewed the document.)

THE WITNESS: No. Other than the 17 and a half percent which was, as you mentioned, half the corporate tax rate, I do not see anything that specifically addresses litigated recoveries.

MR. SCARBOROUGH: Why don't we take a quick break?

THE VIDEOGRAPHER: Going off the record, the time is 10:59:22.

(A recess was taken.)

THE VIDEOGRAPHER: Going back on the record, the time is 11:03:20.

BY MR. SCARBOROUGH:

Q. Mr. Lower, I know from what you've testified to earlier this morning that you firmly believe and hope that there would be 50 percent sharing across the board going forward in the future.

Page 111

A. I firmly believe, not hope. I honestly believe that there was no question about it, 50 percent going forward.

Q. Right, and you made that perfectly clear.

A. Yes. That's my honest belief, with no questions about it.

Q. I understand that, and I'm not going to change you from that belief.

What I just want to make sure we're clear on is is there any language in the Termination Agreement that was finally agreed to that specifically sets forth 50 percent sharing for litigated recovery under Guarini? And if there is --

MR. MIZOGUCHI: Objection -- asked and answered.

BY MR. SCARBOROUGH:

Q. If there is, please tell me right now where it is.

A. I do not know that there is any specific section that clarifies the 50 percent

Page 112

for recovered Guarini, litigation recoveries from the Guarini litigation.

Q. And I think we'll just call it at that. Thank you for your time, and I appreciate you coming today.

A. Thank you.

MR. MIZOGUCHI: I have no questions.

THE VIDEOGRAPHER: This concludes today's videotaped deposition of Stephan Lower.

Going off the record, the time is 11:04:55.

(Whereupon, at 11:05 a.m., the taking of the instant deposition ceased.)

____________________
STEPHAN J. LOWER

SUBSCRIBED AND SWORN to before me this_________ day of__________________, 2006

____________________
NOTARY PUBLIC

My commission expires:

Page 113

CERTIFICATE OF NOTARY PUBLIC

I, Catherine S. Boyd, the Notary Public before whom the proceeding occurred, pages 1 through 112, do hereby certify that the witness was duly sworn, that the testimony of said witness was taken by me and thereafter reduced to this typewritten transcript under my supervision, that said transcript is a true record of the testimony given by said witness, that I am neither counsel for, related to, nor employed by any of the parties to the proceeding, and further, that I am not a relative or an employee of any attorney or counsel employed by the parties thereto, or financially or otherwise interested in the outcome of the proceeding, or any action involved therewith.

Witness my signature and seal:

CATHERINE S. BOYD
Notary Public in and for
The District of Columbia
My commission expires: September 14, 2007





8bf654b0-6cb4-46b9-923c-b86ab9736545