IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - -x

NATIONAL AUSTRALIA BANK, :

Plaintiff, :

vs. : No. 99-690C

UNITED STATES OF AMERICA, : (Senior Judge Bruggink)

Defendant. :

\- - - - - - - - - - - - - - -x

Washington, D.C.

Thursday, November 16, 2006

Deposition of LARS VIITALA, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the District of Columbia, taken at the offices of the United States Department of Justice, 1100 L Street, N.W., Washington, D.C. 20530, at 9:03 a.m., Thursday, November 16, 2006, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.



92c4f126-d0df-4b39-8ceb-460e5c5bd3e3

APPEARANCES:
On behalf of the Plaintiff:
RYAN T. SCARBOROUGH, ESQ.
PAUL MARTIN WOLFF, ESQ.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202)434-5173

On behalf of the Defendant:
JEFFERY T. INFELISE, ESQ.
BRIAN A. MIZOGUCHI, ESQ.
SCOTT D. AUSTIN, ESQ.
Trial Attorneys
Commercial Litigation Branch
United States Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202)307-0282

--Continued--



APPEARANCES: (Continued)
On behalf of the Defendant: (Continued)
THOMAS BAHLO, ESQ.
Counsel, Legal Division
Federal Deposit Insurance Corporation
3501 Fairfax Drive, Room D-7120
Arlington, Virginia 22226
(703)562-2388

ALSO PRESENT:
ELLEN HEBERT
Videographer



CONTENTS


| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFF | DEFENDANT |
|---|---|---|
| LARS VIITALA | | |
| By Mr. Scarborough | 6 | |
| By Mr. Infelise | | 142 |
| By Mr. Scarborough | 150 | |

EXHIBITS

| VIITALA EXHIBIT NO. | | PAGE NO. |
|---|---|---|
| 1 | Draft Termination Agreement dtd 9/16/94 | 74 |
| 2 | Executive Summary Memorandum | 85 |
| 3 | Draft Termination Agreement dtd 9/28/94 | 98 |
| 4 | Termination Agreement | 109 |




PROCEEDINGS

THE VIDEOGRAPHER: This is the video deposition of Lars Viitala taken by counsel for the Plaintiff in the matter of National Australia Bank versus United States of America in the United States Court of Federal Claims, Case No. 99-690C held in the offices of the Department of Justice at 1100 L Street, Northwest, Washington, D.C. on this date, Thursday, November 16th, 2006, at the time indicated on the video screen, 9:03 a.m.

My name is Ellen Hebert. I am the legal video specialist.

The court reporter is Kathy Boyd. We're employed by Alderson Reporting.

Counsel will now introduce themselves and the parties they represent, after which the court reporter will administer the oath to the witness.

MR. SCARBOROUGH: My name is Ryan Scarborough.

I represent National Australia Bank,

Page 6

and I'm with Williams & Connolly.
MR. WOLFF: I'm Paul Wolff with Williams & Connolly, and also representing the Plaintiff.
MR. INFELISE: And I'm Jeffery Infelise representing the United States, and with me is Tom Bahlo from the FDIC.
MR. SCARBOROUGH: Would you swear the witness?
Whereupon,
LARS VIITALA,
was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:
EXAMINATION BY COUNSEL FOR PLAINTIFF
BY MR. SCARBOROUGH:
Q. Good morning, Mr. Viitala.
A. Good morning.
Q. Am I pronouncing your last name correctly?
A. Yes. It's "Vee-tah-lah."
Q. "Vee-tah-lah," okay. You know we're

Page 7

here to discuss the issues relating to the Termination Agreement and the sharing of covered asset loss deductions with regard to Michigan National, between Michigan National and the government?
A. Yes.
Q. Okay. And you're familiar with the terminology we're going to be using today such as Guarini claims, Section 13224, MNB, MNC, those sorts of terms?
A. Correct.
Q. Okay. Sir, I'd like to just start by getting a little bit of your background.
I've read your declaration, and you lay it out in there somewhat, but can you give me just a quick overview from college up to the present about your, starting with your education and moving into your employment?
A. I did undergraduate studies at St. Joseph's College in Maine.
I received a Bachelor of Science with a concentration in accounting, and also at the same

Page 8

time, met the requirements for a Bachelor of Arts with a major in mathematics. That was graduation in 1987.
In 1988, I graduated from the University of North Carolina at Chapel Hill with a Masters Degree in accounting, and after I graduated, I had a temporary job until I was hired by the FSLIC in August of 1988 as a tax accountant.
Q. Okay. And at the time you were hired by FSLIC as a tax accountant, were you working on Assistance Agreements at that time?
A. I, I reviewed selected parts of agreements for languages, the tax sections.
I was primarily working on -- once an acquisition occurred, most agreements required that there was an initial audit to determine the negative net worth of the institution.
I was working at setting that up and with the Inspector General's office, ran the audit, but we would have some correspondence with them to assign it to the appropriate case manager

Page 9

and begin the process.
Q. At what point did you start working for Stephen Lower or Stephan Lower?
A. Steve came to the tax section I think in September '91, that timeframe.
Q. So you had worked -- who were you reporting to prior to that time?
A. I reported to Ken Bobik, B-o-b-i-k, and Joan Spirtas, S-p-i-r-t-a-s, from '88 through '91 when Steve took over the head of the tax area.
Q. Okay. And then in that timeframe and up until Steve started, after Steve started, you were also still working on the initial audit?
A. No. I only worked on the initial audits from the time I was hired until probably December of '88.
Q. Okay. And then what kind of responsibilities did you have after that?
A. Immediately in December '88 through probably February, I was heavily involved in the Congressional reporting required by Congress or requested by the FSLIC, 1988 FSLIC transactions.

Page 10

and I was working on estimating the, the tax benefits that were expected to flow from those transactions.
Q. Okay.
A. After about February, that's when I began my duties as reviewing the Assistance Agreements and acquirer's tax returns to determine the appropriate amount of tax sharing underneath those respective agreements, and at the same time, I would also, when an initial audit was initially completed or a draft of it, I would review that as well.
Q. So it's safe to say that you didn't have any involvement in negotiating the original Assistance Agreement between Michigan National and the government?
A. Correct.
Q. But I'm aware from documents that subsequent to entering into that Assistance Agreement, you were involved in overseeing the implementation of the Assistance Agreement from the tax side?

Page 11

A. That's correct. I also had review of their initial audit as well.
Q. Okay. And the person that you principally worked with at Michigan National or communicated with at Michigan National was Ernie Antczak, isn't that true?
A. That's correct.
Q. Do you know who Larry Gladchun is?
A. I do.
Q. And who is he?
A. He -- I'm not sure his position. I think he was, he may have been chief counsel for Michigan National. I'm not sure bank or corporation, but he was their inside counsel.
Q. Okay. And during the time prior to negotiating the Termination Agreement, did you have any regular interaction with Mr. Gladchun, or was it principally Ernie Antczak?
A. It was principally Ernie Antczak and a small amount with Tim Orians, who reported to Ernie Antczak.
Q. Okay. Sir, you stayed at the FDIC up

Page 12

until I believe 1999?
A. That's like November or December of '99, correct.
Q. At some point from the time you were just describing in the early nineties when you were involved with initial audits and then the tax side of implementing the Assistance Agreements, did your responsibilities change?
A. There was -- well, I always had those responsibilities.
The initial audits went away once, very probably around 1991 or two.
Q. Okay.
A. The tax area, I always stayed on cases I was assigned to, responsible for.
I did pick up additional duties when some of these transactions were to be negotiated for an early termination.
Q. So you then had a role in those terminations?
A. Yes.
Q. How many Assistance Agreements were you

Page 13

overseeing, prior to the time we get to trying to terminate them, but how many Assistance Agreements were you involved in overseeing from the tax side of things?
A. Well, there was a shuffling. We had people coming and going, and I was probably responsible for about 45 at a time.
Q. And was the agreement with Michigan National one of the 45?
A. Yes.
Q. Okay. Then we get into the Termination Agreement time period, you pick up responsibilities with that. Let's skip over that.
After we sort of get through the Termination Agreement time period, so sort of mid to late nineties, would that be correct?
A. Yes.
Q. What were your roles in that timeframe working for FDIC?
A. With regard to Michigan National, or any --

Q. Just generally.
A. The roles continued. I was working, still my primary duties were monitoring tax benefits in cases that I was assigned to or that were assigned to me, and if one of those cases had termination negotiations, I would be involved in those.
And that was primarily it.
Q. Did that take you up through the time you left the government service?
A. Yes.
Q. And when in 1999 did you leave the government?
A. I believe it was either November 3rd or December 3rd. I think December 3rd.
Q. Right before the, right before the turn of the century?
A. That's correct.
Q. Okay. If you were involved in about 45 cases give or take on the Assistance Agreement side, what you --
A. At one time; I probably have been



involved in almost every single 1988 transaction at one point in time.
Q. And the number of that, is that approximately 45?
A. No. That would be 110.
Q. Okay. So you had your, you touched probably all of the '88 deals, which are about 110, but you had more direct role with about 45 of them, is that a fair way to put it?
A. No. The 45 was in the timeframe from about 1988 through '90, '91.
As people left, I would pick up Assistance Agreements.
Also in that time, some Assistance Agreements were only a three-year term or five-year term.
Those would have been retired, and when an individual left the tax department, I might pick up that person's case load.
Q. I understand. Okay. When it came time to enter into Termination Agreements, how many different Termination Agreements, ballpark



figure, were you involved in negotiating or --
A. Do you mean I played an active role, or just a very small role?
Q. Just any, any role at this point where you, you know, you sat in at some point because it was your case, you were there.
A. Twenty-five perhaps.
Q. Okay.
A. And that's all of them. Some of them, I would just have a very, very small role, and it wasn't, for example, might not have been my case, but they wanted to have another person look at something or an aspect of it, or the person was on some type of leave when a meeting came up and I would sit in as a substitute.
Q. Now your role in the, just speaking generally still, not about Michigan National specifically, but your role generally with regard to these negotiations that were terminating Assistance Agreements, it was focused on the tax benefit side, correct?
A. Yes.



Q. So you, you wouldn't necessarily have come in and had overall responsibility for leading those teams?
Your responsibility would have been on, you know, calculating out tax benefits and working out sort of on a, not to be derogatory, but on a mechanistic level how it should work, is that correct?
A. Well, there are some agreements where we did not terminate the tax provisions.
We negotiated a settlement if there were disputes, and clarified language.
Q. Okay.
A. And that was another role in the tax aspect of the transactions that I'd work on.
Q. Okay, but coming back to my original question, was your principal role in these termination, in the overall Termination Agreement negotiations sort of focused on the mechanics of making sure that, you know, whatever agreement was reached with regard to tax benefits was properly set forth and recorded in that, in the

document?
A. Yes.
Q. Okay.
(Plaintiff's counsel conferred.)
BY MR. SCARBOROUGH:
Q. Let's go forward to 1999 when you left the government.
You left around the end of 1999 you said?
A. Correct.
Q. Why did you leave the government at that time?
A. I wanted to move back to where I grew up and be closer to my family.
Q. That was Maine?
A. Correct.
Q. And did you -- what kind of job did you take after you left the FDIC?
A. I went to a regional accounting firm.
Q. Okay. And what was that, what was that accounting firm?
A. The name?



Q. Yes.
A. Berry, Dunn, McNeil & Parker.
Q. And what did you do for them?
A. I was in their tax department, and I was a, I worked during tax season on primarily individual tax returns reviewing and/or preparing some complex returns, and then during, after April, I would work on corporate clients either in the banking area or they introduced me to a new area for nursing homes.
MR. WOLFF: You better spell -- Berry with an A or E?
THE WITNESS: B-e-r-r-y.
(Comments were made off the record.)
BY MR. SCARBOROUGH:
Q. How long did you work at that regional accounting firm?
A. About two years.
Q. So that takes it from 2000 to some time in 2002?
A. Actually, I think it was the, like December of 2001. I worked there all of, I



started in December of 2000, and I left in December of 2001.
Q. When you said -- you mean December of '99?
A. Excuse me -- December of 1999.
Q. Okay. So you were there pretty much a full two years?
A. Yes.
Q. What did you do after you left that accounting firm?
A. Let me add one thing, my other duties I did.
I also, when I was at the accounting firm, I brought with me two contracts with the government.
Q. Okay.
A. The first one, I was heavily involved in litigation with, for the FDIC against Pulte and First Heights Bank.
Q. Pulte is P-u-l-t-e; First Heights.
A. That was a, a contract dispute regarding tax benefits.



Q. Okay. And that, that was a Guarini case, right?
A. Well, what I was working on was not a Guarini case.
Q. Was that the litigation that was going on in Michigan at the time?
A. That is correct. That case started around 1996 or five, and it was not resolved until probably 2001.
Q. Okay. When did you enter into that contract with the FDIC?
A. I did not enter into a contract. The accounting firm entered into a contract with the FDIC.
Q. Okay. You said you brought with you when you left the government two contracts?
A. Right.
Q. So the actual, the actual signatory on the contract was your employer, the accounting firm?
A. That's correct.
Q. Was it just you who was working on it?

Page 22

Were there other people at your accounting firm who also --
A. It was -- I probably did 95 percent of the work. I, I delegated to lower staff some simple tasks to do.
Q. Okay. Prior to the time that you left the government, were you involved in, in assisting the FDIC with regard to that Pulte litigation?
A. I was. I pretty much focused on that for nearly two years or at least a year.
Q. And that was a year or two before you left the government?
A. That was probably '97, and '98 was the most likely the heaviest part of it.
After that, there was an appeal time period which my duties were limited for a fair amount.
Q. So your duties, while you were at the FDIC and involved in that litigation, expanded to include working on that litigation?
A. Yes, because I was the tax accountant

Page 23

assigned on that case.
The case was a tax dispute, and I became the, perhaps a, an expert witness, but I wasn't because I was an employee, they didn't designate me as an expert witness, and also in that case, I was designated as I think a 30(b)(6) witness.
Q. Okay. You're not a lawyer, are you?
A. No, I'm not.
Q. That's impressive that you even remember that term.
A. So that's why I had so much time in the litigation, because I was, I was the main focus on the FDIC side as the person working on the case.
Q. Would it be fair to say that during that concentrated year or two that you were working on that case and it was active, that most of your other responsibilities relating to overseeing Assistance Agreements and everything generally kind of fell by the wayside or didn't really require much of your attention?

Page 24

A. The time I put into those other cases was limited to probably 15 percent of my time, so also at that point in time, there was, the numbers were being reduced as well, so I probably didn't have a case load of 45 cases in that time period.
It probably dropped down to 30 or so, and some of them were not as active as others.
Q. Okay. Now you mentioned that you brought with you two contracts.
What was the second?
A. Well, I need to clarify that. I didn't bring with me two contracts.
One, I was at the accounting firm when we picked up a second consulting contract, and that was with the Department of Justice.
Q. So the first contract was with the FDIC?
A. Yes.
Q. Okay. And then the second one was with the DOJ?
A. Correct.

Page 25

Q. Any particular branch of the Department of Justice?
A. Civil litigation.
Q. Okay. And what was, what was the nature of that contract?
A. I came down I'm thinking around June of 2000 or the summer of 2000 to, to indicate my firm's desire or interest to get involved in these transactions or this litigation case, for the Guarini, the Guarini cases.
Q. Okay. So this was the contract relating to involvement with the Guarini litigation?
A. That's correct.
Q. Okay. Was it entered, I take it it was entered into around that summer of 2000 then?
A. I believe so.
Q. Was it again with your employer, not with, not you directly in name, but through your employer?
A. Correct.
Q. But you were the one who actually





92c4f126-d0df-4b39-8ceb-460e5c5bd3e3

Page 26

brought in the business so to speak?
A. Yes, that's correct.
Q. Okay. Was it a similar situation to that first contract where you were doing 95 percent of the work on the contract and delegating sort of the minor 5 percent, but it was principally you?
A. I would say probably did a hundred percent of that work there.
Q. Okay. So that was all you?
A. Yes.
Q. Did these contracts sort of supplant the other roles or responsibilities you had for the accounting firm relating to individual tax accounts or corporate tax accounts?
A. Unfortunately, not.
Q. You would have preferred that they did I take it?
A. Yes. I worked a lot of overtime during non-tax season.
Q. You left that accounting firm in December of 2001?

Page 27

A. Correct.
(Plaintiff's counsel conferred.)
BY MR. SCARBOROUGH:
Q. You left the, you left the accounting firm in December of 2001, correct?
A. Correct.
Q. Now when you left, did those contracts stay with the accounting firm, or did they come with you?
A. I think maybe technically they were terminated with the accounting firm, and I entered into perhaps new contracts with those, for those two agencies.
Q. Okay. So before we get into the new contracts to talk about them, let's wrap up with regard to the first two contracts that you had, okay?
A. I think, I think I need to add a third contract.
Q. Okay.
A. I had a second contract with the FDIC regarding the duties I worked on when I was at

Page 28

the FDIC administrative tax sharing agreements.
Q. And that's relating to the Assistance Agreements or Termination Agreements that were in place at this time?
A. Correct.
Q. Okay. So those are the three. Are there more contracts prior to the time you left the accounting firm that you recall?
A. I don't recall right now. If I do recall, I'll let you know.
Q. Okay. And all three of those contracts I take it are through your accounting firm, Berry, Dunn, McNeil & Parker?
A. That is correct.
Q. At that time -- okay. So let's talk about the first contract that related to the Pulte litigation, okay?
A. Okay.
Q. What were the, what were the general terms of that contract?
A. What do you mean by terms?
Q. Well, first of all, what was the

Page 29

payment or rate that was set out in the contract?
A. I think I, my billing rate I think was $175.00 an hour.
Q. Okay. So was this a contract that was based on sort of the hourly provision of services?
A. Yes.
Q. There was no up-front fee?
A. No, there wasn't.
Q. Was there any sort of lump sum fee associated with this first contract?
A. None that I'm aware of.
Q. Okay. I know you don't have it in front of you right now, but the life of this contract, was it a two-year contract since you were at the accounting firm for those two years?
A. I think it was an open-ended contract.
Q. Okay.
A. As long as the work was needed.
Q. Okay.
A. And it was terminated with the accounting firm upon my departure from the





92c4f126-d0df-4b39-8ceb-460e5c5bd3e3

Page 30

accounting firm.
Q. Okay. And that again was a contract that was entered into shortly after you started at the accounting firm?
A. I actually think the contract was in place before I got to the accounting firm.
Q. Okay.
A. Because that was in the middle of litigation, and they wanted to ensure that they had my employer engaged when I arrived.
Q. Okay. Can you give me a sense of the total amount that was billed to the government and paid by the FDIC under that contract?
A. During the two-year period of time?
Q. Yes.
A. I would -- this is going to be a, just a guess, but around 20,000, 25,000.
Q. Okay. So in that ballpark?
A. Yes.
Q. Okay. And what exactly did they have you do under that contract for that Pulte litigation?

Page 31

A. At this point, the case had gone to the appellate courts.
I was attending some settlement conferences at the court in I think Ohio.
I was reviewing language that we were at that time also having settlement discussions.
I would review briefs. I would provide calculations for the tax provisions or the tax aspects of the case.
Q. So this was -- and you said this was the, principally the appeal stage?
A. I believe the, the original, the lower court decision came out I think in '99, perhaps late '98, and then this was the appeals stage.
Q. Did you give editorial input at times to the various briefs that were being written?
A. Yes.
Q. And when did that Pulte case wrap up?
A. I think there was a settlement in June of 2001.
Q. And was that it? Was that the, at that time, did that pretty much end your involvement

Page 32

with that contract, with that case?
A. It, it ended the contract with that case.
I had future involvement with the case.
Q. Are you referring to the fact that there was a separate case brought by Pulte known as First Heights?
A. No.
Q. In the Court of Claims?
A. No, I'm not.
Q. Okay. What was your future involvement?
A. The settlement agreement that we had reached stated that we resolved the tax benefits, but left open a provision that if Pulte had an audit, then there could be future work on that.
They could, if they had benefits that they had paid us in the settlement that ultimately were disallowed, they could make a claim for those disallowed benefits.
Q. So essentially adjustments to what the numbers were at the time?

Page 33

A. Yes.
Q. And so did your work on that continue through the end of 2001?
A. Can I speak to my lawyer for a second? There may be --
Q. Sure.
(The witness conferred with counsel.)
THE WITNESS: I'm not sure I can discuss another taxpayer's tax situation, so --
BY MR. SCARBOROUGH:
Q. So the issue related to another taxpayer's tax situation?
A. That's correct.
Q. That's fine. Let me move to the second contract just for a minute here.
This is the one with DOJ relating to civil litigation.
A. Okay.
Q. What were the, what was -- was this also based on an hourly provision of services?
A. Yes, it was.
Q. What was the rate that you charged the

Page 34

Department of Justice under that contract?
A. 175.
Q. Okay. Was it also, this was also a contract that went from June of 2000 up until the time you left, correct?
A. Correct.
Q. And did, and that related to the Guarini litigation?
A. And also Winstar.
Q. And Winstar, okay. How much were you paid over that roughly year and a half timeframe under the, under that contract?
A. You mean my accounting firm?
Q. I apologize. How much was paid under the contract to the accounting firm?
A. I would guess 20 to 25 thousand again.
Q. Okay. And the nature of your, of the services that you provided, you said you did a hundred percent of the work on that?
A. Yes.
Q. Was it similar to what you described for the first contract with Pulte?

Page 35

A. No.
Q. Tell me the nature of the services you provided.
A. One of the cases, the Winstar cases, I hired to be an expert witness.
Q. Okay.
A. And then the other case --
Q. Tell me what that case was first, if you remember.
A. I think American Federal of South Carolina.
Q. Okay. And then you were going to say there was a --
A. Then the other cases were the Guarini cases in which I, my role was a consultant.
Q. Did they, did that contract specifically spell out what Guarini cases you would be working on?
A. No, I don't recall it did.
Q. Did it list the Michigan National or National Australia Bank case as a, specifically as one you'd be working on?

Page 36

A. I don't think it did.
Q. Was it understood that you would be working on, on the Michigan National and NAB case, among others?
A. I think the contract provided that on any case they needed assistance, they could contact me.
Q. Did it turn out during that timeframe that they contacted you for assistance with regard to the Michigan National/NAB Guarini case?
A. I don't think so.
Q. Okay. What were the Guarini cases that you specifically recall working on during that timeframe from June of 2000 to when you left in 2001?
A. Centex.
Q. Okay.
A. First Nationwide, and maybe Local America I think.
Q. Let's talk about the third contract. This is one you said you have with the FDIC about the administrative role of tax sharing?

Page 37

A. Yes.
Q. Was it the same terms, $175.00 an hour on an as-needed basis?
A. Yes.
Q. And what was the total amount that was billed to the FDIC by your company at that time, your employer?
A. Five to ten thousand.
Q. Okay.
A. I think I may have overstated the amount under the Department of Justice contract.
I think that probably also was, now that I think about it, during that timeframe was probably in the $10,000 range as well.
Q. Okay. Before you said 20 to 25. You think it's closer to ten?
A. I think so.
Q. Okay. Why did you leave your, the accounting firm?
A. I had so much work I could do on my own with these three contracts that instead of working so many hours a week, I could cut back

and just work solely on these three cases and not be involved with the other client work.
Q. Okay. So from, essentially from 2002 to the present, have you been self-employed?
A. Yes.
Q. Have you, has your -- do you have your own company, or how do you --
A. No.
Q. Structure your business arrangement?
A. I'm a sole practitioner. I'm not incorporated.
Q. Okay. So you work just directly with, enter directly into contracts with the government?
A. And I have other clients as well.
Q. Okay.
A. Individual clients and small business clients.
Q. Okay. Are those other individual clients and small business clients relating to sort of the more typical accounting work that might be done such as, you know, individual tax



returns or corporate tax returns?
A. Yes. It's probably 90 percent tax clients, tax work.
Q. Okay. Now how many contracts when you, after you left the regional accounting firm, how many contracts did you yourself enter into with the government?
A. Two.
Q. Okay. And have those two -- did you enter into them shortly after you left that accounting firm?
A. Yes.
Q. Have those two contracts been in existence from that time in 2002 up until today?
A. Yes, although the FDIC contract needs to be renewed. It's not open ended. It's a term contract which has to be either renewed or a new contract issued.
Q. Okay. So you have one contract with the FDIC and one with the Department of Justice?
A. Yes.
Q. Okay. Do they both relate to assisting



with the Guarini litigation?
A. No.
Q. Okay. The one with the Department of Justice does, correct?
A. Yes, and also if there was a Winstar case, I could assist on a Winstar case.
Q. Over the timeframe from 2002 until today, have you ever assisted on a Winstar case?
A. Yes.
Q. Okay. What does the FDIC contract call for?
A. Administration of the tax provisions of any remaining Assistance Agreements and/or Termination Agreements.
Q. Okay.
A. And any other tax consultation they want or think they need or --
Q. Okay. What are your hourly rates that you charge under those contracts, and have they changed over time?
A. I don't think they have changed over time.



With the Department of Justice, it is $175.00 an hour.
Q. Okay.
A. And with the FDIC, it is $200.00 an hour.
Q. And those are the rates that you agreed to back in 2002?
A. I believe so.
Q. And those are still the rates that you're charging them today?
A. Correct.
Q. Okay. Incidentally, are you being paid for your time here today?
A. No, I'm not.
Q. Okay. Did you meet with the government, any of its representatives to prepare for today's deposition?
A. Yes.
Q. When did you meet with them?
A. Yesterday.
Q. Did you meet with them to prepare for today's deposition any other time other than

yesterday?
A. No.
Q. Okay. Did you charge for your time yesterday?
A. No, I did not.
Q. Okay. When did you come in? Did you fly in yesterday or --
A. Yes.
Q. Fly in the evening before?
A. Yesterday.
Q. Okay. How much time did you spend yesterday with the government?
A. About three hours.
Q. Okay. Prior to coming here, had they sent you any documents to review to help, just to help get ready for the deposition?
A. No, they did not.
Q. When you met with them yesterday after that, for that three hours or so, did they show you any documents to help you prepare for today's deposition?
A. Yes.



Q. What documents did you see?
A. They provided an Assistance Agreement, which I don't think I looked at; the Termination Agreement.
Q. The final version of it?
A. That's correct, the executed Termination Agreement.
Q. Okay.
A. My declaration, a memo that Jim Meyer had written for approval of the negotiated transaction, settlement transaction.
Q. Was that the September 20th?
A. Yes.
Q. Okay.
A. And two drafts of the Termination Agreement.
Q. What were the dates of those drafts?
A. I think the 28th of September and perhaps the 17th of September.
Q. Maybe the 16th?
A. Maybe.
Q. Somewhere around that timeframe; do you



remember it being before the September 20th Meyer memo?
A. Yes.
Q. Prior to the time, prior to yesterday when you looked at the Termination Agreement and the draft, let's start with the drafts.
Prior to looking at those drafts yesterday, do you recall seeing those drafts at any time prior to or since the negotiations concluded with Michigan National about the Termination Agreement?
A. Yes.
Q. The drafts?
A. Yes.
Q. Okay. When had you looked at those drafts?
A. I was provided drafts in my role as a consultant.
Q. At what point in time?
A. Two or three months ago.
Q. Okay. So not specifically in connection with preparing for today's deposition,



but just generally in your role as a consultant?
A. Correct.
Q. Okay. Were those two drafts provided, those two drafts were provided to you at that time?
A. And additional drafts as well.
Q. Okay. How many additional drafts were provided to you?
A. Six or so.
Q. Okay.
A. All limited to the month of September.
Q. Okay. What were the dates of those drafts to the extent that you can recall them?
A. September 1st, maybe the 8th or 10th.
Q. Okay.
A. Sixteenth, 17th, and then I think probably one for the 27th, 28th, 29th or 26th, 27th, 28th, through that range.
Q. Okay. Do you have a specific recollection about a draft dated the 27th? Because I'm only aware of drafts after September 20th that are dated either the 28th or

Page 46

the 29th.
A. I don't recall.
Q. Okay. Let's go back to your contracts for a minute that you have with the FDIC and Department of Justice.
Maybe it will be easier, is it easier to break it down on a yearly basis about how much you have billed under those contracts, or is it easier to get just one overall number?
A. No. It's probably better annually.
Q. Okay. Let's start with the contract that you have with the FDIC.
How much did you bill the government and get paid in 2002?
A. Thirty thousand.
Q. Okay. What about 2003?
A. Probably about the same, 30, 40 thousand.
Q. Okay. And 2004?
A. Again, probably around 40,000.
Q. Okay. And 2005?
A. Probably 40, 40,000 again.

Page 47

Q. Okay. And to this point in 2006, we're not quite through the entire year, but up through this point, how much have you either billed or been paid?
A. Thirty thousand, 35,000.
Q. Okay. Let's do the Department of Justice contract.
A. Okay.
Q. Same order -- starting in 2002, how much would you have billed under that contract?
A. A hundred and ten thousand -- all these numbers include travel reimbursement as well.
Q. Okay.
A. And during the earlier years, I did a lot more traveling.
Q. Okay. So 110,000 for 2002?
A. Yes.
Q. Okay.
A. Well, maybe make 130,000.
Q. Okay; 2003?
A. Again, probably about the same, 130,000.

Page 48

Q. Okay; 2004?
A. Probably 75,000.
Q. 2005?
A. Fifty thousand.
Q. And for the first eleven and a half months of this year?
A. Seventy-five hundred.
(Plaintiff's counsel conferred.)
MR. SCARBOROUGH:
Q. So since you left, since you left the accounting firm and you've gone out on your own, what percentage of your total income has come from your work with the government, either the FDIC or Department of Justice?
THE VIDEOGRAPHER: Do you want to go off the record?
MR. INFELISE: Yes, please.
THE VIDEOGRAPHER: Going off the record, the time is 9:45:37.
(Government counsel conferred.)
THE VIDEOGRAPHER: Going back on the record, the time is 9:46:38.

Page 49

MR. INFELISE: We would object to asking Mr. Viitala now a percentage of his income that's derived from these contracts because you already have established the amount of that income.
Putting those two numbers together and the amount of his income from the contracts and the percentage, you can derive information on his personal income, which I don't think is relevant.
MR. SCARBOROUGH: Well, it goes directly to bias.
If a hundred percent of his income is coming from contracts with the government, we need to know that.
If it's not, then that's fine. I'm not interested in what, how much money he makes overall.
MR. INFELISE: But you've already gone through the amount exact amounts he received.
Now you're asking for --
MR. SCARBOROUGH: Forty thousand dollars a year to a millionaire means nothing;





92c4f126-d0df-4b39-8ceb-460e5c5bd3e3

Page 50

$40,000 a year to somebody who only makes $40,000 a year means everything.
MR. INFELISE: Then the question seems, if you were interested in that should have been the percentage of income derived from it, not the exact amounts.
MR. SCARBOROUGH: Are you instructing him not to answer? Because if you do, we're going to move to strike him as a witness because this goes directly to bias and his credibility.
MR. INFELISE: We're noting the objection for the record.
You may answer the question.
BY MR. SCARBOROUGH:
Q. Sir, I'm not trying to find out precisely how much you're making. I don't want to know what sort of pensions you have, annuities, anything like that.
What I want to know is as a percentage of your earned income over the past, either on a yearly basis or over the past four years, whatever you prefer, what, what percentage does

Page 51

your work for the government, specifically the FDIC and the Department of Justice, comprise out of the total earned income that you have in that time period?
A. By saying earned income, are you specifically excluding stock transactions, interest, dividends, of that nature?
Q. Sure.
A. Those types of items?
Q. Sure. That's fine.
A. Between these two contracts?
Q. Well, these two, yeah, the total of these two contracts.
A. And whatever other tax services --
Q. Whatever.
A. I provide for my clients?
Q. Let's not talk over each other. These two contracts compared to what other earned income you might have in, in the same timeframe, what percentage would these comprise?
A. Ninety to 95 percent.
Q. Okay. And if you, and weighing the

Page 52

two, the FDIC and the Department of Justice contracts, it appears at least in the early years that you billed more to the Department of Justice contract than the FDIC one?
A. Yes.
Q. Now some of the work that you've done under these contracts relates to Michigan National and National Australia Bank, correct?
A. Correct.
Q. What percentage of the amounts that you have billed relate specifically to this case?
A. Can you clarify that? Can you repeat the question and --
(Plaintiff's counsel conferred.)
BY MR. SCARBOROUGH:
Q. You said that 90 to 95 percent of your total earned income comes from these two contracts, right?
A. Correct.
Q. What, what percentage of that 90 to 95 percent comes from your work on the Michigan National case or anything relating to Michigan

Page 53

National?
A. Ten to 15 percent.
Q. And has that 10 to 15 percent, that's an average over the past four years, correct?
A. That's the average. That's the percent of the total during that time period.
Q. Okay. That has it been concentrated more heavily in particular years?
A. Yes.
Q. What years, if you recall, was it concentrated most heavily?
A. Probably 2003 and 2004.
Q. Okay.
A. And a fair amount of those items include travel reimbursements, as I had mentioned.
Q. I understand. I know it will be give -- me your best estimate about what the dollar figure is that you would have billed to the government relating to the Michigan National case or anything else relating to the Michigan National.





92c4f126-d0df-4b39-8ceb-460e5c5bd3e3

Page 54

A. Sixty-five thousand.
Q. Okay. I take it that you participated in reviewing some of the briefs that the government has filed in this case?
A. Yes.
Q. Have they sent you copies of the briefs and pleadings, et cetera, throughout the, throughout this case?
A. I've received them. I don't know if I received every single item.
Q. I understand.
A. But I have received briefs.
Q. You would have received summary judgment motions that were filed?
A. Yes, I believe so.
Q. I take it you would have seen drafts of those as well?
A. Yes.
Q. Okay. Same thing would go for the briefs that were filed in the, on the appeal in the Federal Circuit?
You would have seen drafts of the, of

Page 55

the appeal brief?
A. I believe, yes.
Q. You would have received a copy of the final version that was filed?
A. I think so, yes.
Q. The same would apply to the reply briefs that the government filed as well?
A. I think so, yes.
Q. You would have, you gave input into the drafts of those briefs, correct?
A. I don't know that I gave input to drafting it.
I reviewed drafts and maybe made comments, and they may have been very limited comments at times.
Q. But you would have offered editorial suggestions to make sure that what was being stated in there was accurate to the best of your recollection?
A. Yes.
Q. Okay. How about the government's responses in discovery?

Page 56

Specifically, since, in this post-appeal phase, we've served limited interrogatories on the government, and the government served limited interrogatories on us.
First of all, were you involved in helping to draft the government's interrogatories that they served on Michigan National?
A. I don't think I've seen any of those.
Q. Okay. What about the interrogatories that National Australia bank received on the government?
Were you involved in responding to those?
A. I don't believe so, no.
Q. Have you seen them ever?
A. Are they recent?
Q. Yes. They would be within the past few weeks?
A. No, I haven't.
Q. Okay. So you wouldn't have been involved in drafting those?
A. No.

Page 57

Q. Okay. Prior discovery responses before the appeal and the original trial court phase, would you have had involvement in drafting the responses to those?
A. Interrogatories?
Q. Yes.
A. I don't think so.
Q. Okay. We met and had depositions of Mr. Meyer two days ago, Mr. Lower yesterday.
Are you're familiar with both those gentlemen, right?
A. Yes.
Q. Have you spoken to them since their deposition?
A. Mr. Lower, I have.
Q. Okay.
A. I have not Mr. Meyer.
Q. And did you talk to him yesterday?
A. Yes.
Q. After his deposition finished?
A. Yes.
Q. Was it anything more than a casual hi,

Page 58

how are you doing conversation?
Did you discuss the substance of his deposition testimony?
A. No. We went out to dinner last night.
Q. Was it purely social?
A. Yes.
Q. Okay. I take it you guys have a, since you worked for him at one point, you have a friendship at this point?
A. We do, and we also share some tax clients.
Q. So have you maintained contact with him over the years since you left the FDIC separate and apart from this litigation?
A. Absolutely.
Q. Okay. Have you maintained contact with Mr. Meyer?
A. No, I haven't.
Q. Okay. In speaking with them, it's very clear that negotiations to terminate Michigan National's Assistance Agreement went in starts and stops?

Page 59

That's consistent with your recollection, isn't it?
A. Yes.
Q. And there were several efforts that took place in '92, '93, but never really amounted to much, correct?
A. Yes.
Q. And really we get into the serious negotiations some time around the summer of 1994, is that correct?
A. Yes.
Q. Okay. So I want to focus you right now on that timeframe in July and August of 1994, okay?
A. Okay.
(Plaintiff's counsel conferred.)
BY MR. SCARBOROUGH:
Q. So I want you to focus on this timeframe in July and August of 1994, okay?
A. Okay.
Q. And that's, that's consistent with your recollection that most of the heated, serious

Page 60

discussions about what the terms were going to be were taking place in that timeframe, correct?
A. Yeah, and I think there were even maybe some in June as well.
Q. Okay, but in this timeframe, in the summer of '94?
A. Correct.
Q. Okay. On the government side, Mr. Meyer told us that he was the chief negotiator for the government team.
That's consistent with your recollection, right?
A. The overall negotiator on certain issues; somebody else might have been the lead negotiator.
Q. So you're saying that Mr. Meyer was not the lead negotiator overall?
A. He was overall, yes, but on specific issues, somebody else might have taken the lead.
Q. With his blessing?
A. Yes.
Q. Okay. So just so we understand, from

Page 61

the government's standpoint, Mr. Meyer's leading the team?
He might delegate a particular issue to somebody underneath him, but he's the guy who maintains control, correct?
A. Yes.
Q. Okay. Who else on the government side was involved in negotiating the terms that would ultimately wind up in the Termination Agreement?
A. There was Mike Duhl.
Q. Okay.
A. Who was outside counsel.
Q. Okay.
A. I had involvement. Steve Lower had some involvement.
Q. Okay.
A. And there may have been, for non-tax issues, there may have been somebody else.
Maybe Jim took that or he might have requested input from the case manager on this specific issue.
Q. Okay.





92c4f126-d0df-4b39-8ceb-460e5c5bd

Page 62

A. But I, I don't think that person attended negotiations.
Q. Okay. Let's set the scene first of all then for the government, or for the Michigan National side of it.
Who -- let me ask it this way. You dealt with Ernie Antczak.
Was he involved in the, was he involved in negotiating these terms?
A. Yes, he was involved in negotiating the terms.
Q. Okay. Larry Gladchun was involved, too, wasn't he?
A. Yes, on some issues.
Q. Well, you say some issues. He was the lead, lead guy for Michigan National in terms of the day-to-day supervision of these negotiations, wasn't he?
A. I'm not sure. I don't know if I'd put it that way.
At some point, he might have been. At other points, Joe Whiteside was there, and I had

Page 63

the feeling that he might have been the lead negotiator based on his ranking in the organization.
Q. Joe Whiteside was the CFO of Michigan National at the time?
A. I think so.
Q. Okay, but Joe was not involved in, in -- he was not there at every meeting, was he?
A. I don't think so, no.
Q. He came and went?
A. Yes.
Q. He focused on certain issues, but not necessarily, he wasn't there necessarily on a day-to-day basis, was he?
A. I don't think so.
Q. Okay. Larry Gladchun was there on a day-to-day basis, wasn't he?
A. I think for the most part, yes.
Q. Okay. He may not have, you know, he may also have delegated certain issues to somebody like Ernie Antczak, but he was the guy who was there on a day-to-day basis, right?

Page 64

A. Yes.
Q. Okay. And so if on Michigan National's, from Michigan -- excuse me -- from Michigan National's standpoint, if they believed that Larry Gladchun was the guy who was running the show, running the negotiations on a day-to-day basis, you don't have any reason to disagree with that based on your involvement in the negotiations?
MR. INFELISE: Objection. Calls for speculation.
You can answer.
THE WITNESS: I didn't really recall him being like a lead negotiator, but he may have been.
He may just have done a lot of delegating.
BY MR. SCARBOROUGH:
Q. Okay. Now in that summer timeframe, the parties reached a handshake agreement, tentative agreement on a number of different issues, correct?

Page 65

A. Yes.
Q. Okay. Most of those issues were resolved fairly quickly once the serious negotiations began during that summer, correct?
There were some back and forth, but ultimately the parties reached a common understanding?
A. Yes.
Q. Okay. Now you recall, don't you, sir, that the government was insisting that Michigan National give up its rights to sue under Guarini?
A. I'm not sure it was, you know, if you don't give up your Guarini claim, that we can have no discussions.
I don't think it was a, that issue. I think we tried to get them to give it up, but I'm not sure it was the end of all the negotiations.
Q. Isn't it the case, sir, that during that timeframe, in the summer and fall, in the summer of 1994, that representatives of the government told Michigan National that it was a deal breaker if they insisted on maintaining

their right to sue under Guarini?
A. I don't recall that.
Q. You don't recall that being a deal breaker issue?
A. No.
Q. You don't recall that being framed in that way to Michigan National?
A. No.
Q. But you do recall that the government pressured Michigan National to give up its rights to sue under Guarini, don't you?
A. I don't know about pressure, but we tried to negotiate them to give their rights up.
Q. Well, isn't -- when you negotiate, don't you try to pressure the other side into, into yielding to your position?
A. Well, I mean that was our goal, but it, it wasn't the end of the negotiations if we couldn't establish that goal.
Q. I understand you don't remember it being a deal breaker issue.
Have you seen documents that refer to



it as being a deal breaker issue?
A. No. I don't recall any.
Q. If there are documents that describe it as a deal breaker issue, would those documents be more reliable than your recollection?
A. Possibly.
Q. Okay. Now you don't like the word pressure.
What word would you use or how would you describe the way the government went about trying to get Michigan National to give up its Guarini rights?
A. I don't recall much about that issue, so I'm not sure what happened on that.
I'm not sure I had much involvement in that.
It may have been a higher-level negotiation.
Q. And that would be consistent with the fact that Mr. Meyer was sort of the chief guy for the government side, correct, the lead negotiator?



A. Yes.
Q. And he would have been engaging in, in these sorts of discussions potentially?
A. Possibly, yes.
Q. Okay. And your role, your role was more focused on the tax side, implementing whatever agreements were reached with regard to tax sharing?
Would that be a fair way of characterizing it?
A. Well, I certainly did not have involvement in non-tax issues.
Q. Okay.
A. So I was involved in providing calculations and estimates and discussions of the tax sharing provisions and how we'd like to see them resolved and settled.
Q. Okay.
(Plaintiff's counsel conferred.)
BY MR. SCARBOROUGH:
Q. Sir, there were a number of meetings that the government had on its side not involving



Michigan National, but just caucusing on its own correct?
A. Yes.
Q. Were you present at some of those meetings?
A. Yes.
Q. Were you present at all of those meetings?
A. Not if they involved non-tax issues, I most probably wasn't.
Q. So were you present at any meeting or at any time when Mr. Meyer said that one of the goals, in words or substance, that one of the goals was to get Michigan National to give up its rights to sue under Guarini?
A. I think what I recall is with regard to suing the FDIC, that was a goal, that we wanted them to give up, if they believed they had a right to sue the FDIC over the Guarini issue, that we got them to drop that issue.
Q. Isn't that, isn't it the case, sir, that that issue came up on the last day in the

last hours before the Termination Agreement was signed?
A. Giving up the right to sue the FDIC?
Q. Yes, that, that Mr. Meyer on that, in that day on that timeframe, Mr. Meyer said fine, you can sue, but you just can't sue the FDIC?
Isn't it true that that issue about the FDIC only came up at the very end?
A. I don't know.
Q. Okay. So let me come back around to my question.
Other than your recollection of some discussion about not suing the FDIC, were you present at any time when Mr. Meyer would have said that one of the goals, in wording or substantial, one of the goals was to get Michigan National to give up its rights to sue under Guarini?
A. I think so. If we could attain that outcome, that would have been desirable.
Q. Okay. And tell me when that meeting occurred or when, when it was, what you remember



about it.
A. I can't recall when, when it was.
Q. Okay, but you do recall Mr. Meyer taking the position that it would be desirable to get Michigan National to give up its rights to sue, correct?
A. If we could get that outcome, yes, that was what we'd like to obtain.
Q. And do you recall that being limited just to give up its rights to sue the FDIC, or more generally, give up its rights to sue anybody at all relating to Guarini?
A. Our primary goal probably would have been to give up the right to sue the FDIC, and if we could go beyond that, we would like that outcome as well.
Q. And do you remember him saying that, or is that just --
A. That's general recollection.
(Plaintiff's counsel conferred.)
BY MR. SCARBOROUGH:
Q. Now that was the government's position



generally, that they wanted Michigan National to give up its rights to sue, correct?
A. I think so.
Q. Okay. Michigan National was adamant they weren't going to give up their rights to sue, right?
A. I think that's right.
Q. In fact they, they insisted for a long time that they didn't want to give up, that they wanted full, unfettered rights to sue whoever they wanted to sue to recover whatever they could, whatever they were entitled to recover, isn't that correct?
A. I think that's right.
Q. Okay. Now you've reviewed drafts of the Termination Agreements you said?
A. Yes.
Q. You reviewed you mentioned a September 1st draft as one of drafts that was sent to you two or three months back?
A. Yes.
Q. And then you mentioned some other



drafts, including one on the 16th, one on the 28th, 29th, and those timeframes?
A. Yes.
Q. Okay. Now what -- you know that the government in those early drafts still insisted that Michigan National give up its rights to sue or at least not have a full, unfettered right to sue, isn't that true?
A. Well, at the very least, if they sued, we didn't want our, the FDIC share of benefits involved in the suit, or there would be sharing if there was.
Q. Don't you recall, sir, that the government put forward, tried to put forward a position to pressure Michigan National into giving up its Guarini rights, that they tried to offer Michigan National only tag-along rights?
A. Can you describe what you mean by tag-along rights?
Q. Do you recall the term -- I will, but do you recall the term tag-along being used at any point during the negotiations for the

Page 74

Termination Agreement?
A. No.
Q. If that term was used at the time -- well, strike that.
You recognize, don't you, sir, that Section 8.4 of the Termination Agreement deals with Section 13224 claims?
A. Yes.
Q. Okay. Those were the Guarini claims that are involved in this litigation here?
A. Yes.
Q. Okay. Are you familiar with the fact that early drafts of the Termination Agreement did not provide full, unfettered rights to sue under Guarini early drafts of 8.4?
A. Yes.
MR. SCARBOROUGH: Okay. Let me mark as Exhibit No. 1 the September 16th draft of the Termination Agreement.
I believe your counsel already has a copy of that.
(Viitala Exhibit No. 1

Page 75

was marked for identification.)
BY MR. SCARBOROUGH:
Q. And ask you to take a look at that.
A. Any particular --
Q. I will direct you. Don't worry. You see in the upper right-hand corner, it's dated September 16th, '94?
A. Yes.
Q. And it's got the word draft there?
A. Yes.
Q. Okay. Let me point out to you as well that underlying phrase at the top there, this draft is subject to further review and revision by MNC and the FDIC.
A. I see that.
Q. Okay. So at this point in time, we don't have a final executed agreement, but this draft represents the current state of the negotiations as they exist, correct?
A. For the most part, there could be, the party that drafted this may have suggested

Page 76

language for a provision they would elect to have had implemented, and it may not have been yet agreed upon.
Q. Right, at least in terms not -- everything in here is not necessarily, there's not a meeting of the minds in terms of everything that's in here at this point in time?
A. That's correct.
Q. Because otherwise they could sign it and it would be done?
A. Yes.
Q. Most of the substantive terms over which there were serious discussions were negotiated in the summer of '94, June, July, and August, correct?
A. Yes.
Q. Okay. And so then when you get into the September 1st draft and the subsequent drafts leading up to the final version on the 29th, what the parties are trying to do is to reduce the agreement that they have reached in principle into a written format that accurately

Page 77

characterizes and captures what they have agreed to, correct?
A. Yes.
Q. Okay. So at this point, other than any particular issues that may be outstanding, and we'll get to that in a minute, their focus is on trying to reduce the agreement into writing and the negotiations, the back and forth about how best to accomplish that?
A. Yeah. I think there may have been some issues that were, as you had mentioned, were still being negotiated and, and that would have been reflected at this point in time.
Q. Okay. Let me ask you to turn to, in this draft, to Section 8.4, and I will give you a specific page number to assist.
MR. INFELISE: Page 48.
BY MR. SCARBOROUGH:
Q. Yeah, page 48, and I'd like you to read Section 8.4 which begins tax matters, to yourself, and then I'm going to ask you some questions about it.





92c4f126-d0df-4b39-8ceb-460e5c5bd3e3

Page 78

(The witness reviewed the document.)
BY MR. SCARBOROUGH:
Q. Have you read that?
A. Yes. I have.
Q. Okay. Now Section 8.4 is entitled tax matters, correct?
A. Yes.
Q. Now you earlier had asked me, you earlier had indicated that you did not have an understanding of what the term tag-along meant in this context?
A. Yes.
Q. After reading Section 8.4, you understand what I mean when I say tag-along to refer to rights that Michigan National would have not to initiate its own lawsuit, but if somebody else succeeded in recovering Guarini losses or damages or covered asset losses, then and only then Michigan National would have the right to also try to recover those?
A. Yes.
Q. Okay. And that's what I refer to as

Page 79

tag-along, okay?
A. Okay.
Q. But you don't remember that term being used at the time?
A. Not today I don't, no.
Q. Okay. Now this provision does not give Michigan National full and unfettered right to sue, correct?
A. That's correct.
Q. It gives them tag-along rights?
A. Yes.
Q. Okay. And it specifically requires, it specifically would require Michigan National to share any litigated recovery at 50 percent, correct?
A. Yes.
Q. And that 50 percent is spelled out at the end of Section 8.4 when it says pay 50 percent and specifically puts into parentheses the numbers 50 percent?
A. Yes.
Q. Correct?

Page 80

A. Correct.
Q. Okay. Now, sir, there's a footnote at the top of Section 8.4, Footnote No. 2.
Do you see that?
A. Yes, I do.
Q. Okay. And that refers down to the footnote at the bottom of the page which says this section is being revised, correct?
A. Yes.
Q. Okay. Isn't it the case, sir, that Michigan National refused to accept tag-along rights and 50 percent sharing, that this provision was not acceptable to Michigan National?
(The witness reviewed the document.)
THE WITNESS: They were negotiating to, to have further rights, so I, you know, I can't speak on their behalf, but it appears that yes, they wanted further rights.
BY MR. SCARBOROUGH:
Q. Okay. They wanted more than what was in Section 8.4 as it was written on

Page 81

September 16th, correct?
A. I would say yes.
Q. Okay. And that's indicated by the fact that there's that Footnote 2 which says that this section is being revised and essentially it's still under discussion?
A. Yes.
Q. Okay. And consistent with that is the fact that on the cover page to this Termination Agreement, it notes that this draft is subject to further review and revision, correct?
A. Yes.
Q. By both Michigan National and the government?
A. Yes.
Q. Okay. Now 2.5, if you would flip to that at page 11?
Do you see there it deals with SRLY and refund payments?
A. Yes.
Q. Okay. And essentially if you look at this provision, it requires 50 percent sharing





92c4f126-d0df-4b39-8ceb-460e5c5bd3e3

Page 82

for federal SRLY payments.
That's in 2.5 (a), correct?
A. Yes.
Q. And it requires 50 percent sharing for California state SRLY payments, and that's in 2.5(b), correct?
A. Correct.
Q. And that's set forth in the terms of 2.5 as they existed on September 16th, correct?
A. Yes.
Q. And there's no footnote in 2.5(a) or (b) or any other part of 2.5 that indicates that that issue is under discussion at this time, correct?
A. Correct.
Q. And in fact it, in fact it's consistent with your recollection, sir, that one of the earliest issues that was agreed upon as to SRLY payments going forward was they would be shared on a 50 percent basis, correct?
A. Correct.
Q. And that agreement was reflected in the

Page 83

first draft of the Termination Agreement, correct?
A. I don't recall what the first draft was.
Q. Okay. Fair enough. I mean I know you've looked at it, but you don't have it here in front of you today.
It was certainly reflected in this draft dated September 16th which we've just looked at, correct?
A. Correct.
Q. And to the best of your recollection, that same agreement is reflected in the final version of the Termination Agreement in 2.5, correct?
A. Regarding the SRLY NOLs?
Q. Yes.
A. Correct.
(Plaintiff's counsel conferred.)
BY MR. SCARBOROUGH:
Q. So as of the 16th, September 16th, 2.5 was a done deal, correct?

Page 84

A. Yeah, I would say for the most part. I don't recall discussions about it at that point.
Q. Okay. In a moment, we'll get to the final version of the Termination Agreement, but as far as your recollection goes right now, you don't know of any substantive change to 2.5 from the version that existed on September 16th and the final version of September 29th, correct, other than stylistic?
A. I think that's correct, yes.
MR. SCARBOROUGH: We've been going for a while.
I do want to try to finish up relatively early today, but why don't we take a short break and then make a push, and we'll see how we can do.
I'd like to try to wrap up before lunch even if it means we have to take a little bit later lunch.
MR. INFELISE: That would be fine.
THE VIDEOGRAPHER: This marks the end of Tape 1 of the deposition of Lars Viitala.

Page 85

Going off the record, the time is 10:23:14.
(A recess was taken.)
THE VIDEOGRAPHER: This marks the beginning of Tape 2 in the deposition of Lars Viitala.
Going back on the record, the time is 10:31:03.
(Viitala Exhibit No. 2 was marked for identification.)
BY MR. SCARBOROUGH:
Q. Mr. Viitala, I've handed you what's been marked as Viitala Exhibit 2, which is the September 20th, 1994 memorandum from James Meyer.
Do you see that?
A. Yes.
Q. This is one of the documents that counsel for the government showed you yesterday, correct?
A. Correct.
Q. And was this also one of the documents

Page 86

that was sent to you two to three months ago in general, in your general role as a consultant on this case?
A. No.
Q. Okay. Prior to yesterday -- well, strike that.
At the time this memorandum was written on September 20th, or finalized on September 20th, were you involved at all in the drafting, review, editing of this particular document?
A. Yes.
Q. Who did you work with in terms of and what was your role with regard to this document?
A. I would have. I think Jim Meyer would have asked for comments on the draft, and I think I may have drafted a portion of it for him.
Q. Okay. What portion do you think you might have drafted or at least done the first draft of?
A. I think the discussion of the tax provisions or the tax disputes.

Page 87

Q. What pages are we talking about there?
A. Pages 7 -- you don't want the Bates numbers, do you?
Q. No. Just page 7 is fine.
A. Page 7 through 9.
Q. Okay. On page 9, would you have drafted the part that begins reformation of the sharing percentage formula?
A. I don't think so. I may have, but I don't recall that I did.
Q. Okay. In any event, setting aside whether, who drafted the first particular pages or not, you saw this, you saw this overall memo prior to the time it was finalized, correct?
A. Yes.
Q. And you reviewed it to make sure it was accurate at the time?
A. Yes.
Q. And it accurately set forth the government's view of the negotiations as they existed as of this date?
A. Yes.

Page 88

Q. Okay. Now did you see the final version of this memo after it was sent on September 20th?
A. Did I see it in around the 21st or 22nd or --
Q. Was it likely that after this memo was finalized, that you received a copy of it?
A. I may have. I probably had for my files.
Q. Okay.
A. I probably did.
Q. From the time it was finalized and sent up to the committee to I guess the time you, through today, when are the other times that you looked at this, at this September 20th memo?
A. When I wrote my declaration.
Q. And that was back in 2004 I believe?
A. I think so.
Q. Okay. Would you have looked at it at any other time other than when you did your declaration before yesterday?
A. What's the timeframe? Between then and

Page 89

now, or --
Q. At any other time between September 20th, '94 when you would have received a copy for your file and yesterday when the government lawyer showed it to you, is there any time that you saw this in that intervening time?
And you just pointed out that you saw it at the time you did your declaration.
A. I think I would have seen it in a discovery phase as well, 2002, three timeframe. I think I would have seen it at that point in time.
Q. Okay. Let me ask you to first of all, turn to page 9.
Do you see there it says reformation of the sharing percentage formula?
A. Yes.
Q. As of September 20th, the government was aware that there was a flaw in the Assistance Agreement sharing formula, correct?
A. Correct.
Q. And in fact, the government was aware

Page 90

of that flaw long before the September 20th, '94 memo?
A. Yes.
Q. In fact, this flaw was brought to the government's attention by Michigan National back in 1991 or 1992, correct?
A. I think '91, yes.
Q. Okay. Both sides prior to entering into the Termination Agreement recognized that the Assistance Agreement sharing formula did not function the way it was contemplated prior to the time the Assistance Agreement was executed, correct?
A. Correct.
Q. Now this memo, if you'd turn to page 22, discusses Michigan National's rights under Section 13224, its Guarini rights, correct?
If you look at the bottom of the page?
A. Yes.
Q. And in fact, at the bottom of the page, Mr. Meyer notes in this memo that Michigan National has agreed not to initiate a lawsuit

Page 91

against the federal government due to Guarini, correct?
A. Yes.
Q. So as of this date, September 20th, it's the government's view that Michigan National is going to give up its right to sue?
A. Yes.
Q. Now Michigan National wasn't willing to give up its right to sue as of this time, but this was the government's view, correct?
MR. INFELISE: Objection -- mischaracterization of the document.
BY MR. SCARBOROUGH:
Q. I'm asking your recollection, sir. As of September 20th, the government's view was that Michigan National was going to give up its right to sue, correct?
A. That's right.
Q. Michigan National's view, though, was that it didn't want to give up current termination rights to sue under Guarini and that it wanted full, unfettered rights to get whatever

Page 92

it could if it brought suit, correct?
A. Around this time, yes. I can't tell you if it was the day before or the day after, but yes.
Q. But generally around this time, Michigan National was insisting on full rights and to recover whatever it could recover?
A. Yes.
Q. Okay. Now let me turn -- and for that reason, if you'd turn to page 20 and 21, you see at the bottom of page 20 and going over to the top of page 21, it refers to settlement of tax benefit sharing obligations?
A. Yes.
Q. If you'd read that to yourself and just stop at the end of the first paragraph at the top of page 21?
(The witness reviewed the document.)
BY MR. SCARBOROUGH:
Q. Did you read that?
A. Not yet.
Q. I'm sorry.

Page 93

(The witness reviewed the document.)
THE WITNESS: Okay.
BY MR. SCARBOROUGH:
Q. Do you see at the top of page 21, it specifically refers to the fact that settlement of the remaining tax benefit sharing obligations moots the issue of reforming the formula in the agreement that determines when tax benefit sharing shifts from 25 to 50 percent?
A. I see that sentence, yes.
Q. I read that correctly?
A. I believe, yes.
Q. Okay. And in fact that's consistent with your understanding that that, the flawed sharing formula in the Assistance Agreement was not reformed, correct?
A. The written language was not reformed, but in arriving at our settlement, the concept of the correction of the formula was reformed.
Q. And your settlement is what is set forth in the Termination Agreement, correct?
A. Yes.

Page 94

Q. And we'll focus on the Termination Agreement final provisions momentarily, but the actual rewriting of the formula that was in the Assistance Agreement, that never happened, correct?
A. That's correct. It was not rewritten.
Q. And it was recognized that there was a flaw long before the September 20th memo, correct?
A. Yes.
Q. And it was pointed out again in the September 20th memo?
A. Yes.
Q. And it was understood after the September 20th memo leading up to the date that the Termination Agreement was finalized on the 29th that there was a flaw in the Assistance Agreement sharing formula, correct?
A. Yes, and that, and that flaw was corrected in the negotiation of the tax benefit sharing values.
Q. Right. And that tax benefit sharing is

Page 95

what's set forth in the Termination Agreement that was signed by the parties on September 29th, correct?
A. Yes.
Q. Okay. Now it wasn't, the flaw in the sharing formula wasn't something -- strike that.
Let's move to the timeframe from September 20th until September 29th when the final Termination Agreement was executed.
A. Okay. Can I put this aside?
Q. Yes, you may. Now as of September 20th or right around that time, Michigan National had made it clear that the way Section 8.4 was then drafted only to give it tag-along rights and 50 percent, specifically 50 percent sharing, Michigan National made it clear that this was unacceptable, correct?
A. Well, they wanted to be able to pursue this litigation if they wanted to.
Q. That's right. Now from the September 16th draft until the final version on September 29th, there were, other than the

Page 96

Guarini issue, Section 13224, there were no other changes of substance that were made to the Termination Agreement, to the deal that the parties had struck, isn't that correct, sir?
(There was a pause in the proceedings.)
THE WITNESS: I don't know that I recall any.
BY MR. SCARBOROUGH:
Q. Okay. There may have been stylistic changes. Obviously there were a couple of more drafts between the 16th and the final version on the 29th, but you don't recall any changes of substance other than those that dealt with Michigan National's rights under Guarini?
A. I don't recall any, but if I looked at the agreement, I don't know if I would see any or not.
I don't recall any.
Q. You were provided with a number of drafts of the agreement over time from September 1st leading up to September 29th, correct?

Page 97

A. Yes.
Q. And you reviewed those?
A. Correct.
Q. Prior to coming here today?
A. Briefly, yes.
Q. Okay.
A. I didn't spend a lot of time reviewing those.
Q. I understand, but based on your review of those, limited as it was, and based on your recollection sitting here today, you don't recall any changes of substance from the 16th until the 29th other than those that may have been done to deal with Michigan National's Guarini rights?
A. Well, I'm not sure of the dates. There was a provision that was removed, and it may be it was prior to the 16th, that dealt with I think the SRLY AMT NOLs of Beverly Hills and whether or not there was a payment required on behalf of that because there was some dispute with the availability of those on current tax returns with the IRS.

And I know at one point in time, there was an issue regarding that.
It may have been resolved before the 16th.
I'm not sure if it was or was not.
Q. Okay. I don't know sitting here today whether it was before the 16thth or after. I think it was before, but I can't represent that to you.
Other than that change, you don't, sitting here today, you don't recall any others that may have occurred, if any?
A. No. No, I can't.
Q. Okay.
(Viitala Exhibit No. 3 was marked for identification.)
BY MR. SCARBOROUGH:
Q. I'm handing you what's been marked as Viitala Exhibit No. 3.
It's the September 28th draft of the Termination Agreement.



Is this also one, this is also one that you would have received prior to today, correct?
A. Yes.
Q. And now if I could ask you to turn to page 56 -- actually, I apologize.
If I could ask you to turn to page 54, do you see that's Section 8.4?
A. Yes.
Q. What's the title of that section?
A. Tax matters.
Q. Okay. And if you look down at Subsection (b), why don't you take a, why don't you read that to yourself?
(The witness reviewed the document.)
THE WITNESS: Okay.
BY MR. SCARBOROUGH:
Q. Sir, that Section 8.4 which discusses Michigan National's rights to sue under Guarini, that section is the same as the version that we looked at on September 16th, correct?
A. Yes.
Q. It still gives, it still would provide



Michigan National tag-along rights only?
A. Yes.
Q. And it specifically would have required 50 percent sharing of any recoveries through litigation, correct?
A. Well, not just litigation -- if they could file an amended return.
It's not a limitation to litigation.
Q. Okay. So as of this time, if Michigan National is able to recover covered asset losses in any way, whether it's litigation or in any other fashion, it specifically requires 50 percent sharing, correct?
A. Yes.
Q. And that 50 percent is still spelled out like it was on the September 16th draft, correct?
A. Yes.
Q. Now if you look at the footnote at the top of Section 8.4, it says Footnote 2, correct?
A. Yes, it does.
Q. And that says to be discussed, correct?



A. Yes.
Q. Now you knew at that time that Michigan National still was not willing to accept the terms of Section 8.4, correct?
A. Yes. They wanted to negotiate a different resolution.
Q. And in fact, the negotiation of that different resolution occurred over the last two days before the Termination Agreement was finalized on the 28th and the 29th, correct?
A. Yes.
Q. Were you there on the 28th and 29th?
A. Yes.
Q. For the negotiations?
A. Yes.
Q. Who else was there for the government?
A. Jim Meyer, Steve Lower, Mike Duhl, myself, and I think on occasions, we would have somebody from the FDIC legal staff there who would be there for making changes to the document.
Q. Okay.

Page 102

A. And that would have either been Les Crawford, but probably more likely it would have been -- I'm trying to remember the woman's name now.
Q. Janet Norcom?
A. Yes.
Q. Who was there from the, from the Michigan National side over those last couple of days?
A. Ernie Antczak, Larry Gladshun was there for the most part, although he did step out for a while.
Tom Dwyer; and I don't recall if Joe Whiteside was there or not, but he may have been.
I don't think I recall any other people there.
Q. Now Larry Gladchun, he stepped out to have dinner on the final night for a few hours, didn't he?
A. I don't know where he stepped out to. They could not locate him, and there was a little, we found it a little, little humorous

Page 103

that they were having trouble tracking him down.
Q. He was somebody --
A. They were concerned where he was at.
Q. Okay. And it's consistent with your recollection, isn't it, sir, that he stepped out the evening of the 29th?
A. What day of the week was the 29th?
Q. Well, forgetting what day of the week it was, that in the last evening --
A. I think it was the last evening.
Q. On the day the agreement was signed, that last evening, he stepped out, and as you said, you guys, nobody could find him, nobody knew where he was?
A. He was gone for about a couple hours I would guess.
Q. Okay. He went out to dinner?
A. I don't know, but he went out.
Q. Other than that time when he stepped out and nobody really could figure out where he was, he generally was there throughout those last couple days of negotiations, correct?

Page 104

A. I believe, yes.
Q. Okay. Ernie was, too?
A. Yes.
Q. Now were you, were you there pretty much from the beginning to the very bitter end of those two days?
A. I believe I was, yes.
Q. Would you have stepped out at any time and not been a part of the discussions, or would you have been present for all the substantive discussions?
A. I believe I would have been there for everything.
Q. Now the parties during those last couple days were not always meeting together, correct?
A. Correct. We would caucus. Each side would caucus and discuss the other side's presentation or proposal, and we would discuss how we wanted to see if we could proceed and what we would counterpropose.
Q. And probably the central focus of those

Page 105

last couple days, the last hours in particular, was what Michigan National's rights would be under Guarini, correct?
A. That was a big focus. There was also general cleaning up and wordsmithing of the rest of the agreement, but yeah, that was probably the substantive discussion.
Q. Right. And when you say cleaning up, wordsmithing, you're referring to stylistic changes to implement what the parties had already agreed to?
It was just a matter of reducing it to writing, correct?
A. Right, making minor modifications to the way it was written, and --
Q. Okay. Now but with regard to Section 8.4 and Michigan National's rights under Guarini, there was still no agreement those last, in those last couple days, in the last hours up until the very end when it was finally resolved, correct?
A. I believe that's correct.
Q. And part of the issue was what the





92c4f126-d0df-4b39-8ceb-460e5c5bd3e3

Page 106

government's view -- strike that.
Mr. Meyer told Michigan National's representative that they needed to give up their right to sue completely, didn't he?
A. I don't recall that statement, but he may have.
Q. Even if you don't recall those particular words, wasn't the substance of the message that was communicated to Michigan National that not only were they not going to get tag-along rights, they needed to give up everything under Guarini?
A. It may have been, yes.
Q. And Michigan National's position was we're not going to give them up, we want full, unfettered rights to recover whatever it is we can recover under either the Assistance Agreement or the Termination Agreement, isn't that true?
A. I think, yes.
(Plaintiff's counsel conferred.)
BY MR. SCARBOROUGH:
Q. Now the parties would caucus separately

Page 107

and then they'd come back together and try to negotiate and then they'd break again, is that generally the way it happened over those last few hours?
A. Yes.
Q. And those last few hours were focused on these Guarini rights, isn't that correct?
A. Yes.
Q. Okay. Other than stylistic wordsmithing?
A. I think once or maybe even twice on that final day, because that final day started at nine or ten in the morning and went until after midnight, so I think at least once, if not twice, updated drafts taking into account the stylistic changes were, were gone over, were reissued, and there was some amount of time going through that as well.
But yeah, the issue at, with substance would have been the rights under 13224.
Q. And isn't it true, sir, that Michigan National specifically and explicitly rejected

Page 108

50 percent sharing of covered asset losses that it had to litigate to recover?
A. I don't think so, no.
Q. Do you remember anybody from Michigan National's side telling the government that if they had to sue and litigate and bear the cost of that litigation to recover covered asset loss deductions, then they didn't want to share 50 percent, but were going to keep as much as they were entitled to under either agreement?
A. Can you repeat that?
MR. SCARBOROUGH: Please.
THE REPORTER: Question: "Do you remember anybody from Michigan National's side telling the government that if they had to sue and litigate and bear the cost of that litigation to recover covered asset loss deductions, then they didn't want to share 50 percent, but were going to keep as much as they were entitled to under either agreement?"
THE WITNESS: Yeah, they wanted to get what they would have been entitled to under the

Page 109

agreements.
BY MR. SCARBOROUGH:
Q. Okay. Let me mark for you as Exhibit 4, which is the final Termination Agreement --
A. Can I discard this now?
Q. You can put it to the side. That's fine.
(Viitala Exhibit No. 4 was marked for identification.)
BY MR. SCARBOROUGH:
Q. That's the final executed Termination Agreement dated September 29th, correct?
A. Yes.
Q. Correct. If I could ask you to turn to page 56, which is where Section 8.4 begins, do you see that?
A. Yes, I do.
Q. Would you read that to yourself and then let me know when you're finished?
(The witness reviewed the document.)

THE WITNESS: Okay.
BY MR. SCARBOROUGH:
Q. Sir, the title of Section 8.4 in the final version says Section 13224 claims, correct?
A. Correct.
Q. Now in all the drafts leading up to the final version, Section 8.4 is described and referred to as tax matters, correct?
A. The ones that I have seen, yes.
Q. Okay, but in the final version, it's referred to as Section 13224 claims?
A. Correct.
Q. Do you know why that title was changed?
A. No, I do not.
Q. Isn't it -- strike that.
(Plaintiff's counsel conferred.)
BY MR. SCARBOROUGH:
Q. Do you recall from the prior drafts of the Termination Agreement that we've looked at dated the 16th and the 28th that Section 8.4 provided for tag-along rights?
A. Yes.



Q. Okay. And it also specifically provided in those drafts for 50 percent sharing, correct?
A. Yes.
Q. Now if you look at Section 8.4 in the final version, tag-along rights are no longer on the table, isn't that correct, sir?
A. Correct.
Q. Michigan National has prevailed and received full unfettered rights to sue whoever it wants to sue to recover Guarini damages other than the FDIC?
A. Yes. It can file suit against a party other than the FDIC manager, yes.
Q. So anybody in the world except the FDIC is fair game for a lawsuit to recover Guarini losses?
A. Yes.
Q. And in fact, that's consistent with your recollection that Mr. Meyer at some point in the negotiations wanted to protect the FDIC, to the extent Michigan National had a right to sue,



he wanted to protect the FDIC from that lawsuit, correct?
A. That's correct.
Q. So that's why the FDIC was carved out from Michigan National's rights to sue, correct?
A. Yes.
Q. Also in Section 8.4, prior drafts had specifically referred to 50 percent sharing, correct?
A. That is correct.
Q. The final version of Section 8.4 no longer refers to 50 percent sharing specifically, does it?
A. No, it does not.
Q. The 50 percent language that had existed in the drafts has now been replaced with a reference to damages or refunds that include the amount that would have accrued to the benefit of the FDIC manager under the Assistance Agreement or that would accrue to the benefit of the FDIC manager under this Termination Agreement, correct?



A. Yes.
Q. That shows, doesn't it, sir, that Michigan National has rejected the 50 percent sharing that existed in the prior drafts for a litigated recovery, doesn't it?
A. The flat across-the-board 50 percent, yes, it has.
There was a negotiation about that they wanted to receive their, sharing the same percent of their Guarini claim as they would have received if the damage would have arose in the year that the other sharing took place.
I think that's clear.
(Plaintiff's counsel conferred.)
THE WITNESS: For example, if --
MR. SCARBOROUGH: Hang on one second, please.
THE WITNESS: Okay.
(Plaintiff's counsel conferred.)
BY MR. SCARBOROUGH:
Q. Please go ahead. I'm sorry.
A. For example, if during a 25 percent/75

Page 114

percent sharing period, 1989, 1990, '91, if they would have been harmed by Guarini, they wanted to get their 75 percent share.

If it was in a tax sharing period in which there was a 50/50 sharing as resolved in the other terms of the agreement, then we wanted to receive our 50 percent share in those years.

(Plaintiff's counsel conferred.)

BY MR. SCARBOROUGH:

Q. Sir, in our -- earlier today, you told me that the Assistance Agreement sharing formula was never reformed?

A. I indicated that in the application, the application, that the formula was corrected as far as the tax sharing settlement underneath this agreement, so that for years 1994 forward, there was a 50/50 sharing of those tax benefits.

Q. And for prior years, you're saying there was?

A. 75/25 sharing.

Q. But you will agree with me, won't you, sir, that the literal terms of the sharing

Page 115

formula in the Assistance Agreement were never reformed?

A. Yes. Those, that provision was not amended or included a corrected version of that formula.

Q. Okay. And if you look at the terms of this provision, it says damages that would have accrued to the benefit of the FDIC manager under the Assistance Agreement or that would accrue to the FDIC under this Termination Agreement.

Doesn't that show, sir, that Michigan National preserved for itself the right to sue under either the Assistance Agreement or the Termination Agreement?

A. No, I don't believe so. I believe that indicates that when they did sue, the amount of damages would be determined in the year in which which agreement governed.

If the Assistance Agreement governed the tax periods prior to the Termination Agreement, then that is the tax sharing percentage that would be applied.

Page 116

The Termination Agreement for damages for those periods, the sharing percentage of 50/50 would apply for the years nineteen -- for the termination forward.

Q. So what you're saying, sir, is that the Assistance Agreement would govern some years and the Termination Agreement sharing would govern other years, correct?

A. Correct.

Q. If that was the deal that was reached, wouldn't this provision say "and," under both the Assistance Agreement and the Termination Agreement, not "or"?

A. I don't know that it would. If it received this under this agreement or the amount received under the other agreement.

Q. One or the other, not both?

A. It's, it is both because they received, they had damages under both agreements, both, the time period of both agreements so it's, it's under this agreement this is what you got during this time period, under this agreement, this is

Page 117

what you got, so it's, it's whichever agreement the damages occurred.

Q. To be consistent with the terms of Section 8.4, your understanding, for your understanding to be consistent with the terms of Section 8.4, that or would have to be changed to and, sir, isn't that correct?

MR. INFELISE: Objection -- asked and answered.

(The witness reviewed the document.)

THE WITNESS: No, I don't think so.

(Plaintiff's counsel conferred.)

THE WITNESS: Because it says the amount of damages sought shall not include the amount that would have accrued to the benefit of the FDIC manager under the Assistance Agreement or the Termination Agreement, so they can go after benefits from either this or that, so it seems like or is the appropriate word.

(Plaintiff's counsel conferred.)

BY MR. SCARBOROUGH:

Q. Sir, you said you've seen pleadings in

this case?
A. Yes.
Q. You've seen the complaint that my client filed against the government?
A. When would have that been?
Q. That would have been the very first document that launched this lawsuit.
A. I most likely have seen it. It would have been, it's been years since I have seen it if I did see it, but I think I probably did see it.
Q. Are you familiar with the fact that my client brought this lawsuit under the terms of the Assistance Agreement?
A. No, I'm not.
Q. Okay. Are you familiar with the fact that it elected not to sue under the Termination Agreement?
A. No, I'm not.
Q. Sir, I want you to take as much time as you need, and I know you've looked at the Termination Agreement yesterday with your



counsel, but take as much time as you need, and I want you to tell me where in this agreement it says that Michigan National or NAB has to sue -- excuse me -- has to share litigated recoveries of Guarini rights at 50 percent.
A. I don't think there's an explicit statement as to what the sharing percentage is at all in this agreement, in the Termination Agreement.
Q. There's no place that explicitly says what the sharing percentage is?
A. Not with regards to this claim, I don't think so.
I don't think it states any percentage.
Q. Okay.
(Plaintiff's counsel conferred.)
BY MR. SCARBOROUGH:
Q. And isn't it true, sir, that under the unreformed sharing formula written in the Assistance Agreement, that the sharing percentage will never shift from 75/25 to 50/50?
A. Under an unreformed formula, that's



correct, it would not, at least given the facts that I'm aware of in this case.
(Plaintiff's counsel conferred.)
BY MR. SCARBOROUGH:
Q. Mr. Viitala, isn't it true that if there was a lawsuit under the Termination Agreement that the percentage that would need to be shared would vary based on the particular type of claim?
A. I'm not sure I understand what you mean by particular type of claim.
MR. INFELISE: Just for the record, we would object to the extent you're asking this witness to give a legal opinion.
BY MR. SCARBOROUGH:
Q. Let me start by pointing out we looked at 2.5 earlier today in the draft.
If you flip to Section 2.5 in the final version, which begins at pages, page 13 and carries over on to 14 for federal and state SRLY payments, that percentage there, if there's a loss relating to SRLY NOLs, it would require



50 percent sharing, correct?
A. That's what this provision states, yes.
Q. Okay. If you flip over -- excuse me -- to 2.6 -- actually, excuse me.
If you flip over to Section 2.5(f) at the top of page 17 dealing with refunds from the carry-back of '89 to '91 NOLs, and there was a lawsuit about that, the sharing percentage that would apply there would be 75/25, correct?
A. Yes.
Q. And if you flip over to 2.6, which deals with adjustments, and there was a lawsuit about 1994, so if you turn to page 21, Section 2.4(c), adjustments?
A. What page? Twenty-one?
Q. Page 21, it's dealing with 2.4(c) adjustments relating to tax benefits in the first I believe three quarter, first three quarters of '94, the sharing percentage that applies there is 43.75 percent, correct?
(The witness reviewed the document.)
THE WITNESS: I'm not sure I see a



Alderson Reporting Company
1-800-FOR_DEPO

92c4f126-d0df-4b39-8ceb-460e5c5bd3e3

percentage.
What page? You're on page 21?
BY MR. SCARBOROUGH:
Q. It goes back, you have to tie it back to 2.4(c).
Don't worry about it for now. There's no basis for disputing that.
Let me take to you 2.6(f)(3), which starts on page 28 and carries over on to the following pages 29 and 30.
Are you there?
A. I'm on 28.
Q. Okay. If you flip over to page 29, this relates to the payments by the FDIC to Michigan National if there is an adjustment to other tax benefit items, correct?
A. Yes.
Q. Okay. And if you look at Subsection (iii) at the bottom of page 29, it runs A through G on page 31, correct?
A. It continues on, but yes, there is an A through G. There is also an H.



Q. But I'm talking about A through G sets out several different tranches of adjustments and a different sharing percentage applies to each, correct?
A. Yes.
Q. So, sir, isn't it true that if Michigan, depending -- if Michigan National brought a suit under the Termination Agreement, depending on what that lawsuit related to, what particular tax benefit items it related to, there could be different percentages that would govern it, correct?
A. Depending on the year, yes.
Q. Well, not just depending on the year. It would also be depending on the type of claim that's brought, correct?
A. Are you talking a 13224 claim, or are you talking about another claim?
Q. Any other claim that Michigan National might bring under the Termination Agreement, if we chose to sue under the Termination Agreement, whether it's Guarini or anything else, depending



on the type of claim it was, and the type of tax benefit we were seeking to recover, the Termination Agreement and the sharing percentages that are set forth in here would govern that, correct?
A. Yes.
Q. And if we chose to sue under the Assistance Agreement with the unreformed sharing formula, the sharing for Guarini rights, the sharing that would be required under the Assistance Agreement literally would be 75/25?
A. Governing through 1993 when the agreement was terminated, yes.
Q. Setting aside whether the agreement was terminated or not, if the lawsuit is brought under the Assistance Agreement and the court determines that the Assistance Agreement governs, then the literal terms of the sharing formula, because it was not reformed, would require 75/25 sharing, not 50/50, isn't that true, sir?
MR. INFELISE: Again, it's been asked and answered.



THE WITNESS: The unreformed formula would be 25/75.
(Plaintiff's counsel conferred.)
BY MR. SCARBOROUGH:
Q. Sir, we know that the Assistance Agreement was terminated because that's what this Termination Agreement does, correct?
A. Yes.
Q. But the rights to sue under the Assistance Agreement for Guarini claims, those were never terminated?
MR. INFELISE: Again, that calls for a legal opinion.
We object.
BY MR. SCARBOROUGH:
Q. No, I'm not asking for a legal conclusion. That's what the judge will do.
What I'm asking for is your recollection and understanding of the negotiations that occurred in those last hours.
Michigan National's right to sue under the Assistance Agreement to recover Guarini





92c4f126-d0df-4b39-8ceb-460e5c5bd3e3

claims, those rights were never terminated, correct?
A. They kept their rights to file a Guarini suit, yes.
Q. Under the Assistance Agreement?
A. I don't know if it was under the Assistance Agreement or just generally.
I don't know. I don't understand if -- the distinction.
Q. Okay. Well, they kept their rights under the Assistance Agreement or the Termination Agreement, which is the language of Section 8.4, correct?
A. I read that, and I recall that being understood, that the recovery would be shared at the rates in which the termination and the Assistance Agreement set forth those sharing percentages.
Q. Sir, you say you recall it being understood.
Do you recall any conversation to that effect with Michigan National or its



representatives?
A. I believe I do, yes.
Q. Tell me about that conversation.
A. I, I can't tell you who spoke on the other side, but I understand or at least I recall the discussion of this section was all right, we understand you don't want a flat 50 percent sharing on the Guarini recovery.
So the understanding I had was that all right, the percentage that Michigan National was entitled to receive would be based upon what it would have been received had the Assistance Agreement either not been terminated and the formula corrected, or underneath this Termination Agreement with taking effect of a corrected formula with the tax sharing of other tax benefits that were settled.
Q. If that was the agreement that was reached, why wouldn't, why wouldn't you have just reformed the sharing formula or been more specific about what sharing would apply in a given year?



A. Well, I think we didn't think we needed to reform the agreement since the dollar values were settled, and I certainly agree we should have written, done a better job, who ever wrote it should have done a better job setting forth how much were shared in each year.
(Plaintiff's counsel conferred.)
BY MR. SCARBOROUGH:
Q. Sir, if you would look in the final Termination Agreement there, Section 9.2, which is at page 59, that's the release.
If you'd read through it, my question will focus toward the latter part of that section, but if you want to read through the whole thing, that's fine.
(The witness reviewed the document.)
THE WITNESS: Okay.
BY MR. SCARBOROUGH:
Q. You get your JD for having read through that paragraph, that whole paragraph. All right.
I want to focus, sir, on the last sentence, but leading up to that, this is a



general release by Michigan National, correct?
A. Yes.
Q. Of it -- okay?
A. Yes.
Q. But this last, the last sentence specifically carves out and specifies that nothing in the Termination Agreement shall release or discharge any of Michigan National's rights under Section 13224 that it may have against any other party, including the United States, correct?
A. I believe, yes.
Q. Okay. Michigan National was not releasing any rights that it had under the Assistance Agreement, correct, with regard, with regard to the Guarini claims?
MR. INFELISE: Objection to the extent it calls for a, for a legal conclusion.
BY MR. SCARBOROUGH:
Q. I'm asking your understanding of this provision as it was drafted at the time.
Michigan National was specifically

carving out its rights under Guarini to preserve them, isn't that the case, sir?
MR. INFELISE: Same objection.
THE WITNESS: I think so. I wasn't involved in the drafting of this provision or discussion.
This would have been the legal representatives.
(Plaintiff's counsel conferred.)
BY MR. SCARBOROUGH:
Q. But as you sit here today, sir, you understand, don't you, that Michigan National kept whatever rights it had for Guarini under the Assistance Agreement?
Isn't that true?
MR. INFELISE: Objection -- vague.
THE WITNESS: Yeah, I understand they kept whatever rights they had to sue.
BY MR. SCARBOROUGH:
Q. Under the Assistance Agreement?
A. I don't know under the Assistance Termination or wherever, but I think whatever



they had rights, they kept.
Q. Okay. Whatever rights they had under the Assistance Agreement, they kept, and whatever rights they had under the Termination Agreement, they kept?
A. And whatever rights they had under general law or whatever. They kept.
Q. Okay. And we're talking --
A. Except for suing the FDIC.
Q. I understand, but -- and we're talking about Guarini.
Whatever claim Guarini rights they had, under the Assistance Agreement or the Termination Agreement, they kept those, correct?
A. I think so, yes.
Q. And that was your understanding at the time?
A. Yes.
Q. And that's consistent -- strike that.
Sir, you told me earlier that there were times when the parties would meet together in these last few hours of the last day or so, they'd meet



together and talk and then they'd break out and have private caucuses, correct?
A. Yes.
Q. Do you recall during the last hours on that last day, Mr. Meyer, in a private caucus just with the government, saying in words or in substance after the government had -- strike that. It's way too long of a question.
At some point in the last few hours, the government agreed to give Michigan National full, unfettered rights to sue, correct?
A. No. We carved out the FDIC.
Q. I apologize. With that understanding, the FDIC was carved out, Michigan National, the government agreed to give Michigan National full, unfettered rights to sue for Guarini damages?
A. Well, there was also a sharing of those damages, but they could file suit, yes.
Q. Okay. During those last few hours on that last day, you had, you were a participant in private caucuses on the government side, correct?
A. Yes.



Q. Mr. Meyer was present?
A. Yes.
Q. Do you recall, sir, Mr. Meyer saying in words or in substance not to worry about the fact that the government had been willing to allow Michigan National to sue because the likelihood of succeeding in a Guarini lawsuit was no better than a snowball's chance in hell?
A. No, I don't recall that.
Q. Do you recall Mr. Meyer, even if he didn't use the specific words, voicing that sentiment, that Michigan National's likelihood of succeeding in any Guarini litigation was virtually non-existent?
A. No, I don't recall that.
Q. Do you recall Mr. Meyer saying in any of those private caucuses -- strike that.
Do you recall Mr. Meyer saying outside of the private caucus to Michigan National, anybody on the Michigan National side that they could have the right to sue for Guarini damages, but he didn't think their chances of winning were





92c4f126-d0df-4b39-8ceb-460e5c5bd3e3

any better than a snowball's chance in hell or that they weren't likely to succeed, anything to that effect?

A. No. I don't recall those, that sentiment.

Q. Okay. In a private caucus on the government side, the last few hours, that's the timeframe I'm talking about right now, do you remember Mr. Meyer saying in words or in substance, that we didn't need to reform the sharing formula in the Assistance Agreement because if Michigan National, in the unlikely event it ever succeeded in litigating, that the government could just go to the judge at that point in time and get the sharing formula reformed?

A. Can I speak with counsel for a second? It may be an issue of privilege.

MR. SCARBOROUGH: How can that be an issue of privilege because --

THE WITNESS: We had counsel in the room with us.



MR. SCARBOROUGH: Well, the counsel in the room was not performing --

THE WITNESS: You're saying that our caucus?

MR. SCARBOROUGH: Right, but --

MR. INFELISE: I think I ought to talk to him to see if there's an issue.

MR. SCARBOROUGH: Go ahead.

(Government counsel conferred.)

MR. SCARBOROUGH: Is he okay to answer the question?

MR. INFELISE: I'll permit him.

MR. SCARBOROUGH: I'm sorry?

MR. INFELISE: I'll permit him to answer.

MR. SCARBOROUGH: Thank you.

BY MR. SCARBOROUGH:

Q. Do you remember the question?

A. No. Can you read it back, please?

THE REPORTER: "In a private caucus on the government side, the last few hours, that's the timeframe I'm talking about right now, do you



remember Mr. Meyer saying in words or in substance, that we didn't need to reform the sharing formula in the Assistance Agreement because if Michigan National, in the unlikely event it ever succeeded in litigating, that the government could just go to the judge at that point in time and get the sharing formula reformed?"

THE WITNESS: No.

(Plaintiff's counsel conferred.)

BY MR. SCARBOROUGH:

Q. Did anybody ever tell you that Mr. Meyer had made this remark?

A. No.

(Plaintiff's counsel conferred.)

BY MR. SCARBOROUGH:

Q. Sir, you said in your declaration at one point that you had performed a present value analysis or computation?

A. Yes.

Q. As part of these negotiations?

A. That's correct.



Q. When did you perform that present value analysis?

A. I probably performed more than one, but it would have been in the July, August timeframe, July, maybe June, July, August timeframe.

Q. And this was the present value analysis that was put, that was done to compute the lump sum payment that would be required to sort of settle the, settle the various disputes?

A. The tax sharing disputes; I wouldn't have done it for non-tax issues.

Q. I understand. And is that present value analysis what ultimately resulted in the agreement on the $7 million payment?

A. It was a component of that $7 million value, yes.

Q. Okay. And that $7 million value was -- I mean obviously there were some negotiations back and forth on that, but that was an agreement that was reached and in place by the time the first draft of the Termination Agreement started the circulating on September 1st, correct?

A. I believe, yes.
Q. And after, after that $7 million agreement was reached, whether it was July or August or whatever, of 1994, there was no need to do any further present value computations after that timeframe, correct?
A. Not with those issues at least.
Q. Did you do any present value computations after September 1st?
A. Not on this transaction, I don't think.
Q. Okay.
A. I don't recall.
Q. I'm limiting it to this transaction.
A. Yeah. I don't recall that I did.
Q. Okay. And in fact --
A. Perhaps somebody else did, but I did not.
Q. Okay. And you wouldn't expect that you would have done it because the principal role of doing that present value computation was to reach agreement on what ultimately became that $7 million figure, correct?



A. Yes.
Q. Now, sir, nearing the end, I want you to take the Termination Agreement from September 29th, the final version, and I want you to tell me what language anywhere in this agreement provides that Michigan National only gets Assistance Agreement damages up to a certain year, 1993, '94, whatever the year would be, and gets Termination Agreement damages after that, after whatever that year is.
Do you understand my question?
A. These are the Guarini damages you're talking about?
Q. Yes. I'm talking about Guarini damages, covered asset losses recovered through litigation.
I'd like for you to read into the record, just so we're clear, what language in the Termination Agreement anywhere says that Michigan National or NAB gets Assistance Agreement damages only up to a particular year and thereafter, only gets Termination Agreement damages.



A. I don't know that there's a provision that explicitly states it as that, but what I refer to is that provision in 8.4 which says damages under the Assistance Agreement or under this agreement.
Q. Okay. Is there any other provision other than 8.4 that deals with how litigated recovery should be shared for Guarini damages?
A. Not, not that I can recall.
MR. SCARBOROUGH: Let's go ahead and take a break.
Can you guys give us just a couple minutes?
MR. INFELISE: Sure.
MR. SCARBOROUGH: I think we may be done, but let me just talk.
THE VIDEOGRAPHER: Going off the record, the time is 11:34:10.
(A recess was taken.)
THE VIDEOGRAPHER: Going back on record, the time is 11:41:46.
BY MR. SCARBOROUGH:



Q. Mr. Viitala, am I correct then that you're saying that Michigan National's rights to sue under the Assistance Agreement for Guarini damages stopped as of nineteen, the end of '93 or end of '94, and thereafter, if they wanted to sue, they had to sue under the Termination Agreement?
MR. INFELISE: Objection. Mischaracterizes the testimony.
THE WITNESS: Well, it seems that the agreement is terminated, then that's when the damages stopped underneath that agreement and, that the damages for post-Assistance Agreement termination years would come under the Termination Agreement.
That's how, that's how I would see it.
MR. SCARBOROUGH: But -- okay. I think I'm done.
THE VIDEOGRAPHER: Going off the record, the time is 11:42:44.
(There was a pause in the proceedings.)
THE VIDEOGRAPHER: Going back on the

Page 142

record, the time is 11:43:31.

EXAMINATION BY COUNSEL FOR DEFENDANT
BY MR. INFELISE:

Q. Okay. Mr. Viitala, counsel asked you at one point whether you had any recollection concerning any term of the agreement being, as I think he characterized it, as a deal breaker.

Do you recall from the perspective of the government or the FDIC was there any specific term of this agreement that was a deal breaker?

A. Yes.

Q. What was it?

A. That, that the FDIC needed to receive 50 percent tax sharing as if the tax, the formula governing sharing was corrected.

Q. And what would that -- strike that. You say that as if the formula had been corrected, but I believe you testified it was not corrected in the Termination Agreement?

A. There was not a restatement of that in the Termination Agreement showing the corrections.

Page 143

The impact of the correction to that formula was in the values of the settlement amounts.

Q. All right. Now did, at any point in time during the negotiations, Michigan National communicate to you whether it wanted to reform the sharing provision in the Assistance Agreement?

A. Can you repeat that or --

Q. Let me restate it. Was there a reason why the sharing agreement in the Assistance Agreement was just reformed as part of this negotiation?

And obviously I mean the formula itself.

A. Can you repeat that?

Q. Yeah. Was there any reason why, as a result of these negotiations, the formula for sharing in the Assistance Agreement was not reformed?

A. Yeah. We believed that through the negotiation of the settlement agreement, that

Page 144

with the values being as if the formula was corrected, there were, there was no further reason to correct the formula because we did not believe there were any remaining issues that would be impacted by that formula.

Q. Did Michigan National ever express any concern about going back to reform the sharing formula?

A. I don't recall.

Q. I think you just testified that the, rather than reform the sharing formula, the purpose of the Termination Agreement or one of the goals of the Termination Agreement was to address the correct sharing of the tax benefits?

A. Yes.

Q. All right. How exactly was that done in Section 8.4 or the other provisions of the Assistance Agreement, or excuse me -- Termination Agreement?

A. That was, the formula was corrected in the negotiated settlement of future tax sharing benefits.

Page 145

We, I had prepared a present value calculation of the future benefits under a corrected formula scenario, and the parties agreed that that component to the seven, was part of that 7 million, so that was with a corrected formula.

Q. Now let me ask you this. Assuming that as part of any litigation, Michigan National required, recovered tax benefits, and I'm specifically referring to Guarini legislation tax benefits, they recovered tax benefits which were accrued in the years say 1991, how would the benefits be shared based upon your understanding and the intent of the Termination Agreement?

A. If they would have been realized in that year?

Q. Yes.

A. Then that would have been a 25/75 percent sharing year, so Michigan National would have received 75 percent of those benefits.

Q. And assuming that the benefits were ones that were realized in the year 1995, how

Page 146

would they have been shared?
A. That would have been shared on a 50/50 basis.
Q. And what provisions, again of the Termination Agreement, do you rely on for reaching that conclusion?
A. 8.4 where it states that the damages will be based on the Assistance Agreement or under the Termination Agreement.
Q. Okay. And were there -- let me ask you this.
Looking at -- do you have I believe it's Viitala Exhibit No. 3?
Is that the Termination Agreement, or is that 4?
A. Four.
Q. The final?
A. Four is the final.
Q. Okay. Exhibit No. 4, if you'd look at Sections 2.5 or 2.6, and 2.6, are these sections in any way relevant to how the benefits or any Guarini tax benefits would be shared in either

Page 147

the period before the termination or after?
(The witness reviewed the document.)
THE WITNESS: Well, there's a technical possibility that 2.5 could govern.
If Beverly Hills had taken a tax chargeoff on an asset that became a covered asset, and that covered asset loss was reimbursed by the FDIC after March of 1991, then technically, the Michigan National or Beverly Hills could recover an increased NOL in its SRLY NOLs, and then the 2.5 would govern that there's a 50/50 share of that benefit.
BY MR. INFELISE:
Q. I recall in your declaration that you had referred to Section 2.6.
And what was the relevance of 2.6 with respect to any sharing of any tax benefits under the Termination Agreement?
A. I believe 2.6 is if there were adjustments to tax benefits, this would indicate the rate in which those tax benefits were to be repaid if there was some disallowance.

Page 148

And for some of the years, it sets forth that the disallowance would be repaid at a 50 percent rate.
For example, on page 29 of the Termination Agreement, if there was an adjustment to the tax benefit items, then the repayment would be, if there's a decrease in the tax benefits, then there would be a payment at a rate of a $175.00 per each thousand of disallowance.
That comes out to be a tax rate of 17 and a half percent, which is 50 percent of the corporate tax rate of 35 percent, resulting in a 50/50 share of that disallowed deduction or disallowance of benefits.
Q. But that, doesn't that apply to payments which the FDIC would have to make to Michigan National?
A. Yes, it does.
Q. How is that relevant to the sharing of tax benefits that Michigan National recovered with FSLIC, or excuse me -- the FDIC?
A. How is it relevant that --

Page 149

Q. Let me rephrase the question. It wasn't phrased very well.
The provision that you referred to has to do with payment of, by the FDIC to Michigan National when there's a disallowance of deductions?
A. Right.
Q. How is that relevant to the obligation of Michigan National to share 50 percent of any recovery of Guarini benefits?
A. Well, that is a demonstration that the tax benefits outside of Guarini were shared at a 50/50 rate, and that the parties had agreed that there was a 50/50 sharing on tax benefits that governed by this section.
MR. INFELISE: I don't think I have any further questions.
Thank you.
MR. SCARBOROUGH: We do, so we'll switch sides.
THE VIDEOGRAPHER: Going off the record, the time is 11:53:01.

Page 150

(There was a pause in the proceedings.)
THE VIDEOGRAPHER: Going back on the record, the time is 11:55:25.
FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF
BY MR. SCARBOROUGH:
Q. Mr. Viitala, I just have a few follow-up questions.
Just so we're clear, Michigan National rejected an overall 50 percent sharing rate in the final version of Section 8.4, correct?
A. Yes.
Q. Would you turn in the Termination Agreement to 2.6(f), and you were referring to (f)(iii) I believe.
Are you there?
A. Page 28?
Q. Page 28 begins at 2.6(f), and that deals with adjustments to other tax benefit items?
A. Yes.
Q. And you were specifically referring to

Page 151

payments by the FDIC manager, and you pointed out that those relate to FDIC payments to Michigan National and not payments by Michigan National to the FDIC, correct?
A. Correct.
Q. And you pointed out specifically that under Subsection (iii), the first tranche that's listed there works out to be a 50 percent sharing rate, correct?
A. Yes.
Q. Because you said that's what the parties agreed to is 50 percent, right?
A. Yes.
Q. But you didn't go on to talk about B through G, which incorporate sharing rates that are other than 50 perfect, correct?
A. Correct.
Q. Each one of those provisions B, C, D, E F and G has something other than a 50 percent sharing rate, am I correct?
A. Correct.
Q. If you will turn to page 32, which is

Page 152

still in 2.6(f), but now we're at Subsection (vi), there is a provision under 2.6(f) that deals with payments by Michigan National back to the government, correct?
A. Yes.
Q. And that's set forth in Subsection (vi) which says Independence One payment?
That begins on page 32 and carries over to page 33.
A. Yes.
Q. Now under 2.6 (f), this relates to adjustments to other tax benefit items, correct?
A. Yes.
Q. And covered asset losses are included in the definition of other tax benefit items, correct?
A. Yes, they are.
Q. So if there is a decrease in the amount of covered asset losses, then that would require a payment from the government to Michigan National?
A. Correct.

Page 153

Q. And under the terms of 2.6, if there are certain types of increases in covered asset losses, that might trigger a payment from Michigan National to the government, correct?
A. Correct.
Q. And if you look at 2.6(f)(vi) at the top of page 33, it lays out two discrete scenarios in which Michigan National would have to make a 50 percent payment to the government, correct, sir?
A. Yes.
Q. One of those provisions is Subsection (a) which says if the IRS or the Congress does something to permanently increase the amount of covered asset lawsuits, then we have to share 50 percent, correct?
A. Yes.
Q. And if the FDIC manager or Office of Inspector General does something to permanently increase the amount of covered asset losses, then Michigan National would have to share that recovery at 50 percent, correct?

Page 154

A. That and other types of tax benefit items: it's not limited to covered asset losses.
Q. It is not -- I understand. It's not limited to covered asset lawsuits, but covered asset losses are included and encompassed within other tax benefit items?
A. Yes.
Q. Neither one of those provisions applies to a litigated recovery, does it, sir?
A. No.
Q. Sir, with regard to Section 8.4, there is no specific mention of 50 percent, of a 50 percent sharing rate in 8.4, correct?
A. Correct.
Q. And as you said earlier, Michigan National rejected across the board 50 percent sharing rate for covered asset, litigated recoveries of covered asset losses, correct?
A. Yes. Yes.
Q. Is there -- I want you to point me to any other place in the Termination Agreement other than Section 8.4 that specifically requires

Page 155

50 percent sharing of litigated recoveries, whether it's after a certain year or at any other time.
A. I don't -- I'm not aware of any.
Q. And, sir, Section 9.2, which has the release that Michigan National entered into, does not limit Michigan National's rights to sue under the Assistance Agreement only up until the date of the Termination Agreement, September 29th, 1994, does it, sir?
A. I'm not aware that it does, no.
Q. Michigan National has whatever rights it has under the Assistance Agreement, correct, for Guarini?
A. Yes.
Q. And it has whatever rights it had, has under the Termination Agreement for Guarini?
A. Yes.
Q. With the sole exception that Michigan National agreed not to sue the FDIC, am I correct, sir?
A. That's correct.

Page 156

(Plaintiff's counsel conferred.)
MR. SCARBOROUGH: I think we're done.
MR. INFELISE: I have no other questions.
THE VIDEOGRAPHER: This concludes the videotaped deposition of Lars Viitala.
Going off the record, the time is 12:01:14.
(Whereupon, at 12:01 p.m., the taking of the instance deposition ceased.)

____________________
LARS VIITALA

SUBSCRIBED AND SWORN to before me this_________

day of____________________, 2006

____________________
NOTARY PUBLIC

My commission expires:

Page 157

CERTIFICATE OF NOTARY PUBLIC

I, Catherine S. Boyd, the Notary Public before whom the proceeding occurred, pages 1 through 156, do hereby certify that the witness was duly sworn, that the testimony of said witness was taken by me and thereafter reduced to this typewritten transcript under my supervision, that said transcript is a true record of the testimony given by said witness, that I am neither counsel for, related to, nor employed by any of the parties to the proceeding, and further, that I am not a relative or an employee of any attorney or counsel employed by the parties thereto, or financially or otherwise interested in the outcome of the proceeding, or any action involved therewith.

Witness my signature and seal:

CATHERINE S. BOYD
Notary Public in and for
The District of Columbia
My commission expires: September 14, 2007