DATE: September 20, 1994

MEMORANDUM TO: Committee on Loans, Liquidations and Purchases of Assets

THROUGH: Robert H. Hartheimer, Acting Director
Division of Resolutions

FROM: James A. Meyer, Senior Resolutions Specialist
Division of Resolutions

SUBJECT: Authority to Prepay a FSLIC Resolution Fund Promissory Note, Resolve Disputes, and agree to an Early Termination of an Assistance Agreement with Michigan National Corporation and Independence One Bank of California, Beverly Hills, California (Formerly Beverly Hills Federal Savings Bank, Beverly Hills, California)

## Executive Summary

**Proposal and Recommendation:**

That the Acting Director, Division of Resolutions ("DOR") or his designee be authorized, on behalf of the FDIC, as Manager of the FSLIC Resolution Fund ("FRF"), to enter into a Termination Agreement with the concurrence of the Assistant General Counsel (Resolutions) or his designee, to: (i) prepay a $348.9 million call protected promissory note ("Note"); (ii) resolve a number of contractual disputes, and (iii) agree to the early termination of the December 31, 1988, Assistance Agreement ("Agreement") by and between the former Federal Savings and Loan Insurance Corporation ("FSLIC"), Michigan National Corporation ("MNC") and Independence One Bank of California, Beverly Hills, California, formerly Beverly Hills Federal Savings Bank, Beverly Hills, California ("IOBC").

PLAINTIFF'S EXHIBIT 2
PENGAD 800-631-6989

**Summary of the Termination Proposal:**

- Settlement will occur on or about September 30, 1994.
- The FRF will retire its $348.9 million Note, plus accrued interest.
- IOBC will make a $7.0 million payment to the FRF.
- Except as noted below, the Agreement, which expires on December 31, 1998, will be terminated at closing.
- IOBC will file its final Agreement claim for the quarter ending September 30, 1994, by no later than December 31, 1994. This claim will also include a special payment for the FRF's share of tax benefits related to Agreement and Note interest payments made in 1994. Since the final claim is expected to be a payment to the FRF, the FRF will hold back $4.5 million from the settlement payments until the final claim has been received and reviewed. The FRF will pay IOBC interest at the 26 week Treasury Bill rate on the amount held back.
- The following matters will survive termination of the Agreement:
    - Sharing (50.0%) of tax benefits, when used, that are associated with pre-acquisition losses.
    - Sharing of tax refunds (25.0%, plus interest) not yet received from the Internal Revenue Service ("IRS") from past tax years.
    - Indemnification for existing litigation, as well as for certain environmental claims which resulted from



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CMI054 0073

actions of the failed institution, all of which are covered by the existing Agreement. The FRF will have the right to take assignment of such litigation and/or directly defend the institution following the termination. Any indemnification payments made to IOBC in this regard will be discounted to account for the FRF's share of the tax benefit at the time of payment.

- The obligation to repay tax benefits that are permanently disallowed by the IRS.

- All contractual disputes related to the Agreement and the Note will be resolved.
- The termination agreement will contain provisions for a final Office of Inspector General audit, alternative dispute resolution, and customary mutual releases.

Financial Impact to the FRF:

Approval of the proposal will result in a net cash outlay (excluding accrued interest on the Note), on the proposed closing date as follows:

| | |
|---|---|
| Prepayment of Note Principal | $348,930,193 |
| IOBC Payment | (7,000,000) |
| Hold Back | (4,500,000) |
| Net Payment by the FRF | $337,430,193 |



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CMI054 0074

The $7.0 million payment from IOBC represents the net value of the consideration for settlement of the remaining items of assistance under the Agreement, compensation for the premium value of the call protected Note, and resolution of the contractual disputes. As summarized below on page 23, staff has evaluated the elements of this proposed settlement as a $5.8 million payment from IOBC. Thus, staff believes this proposal is more cost effective to the FRF than continuing the Agreement until 1998, paying the Note with yearly payments in accordance with its terms and resolving the disputes through litigation.

**Concurrences:**

The recommendation is supported by:

Paul M. Driscoll
Associate Director
Division of Resolutions

Gerald B. Stanton
Assistant Director
Division of Resolutions

**No Legal Objection:**

Henry R.F. Griffin
Assistant General Counsel (Resolutions)
Legal Division

**Contacts:**

James A. Meyer, Senior Resolutions Specialist, (202) 898-8543;

Leslie R. Crawford, Senior Counsel (Resolutions), (202) 898-6520.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CMI054 0075

**Background:**

On December 31, 1988, MNC acquired Beverly Hills Federal Savings Bank (now IOBC) in a transaction facilitated by a 10-year FSLIC assistance agreement. MNC acquired approximately $827 million in assets and assumed liabilities of approximately $1.64 billion. The FSLIC issued a 10-year, call-protected promissory note in the amount of $811.5 million, which was equal to the negative capital of the failed institution.

**Assistance Agreement Summary:**

The major components of the Agreement are:

- Capital loss protection on the liquidation of approximately $674 million in assets ("Covered Assets") at the effective date;
- Guaranteed yield on the Covered Assets based on the 11th District Cost of Funds Index ("11th District COFI"), plus a specified number of basis points;
- Indemnifications for litigation related to Covered Assets and actions of the failed institution;



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CMI054 0076

- A complicated equity sharing arrangement allowing the FRF to recapture a portion of the increase in value of the acquired institution at the end of the Agreement;

- Reimbursement of the interest costs in excess of the 11th District COFI for a specific pool of long-term, high-yield, zero-coupon certificates of deposit; and

- Sharing of tax benefits arising from carryovers and the receipt of tax-free assistance payments from the FRF.

**Assistance related to the Covered Assets expired at the end of** 1992. As of March 31, 1994, the FRF had paid $363 million in Agreement claims to IOBC.

Description of the Promissory Note:

The FSLIC issued an $811.5 million 10-year, call protected promissory note to IOBC which represented the negative capital of the failed institution. Because the Note is considered assistance, interest and principal payments on the Note are tax-free. The rate on the Note is the 11th District COFI plus a specified basis point premium, which started at 200 basis points and declines to 50 basis points for the final two years. The current premium is 75 basis points. The FRF is permitted to make optional principal payments



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CMI054 0077

with 90 days notice, with annual limitations specified in the Note. To date, the FRF has made the maximum level of principal prepayments permitted by the terms of the Note. The total principal prepayments to date have been $462.6 million.

**Description of the Disputes:**

Tax Benefit Sharing Related Disputes and Issues

The Agreement provides that the FRF share in a percentage (either 25% or 50%) of the Net Tax Benefits (as defined in the agreement) realized by any member of the MNC consolidated group **arising from carryovers (principally, Net Operating Loss Carry** Forwards ("NOLs") and built-in losses on acquired assets), and the tax-free nature of the FRF assistance payments relating to matters other than indemnifications. The FRF realizes 100% of the tax benefits associated with indemnifications.

In determining the Net Tax Benefits, three major disputes/issues were discovered in reviewing the annual tax benefit reports filed by IOBC under the Agreement.

- Shareability of subsidiary carryovers. The Agreement provides that the FRF is entitled to share in the tax benefits resulting from NOLs and other carryovers of Beverly Hills Savings, a Federal Savings and Loan Association, defined as the Acquired



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CMI054 0078

Association in the Agreement. Since this provision of the Agreement does not add the phrase "and the subsidiaries of the Acquired Association," IOBC and MNC believe that the Agreement does not provide for the sharing of tax benefits generated from the subsidiaries that were acquired by IOBC. Staff believes that for determining tax benefits, implicit in the term, Acquired Association, are the acquired subsidiaries of IOBC. This is based upon the fact that for tax purposes, prior to the effective date, the Acquired Association and its subsidiaries filed a consolidated tax return, and therefore, the only NOLs and other carryovers that are reflected are those reflected in the Acquired Association's consolidated tax return. In addition, the Acquired Association's investment in the subsidiaries were Covered Assets under the Agreement and losses incurred in the subsidiaries prior to the acquisition were reimbursed by the FRF through the Note described above.

- The amount in dispute through the tax year ended 1993 is approximately $15.3 million.

- Shareability of benefits related to Covered Asset losses recorded in the Bad Debt Reserve. Under the Agreement the FRF shares in the tax benefit derived from Covered Asset losses and carryovers. Thrift institutions charge most tax losses on assets through the Bad Debt Reserve. Deductions for additions to the Bad Debt Reserve are based on a six-year, moving average of losses



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CMI054 0079

incurred. As a result of the averaging, when IOBC's Covered Asset losses were charged against the Bad Debt Reserve, they received deductions greater than the actual Covered Asset losses reimbursed by the FRF under the Agreement. IOBC and MNC believe that the FRF is entitled only to share in the amount of benefits related to actual Covered Asset loss reimbursement, and not the amount of the actual tax savings. Staff believes the Agreement provides for sharing of all tax benefits related to the Covered Assets.

- The amount in dispute through the tax year ended 1993 is approximately $1.9 million.

- **Reformation of the Sharing Percentage formula.** Under the Agreement, the FRF receives 25% of the Net Tax Benefits until the tax year following the year when the Net Investment Account falls below zero. At that point, the sharing percentage shifts to 50%. The Net Investment Account (a defined term in the Agreement) was intended to measure the point in time when MNC had recovered its full investment (including subsequent investments of capital) in IOBC, plus a 20% return thereon. In general, the Net Investment Account is increased by additional capital contributions to IOBC (plus a 20% annual return) and is reduced by MNC's share of the tax benefits and dividends from IOBC.

Staff has discovered that in the drafting of the provision in the Agreement for the Net Investment Account calculation, there



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CMI054 0080

were numerous mutual mistakes which have rendered the formula inoperative. If this provision is not reformed, the sharing of tax benefits will never increase to 50%. In addition to tax benefit sharing, this definition is also used in the equity sharing provision (described below) which becomes operative in 1998. This issue has not yet become a dispute, because 1994 is the first year that tax benefits would be shared at the 50% level if the definition were reformed. The tax benefit payment for 1994 will not be due until the fourth quarter of 1995.

- Based on staff's estimates of the present value of the remaining tax benefits yet to be used by MNC, **reformation of the definition is approximately** $15.6 million issue to the FRF.

Other Assistance Agreement Disputes

The FRF and IOBC have eighteen disputes over various other charges made to the Agreement and disallowed by staff because the particular items were believed to be either not covered by the Agreement or unreasonable. These disputes total approximately $5.1 million, and range from $1,250 to $1.8 million. These disputes are listed in Exhibit 1, with an assessment of risk as to each if the issues were to be litigated by IOBC and MNC.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CMI054 0081

Promissory Note Dispute

The FRF has made its annual partial prepayments of Note principal in January of each year. Although each of the annual payments have been accepted by IOBC, IOBC and MNC have formally protested the payments, asserting that the payments are permitted only at the end of each calendar year. Staff believes that the FRF's prepayments have been proper under the terms of the Note. However, there nonetheless exists a certain, minimal risk that the FRF could lose this dispute in litigation if the matter is not otherwise resolved.

**Settlement Negotiations:**

In 1992, and continuing into early 1993, the Resolution Trust Corporation, under its authority from Congress to renegotiate the 1988-89 FRF assistance agreements, unsuccessfully tried to negotiate an early termination of the Agreement and prepayment of the Note.

During the fourth quarter of 1993, staff made a formal demand on IOBC and MNC to collect the disputed tax benefit items. Staff threatened to offset the amounts due the FRF in this regard against amounts due IOBC under the Agreement. MNC, with new management, contacted staff with an offer to resume negotiations to settle the



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CMI054 0082

disputes. Staff suggested that MNC make a comprehensive proposal which would provide for the early termination of the Agreement, payment of the Note, and settle all disputes.

Early this year, MNC made a settlement proposal to the FRF. The proposal was for settlement as of March 31, 1994, with a payment of $38.9 million to IOBC from the FRF, and prepayment of the Note. This proposal also offered the alternative of leaving the Note in place (but moving prepayments to year end), and a payment from the FRF in the amount of $6.2 million. Both alternatives provided for the continuation of tax sharing and did not address reformation of the sharing formula.

After completing an analysis of the proposal and all the issues, staff countered with an offer to terminate the Agreement, retire the Note, and settle all disputes for no payment to either party beyond the pay off of the Note. The staff's counter proposal provided for continued tax sharing, but contained a requirement that the sharing formula be reformed. After considerable discussion over assumptions and analysis, it was clear that MNC had placed a high premium on the value of the Note and compensation to IOBC for the FRF's beginning of the year prepayments of the Note, During these discussions, the parties were never closer than approximately $5.0 million.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CMI054 0083

Over the next few months, MNC sought to negotiate the various disputes and issues with the FRF on an issue-by-issue basis. However, staff wanted a global settlement of all issues. Although discussions continued, they were slowed as a result of other issues at MNC that diverted their management's attention.

By the summer of 1994, MNC and the staff agreed to negotiate the early termination of the tax benefit sharing arrangement as a part of the global settlement. Since MNC at the time was considered to be a takeover target as a result of shareholder dissatisfaction, staff was initially hesitant to settle the tax sharing because it is heavily dependent on future earnings. However, after several meetings with MNC and consultations with the Legal Division, staff became satisfied with management's estimates of future taxable earnings. Staff was also satisfied that a takeover would not accelerate the use of the benefits, thus adversely impacting the valuations, since the use of tax loss carry forwards and credits are limited in the event of a change of control.

During the week of July 22, MNC made a formal global settlement proposal which also included settlement of the tax benefit sharing provisions in the early termination. MNC's proposal provided for prepayment of the Note with no further payment by either party and a settlement date of September 30, 1994. In early August, after staff had updated its analysis, a



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CMI054 0084

counter offer was made to settle for a payment to the FRF in the amount of $12.4 million in addition to the prepayment of the Note. Two days of negotiations occurred and the staff and MNC finally agreed to a proposed $7.0 million settlement which includes prepayment of the Note and the early termination of the Agreement.

**Early Termination Proposal and Analysis:**

- Resolution of All Disputes

Included in the proposed termination is compensation for the settlement of the dispute concerning sharing of subsidiary tax benefits. **Based on the Legal Division's litigation risk analysis,** this $15.3 million dispute has a settlement value of $8.1 million from IOBC to the FRF.

The dispute over sharing of tax benefits from the Bad Debt Reserve would be resolved by the institution agreeing to make an election on its 1995 tax return and triggering a recapture of the excess deductions to the IRS. On a "government as a whole" basis, this is favorable because MNC is agreeing to give up its share of the benefits from the excess deductions.

The issue of reforming the sharing formula has been resolved in the settlement of the future tax benefits which is described below. In valuing the future tax benefits, staff took into



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CMI054 0085

consideration the Legal Division's opinion that the FRF would have an excellent (75%) chance of prevailing if the parties litigated the issue.

The other Agreement disputes are considered resolved. Based on the risk assessment in <u>Exhibit 1</u>, these disputes have a settlement value of $2.4 million from the FRF to IOBC. The reason this settlement value is running from the FRF to IOBC is because the FRF has already realized the entire $5.1 million in dispute through offset.

The Note will be paid off at closing, thereby resolving the dispute over the proper date for the annual prepayments. The premium value of the Note described below is reflected in the settlement amount. The Note was valued based on the assessment that the FRF could continue making the prepayments in January, pursuant to the FRF's interpretation of the provisions providing for such prepayment in the Note.

- <u>Early Termination of the Agreement</u>

The Agreement will be terminated, with the exception of certain specific provisions, effective as of September 30, 1994. A high rate deposit subsidy, an equity sharing provision, and the sharing of post acquisition tax benefits under the Agreement were valued and reflected in the settlement payment. These items are



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CMI054 0086

further described below. The following provisions will survive termination of the Agreement:

Continued sharing of tax benefits related to pre-acquisition losses and credits on a 50/50 basis. Unlike tax benefits generated from post acquisition assistance payments which can shelter any income in the MNC consolidated group, these tax attributes can only be used to shelter earnings at the IOBC level. There are approximately $250 million of pre-acquisition NOLs of which $45 million expire in 1999, $190 million expire in 2003, and the remaining $15 million expire in other years. If fully utilized, the FRF would receive as much as $43 million. Staff **believes that it is unlikely these benefits will be fully used.**

MNC will share tax refunds from the IRS that are expected but not yet received from past tax years. These refunds will be shared at the 25% level plus interest. The FRF's share of the refunds is approximately $3.9 million plus interest.

Certain Indemnifications under the Agreement will Continue. IOBC and MNC will continue to receive indemnifications related to claims covered by the Agreement that exist as of the closing date. Presently, there are seven such matters. IOBC and MNC will continue to be indemnified for certain types of environmental claims resulting from actions of the failed institution through the original termination date of the Agreement. The FRF will have the



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CMI054 0087

right to take assignment and/or directly defend the institution (and MNC) in connection with these matters following termination. If payments are made to IOBC, they will be reduced to capture any tax benefits at the time of payment.

An obligation to repay tax benefits, including such benefits that will be prepaid by MNC as a part of the early termination, that are permanently disallowed by the IRS. This repayment obligation is only to the extent that benefits were paid to the FRF. Staff believes that the risk of a permanent disallowance of benefits is minimal.

- **Settlement of Obligations linked to the 11th District COFI**

The $348.9 million Note described above will be paid off on September 30, 1994.

The Agreement provides for quarterly assistance payments to support a series of high-yield, long-term, zero-coupon certificates of deposit which were issued by the failed institution. The outstanding principal of these certificates of deposit total $137.9 million, and the weighted average yield is 12.78%. The FRF reimburses IOBC for the difference between the interest on the deposits and the 11th District COFI (the "Deposit Subsidy").



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CMI054 0088

Attached as <u>Exhibit 2</u> is a summary of the model and methodology used to discount the cash flows associated with the Note and Deposit Subsidy to establish the present value cost to the FRF of satisfying these two obligations at closing rather than over the remaining term of the Note and the Deposit Subsidy claims in the Agreement. Staff's estimates of the present value of Note premium and the present value of the Deposit Subsidy are $10.2 million and $15.7 million from the FRF to IOBC, respectively.

- <u>Termination of the Equity Sharing Arrangement</u>

The Agreement provides for the FRF to share in a portion of the increase in equity of IOBC during the ten-year life of the Agreement. At termination IOBC is required to pay the FRF one of the following two amounts (at IOBC's option):

- $15 million compounded annually at 10% from the effective date to the date of payment (this option can be exercised at any time by IOBC to terminate the provision); or

- A payment (in cash or preferred stock in IOBC at the institution's option) in an amount equal to 20% of the increase in IOBC's equity during the 10 year life of the Agreement. The Agreement contains a formula for computing this amount.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CMI054 0089

From the effective date through year end 1993, IOBC shrank from $1.5 billion in assets to $900 million. Based on conversations with management, the shrinkage will continue as the Note is retired by the FRF. The Note currently represents over a third of IOBC's assets. Staff believes the shrinkage may be accelerated through branch sales as MNC is seeking to retreat from California. Historically, IOBC's return on assets has ranged from 0.71% to 1.1%. At year-end 1993, MNC took a $29.5 million distribution from IOBC to remove excess capital, which had grown to over 12.0% of assets due to the shrinkage of IOBC.

In 1993, the investment firm of Donaldson, Lufkin, & Jenrette Securities Corporation created a model to value the equity sharing provision. When the firm's contract with the FRF ended, staff obtained a copy of the model and has continued to update it as needed.

Based on the above information, staff valued the equity sharing provision with the following key assumptions:

- Return on Assets of 0.8%;
- Capital will be maintained at 6.0%;
- Continued shrinkage of IOBC as the Note is paid by the FRF as forecast by MNC;



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CMI054 0090

- The projected equity sharing obligation in 1998 was discounted at 15.0%, which staff believes is an appropriate rate for discounting cash flows based on earnings projections; and
- IOBC will select the second option noted above since it yields a value in 1998 significantly less than the first option.

Based on the above assumptions, the equity sharing provision is valued in the proposed settlement at $9.4 million from IOBC to the FRF. MNC viewed this obligation to be worth approximately $6.0 million using similar assumptions because they have the right to **satisfy the obligation by issuing preferred stock in 1998 with a** below market dividend rate.

Lastly, it is noted that the formula for calculating the equity sharing is based in part on the same definition that determines when the tax benefit sharing shifts from 25% to 50%, which is in error. In valuing the sharing, staff assumed a corrected definition.

- Settlement of Tax Benefit Sharing Obligations.

Except as noted above in the section discussing the early termination of the Agreement, the obligation to share tax benefits with the FRF will be terminated with the proposed settlement.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CMI054 0091

Settlement of the remaining tax benefit sharing obligations moots the issue of reforming the formula in the Agreement that determines when tax benefit sharing shifts from 25% to 50%. As noted above in the section discussing the settlement of the disputes, the Legal Division believes that the FRF would have a 75% chance of prevailing if litigation were initiated over reformation of the formula.

In valuing the settlement of the tax sharing obligations, staff used the following assumptions in its projections:

- NOLs are approximately $170 million;
- **Alternative Minimum Tax Credits are approximately $52** million;
- Based on discussions with management, MNC's stabilized taxable income level was assumed to be $100 million per year, or approximately 1.0% of assets. If historical performance is an indicator, this level of taxable earnings is optimistic;
- A sharing percentage of 43.75% (which is 75% of the distance between 25% and 50%) was used in the projections to reflect the Legal Division's litigation risk assessment of the issue;
- An equity discount rate of 15.0% was used to discount the cash flows reflecting that they are a function of future earnings; and



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CMI054 0092

- 1994 taxable earnings are increased by $60 million to reflect MNC's recent sale of its mortgage banking operations.

Based on the above assumptions, staff's valuation of the tax sharing provision in the Agreement is $16.6 million from IOBC to the FRF.

This valuation did not consider assistance paid by the FRF in 1994. Therefore, MNC has agreed to have IOBC to make a special payment to the FRF when IOBC files its final assistance claim for the quarter ending September 30, 1994, in the amount of 43.75% **(which is the risk adjusted sharing percentage used to value all** future tax benefit sharing payments described in the assumptions noted above) of the tax benefits related to Agreement and Note interest payments made in 1994. This payment is expected to be approximately $1.5 million and will be received no later than December 31, 1994.

Since the FRF is proposing to settle its right to receive future tax sharing payments as part of this early termination, MNC has agreed not to initiate a lawsuit against the federal government as a result of Section 13224 of the Revenue Reconciliation Act of 1993, which prohibits the deduction of losses (after March 4, 1991) to the extent that federal financial assistance has been received for such loss.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CMI054 0093

**Summary of the Staff's Settlement Valuations:**

The following is a summary of the staff's valuation of the elements of the settlement described above.

| | |
|---|---|
| • Subsidiary Tax Benefit Sharing Dispute | $8.1 million |
| • Other Assistance Agreement Disputes | (2.4 million) |
| • Promissory Note Premium | (10.2 million) |
| • Deposit Subsidy | (15.7 million) |
| • Equity Sharing | 9.4 million |
| • Tax Benefit Sharing | 16.6 million |
| Total Settlement Value | $5.8 million |

The negative numbers represent settlement adjustments from FRF to IOBC and the positive numbers represent settlement adjustments from IOBC to the FRF. The negotiated settlement of $7.0 million from IOBC to the FRF represents a $1.2 million benefit to settling the issues with IOBC and MNC as proposed.

As noted above, the staff's valuation of the disputes and other Agreement issues have been risk-adjusted. Given the large number of disputes and issues with IOBC and MNC, staff believes that litigation will result if the settlement is not approved. Accordingly, approval is recommended.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CMI054 0094

**Exhibits:**

- Exhibit 1- Other Assistance Agreement Disputes
- Exhibit 2- Note and Deposit Subsidy Valuation Models



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CMI054 0095