# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| NATIONAL AUSTRALIA BANK, LTD., Plaintiff, | ) | |
| v. | ) | No. 99-690C (Senior Judge Bruggink) |
| THE UNITED STATES, Defendant. | ) | |

## DECLARATION OF JAMES A. MEYER

I, James A. Meyer, make the following statements under penalty of perjury:

1. I graduated from the University of Missouri at Columbia with a bachelors in business administration in 1977. In 1985, I graduated from George Mason University with a Masters in Business Administration in Finance.

2. In 1978, I joined the Federal Home Loan Bank Board as a savings and loan examiner. In 1981, I transferred to Washington, D.C. as a Financial Analyst in the Office of Examinations & Supervision. In 1983, I began working at the Federal Savings and Loan Insurance Corporation in the Financial Assistance Division in progressively more responsible positions, where I managed transactions after they were put together. In 1989, my duties were transferred to the Federal Deposit Insurance Corporation ("FDIC"). In 1994, I was a Senior Resolutions Specialist with the FDIC's Division of Resolutions. In 1996, I was promoted to Assistant Director in the FDIC's Division of Resolutions and Receiverships.

3. In 1994, I served as the lead negotiator for the FDIC with Michigan National Corporation



PLAINTIFF'S EXHIBIT 5

PENGAD 800-631-6989

regarding the Termination Agreement By And Among Federal Deposit Insurance Corporation, As Manager Of The FSLIC Resolution Fund, Michigan National Corporation And Independence One Bank Of California, FSB ("Termination Agreement") executed September 29, 1994. The Termination Agreement terminated the Assistance Agreement Among The Federal Savings And Loan Insurance Corporation, Michigan National Corporation and Beverly Hills Federal Savings Bank ("Assistance Agreement") executed December 31, 1988.

4. I drafted a September 20, 1994 memorandum seeking authorization for Division of Resolutions to be authorized to enter into a Termination Agreement with MNC. See Ex. 1.

5. The FDIC attempted to negotiate with MNC a termination of the Assistance Agreement in 1992. Such negotiations, however, failed. In 1994, after a change in management, MNC contacted the FDIC about negotiation a termination of the Assistance Agreement. See Ex. 1, at 11-12 ("MNC, with new management, contacted staff with an offer to resume negotiations to settle the disputes.").

6. The tax sharing formula in the Assistance Agreement did not function properly. It was my understanding that it was supposed to shift so that the FDIC went from receiving only 25 percent of the tax benefits to receiving 50 percent based on when MNC achieved a specified return on its investment.

7. In the September 20, 1994 memorandum, I address this problem in the tax sharing formula:

> Staff has discovered that in the drafting of the provision in the Agreement for the Net Investment Account calculation, there were numerous mutual mistakes which have rendered the formula inoperative. If this provision is not reformed, the sharing of tax benefits will never increase to 50 percent.... This issue has not become a dispute, because 1994 is the first year that tax benefits would be shared at the 50 percent level if the definition were

> reformed. The tax benefit payment for 1994 will not be due until the fourth quarter of 1995.

Ex. 1, at 22.

8. During the negotiations of the Termination Agreement, MNC's negotiators (in particular Ernest Antczak) acknowledged that the Assistance Agreement's tax sharing formula did not function properly as intended. Moreover, they understood that it was the FDIC's position that the tax sharing formula had to be reformed in order to reach any type of agreement in a Termination Agreement.

9. In the September 20, 1994 memorandum, I noted:

> Since the FRF is proposing to settle its right to receive future tax sharing payments as part of this early termination, MNC has agreed not to initiate a lawsuit against the federal government as a result of Section 13224 of the Revenue Reconciliation Act of 1993, which prohibits the deduction of losses (after March 4, 1991) to the extent that federal financial assistance has been received for such loss.

Ex. 1, at 22. Prior to the signing of the Termination Agreement, however, MNC changed its position and wanted to preserve its right to sue the Government.

10. I had to get approval because of the size of the transaction, under delegated authority, to enter into the Termination Agreement from a level higher than the division. When I got approval, I got some flexibility to deviate from the original agreement proposed to FDIC management regarding the Termination Agreement with last minute changes. The only way I could go forward, however, was subject to the existing approval. Therefore, I had to satisfy myself that the economic value of the agreement that was at the basis of the September 20, 1994 memorandum was essentially the same or a similar deal that ultimately was entered into in the Termination Agreement. The FDIC was always going to need to retain the 50 percent share of the tax benefits so that it would keep the FDIC in the same place as if MNC never sued over the Guarini legislation. In order for the

Termination Agreement to be the same or similar to the September 20, 1994 memorandum, the FDIC would have to receive its 50 percent share in some manner. Additionally, this 50 percent also applied to the sharing of tax benefits that were realized by MNC after the Termination Agreement came into effect.

11. I would have never negotiated the signature by the FDIC unless I was comfortable that the FDIC was going to receive 50 percent of the tax benefits after the Termination Agreement.

12. If the FDIC did not enter into the Termination Agreement, it was going to sue MNC to reform the Assistant Agreement's tax sharing provision.

I declare under penalty of perjury that the foregoing is true and correct.

JAMES A. MEYER

Executed February 25, 2004
Washington, D.C.