**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| NATIONAL AUSTRALIA BANK, LTD., Plaintiff, | ) | |
| v. | ) | No. 99-690C (Senior Judge Bruggink) |
| THE UNITED STATES, Defendant. | ) | |

**DECLARATION OF STEPHAN LOWER**

I, Stephan Lower, make the following statements under penalty of perjury:

1. I graduated from Idaho State University with a bachelors of arts in 1966. Between 1972 and 1974, I completed two years of study towards a masters degree at the University of Nevada at Reno.

2. In 1974, I joined the Internal Revenue Service ("IRS") as a tax auditor in Bakersfield, California. In 1976, I was transferred by the IRS to Washington, D.C. where I worked in the Office of International Operations. In the fall of 1982, I left the IRS and went to work at Defense Audit Services, which in January 1983 became the Office of the Inspector General at the Department of Defense. In March 1988, I left the Department of Defense and went to work at the Federal Home Loan Bank Board ("FHLBB") in the Office of Inspector General. When the FHLBB merged into the Federal Deposit Insurance Corporation ("FDIC"), I continued working there. In 1991, I was promoted to Chief of the FSLIC Resolution Fund Tax Unit, which was part of the Resolution Trust Corporation ("RTC"). In 1993, my office at the RTC was transferred back to the FDIC where I

PENGAD 800-631-6989 PLAINTIFF'S EXHIBIT 6

continued to work until I retired in 1998.

3. I remember that the tax sharing formula in the Assistance Agreement Among The Federal Savings And Loan Insurance Corporation, Michigan National Corporation and Beverly Hills Federal Savings Bank ("Assistance Agreement") was flawed so that it would never reach 50% sharing with the Government. Under the tax sharing formula, the FDIC was supposed to switch from receiving 25% to 50% after Michigan National received its full investment into Beverly Hills plus a 20% return.

4. In the initial meetings with Michigan National to negotiate the Termination Agreement, the representatives of Michigan National agreed that it was always the intention of the parties negotiating the Assistance Agreement that the tax sharing would eventually get to 50%. I recall that during the negotiations to terminate the Assistance Agreement, Michigan National was represented by various individuals, including Lawrence Gladchun and Ernest Antczak.

5. I remember that if Michigan National did not agree to fix the flaw within the tax sharing formula, then this refusal would have been a deal-breaker. Consequently, this was the first issue resolved by the parties.

6. I worked with James Meyer on his September 20, 1994 memorandum to the FDIC Board of Directors' Committee on Loans, Liquidation and Purchases of Assets. Ex. 1 (EMI042 0129 - 0155). This memorandum is what those of us negotiating the termination of the Assistance Agreement with Michigan National are telling the FDIC Board of Directors that the FDIC was going to receive in a termination agreement. The FDIC Board of Directors would have relied on our representations in making the decision to approve

terminating the Assistance Agreement.

7. Taken as a whole, the memorandum reflects that the parties negotiated that the FDIC was going to receive 50% of the tax benefits. In particular, the memorandum reflects that the parties acknowledge the tax sharing formula did not function properly. See, e.g., Ex. 1, at 9-10, 12, 14. Moreover, the parties expected that after the termination of the Assistance Agreement the FDIC would share the tax benefits at 50%. See, e.g., Ex. 1, at 9-10.

I declare under penalty of perjury that the foregoing is true and correct.

Stephan Lower

STEPHAN LOWER

Executed February 20 2004
Reno, Nevada