IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| NATIONAL AUSTRALIA BANK, LTD,<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant. | Case No. 99-690C<br><br>(Senior Judge Bruggink) |

**DECLARATION OF LARS S. VIITALA**

I, Lars S. Viitala, make the following statements, based on my own personal knowledge.

1. I was hired by the Federal Savings and Loan Insurance Corporation ("FSLIC") in August 1988 as a tax accountant. In October of 1989, I was transferred to the Federal Deposit Insurance Corporation ("FDIC"). I retained my same position at the FDIC as a tax accountant until April 1991. In April 1991, I was transferred to the Resolution Trust Corporation ("RTC") to assist in the renegotiations of the 1988 and 1989 FSLIC-assisted transactions. During this time, I retained my responsibilities at the FDIC. In September 1991, I was promoted to a senior tax accountant at the RTC. In October 1992, I returned to full-time status at the FDIC as a senior tax accountant. I remained in this position until December of 1999.

2. My duties and responsibilities with the FSLIC, the FDIC, and the RTC included the administration and interpretation of the tax benefit sharing provisions in nearly all of the FSLIC assistance agreements executed in 1988. My responsibilities also included the calculation



PENGAD 800-631-6989
PLAINTIFF'S EXHIBIT
7

of the tax benefit sharing payments that the FDIC was entitled to receive under all of these 1988 agreements. The Assistance Agreement among the FSLIC, Michigan National Corporation ("Michigan National"), and Beverly Hills Federal Savings Bank ("Beverly Hills") was one such assistance agreement for which I had the responsibility of monitoring and calculating tax benefits.

3. I was personally involved in the settlement negotiations between the FDIC and Michigan National in which the FDIC and Michigan National reached an agreement (the "Termination Agreement") to terminate the Assistance Agreement during 1994 (Attached as Attachment 1). After I left the FDIC in 1999, I was retained by the FDIC as a consultant, among other things, to continue monitoring the tax benefit provisions contained in the Termination Agreement.

4. Through my involvement in monitoring the tax benefit provisions of the Michigan National acquisition of Beverly Hills and my participation in the termination negotiations with Michigan National, I am aware of numerous disputes between the parties. These disputes included non-tax issues and tax issues. There were three primary disputes with regard to tax issues. One dispute was the extent to which the FDIC shared in the tax savings generated from the bad deduction claimed in excess of reimbursed charge-offs. A second dispute was whether the FDIC shared in the tax savings attributable to the built-in losses and net operating losses ("NOLs") of BH Mortgage Corporation and other Beverly Hills subsidiaries that accrued prior to the acquisition. The third tax sharing dispute was whether the percentage of tax benefits the FDIC was entitled to receive was 25% or 50%. All of these disputes were resolved in the Termination Agreement.

5. The first tax sharing dispute regarding the manner in which the FDIC shared in tax benefits from bad debt deductions in excess of the reimbursed charge-offs was settled in the Termination Agreement. The dispute was resolved by the FDIC agreeing not to share in the tax benefits in excess of reimbursed charge-offs and Beverly Hills agreeing to apply to the Internal Revenue Service ("IRS") to change its bad debts method of accounting from the reserve method to the specific charge-off method. (See Attachment 1, at Section 2.7 and Exhibit 2.3, Item B.2 to the Termination Agreement).

6. The second dispute between the FDIC and Michigan National pertaining to the FDIC's rights to share in built-in losses and NOLs in BH Mortgage Corporation and other Beverly Hills subsidiaries was resolved by Michigan National making a payment to the FDIC. The parties agreed to a payment to the FDIC that was part of the $7 million payment identified in Section 2.1(a)(viii) for the FDIC's share of these subsidiary tax benefits for tax years prior to 1994. This agreed upon $7 million payment constituted several factors, including tax benefit sharing, which was computed at a 50% tax sharing rate.

7. The sharing of the subsidiary tax attributes and the amount of the settlement of the dispute is further evidenced by Section 2.6(e) of the Termination Agreement. This section provides that the FDIC was obligated to reimburse Beverly Hills in the event of the disallowance of a Subsidiary Tax Benefit Item in an amount not to exceed $8,027,208 plus any additional payments to the FDIC by Beverly Hills for increases to Subsidiaries Tax Benefit Items after the effective date of the Termination Agreement. This $8,027,208 was the amount that Michigan National and the FDIC negotiated to resolve this dispute.

8. For tax years after December 31, 1993, the parties agreed that the SRLY ("Separate Return Limitation Year") NOLs and Tax Credits of the Beverly Hills subsidiaries would be shared with the FDIC at a 50% tax sharing rate (See Attachment 1, at Sections 2.5(a) and (b)). The Termination Agreement did not provide for additional sharing of the built-in losses of subsidiary assets as nearly all of such built-in losses had already been realized.

9. As noted above, the third dispute concerned whether the tax benefits sharing rate that the FDIC was entitled to receive was 25% or 50%. After the execution of the Assistance Agreement, the parties discovered that the formula determining the percentage of tax benefits to be shared was flawed (See Attachment 2, at Sections 9(f) and 1(kk)). These sections provided that the FDIC received 25% of tax benefits until Michigan National had received as a return on its investment the capital investments in Beverly Hills plus a 20% annual return. Once this return was obtained, the sharing changed to 50% until the Michigan National's return became less than its capital investment plus 20% annual return.

10. The formula in the Assistance Agreement was flawed in that it added in Michigan National's aggregate capital contributions every year rather than only the additional capital contributions that it made each year. For example, if Michigan National contributed $60 million in 1989, $24 million in 1990, and nothing after that, the total capital contributions included in the calculation should be $84 million. However, application of the flawed formula as written added in $60 million in 1989, $84 million in 1990, and $84 million each year thereafter, rather than $60 million in 1989, $24 million in 1990, and nothing thereafter. Thus, Michigan National could not possibly reach its capital investment plus a 20% annual return.

11. Tim Orians of Michigan National identified this flaw in a schedule attached to his November 15, 1991 letter addressed to me (See Attachment 3, at MNB018_B007). Upon review of his letter, the FDIC agreed that the formula did not work properly.

12. Barry Taff, of Silver Freedman & Taff, served as Michigan National's tax counsel during the Assistance Agreement negotiations. I understand that days before the signing of the Assistance Agreement, the tax sharing percentage formula in Section 1(kk) worked properly. After Mr. Taff's revisions, Section 1(kk) was changed so that it no longer functioned properly.

13. As a result of the flaw in Section 1(kk), Michigan National could not possibly reach the point where it recouped its investment plus a 20% annual return. Thus, Michigan National would never have to share more than 25% of the tax benefits with the FDIC. It was my understanding that the parties fully expected that Michigan National would eventually reach a point where it would have to share 50% of the tax benefits with the FDIC. Otherwise, there is no point to this formula in Section 1(kk).

14. During the negotiations of the Termination Agreement, the parties understood that the flaw in Section 1(kk) had to be corrected to provide for 50% sharing with the FDIC of any tax benefits. Indeed it was the FDIC's position that, under the Resolution Trust Corporation Funding Act of 1991, we were obligated to negotiate so as to maximize the tax benefits available to the FDIC. Consequently, we would not have settled for anything less than 50% because that was the amount to which we believed the FDIC was entitled.

15. The third dispute regarding the FDIC's sharing percentage of the tax benefits was resolved in the Termination Agreement with the FDIC obtaining 50% of the tax benefits after

1994.[1] The resolution is reflected in Sections 2.5(a) and (b) of the Termination Agreement. These provisions calculate the sharing of the SRLY NOLs and tax credits of Beverly Hills at a 50% sharing rate. These provisions reflect the parties' agreement to correct the flawed sharing provision Section 1(kk) in the Assistance Agreement. For tax years from 1994 through 1999, Michigan National began paying the FDIC tax benefits pursuant to these provisions of the Termination Agreement at a 50% tax sharing rate.

16. As the tax accountant assigned to this transaction, in the summer of 1994, I prepared a calculation of the future tax benefits that the FDIC would receive from the post-acquisition NOLs and tax credits beginning with the 1994 tax year. Consistent with Sections 2.5(a) and 2.5(b) of the Termination Agreement, in preparing the analysis of the FDIC sharing of future tax benefits, I based my calculation on the FDIC receiving a 50% share of these tax benefits. I obtained estimated future earnings from Michigan National as well as utilizing industry analyst projections to forecast the amount of tax benefits that the FDIC would be entitled an on annual basis. I then discounted this amount to arrive at a present valued and litigation risk adjusted value that the FDIC would accept to terminate the 50% tax sharing to which the FDIC was entitled with regard to these NOLs and tax credits. Included in the post-acquisition NOLs were Covered Asset Losses that were not denied by Section 13224 of the

[1] The tax year 1994 was a transition year. As a transition from the 25% sharing rate to a 50% sharing rate, there was an agreement to share the tax benefit arising from the 1994 assistance payments at 43.75%. The sharing percentage of 43.75% is equal to the undisputed sharing percentage of 25% plus 18.75%, which represents 75% of the difference between the two disputed sharing percentage of 50% and 25%. Subsections 2.4 (c) (ii) and (iii) of the Termination Agreement use a 15.3125% reduction in the assistance to capture this tax benefit, which represents the FDIC's 43.75% share of the tax savings. This 15.3125% reduction is the compromised tax sharing percentage of 43.75% times the corporate tax rate of 35%.

Omnibus Budget Reconciliation Act of 1993 ("the Guarini legislation") as well as a small amount of Covered Asset Losses that were denied by the Guarini legislation and subsequently removed as a result of an IRS audit.

17. If the Guarini legislation had not been enacted, the amount of post-acquisition NOLs that were paid to the FDIC in the settlement agreement would have included the Covered Asset Losses that were denied by the Guarini legislation. Thus, these tax benefits also would have been shared at a 50% tax sharing rate as there would be no difference between the pre-March 4, 1991 Covered Asset Losses and the Covered Asset Losses incurred after March 3, 1991 (if the Guarini legislation not been enacted).

18. In addition to Sections 2.5(a) and 2.5(b), Section 2.6(f) of the Termination Agreement provides further evidence of the parties' agreement to a 50% sharing of tax benefits for tax year 1994 and thereafter. In Section 2.6(f) there is a reimbursement schedule in the event that the IRS audits and disallows any tax benefits for which the FDIC had been paid a tax benefit. In subsection (iii), the parties agreed to a repayment at a rate of $175 for each $1,000 disallowance of Other Tax Benefit Items (which includes Covered Asset Losses), for the first $172 million of such disallowance. This repayment rate translates to a 50% tax benefit sharing rate: $175 per $1,000 equals 17.5%. Fifty percent (50%) of the 35% tax rate equals 17.5%.

19. If there had not been an agreement that the FDIC was to receive a 50% sharing percentage for the tax benefits to be received after 1994 (1993 with respect to post-acquisition NOLs and tax credits), then the FDIC would not have been willing to reimburse Beverly Hills at the 50% tax sharing rate (i.e. $175 per $1,000) in the event of an IRS audit disallowing tax

benefits for which the FDIC had been paid. It was our opinion that reimbursing Michigan National at a 50% tax sharing rate, if we only received a 25% tax sharing rate, would violate the Resolution Trust Corporation Funding Act of 1991, which obligated us to renegotiate so as to maximize the tax benefits available to the FDIC. If the Guarini legislation had not been enacted, the amount of Covered Asset Losses included in the chart in Section 2.6(f)(iii) would have been increased by the amount of those Covered Asset Loss deductions that were actually denied by the Guarini legislation.

20. In at least one situation, the FDIC actually did reimburse Beverly Hills for Covered Asset Losses denied by the Guarini legislation at a 50% tax sharing rate pursuant to Section 2.6(f) of the Termination Agreement. The IRS disallowed Covered Asset Losses on its audit of Michigan National for the period 1989 through 1991. On October 2, 2000, Ernest Anctzak of Michigan National submitted to the FDIC its 1999 tax benefits report (See Attachment 4). I processed this report in my capacity as an FDIC consultant.

21. In this 1999 tax benefits report, Michigan National calculated that it was due $507,495 (plus interest) as a result of the IRS disallowance of approximately $1.45 million of post-Guarini Covered Asset Losses and $1.45 million of other adjustments. Specifically, the Covered Asset was known as Le Mondrian. The 1999 tax benefits report prepared by Michigan National calculated the $507,495 payment utilizing the 50% tax sharing rate reflected in Section 2.6(f): $2.9 million times 17.5% equals $507,500. In the Termination Agreement, the tax benefits were paid utilizing a 50% tax sharing rate. Consequently, the first dollars paid pursuant to Section 2.6(f) were paid utilizing a 50% tax sharing rate. The FDIC agreed with the Michigan

National report and made the approximate $500,000 payment.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on May 26, 2004
Harrison, Maine

Lars S. Viitala