C-392

# ASSISTANCE AGREEMENT

AMONG

THE FEDERAL SAVINGS AND LOAN INSURANCE COOPERATION

MICHIGAN NATIONAL CORPORATION

AND

BEVERLY HILLS FEDERAL SAVINGS BANK,
BEVERLY HILLS, CALIFORNIA

PENGAD 800-631-6989 PLAINTIFF'S EXHIBIT 8

ANTCZAK DEPOSITION EXHIBIT 1 9-19-02 LS

ASSISTANCE AGREEMENT

AMONG

THE FEDERAL SAVINGS AND LOAN INSURANCE COOPERATION,

MICHIGAN NATIONAL CORPORATION

AND

BEVERLY HILLS FEDERAL SAVINGS BANK,
BEVERLY HILLS, CALIFORNIA

SUMMARY OF SUBSTANTIVE PROVISIONS

| | Assistance Provided | Section in Agreement |
|---|---|---|
| 1. | FSLIC Promissory Note in an aggregate amount equal to the ACQUIRED ASSOCIATION's Negative Regulatory Capital as determined by an audit | § 6(a) |
| 2. | Reimbursement for losses resulting from capital losses on Covered Assets, write-down or adjustment of Covered Assets and for certain related costs and expenses | §§ 3(a) and 4 |
| 3. | Guaranteed yield on certain Covered Assets | § 3(a) |
| 4. | Indemnification for certain unreserved for Claims against the ACQUIRED ASSOCIATION and litigation challenging the Transaction | §§ 3(a) and 7(a) |
| 5. | Indemnification for expenses of pursuing Related Claims | §§ 3(a) and 7(b) |



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0090

# ASSISTANCE AGREEMENT

THIS AGREEMENT, dated December 31, 1988, is entered into by and among MICHIGAN NATIONAL CORPORATION, a savings and loan holding company incorporated under the laws of the State of Michigan ("ACQUIRER"), BEVERLY HILLS FEDERAL SAVINGS BANK, Beverly Hills, California, a federally-chartered stock savings bank wholly owned by the ACQUIRER ("NEW ASSOCIATION"), and the FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION, a corporate instrumentality and agency of the United States ("CORPORATION").

## RECITALS

A. The Federal Home Loan Bank Board, by Resolution No. 88-1543, dated December 30, 1988, authorized (1) the supervisory conversion of Beverly Hills Savings, a Federal Savings and Loan Association, Beverly Hills, California, a federally-chartered mutual savings and loan association ("ACQUIRED ASSOCIATION"), into the NEW ASSOCIATION, and (2) the purchase by the ACQUIRER of all of the NEW ASSOCIATION's initially issued and outstanding Common Stock pursuant to the Stock Purchase Agreement of even date herewith by and between the ACQUIRER and the NEW ASSOCIATION.

B. The CORPORATION insures the accounts of the ACQUIRED ASSOCIATION and the NEW ASSOCIATION in accordance with § 403 of the National Housing Act ("NHA"), 12 U.S.C. § 1726 (1982).

C. A condition to the obligation of the parties to consummate the Transaction (defined below) is that the CORPORATION, the NEW ASSOCIATION and the ACQUIRER enter into an agreement in the form of this Agreement, pursuant to which the CORPORATION will provide financial assistance and indemnification to the NEW ASSOCIATION and the ACQUIRER.

D. The CORPORATION has decided, pursuant to § 406(f)(1)-(4) of the NHA, 12 U.S.C. § 1729(f)(1)-(4) (1982), to provide financial assistance and indemnification as set forth in this Agreement, having determined that the ACQUIRED ASSOCIATION is in danger of default and that the amount of such financial assistance and indemnification would be less than the losses the CORPORATION would sustain upon the liquidation of the ACQUIRED ASSOCIATION through a receivership accompanied by the payment of insurance of accounts.

In consideration of the mutual promises contained in this Agreement, the parties enter into the following Agreement.

## AGREEMENT

§ 1 Definitions. For the purposes of this Agreement, the following terms have the indicated meanings:

(a) "Acquired Association Claim": Any Claim of the ACQUIRED ASSOCIATION or the NEW ASSOCIATION as its successor against any person or persons, partnership, corporation, or other entity ("third party"), and any administrator, executor, personal



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0097

representative, heir, or assign of such third party, that is related to a Converting Association Claim.

(b) "Acquisition": The purchase of the Common Stock of the NEW ASSOCIATION by the ACQUIRER pursuant to the Stock Purchase Agreement.

(c) "Actual Yield": With respect to a Covered Asset, the amount of all interest and other income received or accrued, including specifically, with respect to any Real Estate Owned, all net operating income or loss, and with respect to any Investment in any Subsidiary, the NEW ASSOCIATION's distributable share of net earnings, whether or not distributed, or loss. Net operating income or loss for any Real Estate Owned shall be equal to the difference between the gross income received from or accrued on the asset and the sum of expenses in the form of payments to third parties accrued or paid by or on behalf of the NEW ASSOCIATION that are directly related to the Real Estate Owned and that have been approved by the CORPORATION in accordance with the procedures set forth in §§ 12, 13 and 14. Net earnings or loss for any Subsidiary shall be computed in accordance with generally accepted accounting principles, but without deduction for any dividend or other distribution from the Subsidiary to the NEW ASSOCIATION or any Affiliate of the NEW ASSOCIATION, provided that no loss of a Subsidiary will be taken into account in determining Actual Yield if the amount of the loss, when combined with all losses previously taken into account

in determining Actual Yield with respect to such Subsidiary, would exceed the Investment in such Subsidiary.

(d) "Affiliate": With respect to the NEW ASSOCIATION, an affiliate, as that term is defined in § 561.25 of the Insurance Regulations. With respect to the ACQUIRER, any person or company which controls, is controlled by or is under common control with, the ACQUIRER.

(e) "Average Book Value": For any full Quarter, the sum of the Book Value of Covered Assets which have not been Liquidated or written down to one dollar on the first day of the Quarter and on the last day of each calendar month ending within the Quarter divided by four; for the first Quarter, the sum of (x) the Book Value of Covered Assets which have not been Liquidated or written down to one dollar on the first day of the Quarter and on the last day of each calendar month ending within the Quarter divided by (y) one plus the number of calendar months in the Quarter; and in the event the last Quarter ends on any day other than the last day of a full Quarter, for the last Quarter, the sum of (x) the Book Value of Covered Assets which have not been Liquidated or written down to one dollar on the first and last days of the Quarter and on the last day of each calendar month ending within the Quarter divided by (y) two plus the number of full calendar months in the Quarter.

(f) "Average Deposit Balance": For any full Quarter, the sum of the outstanding principal balances of the Stated Maturity Deposit Liabilities outstanding on the first day



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0099

of the Quarter and on the last day of each calendar month ending within the Quarter divided by four; for the first Quarter, the sum of (x) the outstanding principal balances of the Stated Maturity Deposit Liabilities outstanding on the first day of the Quarter and on the last day of each calendar month ending within the Quarter divided by (y) one plus the number of calendar months in the Quarter; and in the event the last Quarter ends on any day other than the last day of a full Quarter, for the last Quarter, the sum of (x) the outstanding principal balances of the Stated Maturity Deposit Liabilities outstanding on the first and last days of the Quarter and on the last day of each calendar month ending within the Quarter divided by (y) two plus the number of full calendar months in the Quarter.

(g) "Bank": The Federal Home Loan Bank of San Francisco.

(h) "Bank Board": The Federal Home Loan Bank Board.

(i) "Bank Indebtedness Losses": With respect to any advances made by the Bank to the ACQUIRED ASSOCIATION or any other indebtedness of the ACQUIRED ASSOCIATION, excluding obligations to World Savings and Loan Association, a Federal Savings and Loan Association, Oakland, California, deposit liabilities, escrows and accounts payable ("Debt"), the penalties incurred by the NEW ASSOCIATION in prepaying any such Debt within the first 120 days of the term of this Agreement, or, if prepayment is not possible within such 120 day period, as demonstrated



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0100

to the CORPORATION's satisfaction, within 15 days after the date on which prepayment becomes possible, provided that the NEW ASSOCIATION gives the CORPORATION prior written notice of the payment of any such penalties, which notice must be given at least 10 days in advance of any prepayment.

(j) "Books and Records": Any and all books and records of the ACQUIRED ASSOCIATION as of immediately prior to the Effective Date.

(k) "Book Value":

(1) The Book Value of any asset shall be initially determined as follows:

(A) With respect to any Covered Asset reflected on the Books and Records, the book value of the asset (before deduction for any specific valuation allowance, loan loss, credit loss or other loss reserve) as so reflected or as adjusted by the Initial Audit;

(B) With respect to any Covered Asset acquired by the NEW ASSOCIATION after the Effective Date pursuant to a legally binding commitment of the ACQUIRED ASSOCIATION, the amount determined in accordance with the accounting principles required by this Agreement; and

(C) With respect to any real or personal property or interest therein which secures a Covered Asset and is acquired by the NEW ASSOCIATION after the Effective Date by Foreclosure, the outstanding principal amount of the indebtedness secured by such property.



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0101

(2) After initial determination, Book Value shall be adjusted or determined in accordance with the accounting principles required by this Agreement, provided that

(A) Any expenditure that would properly be capitalized must be permitted by §§ 12, 13 and 14 of this Agreement and must not have been reimbursed under another provision of this Agreement; and

(B) Book Value of an Investment in a Subsidiary which is a Covered Asset shall be increased or decreased, but not decreased below zero, as the case may be, by the net earnings or loss of such Subsidiary taken into account in determining Actual Yield and decreased by any capital distributions paid to the NEW ASSOCIATION by such Subsidiary.

(3) The following shall not be included in the determination of Book Value:

(A) The amount of any accrued and uncollected interest or late charges on the principal amount of indebtedness related to a Covered Asset that has been accrued through the Effective Date;

(B) The undisbursed portion of any loan in process account, provided that disbursements made after the Effective Date pursuant to a legally binding commitment of the ACQUIRED ASSOCIATION shall not be excluded from Book Value;

(C) The amount of any deferred income related to a Covered Asset, including, without limitation, unearned discounts on loans purchased, unearned profit on real



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0102

estate sold, deferred loan fees or acquisition credits, unearned discounts on installment loans, deferred gains on securities, and other unearned discounts;

(D) With respect to any Covered Asset reflected on the Books and Records, any adjustment to the value of such Covered Asset made solely as a result of the purchase accounting adjustments under general accepted accounting principles made as a result of the Transaction; and

(E) The amount of any depreciation expense.

(l) "<u>Capital Maintenance Agreement</u>": The agreement among the NEW ASSOCIATION, the ACQUIRER and the CORPORATION of even date herewith pursuant to which the ACQUIRER grants to the CORPORATION certain voting and disposition rights with respect to the Common Stock held by the ACQUIRER, which rights may be exercised if the NEW ASSOCIATION's regulatory capital falls below the level provided in such agreement.

(m) "<u>Claim</u>": Any claim, demand, cause of action or judgment.

(n) "<u>Common Stock</u>": That class or classes of stock that constitutes the common stock of the NEW ASSOCIATION.

(o) "<u>Conversion</u>": The supervisory conversion of the ACQUIRED ASSOCIATION from a federally-chartered mutual savings and loan association to a federally-chartered stock savings bank pursuant to Bank Board Resolution No. 88-1543, dated December 30, 1988, and applicable law.

(p) "Converting Association Claim": (i) Any known or unknown Claim that the ACQUIRED ASSOCIATION or the NEW ASSOCIATION as its successor has (A) against the ACQUIRED ASSOCIATION's or any of its Subsidiaries' present or former employees, agents, or controlling persons, or directors, officers or other persons directly or indirectly exercising a controlling influence over the management or policies of the ACQUIRED ASSOCIATION or any of its Subsidiaries prior to the Effective Date, (B) against any appraiser, accountant, auditor, attorney, investment banker or broker, loan broker, deposit broker, securities dealer, or other professional individual or entity performing services for the ACQUIRED ASSOCIATION arising out of events which occurred prior to the Effective Date, and (C) against any administrator, executor, personal representative, heir, assign, director or officer and any employees, agents or other persons aiding and abetting any person or entity identified in § 1(p)(i)(A) or (B), arising out of any act(s) or omissions(s) of such persons prior to the Effective Date with respect to the ACQUIRED ASSOCIATION or its property, or any of its Subsidiaries or the Subsidiaries' property; and (ii) any known or unknown Claim that the ACQUIRED ASSOCIATION has against a surety for any person or entity identified in § 1(p)(i)(A), (B) and (C), including any insurer who may be liable for indemnification for the loss caused by action or inaction of any such person or entity.



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0104

(q) "<u>Covered Asset</u>": The term "Covered Asset" means the following:

(1) Each asset of the ACQUIRED ASSOCIATION, except as provided in § 1(q)(4) below, on the Books and Records, and any real or personal property or interest therein that is acquired by the NEW ASSOCIATION as a result of Foreclosure of, or other judicial collection proceedings related to, any such asset or pursuant to a legally binding obligation of the ACQUIRED ASSOCIATION in effect immediately prior to the Effective Date;

(2) Any loan or Investment, including the Investment in any Subsidiary of the ACQUIRED ASSOCIATION, reflected on the Books and Records, or that is made by the NEW ASSOCIATION after the Effective Date pursuant to a legally binding commitment of the ACQUIRED ASSOCIATION in effect immediately prior to the Effective Date;

(3) A loan, contract, or Investment made by the NEW ASSOCIATION in connection with the sale of, or to salvage, a Covered Asset, or any property or interest therein received in exchange for a Covered Asset, if, prior to the making of any such loan, contract, Investment, or exchange of a Covered Asset, the NEW ASSOCIATION has obtained the CORPORATION's written consent to the transaction and to the treatment as a Covered Asset of such loan, contract, Investment, or property or interest received in exchange for a Covered Asset; and

(4) The term "Covered Asset" shall not include any item not specifically set forth in § 1(q)(1)-(3) above, including but not limited to:

(A) The ACQUIRED ASSOCIATION's office buildings and facilities, any real estate or leasehold interest appurtenant thereto, and any related parking lots;

(B) The ACQUIRED ASSOCIATION's leasehold improvements, office furniture, fixtures and equipment;

(C) Any property, real or personal, or interest therein, or any asset of any nature or kind that belongs to or is claimed to belong to a Subsidiary, including any service corporation, of the ACQUIRED ASSOCIATION;

(D) Marketable Securities;

(E) Any intangible asset listed in § 1(jj);

(F) Cash on the Books and Records; and

(G) The Promissory Note issued to the ACQUIRED ASSOCIATION pursuant to the Note Agreement.

(r) "<u>Covered Asset Loss</u>": One hundred percent of the amount authorized pursuant to the provisions of §§ 12, 13 and 14, (i) by which the Book Value of a Covered Asset exceeds the Net Proceeds Received by the NEW ASSOCIATION upon the Liquidation of such Covered Asset, or (ii) of any write-down of or negative adjustment to the Book Value of a Covered Asset as directed or approved by the CORPORATION pursuant to § 4.



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0106

(s) "Covered Asset Recovery": (1) With respect to any Covered Asset that has not been written down pursuant to § 4, 50% of the amount, if any, by which the Net Proceeds Received by the NEW ASSOCIATION upon Liquidation of such Covered Asset exceeds the Book Value of such Covered Asset; and (2) with respect to any Covered Asset that has been written down pursuant to § 4, the sum of (A) the amount by which the Net Proceeds Received by the NEW ASSOCIATION upon Liquidation of such Covered Asset exceeds the amount to which the Book Value of such asset has been written down pursuant to § 4, up to the aggregate amount of all write-downs pursuant to § 4, plus (B) 50% of the amount, if any, by which the Net Proceeds Received by the NEW ASSOCIATION upon Liquidation of such Covered Asset exceeds the Book Value of such Covered Asset without regard to write-downs pursuant to § 4.

(t) "Credit" or "Credit Item": An amount credited to the Special Reserve Account pursuant to the provisions of § 3.

(u) "Debit" or "Debit Item": An amount charged or debited to the Special Reserve Account pursuant to the provisions of § 3.

(v) "Deposit Spread Rate": A rate of interest equal to the excess of WEIGHTED AVERAGE COST OF SAVINGS over ELEVENTH DISTRICT COF, divided by four. For purposes of the foregoing formula, WEIGHTED AVERAGE COST OF SAVINGS for any Quarter shall mean the weighted average rate of interest for the aggregate balances of all outstanding Stated Maturity Deposit

Liabilities as of the first and last days of the Quarter and the last day of each calendar month ending prior to the last day of the Quarter, divided by four.

(w) "<u>Deposit Spread Amount</u>": The Deposit Spread Amount for a Quarter shall be the product of (x) the Average Deposit Balance for such Quarter, and (y) the Deposit Spread Rate for such Quarter.

(x) "<u>Effective Date</u>": The date and time at which the Transaction becomes effective pursuant to the terms of the Stock Purchase Agreement, Bank Board Resolutions and applicable law.

(y) "<u>ELEVENTH DISTRICT COF</u>": The average cost of funds expressed as a simple annualized rate of interest, as most recently reported by the Bank or, if the Bank ceases to report such rate, as provided by the Bank Board.

(z) "<u>Foreclosure</u>": Unless specifically indicated otherwise by the context, includes, in addition to foreclosure, (1) the forfeiture of a contract of sale or a contract for deed, (2) a trustee's sale under a deed of trust, (3) the grant of a deed in lieu of foreclosure, (4) the acquisition of title to real estate pursuant to other comparable procedures allowed under applicable law, (5) the acquisition of title to personal property pursuant to procedures for the enforcement of a security interest in such property under applicable law, and (6) the exercise of rights of possession to or control over personal property arising under contract or applicable law.

(aa) "<u>Guaranteed Rate</u>": A rate of interest determined through application of the following formula: $(1 + \text{ELEVENTH DISTRICT COF} + \text{BASIS POINTS})^{x} - 1$. For purposes of the foregoing formula, BASIS POINTS shall equal 250 for the first four Quarters and 150 for the next four Quarters, and for all subsequent Quarters for the purposes of §§ 4(d) and 6(a)(2). For the first and last Quarters, x shall equal a fraction, the numerator of which shall be the number of days in such Quarter and the denominator of which shall be 365. For all other Quarters, x shall equal .25.

(bb) "<u>Guaranteed Yield Amount</u>": The Guaranteed Yield Amount for a Quarter shall be the product of (x) the Average Book Value for such Quarter, and (y) the Guaranteed Rate for such Quarter.

(cc) "<u>Initial Audit</u>": The audit conducted pursuant to § 5(b) of this Agreement.

(dd) "<u>Insurance Regulations</u>": The Rules and Regulations for the Federal Savings and Loan Insurance Corporation in Title 12 of the Code of Federal Regulations, or any successor rules or regulations.

(ee) "<u>Investment</u>": Any debt or equity investment.

(ff) "<u>Lease Obligation Losses</u>": With respect to any obligations, reflected on the Books and Records, to lease office buildings, the lesser of (1) the excess of the present value of all payments under the leases evidencing such



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0109

obligations (the "Leases") over the present value of the payments that would be made under leases for the same buildings (over the remaining term of the Leases) under an agreement or agreements to sublet such buildings made with an independent third party or parties as of the Effective Date at market rates prevailing at such time for similar office buildings similarly located ("Sublease Payments"), or (2) the amount of any termination fee or cost attributable to the early termination of any Lease, provided that the NEW ASSOCIATION gives the CORPORATION prior written notice of the payment of any such fee or cost, which notice must be given at least 10 days in advance of any such payment. Sublease Payments shall be determined by an independent third party mutually acceptable to the CORPORATION and the NEW ASSOCIATION and 50% of the cost of such determination shall be debited to the Special Reserve Account pursuant to § 3(a)(17).

(gg) "Liquidation": (1) A sale of any Covered Asset, whether for cash or on other terms, other than a Fore-closure pursuant to which the NEW ASSOCIATION acquires title to such Covered Asset; or (2) the release, compromise, satisfaction, settlement, reduction to judgment, or assignment to other than the CORPORATION of any Claim.

(hh) "Marketable Securities": Any security on the Books and Records for which there is a regular trading market and as to which as least two nationally recognized investment banking firms regularly quote prices, and any interest rate swap

agreement of the ACQUIRED ASSOCIATION in effect as of immediately prior to the Effective Date ("Swap Agreement").

(ii) "Marketable Securities Losses": Except with respect to Swap Agreements, the excess of the Book Value over the fair market value, as of January 3, 1989, of all Marketable Securities of the ACQUIRED ASSOCIATION, as determined by the higher of prices quoted on January 3, 1989 by two nationally recognized investment banking firms that regularly quote prices for such securities; and, with respect to any Swap Agreement, the amount of the highest bid from an independent third party as obtained on January 3, 1989 by the NEW ASSOCIATION's good faith effort to seek the highest bid available on such day, or, in the event that no such bid is available, the amount of any termination fee or cost attributable to the termination of any Swap Agreement, provided that prior to any such termination, the NEW ASSOCIATION shall consult with and obtain the prior written approval of the CORPORATION concerning the methodology to be used to determine any fee or cost associated with such termination.

(jj) "Negative Regulatory Capital": The amount by which the regulatory capital of the ACQUIRED ASSOCIATION, as defined in § 561.13 of the Insurance Regulations and determined pursuant to § 5(b), is less than zero. In determining such Negative Regulatory Capital for the purposes of this § 1(jj), any amounts on the Books and Records attributable to (i) Appraised Equity Capital (as defined in § 563.13(c) of the Insurance Regulations), (ii) Income Capital Certificates and corresponding

promissory notes to be cancelled pursuant to § 2 of this Agreement and any interest accrued on such promissory notes, (iii) deferred losses on loans and investments which have been disposed of by the ACQUIRED ASSOCIATION prior to the Effective Date, and (iv) goodwill, including, but not limited to, all intangible assets and liabilities and contra-accounts with respect to assets and liabilities, shall be eliminated, and all general loss reserves, and all specific loss reserves or valuation allowances ("Existing Reserves"), on the Books and Records shall be reversed.

(kk) "<u>Net Investment Account of the ACQUIRER</u>": The balance in the Net Investment Account of the ACQUIRER shall be calculated as of the end of each fiscal year of the ACQUIRER as follows:

(1) The balance in the Net Investment Account of the ACQUIRER as of the end of the ACQUIRER's first fiscal year ending after the Effective Date shall be calculated by subtracting item (B) from item (A), with item (A) being equal to the sum of (i) the amount of the Average Equity Investment (defined below) for such first fiscal year, (ii) if the Promissory Notes are no longer outstanding, the aggregate net loss, as determined in accordance with generally accepted accounting principles as applied to the savings and loan industry ("Net Loss"), incurred by the NEW ASSOCIATION during the period from the Effective Date through the end of such first fiscal year ("Initial Period") that the Promissory Notes were no longer

outstanding, and (iii) the product of 20% times the sum of the amounts set forth in the immediately preceding subparagraphs (1)(A)(i) and (ii), and with item (B) being equal to the sum of (i) the amount of cash dividends, interest and redemption payments ("Withdrawals") made by the NEW ASSOCIATION on the Initial Capital (defined below) and Additional Capital (defined below) during the Initial Period, and (ii) 75% of the Net Tax Benefits realized by the NEW ASSOCIATION during the Initial Period.

(2) *The balance in the Net Investment* Account of the ACQUIRER as of the end of each of the ACQUIRER's subsequent fiscal years shall be calculated by subtracting item (B) from item (A), with item (A) being equal to the sum of (i) the balance in the Net Investment Account of the ACQUIRER as of the end of the ACQUIRER's immediately preceding fiscal year, (ii) the amount of the Average Equity Investment (defined below) for the then ended fiscal year, (iii) the amount of any Net Loss incurred by the NEW ASSOCIATION during the portion, if any, of the then ended fiscal year that the Promissory Notes were no longer outstanding, and (iv) the product of 20% times the sum of the amounts set forth in the immediately preceding subparagraphs (2)(A)(i), (ii) and (iii); and with item (B) being equal to the sum of (i) the amount of Withdrawals made by the NEW ASSOCIATION during the then ended fiscal year on the Initial Capital (defined below) and all Additional Capital (defined below) purchased during the period from the *Effective Date* through the end of the

then ended fiscal year, and (ii) 75%, if the Applicable Percentage (as defined in § 9(f)) for the then ended fiscal year equaled 25%, or 50%, if the Applicable Percentage for the then ended fiscal year equaled 50%, of the Net Tax Benefits realized by the NEW ASSOCIATION during the then ended fiscal year.

(3) For purposes of this § 1(kk), Initial Capital shall mean the amount of cash paid by the ACQUIRER to purchase Common Stock, pursuant to the Stock Purchase Agreement, as set forth in § 2(b)(4); Additional Capital shall mean the amount paid by the ACQUIRER or any Affiliate of the ACQUIRER to purchase additional shares of Common Stock or shares of preferred stock or subordinated debentures issued by the NEW ASSOCIATION; and Average Equity Investment shall mean the sum of the aggregate amount of the Initial Capital and Additional Capital existing on the first and last days of any fiscal year and on the last day of each of the first three Quarters during such fiscal year, divided by five.

(ll) "<u>Net Proceeds Received</u>": As used in reference to the amount received upon the Liquidation of a Covered Asset or a Claim, the amount computed by deducting from the gross proceeds received all reasonable expenses in the form of payments to third parties actually incurred or paid in connection with such Liquidation, <u>provided</u> that such expenses are authorized pursuant to §§ 12, 13 and 14, have not been reimbursed otherwise and have not previously been properly capitalized to increase Book Value in accordance with § 1(k)(2)(A).



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0114

(mm) "Note Agreement": The agreement between the ACQUIRED ASSOCIATION and the CORPORATION of even date herewith pursuant to which the CORPORATION has issued and delivered the initial Promissory Note to the ACQUIRED ASSOCIATION.

(nn) "Promissory Notes": The initial promissory note previously delivered by the CORPORATION to the ACQUIRED ASSOCIATION, as provided in § 6(a)(1), and the new promissory note for which the initial promissory note is to be exchanged pursuant to § 6(a)(1)(A).

(oo) "Quarter": Three consecutive calendar months, provided that the first Quarter during the term of this Agreement shall be deemed to include the period, if any, from the Effective Date to the last day preceding the first day of the fourth full calendar month following the Effective Date, and provided that the last Quarter during the term of this Agreement shall be deemed to include the period, if any, from the first day after the last day of the last full Quarter (as defined above) during the term of this Agreement to the date on which this Agreement terminates.

(pp) "Real Estate Owned": Any real estate interest held for investment or acquired by Foreclosure except property held for use or development as an office site of the NEW ASSOCIATION.

(qq) "Related Claim": Any counterclaim, offset, insurance settlement, or other Claim which may result in a recovery by the NEW ASSOCIATION or the ACQUIRER and which is

related to a Claim for which the CORPORATION is obligated to indemnify the NEW ASSOCIATION and the ACQUIRER under § 7 of this Agreement.

(rr) "Repossessed Personal Property": An item of personal property acquired by Foreclosure.

(ss) "Special Reserve Account": The account established pursuant to § 3 of this Agreement.

(tt) "Stated Maturity Deposit Liabilities": All fixed term deposit liabilities of the ACQUIRED ASSOCIATION, reflected on the Books and Records, which will mature on a date after the first anniversary of the Effective Date.

(uu) "Stock Purchase Agreement": The agreement between the ACQUIRER and the NEW ASSOCIATION of even date herewith pursuant to which the ACQUIRER has purchased all of the issued and outstanding Common Stock of the NEW ASSOCIATION.

(vv) "Subsidiary": Any corporation or other entity 25 percent or more owned, directly or indirectly, by the ACQUIRED ASSOCIATION immediately prior to the Effective Date or the NEW ASSOCIATION as its successor in interest.

(ww) "Supervisory Agent": The Principal or other Supervisory Agent of the Federal Home Loan Bank Board at San Francisco, California.

(xx) "Transaction": The Acquisition and all related transactions.



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0116

§ 2 Conditions.

(a) The obligations of the parties are subject to the Transaction becoming effective no later than 30 days after the date of this Agreement, unless such date is extended by mutual agreement of the parties.

(b) The CORPORATION's obligations under this Agreement are also conditioned upon the following:

(1) The execution and delivery by the ACQUIRER and the NEW ASSOCIATION, as appropriate, of the Capital Maintenance Agreement and the related Irrevocable Proxy;

(2) The CORPORATION's receipt on or prior to the Effective Date of opinions from counsel for the NEW ASSOCIATION and the ACQUIRER, in form and substance satisfactory to the CORPORATION and its counsel, to the effect that:

(A) The Transaction has been duly authorized by all requisite corporate action of the NEW ASSOCIATION and the ACQUIRER and effected in compliance with the charters and bylaws of the NEW ASSOCIATION and the ACQUIRER and with applicable law; and

(B) This Agreement, the Stock Purchase Agreement and any other agreements or instruments executed by the NEW ASSOCIATION or the ACQUIRER in connection with the Transaction have been duly authorized, executed and delivered, and constitute valid and binding obligations of the NEW ASSOCIATION or the ACQUIRER, as the case may be, enforceable in accordance with their terms;



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0117

(3) The CORPORATION's receipt on or prior to the Effective Date of certified copies of the corporate resolutions of the NEW ASSOCIATION and the ACQUIRER authorizing the Transaction and the execution and delivery of the Stock Purchase Agreement, this Agreement and any other agreements or instruments executed by the NEW ASSOCIATION or the ACQUIRER;

(4) The ACQUIRER's purchase in cash, on the Effective Date, of all of the issued and outstanding Common Stock for a purchase price of at least $52 million and the CORPORATION's receipt of a copy of the Common Stock certificate issued by the NEW ASSOCIATION to the ACQUIRER, which certificate shall include a statement to the effect that the shares represented thereby are restricted as to transfer as provided in the Capital Maintenance Agreement;

(5) The NEW ASSOCIATION, the ACQUIRER and any of their respective Affiliates and subsidiaries, within the time periods specified by the terms of this Agreement or by the Bank Board, (A) having executed and delivered to the CORPORATION all other agreements, instruments, filings and documents required to be executed and delivered by the terms of this Agreement and by any action of the Bank Board in approving the Transaction, and (B) having taken all other actions imposed as conditions herein to the CORPORATION's obligation to provide assistance in any action taken by the Bank Board in approving the Transaction;

(6) The NEW ASSOCIATION and the ACQUIRER continuing to fulfill its obligations under § 16 hereof; and

(7) The CORPORATION's receipt on or prior to the Effective Date of a certified copy of the corporate resolutions of the ACQUIRED ASSOCIATION authorizing (i) the Transaction, the Stock Purchase Agreement, the Note Agreement, an Exchange Agreement of even date herewith between the CORPORATION and the NEW ASSOCIATION, and any other agreements or instruments executed by the ACQUIRED ASSOCIATION and (ii) the return and cancellation of all promissory notes of the CORPORATION held by the ACQUIRED ASSOCIATION in exchange for which the ACQUIRED ASSOCIATION had issued any Income Capital Certificates to the CORPORATION.

§ 3 Special Reserve Account. The NEW ASSOCIATION, for itself and the ACQUIRER, shall establish as of the Effective Date a memorandum account, with an opening balance of zero, to be called the Special Reserve Account, and shall maintain such account solely for the purpose of, and in accordance with, the provisions of this Agreement.

(a) Debits to Special Reserve Account. The NEW ASSOCIATION, for itself and the ACQUIRER, may, following the Effective Date, charge as Debits to the Special Reserve Account amounts equal to each of the following items:

(1) Capital Losses on Covered Assets. The amount of Covered Asset Losses incurred during the first two years of the term of this Agreement, and during any subsequent periods of time during the term of this Agreement with respect to certain Covered Assets as provided in § 4(d);

(2) Indemnifications. The amounts payable by the CORPORATION under § 7 pursuant to its obligation to indemnify the NEW ASSOCIATION and the ACQUIRER for the items described in § 7(a);

(3) Related Claim Expenses. The amounts payable by the CORPORATION under § 7 pursuant to its obligation to reimburse the NEW ASSOCIATION and the ACQUIRER for the reasonable costs and expenses incurred by the NEW ASSOCIATION and the ACQUIRER in pursuit of a Related Claim pursuant to § 7(b);

(4) Covered Asset Purchase. The amount of the purchase price of an asset purchased by the CORPORATION pursuant to §§ 4 or 18;

(5) Assignment of Acquired Association Claims. The amount, if any, of the value reflected on the Books and Records of an Acquired Association Claim assigned to the CORPORATION pursuant to § 8;

(6) Accrued but Uncollected Interest. The amount of the ACQUIRED ASSOCIATION's uncollected interest, if any, accrued prior to the Effective Date (net of any Existing Reserve) that remains uncollected subsequent to the Effective Date, at such time as such accrued and uncollected interest is determined by the NEW ASSOCIATION, with the written concurrence of the CORPORATION, to be uncollectable and is written off; provided that the amounts of such interest that are subsequently collected shall be credited to the Special Reserve Account upon collection;



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0120

(7) Guaranteed Yield Amount. For any of the first eight Quarters during the term of this Agreement, and during any subsequent periods of time during the term of this Agreement with respect to certain Covered Assets as provided in § 4(d), the Guaranteed Yield Amount;

(8) Regulatory Capital Adjustment. The amount, if any, permitted to be debited to the Special Reserve Account pursuant to § 6(a)(1)(B);

(9) Nonexistent Assets. The amount, if any, of the value reflected on the Books and Records of any asset determined by the NEW ASSOCIATION, with the written concurrence of the CORPORATION, to have been nonexistent or missing as of the Effective Date;

(10) Payment of Credits. The amount of any payments made by the NEW ASSOCIATION to eliminate a credit balance in the Special Reserve Account;

(11) Deposit Spread Amount. For any given Quarter during the term of this Agreement, the Deposit Spread Amount;

(12) Severance Payments. The amount of any payment made by the NEW ASSOCIATION to any employee of the ACQUIRED ASSOCIATION pursuant to applicable law or a severance plan approved by the Supervisory Agent, provided that the employment by the NEW ASSOCIATION of any employee to whom any such severance payment is made is terminated within 60 days after the Effective Date, and provided further that, in the event that



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0121

the employee for whose benefit the Special Reserve Account was debited under this § 3(a)(12) is employed by the NEW ASSOCIATION or an affiliate of the NEW ASSOCIATION within two years after the Effective Date, the NEW ASSOCIATION shall credit the Special Reserve Account, pursuant to § 3(c)(7) of this Agreement, with the amount previously debited with respect to such employee pursuant to this provision;

(13) Bank Indebtedness Losses. The amount of Bank Indebtedness Losses;

(14) Marketable Securities Losses. The amount of Marketable Securities Losses;

(15) Lease Obligation Losses. The amount of Lease Obligation Losses;

(16) Net Tax Detriments and Disallowed Deductions. The amounts permitted to be debited by § 9(g)(4) or (j);

(17) Valuation Expenses. The CORPORATION's share of the costs of determinations obtained in accordance with § 1(ff) and (ii); and

(18) World Loan Expenses. The amounts required to be debited to the Special Reserve Account pursuant to § 33.

(b) Credits to Special Reserve Account. The NEW ASSOCIATION, for itself and the ACQUIRER, shall promptly credit each of the following items to the Special Reserve Account, to

the extent that such item was not shown as an asset on the Books and Records, as adjusted by the Initial Audit:

(1) Unreflected Assets. Any amounts received by the NEW ASSOCIATION, including interest, late fees, penalties, refunds and other recoveries or benefits which were not reflected as an asset in the determination of Negative Regulatory Capital;

(2) Covered Asset Recoveries. The amount of Covered Asset Recoveries realized during the first two years of the term of this Agreement, and during any subsequent periods of time during the term of this Agreement with respect to certain Covered Assets as provided in § 4(d);

(3) Offset Gains. Any amounts which the NEW ASSOCIATION recovers from other than the CORPORATION, whether by counterclaim, offset, insurance settlement, or otherwise, with respect to any Claim or other item with respect to which the NEW ASSOCIATION debited the Special Reserve Account;

(4) Actual Yield. With respect to the Covered Assets for which a Debit to the Special Reserve Account for the amount of the Guaranteed Yield Amount was made pursuant to § 3(a)(7) for any given Quarter, the amount of any Actual Yield for such Quarter on such Covered Assets and, in the event of reinstatement of a Covered Asset to income producing status and collection of delinquent interest attributable to the period during which the Guaranteed Yield Amount was paid, the amount of such delinquent interest collected;

(5) Tax Benefits. The amount of the Tax Benefits required to be credited pursuant to § 9;

(6) CORPORATION's Contributions. Contributions made by the CORPORATION to eliminate a Debit balance in the Special Reserve Account;

(7) Severance Payment Adjustment. The amount, if any, required to be credited to the Special Reserve Account pursuant to § 3(a)(12); and

(8) Equity Payment. The amount, if any, required or permitted to be credited to the Special Reserve Account pursuant to § 32.

§ 4 Write-Down or Required Sale of a Covered Asset.

(a) Corporation Directed Write-Down. The CORPORATION may require the NEW ASSOCIATION to write down the Book Value of any Covered Asset.

(b) Requested Write-Downs by NEW ASSOCIATION. For purposes of this Agreement, the NEW ASSOCIATION shall not write down any Covered Asset without first obtaining the CORPORATION's written consent pursuant to the terms of this § 4. In the event that the NEW ASSOCIATION proposes to write down a Covered Asset, the NEW ASSOCIATION shall first apply to the CORPORATION for permission to write down a Covered Asset pursuant to § 4(b) by submitting to the CORPORATION in writing the terms, including the amount, of the proposed write-down, and the grounds for the NEW ASSOCIATION's opinion that the Covered Asset should



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0124

be written down, supported by such information or documents as the CORPORATION may reasonably request.

(c) Determination of Write-Down. Within 30 days of the CORPORATION's receipt of an application from the NEW ASSOCIATION setting forth the grounds for the NEW ASSOCIATION's opinion that the value of a Covered Asset is less than its Book Value, and such information or documents as the CORPORATION may reasonably request, the CORPORATION may:

(1) approve the application, with or without modifications or conditions, and permit the NEW ASSOCIATION to write down the Covered Asset's Book Value;

(2) deny the application; or

(3) require the NEW ASSOCIATION to submit such additional information as the CORPORATION may reasonably request, including, but not limited to, an independent appraisal. Within 30 days after the CORPORATION's receipt of any additional information requested, the CORPORATION shall approve, with or without modifications or conditions, or deny such application.

(d) Adjustments at Termination.

(1) As of the second anniversary of the Effective Date, the NEW ASSOCIATION may adjust the Book Value of any Covered Asset remaining on its books to the fair market value of such asset as determined by:

(A) mutual agreement of the NEW ASSOCIATION and the CORPORATION; or

(B) the following procedures:

(i) The NEW ASSOCIATION may obtain an appraisal of such Covered Asset, performed by an appraiser selected by the NEW ASSOCIATION, and present such appraisal to the CORPORATION. If the CORPORATION and the NEW ASSOCIATION agree with the conclusion of the appraisal, the Book Value of such Covered Asset shall be adjusted in accordance therewith or as mutually agreed by the NEW ASSOCIATION and the CORPORATION. The cost of obtaining such appraisal may be deducted as an expense in calculating Actual Yield. Such appraisal may be obtained at any time beginning on the date which is one and one half years from the Effective Date. The amount of any adjustment of the Book Value of any Covered Asset pursuant to this § 4(d)(1)(B)(i) shall be deemed, for purposes of this Agreement, a Covered Asset Loss or a Covered Asset Recovery, as appropriate, as of the second anniversary of the Effective Date.

(ii) If the CORPORATION and the NEW ASSOCIATION are unable to agree upon the fair market value of a Covered Asset, the CORPORATION, at its option, shall either purchase such asset at its Book Value or extend the provisions of this Agreement which relate to Covered Assets, including the Guaranteed Rate in effect during the second four Quarters during the term of this Agreement, for a period of two years ("Extension Period"). During the Extension Period, the NEW ASSOCIATION and the CORPORATION shall consult in good faith to determine a mutually acceptable fair market value for each remaining Covered



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0126

Asset. If the CORPORATION and the NEW ASSOCIATION cannot agree on the fair market value of a Covered Asset during the first year of the Extension Period, the NEW ASSOCIATION may obtain an appraisal for such Covered Asset, performed by an appraiser mutually acceptable to the CORPORATION and the NEW ASSOCIATION, which estimates the value of such asset if it were to be sold immediately and the value determined by such appraisal shall be deemed the liquidation value ("Liquidation Value") of such asset. The cost of obtaining such appraisal may be deducted as an expense in calculating Actual Yield. At the end of the Extension Period, the CORPORATION shall, at its option, either purchase the Covered Asset at its Book Value or adjust the Covered Asset to its Liquidation Value. The difference between the Book Value and the Liquidation Value of a Covered Asset shall be deemed, for purposes of this agreement, a Covered Asset Loss or a Covered Asset Recovery, as appropriate, as of the date of termination of the Extension Period.

(2) Any purchase of a Covered Asset at its Book Value or adjustment of a Covered Asset pursuant to this § 4(d) shall be deemed a Liquidation of the Covered Asset for purposes of this Agreement.

(e) Required Sale. The CORPORATION may at any time require the NEW ASSOCIATION to sell any Covered Asset to any person or entity the CORPORATION designates, including the CORPORATION, at a price specified pursuant to § 18(a), provided,



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0127

that the CORPORATION may not require the NEW ASSOCIATION to provide financing to such person or entity.

§ 5 Inventory and Initial Audit. As soon as is practicable after the Effective Date, the CORPORATION, at its own expense, but with the assistance of the NEW ASSOCIATION's personnel, whose salaries and expenses shall be paid by the NEW ASSOCIATION without reimbursement from the CORPORATION, shall:

(a) Cause to be prepared an inventory of all assets and liabilities of the ACQUIRED ASSOCIATION as of the Effective Date. Such inventory shall be limited to such assets and liabilities as are shown on the Books and Records or which are reasonably ascertainable during the preparation of the inventory. A copy of the inventory, in such form as the CORPORATION shall determine, shall be furnished to the NEW ASSOCIATION upon completion and approval by the CORPORATION; and

(b) Cause to be prepared an audit of the ACQUIRED ASSOCIATION in accordance with generally accepted auditing standards immediately prior to the Effective Date, except that the scope of the audit shall be limited to that which the CORPORATION determines to be necessary to implement this Agreement and shall include such adjustments and auditing procedures as are necessary to determine, in accordance with § 1(ii), the Negative Regulatory Capital of the ACQUIRED ASSOCIATION. The scope of the audit shall not include (i) a determination of whether accrued but uncollected interest, if any, is collectible; (ii) a reevaluation of the ACQUIRED ASSOCIATION's



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0128

that the CORPORATION may not require the NEW ASSOCIATION to provide financing to such person or entity.

§ 5 Inventory and Initial Audit. As soon as is practicable after the Effective Date, the CORPORATION, at its own expense, but with the assistance of the NEW ASSOCIATION's personnel, whose salaries and expenses shall be paid by the NEW ASSOCIATION without reimbursement from the CORPORATION, shall:

(a) Cause to be prepared an inventory of all assets and liabilities of the ACQUIRED ASSOCIATION as of the Effective Date. Such inventory shall be limited to such assets and liabilities as are shown on the Books and Records or which are reasonably ascertainable during the preparation of the inventory. A copy of the inventory, in such form as the CORPORATION shall determine, shall be furnished to the NEW ASSOCIATION upon completion and approval by the CORPORATION; and

(b) Cause to be prepared an audit of the ACQUIRED ASSOCIATION in accordance with generally accepted auditing standards immediately prior to the Effective Date, except that the scope of the audit shall be limited to that which the CORPORATION determines to be necessary to implement this Agreement and shall include such adjustments and auditing procedures as are necessary to determine, in accordance with § 1(ii), the Negative Regulatory Capital of the ACQUIRED ASSOCIATION. The scope of the audit shall not include (i) a determination of whether accrued but uncollected interest, if any, is collectible; (ii) a reevaluation of the ACQUIRED ASSOCIATION's

assets; or (iii) a determination of the adequacy of any Existing Reserves, and no new specific or general loss reserves or valuation allowances shall be established, nor shall the amounts of Existing Reserves be adjusted. The audit shall confirm the results of any determinations obtained in accordance with § 1(ff) and (ii). A copy of the audit, which shall be prepared in such form as the CORPORATION shall determine, shall be furnished to the NEW ASSOCIATION upon completion and approval by the CORPORATION.

§ 6 Payments and Contributions.

(a) Contributions by the CORPORATION.

(1) Promissory Note. Pursuant to the Note Agreement, the CORPORATION has delivered to the ACQUIRED ASSOCIATION an initial promissory note, duly executed by the CORPORATION and in substantially the form of Exhibit A attached hereto ("Initial Promissory Note"), the principal amount of which is equal to the Negative Regulatory Capital of the ACQUIRED ASSOCIATION immediately prior to the Effective Date based on the information contained in the ACQUIRED ASSOCIATION's latest monthly or quarterly reports submitted to the Bank Board and calculated in accordance with § 1(jj).

(A) On the interest payment date, as provided in the Promissory Notes, immediately following the CORPORATION's receipt and approval of the Initial Audit, in addition to receiving the interest payment due, the NEW ASSOCIATION shall exchange the Initial Promissory Note for a new



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0129

promissory note (the "Exchange") in the form of the Initial Promissory Note to be executed and delivered by the CORPORATION, the principal amount of which shall be equal to (i) the actual Negative Regulatory Capital of the ACQUIRED ASSOCIATION, as determined by the Initial Audit, minus the aggregate amount of any principal payments made by the CORPORATION on the Initial Promissory Note prior to the date of the Exchange, and plus or minus, as the case may be, (ii) the difference between (x) the aggregate amount of interest which would have been payable from the Effective Date to the interest payment date immediately preceding the Exchange if the principal amount of the Initial Promissory Note had been equal to the actual Negative Regulatory Capital of the ACQUIRED ASSOCIATION, as determined by the Initial Audit, and (y) the actual aggregate amount of interest that was paid for such period.

(B) Notwithstanding the provisions of § 6(a)(1)(A), the CORPORATION at its sole option may permit the NEW ASSOCIATION to charge as a Debit to the Special Reserve Account interim adjustments if the CORPORATION is satisfied that the Initial Audit will result in a determination of Negative Regulatory Capital that will require an additional payment by the CORPORATION. The amount of any such interim adjustments shall be taken into account in calculating the adjustment required by § 6(a)(1)(A) after receipt of the completed Initial Audit.

(2) Net Debit Balance. Within 30 days after the CORPORATION's receipt of each Quarterly Report required pursuant to § 15(a) and within 90 days after the final accounting required pursuant to § 15(d) of this Agreement, the CORPORATION, at its option, shall either wire transfer to the account of the NEW ASSOCIATION at the Bank in immediately available funds, or deliver to the NEW ASSOCIATION a promissory note, duly executed by the CORPORATION, the principal amount of which shall be equal to, the amount of the net Debit balance, if any, of the Special Reserve Account. Any promissory note issued to the NEW ASSOCIATION pursuant to this § 6(a)(2) shall have the same maturity date as the Promissory Notes and shall otherwise be in substantially the form of Exhibit A attached hereto, except that the promissory notes issued pursuant to this § 6(a)(2)shall bear interest at a rate equal to the Guaranteed Rate. For purposes of this Agreement, each contribution made pursuant to this § 6(a) of this Agreement, except for any contribution made following the final accounting required by § 15(d) of this Agreement, shall be deemed to have been made as of the last day of the Quarter reported in the Quarterly Report on which such contribution is based.

(b) Reimbursement of Net Credit Balances. Within 30 days after the CORPORATION's receipt of each Quarterly Report and within 90 days after the final accounting required under § 15(d), the NEW ASSOCIATION, for itself and the ACQUIRER, shall remit to the CORPORATION in immediately available funds an

amount equal to the net Credit balance, if any, of the Special Reserve Account as of the last day of the Quarter to which such Quarterly Report or the last day of the term of this Agreement to which such final accounting, as the case may be, relates, provided that if such amount exceeds the total contributions made by the CORPORATION to date under this Agreement and not repaid, then the NEW ASSOCIATION shall remit to the CORPORATION only so much of such amount as equals the total of such contributions to the extent not previously repaid.

(c) Adjustments. Any contribution or payment by the CORPORATION, the NEW ASSOCIATION or the ACQUIRER pursuant to this Agreement, any Credit or Debit to the Special Reserve Account, or any accounting or report furnished by the NEW ASSOCIATION or the ACQUIRER under this Agreement shall be subject to adjustment if it is subsequently determined that such contribution, payment, Credit, Debit, accounting, or report was based upon error, or was not computed in accordance with the accounting principles prescribed by this Agreement.

(d) Repayment of Certain Assistance. The CORPORATION has agreed to provide assistance pursuant to this Agreement only in connection with the Transaction and it is the intent of the parties that, in the event that a court of competent jurisdiction by final judgment directs, or, following a judgment that is not final, the parties otherwise agree, that the ACQUIRER shall divest itself of Common Stock of the NEW ASSOCIATION, the contributions made by the CORPORATION pursuant



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0132

to § 6(a) shall be repaid by the NEW ASSOCIATION to the CORPORATION. Nothing contained in this § 6(d) shall limit the CORPORATION's obligation to indemnify the NEW ASSOCIATION and the ACQUIRER pursuant to the terms of § 7(a).

§ 7 Indemnifications and Pursuit of Related Claims.

(a) Indemnifications. To the extent not otherwise reimbursed or reimbursable, the CORPORATION will indemnify the NEW ASSOCIATION and the ACQUIRER for, and pay as provided in § 6(a), (i) the amounts (including fines or penalties) actually incurred and paid by the NEW ASSOCIATION and the ACQUIRER (including any amounts so paid by the NEW ASSOCIATION or the ACQUIRER pursuant to any indemnification by the NEW ASSOCIATION or the ACQUIRER of any of its officers, directors or employees provided in accordance with applicable law) in connection with the satisfaction, settlement or compromise of the following Claims and challenges to the Transaction, and (ii) the reasonable costs and expenses of litigation related to such Claims and to the defense of such challenges to the Transaction, including reasonable attorneys' and accountants' fees, travel expenses, court costs and related litigation expenses, and such other actual and reasonable costs as may be actually incurred and paid by the NEW ASSOCIATION and the ACQUIRER in connection with such satisfaction, settlement, or compromise, provided that before such costs and expenses may be debited to the Special Reserve Account, the NEW ASSOCIATION and the ACQUIRER shall comply in all material respects with the covenants set forth in §§ 16 and 17

and the provisions of § 30 and submit to the CORPORATION in a form reasonably satisfactory to the CORPORATION the reports and submissions required by §§ 14 and 15 of this Agreement, and provided that such costs and expenses shall be subject to approval by the CORPORATION as being related to matters subject to indemnification under this § 7(a):

(1) Unreserved for Claims. Any Claim against the ACQUIRED ASSOCIATION, or the NEW ASSOCIATION as its successor or the ACQUIRER, based upon an action or failure to act of the ACQUIRED ASSOCIATION, or strict liability based upon events occurring, prior to the Effective Date, whether filed before or after such date, to the extent that such Claim (A) was not adequately reserved for or provision made for its payment on the Books and Records, and (B) is not fully reimbursable under any insurance policy, bond, or other provision for funding of the ACQUIRED ASSOCIATION.

(2) Challenges to the Transaction. Any action brought by any party other than the NEW ASSOCIATION, the ACQUIRER or any of their respective Affiliates, subsidiaries, creditors or stockholders to challenge or set aside the Transaction or this Agreement to the extent that such action is grounded upon a claim that an action or failure to act by the Bank Board or the CORPORATION was not in accordance with the Bank Board's or the CORPORATION's enabling legislation, and, in the event that a court of competent jurisdiction directs the ACQUIRER to divest itself of the Common Stock of the NEW ASSOCIATION on



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0134

such ground, the reasonable costs and unwinding expenses of such divestiture and any damages due to a breach of contract caused directly by such divestiture, provided that such damages are directly attributable to such action or failure to act by the Bank Board or the CORPORATION.

(b) Pursuit of Related Claims. The NEW ASSOCIATION and the ACQUIRER shall use their best efforts to reduce or minimize the CORPORATION's indemnity payments under this § 7 by the pursuit of Related Claims, and the CORPORATION shall indemnify the NEW ASSOCIATION and the ACQUIRER for the amount of the reasonable and related costs and expenses actually incurred and paid by the NEW ASSOCIATION and the ACQUIRER in complying with this § 7(b), provided that the NEW ASSOCIATION and the ACQUIRER comply with the covenants set forth in § 16, and provided that the pursuit of Related Claims shall be subject to approval by the CORPORATION and the reports and submissions required by §§ 12, 13, 14 and 15 of this Agreement, in a form satisfactory to the CORPORATION, shall be submitted to the CORPORATION before costs and expenses related to the pursuit of Related Claims shall be debited to the Special Reserve Account pursuant to § 3(a). All sums recovered from each such Related Claim shall be credited to the Special Reserve Account pursuant to § 3(b)(1) of this Agreement. The CORPORATION's right to recovery on any Related Claim shall survive the termination of this Agreement and shall be paid in cash after the date of such termination.

(c) Scope of Indemnifications. The indemnifications provided for in § 7(a) above shall not extend to: (1) capital losses on or attributable to assets of the ACQUIRED ASSOCIATION or which the NEW ASSOCIATION could be obligated to purchase pursuant to an obligation of the ACQUIRED ASSOCIATION, including any obligation that the NEW ASSOCIATION may have to fund commitments of the ACQUIRED ASSOCIATION; and (2) balance sheet liabilities of the ACQUIRED ASSOCIATION incurred prior to the Effective Date which normally recurred in the ACQUIRED ASSOCIATION's ordinary course of business and operations and which either (A) were ordinarily posted on the ACQUIRED ASSOCIATION's books on a periodic basis, or (B) are in amounts that are materially the same as and can reasonably be predicted from prior postings on the ACQUIRED ASSOCIATION'S books, including, but not limited to, items such as (i) accrued employee salaries, (ii) utility bills, (iii) accrued interest due to depositors and accountholders, and (iv) accrued interest payable to the Bank, or any other lender to the ACQUIRED ASSOCIATION, provided that, with respect to accrued interest payable to the Bank, depositors, accountholders or a lender, the underlying obligation to pay principal is reflected on the ACQUIRED ASSOCIATION's books.

§ 8 Acquired Association Claims and Converting Association Claims.

(a) As of the Effective Date, the NEW ASSOCIATION hereby assigns to the CORPORATION to the fullest extent permitted by law or applicable contract provision all Converting Association Claims. At any time during the term of this Agreement and until 90 days after the date on which this Agreement terminates, upon the request of the CORPORATION, the NEW ASSOCIATION shall assign to the CORPORATION to the fullest extent permitted by law or applicable contract provision all of its right, title and interest in and to any Acquired Association Claim. The purchase price for any Acquired Association Claim shall be the Book Value (if any) of such Claim on the Books and Records.

(b) In order to facilitate and effectuate the assignment of the Acquired Association Claims and Converting Association Claims pursuant to § 8(a), the NEW ASSOCIATION shall, at the CORPORATION's request:

(1) Execute and deliver instruments of assignment or transfer in addition to this Agreement and make endorsements in such form and manner, and at such time, as the CORPORATION shall require;

(2) Execute and deliver all other instruments that the NEW ASSOCIATION possesses and the CORPORATION deems necessary to complete such assignments or transfers; and

(3) Deliver to the CORPORATION all documents and other materials in its possession or control, and use its best efforts to obtain any further information that the CORPORATION deems necessary to prosecute effectively any Acquired Association Claim or Converting Association Claim.

(c) The NEW ASSOCIATION agrees to notify the CORPORATION of any evidence it discovers indicating the existence of an Acquired Association Claim, to use its best efforts, cooperate fully and take all such actions as are necessary to assist the CORPORATION in the pursuit of Acquired Association Claims assigned to the CORPORATION pursuant to § 8(a), and to provide the same cooperation and assistance with respect to Converting Association Claims.

§ 9 Tax Benefits and Detriments. For each taxable year of the NEW ASSOCIATION that closes after the Effective Date, the NEW ASSOCIATION shall credit to the Special Reserve Account or, if this Agreement has terminated, pay to the CORPORATION an amount equal to the Indemnification Tax Benefits (as defined and calculated in accordance with § 9(c)), the Federal Net Tax Benefits (as defined and calculated in accordance with § 9(d)) and the State Net Tax Benefits (as defined and calculated in accordance with § 9(e)), if any, realized by the NEW ASSOCIATION in any year (collectively "Net Tax Benefits"), and for each taxable year of the NEW ASSOCIATION that closes after the Effective Date, the CORPORATION shall debit to the Special Reserve Account or, if this Agreement has terminated, pay to the

NEW ASSOCIATION an amount equal to the Net Tax Detriments (as defined and calculated in accordance with § 9(g)).

(a) Tax Benefit Items. For purposes of this Agreement, the Net Tax Benefits shall be the tax benefits that are attributable to the items described in § 9(a)(1), (2), (3), (4) and (5) below ("Tax Benefit Items") and that are actually utilized by the NEW ASSOCIATION, or the Affiliated Group (as defined in Section 1504 of the Internal Revenue Code of 1986, as amended ("Code")) of which it is a member ("Consolidated Group"), to reduce its Federal or state income tax liability in a given tax year, by virtue of a Tax Benefit Item being a tax deduction from income of the Consolidated Group or being excluded from income for such tax year as calculated in § 9(c), (d) and (e) below.

(1) The amount of any net operating loss carryovers, for Federal or state income tax purposes, as applicable, on the Books and Records of the ACQUIRED ASSOCIATION at the Effective Date, any capital loss carryovers and any other carryovers of the ACQUIRED ASSOCIATION at the Effective Date, which result in a tax deduction from the NEW ASSOCIATION's gross income;

(2) Any cost, expense or loss (i) which is incurred by the NEW ASSOCIATION, (ii) for which the CORPORATION has made assistance indemnification payments to the NEW ASSOCIATION pursuant to § 3(a)(2) or (3) of this Agreement, and (iii) which is deductible on the NEW ASSOCIATION's Federal or

state income tax return or reduces the balance of the NEW ASSOCIATION's bad debt reserve but only to the extent such reduction would result in a tax deduction on the experience method;

(3) Any cost, expense or loss (i) which is incurred by the NEW ASSOCIATION, (ii) for which the CORPORATION has made or is obligated to make assistance payments (excluding any payments pursuant to § 3(a)(2) or (3) of this Agreement) to the NEW ASSOCIATION pursuant to § 3(a) of this Agreement, and (iii) which is deductible on the NEW ASSOCIATION's Federal or state income tax return or reduces the balance of the NEW ASSOCIATION's bad debt reserve but only to the extent such reduction would result in a tax deduction on the experien method;

(4) The sum of (i) the amount of any interest paid to the NEW ASSOCIATION by the CORPORATION on the Promissory Notes and (ii) the Guaranteed Yield Amount that the NEW ASSOCIATION receives under this Agreement to the extent that the amounts described in clauses (i) and (ii) of this § 9(a)(4) are excludable from gross income for Federal or state income tax purposes, less the aggregate Actual Yield, if positive, during such taxable year on all Covered Assets. Provided, however, if the NEW ASSOCIATION receives a tax deduction for any Actual (positive) Yield during such taxable year on Covered Assets the amount thereof shall not constitute a reduction from Guaranteed Yield Amount.

(5) Any other attributes or items of the ACQUIRED ASSOCIATION to which the NEW ASSOCIATION succeeds under Section 381 of the Code whose inclusion on the income tax returns of the NEW ASSOCIATION decrease the taxable income of the NEW ASSOCIATION.

(b) Tax Detriment Items. For purposes of this Agreement, Tax Detriment Items shall be the items described in § 9(b)(1), (2), (3) and (4), below:

(1) Any taxable gain recognized by the NEW ASSOCIATION upon the Liquidation of a Covered Asset, to the extent that such gain is attributable to the excess of the Book Value of such Covered Asset over the tax basis of such Covered Asset in the hands of the NEW ASSOCIATION.

(2) Any taxable gain recognized by the NEW ASSOCIATION upon the Liquidation of any Covered Asset to the extent that such gain is credited to the Special Reserve Account pursuant to § 3(b)(2) of this Agreement and is attributable to the excess of the Net Proceeds Received over the Book Value of such Asset in the hands of the NEW ASSOCIATION.

(3) All items of income recognized for Federal or state tax purposes on or after the Effective Date by the NEW ASSOCIATION that accrued for book purposes to the ACQUIRED ASSOCIATION prior to the Effective Date and all items of expense that accrue for book purposes to the NEW ASSOCIATION after the Effective Date that were deducted for tax purposes by

the ACQUIRED ASSOCIATION prior to the Effective Date, including, without limitation, any taxable income attributable to:

(i) any gross income resulting from any adjustment pursuant to Section 448 or 481 or similar provisions of the Code (or, with respect to state tax liability, any comparable provision of state law) to which the NEW ASSOCIATION succeeded from the ACQUIRED ASSOCIATION,

(ii) the excess, as of the Effective Date, of the book value of the stock of any direct or indirect subsidiary of the ACQUIRED ASSOCIATION that becomes a direct or indirect subsidiary of the NEW ASSOCIATION on the Effective Date over the tax basis in such stock,

(iii) any loan fees (including points) with respect to loans made prior to the Effective Date,

(iv) gains reported by the ACQUIRED ASSOCIATION or its predecessor under the installment method pursuant to Section 453 of the Code,

(v) the excess of book value over tax basis of retained servicing fees on loans sold by the ACQUIRED ASSOCIATION or its predecessor,

(vi) the excess, as of the Effective Date, of accumulated depreciation for Federal income tax purposes with respect to assets of the ACQUIRED ASSOCIATION or owned by any direct or indirect subsidiary of the ACQUIRED ASSOCIATION, over the accumulated book depreciation with respect to such assets, and



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0142

(vii) the excess, if any, of the expenses for book purposes with respect to the Bank advances of the ACQUIRED ASSOCIATION over the deductions with respect to such advances for income tax purposes;

(4) Any other attributes or items of the ACQUIRED ASSOCIATION to which the NEW ASSOCIATION succeeds under Section 381 of the Code which inclusion on the income tax returns of the NEW ASSOCIATION increases the taxable income of the NEW ASSOCIATION.

(c) Indemnification Net Tax Benefits. The Indemnification Net Tax Benefit for a taxable year shall be equal to 100% of the sum of:

(1) The excess, if any, of:

(A) The Federal income tax liability for such taxable year (taking into account all carryovers and carrybacks to such year that would have been allowable) which would have been incurred by the NEW ASSOCIATION, or the Consolidated Group, if the Tax Benefit Items described in § 9(a)(1), (2), (3), (4) and (5) had not been deducted, credited or excluded in any taxable year, over

(B) The Federal income tax liability for such taxable year (taking into account all carryovers and carrybacks to such year that would have been allowable) which would have been incurred by the NEW ASSOCIATION, or the Consolidated Group, if the Tax Benefit Items described in § 9(a)(2) had been deducted and if the Tax Benefit Items

described in § 9(a)(1), (3), (4) and (5) above had not been deducted, credited or excluded in any taxable year; and

(2) The excess, if any, of

(A) The state tax liability for such taxable year (taking into account all carryovers and carrybacks to such year that would have been allowable) which would have been incurred by the NEW ASSOCIATION, or the Consolidated Group, if the Tax Benefit Items described in § 9(a)(1), (2), (3), (4) and (5) had not been deducted, credited or excluded in any taxable year, over

(B) The state tax liability for such taxable year (taking into account all carryover and carrybacks to such year that would have been allowable) which would have been incurred by the NEW ASSOCIATION, or the Consolidated Group, if the Tax Benefit Items described in § 9(a)(2) had been deducted and if the Tax Benefit Items described in § 9(a)(1), (3), (4) and (5) above had not been deducted, credited or excluded in such taxable year.

(d) Federal Net Tax Benefits. The Federal Net Tax Benefits for a taxable year shall be the Applicable Percentage (as defined in § 9(f)) multiplied by an amount equal to the excess, if any, of:

(1) the Federal income tax liability for such taxable year (taking into account all carryovers and carrybacks to such year that would have been allowable) which would have been incurred by the NEW ASSOCIATION, or the



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0144

Consolidated Group, (i) if the Tax Benefit Items described in § 9(a)(1), (3), (4) and (5) had not been deducted, credited or excluded in any taxable year, (ii) if the Tax Detriment Items described in § 9(b)(1), (2) and (4) had not been included in income in any taxable year, (iii) if income were reduced by the Tax Detriment Items described in § 9(b)(3), (iv) if income were reduced by an amount equal to the Tax Benefit Items utilized under § 9(d)(2) to reduce income or gain arising from dividends or distributions on or redemptions of Common Stock or preferred stock of the NEW ASSOCIATION, (v) if any Credits pursuant to § 3(b)(1) and (3) and § 3(a)(6) which were included in taxable income for such taxable year (provided that such Credits were not deductible for such taxable years) were not so included, and (vi) if income were reduced by any taxable income recognized by the NEW ASSOCIATION solely as the result of the inclusion of the principal balance or any portion thereof of the Promissory Notes described in § 6(a)(1) in the earnings and profits, as computed for Federal income tax purposes, of the NEW ASSOCIATION, over

(2) the Federal income tax liability for such taxable year (taking into account all allowable carryovers and carrybacks to such year) actually incurred by the NEW ASSOCIATION, or the Consolidated Group, except that the Federal income tax liability actually incurred shall in no event be less than zero, unless a refund is made available by a carryback of a net operating loss incurred for such taxable year to a taxable year of the NEW ASSOCIATION or the Consolidated Group other than



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0145

refunds attributable to taxes paid on the income or gain described in § 9(d)(1)(iv) above.

(e) State Net Tax Benefits. The State Net Tax Benefits for a taxable year shall be the Applicable Percentage (as defined in § 9(f)) multiplied by the excess, if any, of:

(1) the state tax liability for such taxable year (taking into account all carryovers and carrybacks to such year that would have been allowable) which would have been incurred by the NEW ASSOCIATION, or the Consolidated Group, (i) if the Tax Benefit Items described in § 9(a)(1), (3), (4) and (5) had not been deducted, credited or excluded in any taxable year, (ii) if the Tax Detriment Items described in § 9(b)(1), (2) and (4) had not been included in income in any taxable year, (iii) if income were reduced by the Tax Detriment Items described in § 9(b)(3), (iv) if income were reduced by an amount equal to the Tax Benefit Items utilized under § 9(e)(2) to reduce income or gain arising from dividends or distributions on or redemptions of Common Stock or preferred stock of the NEW ASSOCIATION, (v) if income were reduced by the amount of gross receipts or income of the members of the Consolidated Group subject to State of California taxation to the extent such receipts and income relate to non-California activities, (vi) if any Credits pursuant to § 3(b)(1) and (3) and § 3(a)(6) which were included in the taxable income for such taxable years were not so included, and (vii) if income were reduced by any taxable income recognized by the NEW ASSOCIATION solely as the result of the inclusion of the

principal balance or any portion thereof of the Promissory Notes described in § 6(a)(1) in the earnings and profits, as computed for state income tax purposes, of the NEW ASSOCIATION, over

(2) the state tax liability for such taxable year (taking into account all allowable carryovers and carrybacks to such year) actually incurred by the NEW ASSOCIATION, or the Consolidated Group, except that the state income tax liability actually incurred shall in no event be less than zero unless a refund is made available by a carryback of a net operating loss incurred for such taxable year to a taxable year of the NEW ASSOCIATION or the Consolidated Group other than refunds attributable to taxes paid on the income or gain described in § 9(e)(1)(iv) above.

(f) Applicable Percentage. For each fiscal year as of the beginning of which the Net Investment Account of the ACQUIRER is greater than zero, the Applicable Percentage shall be twenty-five percent (25%). For each fiscal year as of the beginning of which the Net Investment Amount of the ACQUIRER is equal to or less than zero, the Applicable Percentage shall be fifty percent (50%).

(g) Net Tax Detriments.

(1) Federal Net Tax Detriments. The Federal Net Tax Detriments for a taxable year shall be equal to the excess, if any, of the amount computed pursuant to § 9(d)(2) over the amount computed pursuant to § 9(d)(1), provided, however, that for purposes of this § 9(g)(1), the amounts



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0147

described in § 9(d)(2) shall be computed without regard to (i) the income described in § 9(b)(2) and (ii) the income or expense described in § 9(b)(3).

(2) State Net Tax Detriments. The State Net Tax Detriments for a taxable year shall be equal to the excess, if any, of the amount computed pursuant to § 9(e)(2) over the amount computed pursuant to § 9(e)(1), provided, however, that for purposes of this § 9(g)(2), the amounts described in § 9(e)(2) shall be computed without regard to (i) the income described in § 9(b)(2), (ii) income or expense described in § 9(b)(3), and (iii) the income described in § 9(e)(1)(v).

(3) Asset Net Tax Detriments. The Asset Net Tax Detriments for a taxable year shall be equal to the excess, if any, of:

(A) the Federal and state income tax for such taxable year (taking into account all allowable carryovers and carrybacks to such year) actually incurred by the NEW ASSOCIATION, or the Consolidated Group, over

(B) the Federal and state income tax liability for such taxable year (taking into account all carryovers and carrybacks to such year that would have been allowable) which would have been incurred by the NEW ASSOCIATION, or the Consolidated Group, if the Tax Detriment Items described in § 9(b)(2), and any deductions arising as a consequence of any corresponding Credit to the Special Reserve Account pursuant to § 3(b)(2), had not been taken into account in any taxable year in



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0148

computing the tax liability of the NEW ASSOCIATION, or the Consolidated Group.

(4) Treatment of Net Tax Detriments. The Net Tax Detriments for a taxable year described in § 9(g)(3) shall be debited to the Special Reserve Account or, if this Agreement is terminated, paid to the NEW ASSOCIATION or the ultimate parent of the Consolidated Group, as provided in § 9(h). The Tax Detriments described in § 9(g)(1) and (2) for a taxable year shall be debited to the Special Reserve Account, or, if this Agreement is terminated, paid to the NEW ASSOCIATION or the ultimate parent of the Consolidated Group, subject to the provisions of this paragraph. The aggregate amount of Federal Net Tax Detriments and State Net Tax Detriments (the "Limited Tax Detriments") for any year may not be so debited or paid to the extent that such aggregate amount of such Limited Tax Detriments would exceed the cumulative amount of the Net Tax Benefits that have been credited to the Special Reserve Account or paid to the CORPORATION for years prior to such year (reduced by any prior Debits or payments on account of Limited Tax Detriments for prior years). The amount of any Limited Tax Detriments that may not be used for a particular year shall be carried forward and shall reduce the Net Tax Benefits which would otherwise be credited to the Special Reserve Account or paid to the CORPORATION for future years (using the earliest to arise of such unused Limited Tax Detriments first to reduce such subsequent Net Tax Benefits).



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0149

(h) Timing of Payment. The Indemnification, Federal and State Net Tax Benefits shall be credited to the Special Reserve Account or, if this Agreement has terminated, paid to the CORPORATION, and the Federal and State Net Tax Detriments and the Asset Net Tax Detriments shall be debited to the Special Reserve Account or, if this Agreement has terminated, paid to the NEW ASSOCIATION or the ultimate parent of the Consolidated Group, within 30 days after the NEW ASSOCIATION or the Consolidated Group files its Federal and state income tax returns for the taxable year in which such Net Tax Benefits or Detriments are realized or incurred (including by way of carryovers and carrybacks). If Net Tax Benefits are realized by way of carryback, however, such Net Tax Benefits shall be credited to the Special Reserve Account, or if this Agreement has terminated, paid to the CORPORATION, when the NEW ASSOCIATION or the Consolidated Group receives its income tax refund from the Internal Revenue Service ("Service") or appropriate state tax authority.

(i) Cooperation. The NEW ASSOCIATION shall, upon request of the CORPORATION, provide copies of the tax returns and amended tax returns of the NEW ASSOCIATION for any taxable years specified by the CORPORATION. The NEW ASSOCIATION agrees to use its best efforts, cooperate fully with the CORPORATION and take all such reasonable actions as are appropriate to maximize the Net Tax Benefits realizable by it and to implement the provisions of this § 9, provided that this

covenant shall not be interpreted as requiring the NEW ASSOCIATION or the Consolidated Group to increase its tax liability.

(j) Disallowed Deductions. If the NEW ASSOCIATION or the Consolidated Group (i) amends its Federal or state income tax return for any year, or (ii) enters into an agreement in connection with the examination of any such income tax return by the Service or an appropriate state taxing authority, and, in the case of such an amendment or agreement that affects a Tax Benefit Item or Tax Detriment Item, the CORPORATION has consented thereto, or (iii) is subject to any administrative or judicial determination, which has become final and from which, with the consent of the CORPORATION, no appeal has been taken, restating its income, deductions, losses, credits, other tax items, or tax consequence relating to any relevant Federal or state income tax return, the calculations made for any such taxable year(s) pursuant to § 9(c), (d), (e) and (g), shall be recomputed taking into account the results of such amendments, agreements or determinations and any adjustments then required to the, Indemnification, Federal or State Net Tax Benefits or the Net Tax Detriments described in § 9(g), for such year or years shall be credited or debited to the Special Reserve Account, whichever shall apply, or paid to the CORPORATION or the NEW ASSOCIATION, or the ultimate parent of the Consolidated Group, as applicable, within 30 days of any such amendments, agreements or determinations, as provided in § 9(h). The amount

of any interest, penalties (other than penalties imposed for negligence or willful misconduct) or both assessed by the Service or the appropriate state taxing authority in connection with, and allocable to, the reduction in any Tax Benefit Item or increase in any Tax Detriment Item pursuant to an amendment, agreement or final determination referred to in the immediately preceding sentence shall be added to the amount debited to the Special Reserve Account or paid to the NEW ASSOCIATION or the ultimate parent of the Consolidated Group pursuant to this § 9(j) within 30 days of written notice to the CORPORATION.

(k) Definition. For purposes of §§ 9(c)(1)(B), 9(c)(2)(B), 9(d)(2) and 9(e)(2), the term Federal income tax liability or state income tax liability shall mean the act 1 liability as shown on the tax returns of the NEW ASSOCIATION or the Consolidated Group filed with the Service and the appropriate state taxing authority.

(l) Indemnity. The CORPORATION indemnifies the NEW ASSOCIATION and the other members of the Consolidated Group for an amount equal to the Applicable Percentage (as defined in § 9(f)) multiplied by the amount of any reasonable legal, accounting, and related fees and costs incurred in connection with any administrative submission, protest or subsequent proceedings or litigation concerning a challenge by the Service or an appropriate state taxing authority to the validity of any Tax Benefit Item claimed by the NEW ASSOCIATION or the Consolidated Group, provided that the CORPORATION shall be given

notice of such submission, protest, or subsequent proceedings or litigation and shall have the right to participate therein.

(m) Survival. This § 9 shall survive the termination of this Agreement, provided, however, that this § 9 shall terminate at such time that Net Tax Benefits or Net Tax Detriments may no longer be realized by way of carryover or carryback.

§ 10 Duplicate Payments. Any cost or expense for which the NEW ASSOCIATION or the ACQUIRER has been reimbursed under any section of this Agreement, or any recovery which has been paid over to or retained by the CORPORATION under any section of this Agreement, shall not be reimbursed to the NEW ASSOCIATION or the ACQUIRER, or paid over to or retained by the CORPORATION, under any other section of this Agreement, even though such cost, expense, or recovery may be described in whole or in part in two or more sections of this Agreement.

§ 11 Non-Reimbursable Expenses. In calculating Actual Yield with respect to a Covered Asset, the NEW ASSOCIATION shall not deduct expenses incurred in the administration of this Agreement and shall not seek reimbursement from the CORPORATION for such expenses under any other provision of this Agreement. For purposes of this § 11, such expenses shall include, but shall not be limited to, compensation paid for the preparation of reports and submissions and supporting documentation required to be filed with the CORPORATION under §§ 12, 13, 14 and 15 of this Agreement, provided that Technical Assistance within the meaning

of § 16(b) may be required from attorneys for the preparation of some or all of the Significant Litigation Plans and Budgets required by § 14 and, upon written approval by the CORPORATION, the cost of such Technical Assistance may be deducted as an expense in calculating Actual Yield with respect to the asset to which it relates, or debited to the Special Reserve Account as a cost related to an indemnifiable item described in § 7(a).

§ 12 Significant Covered Assets. Unless otherwise permitted in writing by the CORPORATION, the material failure of the NEW ASSOCIATION to comply with the provisions of this § 12 with respect to any Covered Asset that is a Significant Covered Asset, as defined below, shall result in the disallowance of any related Debit to the Special Reserve Account, the disallowance of any adjustment of a related contribution or payment by the CORPORATION, the disallowance of any deduction in determining Actual Yield, and the disallowance of the addition to the Book Value of such asset of any properly capitalized expense within the meaning of § 1(k)(2)(A) until, in the CORPORATION's judgment, such requirement is met or the CORPORATION otherwise permits:

(a) Significant Covered Asset Submissions. Each Covered Asset with a Book Value as of the Effective Date in excess of $1.0 million and each Covered Asset with a Book Value as of the Effective Date of less than $1.0 million but with respect to which the NEW ASSOCIATION has funding or other obligations which could result in an increase in Book Value to an amount in excess of $1.0 million shall be deemed to be a



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0154

Significant Covered Asset ("Significant Covered Asset"). The NEW ASSOCIATION shall provide to the CORPORATION for approval the following information relating to plans for Significant Covered Assets ("Significant Covered Asset Submissions" or "Submissions"):

(1) Within 90 days after the Effective Date, the form of and information to be contained in (A) a collection plan ("Collection Plan") pursuant to which the NEW ASSOCIATION proposes to provide information regarding its plans with respect to Significant Covered Assets that are loans, (B) a business plan ("Business Plan") pursuant to which the NEW ASSOCIATION proposes to provide information regarding its plans with respect to Significant Covered Assets that are Investments in Subsidiaries, and (C) a property plan ("Property Plan") pursuant to which the NEW ASSOCIATION proposes to provide information regarding its plans with respect to Significant Covered Assets that are Real Estate Owned or Repossessed Personal Property, all of which forms ("Plans"), shall, in form and proposed content, be subject to the approval of the CORPORATION. The Plans to be submitted pursuant to this section shall include Memoranda describing and supporting the recommended Plan, Interim Budgets for the period prior to Plan approval, 12-Month Budgets for Significant Covered Assets for which a Plan has been approved, and Cover Sheets including basic information about the status of the asset or the Plan (examples of which are attached as Exhibits B, C, D and E), and such other documentation as the

CORPORATION determines to be necessary to monitor and to approve the NEW ASSOCIATION's plans and expenditures with respect to Significant Covered Assets.

(2) Within 90 days after the Effective Date, a schedule of all Significant Covered Assets as of the Effective Date substantially in the form of Exhibit F ("SCA Schedule") and, every 30 days thereafter, an updated SCA Schedule substantially in the form of Exhibit F;

(3) Within 120 days after the Effective Date,

(A) a schedule of dates substantially in the form of Exhibit G ("Plan Schedule"), none of which dates shall be later than the first anniversary of the Effective Date, on which the Property, Business and Collection Plans required pursuant to § 12(a)(4), (5) and (6) will be submitted; and

(B) for each Significant Covered Asset, a proposed interim budget substantially in the form of Exhibit C ("Interim Budget") estimating the expenses to be incurred during the time period beginning on the date of submission of the Interim Budget through and including the 60-day period after the date on which the Property, Business or Collection Plan for such Significant Covered Asset is due to be submitted to the CORPORATION and setting forth the assumptions, in reasonable detail, on which such estimates are based;

(4) Before the date set forth on the Plan Schedule, a Property Plan for each Significant Covered Asset for



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0156

which such a Submission is required, a summary of the Property Plan Memorandum in a form acceptable to the CORPORATION and the appraisal required by § 12(d);

(5) Before the date set forth on the Plan Schedule, a Collection Plan for each Significant Covered Asset for which such a Submission is required, a summary of the Collection Plan Memorandum in a form acceptable to the CORPORATION and the appraisal required by § 12(d); and

(6) Before the date set forth on the Plan Schedule, a Business Plan for each Significant Covered Asset for which such a Submission is required, a summary of the Business Plan memorandum in a form acceptable to the CORPORATION and the appraisal required by § 12(d).

(b) CORPORATION's Approval Requirements. With respect to each proposed Significant Covered Asset Submission, the CORPORATION shall, within 60 days after receipt, approve such Submission or disapprove all or any portion of such Submission. In the event that the CORPORATION disapproves all or a portion of a Submission, the NEW ASSOCIATION and the CORPORATION shall consult in a good faith effort to establish within a reasonable time an appropriate Submission that is approved by the CORPORATION. Any permission or approval of the CORPORATION pursuant to this § 12 shall be effective only if made in writing.

(c) Expenses Pending Approval of Interim Budget. With respect to each Significant Covered Asset, until such time as the CORPORATION has approved an Interim Budget for such



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0157

Significant Covered Asset, the NEW ASSOCIATION shall attempt to minimize expenses incurred with respect to such asset and may increase Book Value for expenses properly capitalized under § 1(k)(2)(A) or deduct expenses when determining Actual Yield with respect to such asset only to the extent that they are reasonably necessary to maintain such Significant Covered Asset in its current condition and do not exceed in the aggregate the greater of (i) ten percent of Book Value, not to exceed $100,000, or (ii) $50,000. After the CORPORATION has approved an Interim Budget for such Significant Covered Asset, the NEW ASSOCIATION shall administer the Significant Covered Asset in accordance with the Interim Budget and may add to Book Value the amounts of each expense item specified on such Interim Budget which is properly capitalized under § 1(k)(2)(A) or deduct the amounts of such expense item in determining Actual Yield, as the case may be, when such amounts are paid, provided that the aggregate amount so deducted or capitalized for a particular expense item specified on such Interim Budget shall not exceed the total amount budgeted for such expense item in the period covered by such Interim Budget without the CORPORATION's express prior written permission.

(d) Appraisals. As to each Significant Covered Asset that is Real Estate Owned or a loan secured by real estate, or an Investment in a Subsidiary with an interest in real estate (which real estate would itself constitute a Significant Covered Asset if it were a Covered Asset), the NEW ASSOCIATION shall

submit a written appraisal of such real estate which shall conform to such requirements as the CORPORATION may reasonably prescribe, and which shall be performed by an appraiser approved by the CORPORATION ("Commercial Appraisal"). Each Commercial Appraisal shall be submitted to the CORPORATION with the Property, Collection or Business Plan for the Significant Covered Asset unless the CORPORATION permits additional time for submission of the Commercial Appraisal. Additional appraisals or updates of prior appraisals shall be obtained as necessary in the event of changes in Plans concerning Significant Covered Assets and changes in assumptions underlying existing appraisals. Commercial Appraisals (along with updates) shall be as of a date no more than one year prior to the proposed disposition date contained in the Property, Collection or Business Plan. To the extent reasonably possible, the NEW ASSOCIATION shall use appraisals prepared prior to the Effective Date and update such appraisals as necessary, rather than ordering completely new appraisals, in order to minimize the cost of obtaining appraisals pursuant to this § 12(d). The cost of obtaining appraisals pursuant to this § 12(d) may be added to Book Value, if such cost is a properly capitalized expense within the meaning of § 1(k)(2)(A), or may be deducted as an expense in calculating Actual Yield.

(e) Revised Property, Business and Collection Plans.

(1) Annual Revisions. Not later than two months (or such shorter time period as the CORPORATION in its sole discretion may permit) prior to expiration of the 12-month period covered by each Property, Business or Collection Plan which has been approved by the CORPORATION, the NEW ASSOCIATION shall provide to the CORPORATION a revised Property, Business or Collection Plan for the 12-month period following such expiration. The provisions of § 12(a)(4), (5) or (6), as the case may be, with respect to the content and form of such Submissions and the provisions of § 12(b) shall apply to such Submissions.

(2) Revisions Due to Changes in Plans or Underlying Assumptions. In the event the NEW ASSOCIATION determines (1) that the aggregate amount to be expended for a particular expense item will materially exceed the amount specified for that item in an Interim Budget or a Property, Business or Collection Plan, (2) that the Property, Business or Collection Plan for a Significant Covered Asset should be changed in some other material respect, whether due to a change in plans, assumptions or otherwise, or (3) that any other Submission is no longer complete or accurate in some material respect, the NEW ASSOCIATION shall provide to the CORPORATION for approval such revised Submissions as are necessary to keep the CORPORATION informed on a current basis of its plans concerning Significant Covered Assets. The CORPORATION shall have the right to obtain from the NEW ASSOCIATION (a) additional or revised Submissions



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0160

with respect to any Significant Covered Asset, and (b) all information and documents reasonably within the control of the NEW ASSOCIATION or any Affiliate thereof that supports any Submission or relates to any Significant Covered Asset. The provisions of § 12(a), (b) and (c) to the extent applicable to the particular type of Submission shall govern the form and content of Submissions submitted pursuant to this § 12(e)(2).

(f) Specific Requests For Approvals. In the event the NEW ASSOCIATION determines (1) that the aggregate amount to be expended for a particular expense item will exceed the amount specified for that item in an Interim Budget or a Property, Business or Collection Plan, (2) that the Property, Business or Collection Plan for a Significant Covered Asset should be changed in some other respect, or (3) that some other Submission should be changed in some respect and the NEW ASSOCIATION believes that the anticipated increased amounts or the change to a Submission is not sufficiently material to require a revised submission to be submitted, the NEW ASSOCIATION shall submit a Specific Request for Approval of the change in plans or the expense item not authorized ("Specific Request"). A Specific Request shall include a Cover Sheet substantially in the form attached as Exhibit H and shall include all attachments described in the Cover Sheet necessary to describe the nature and reasons for the change or the increased amount. The CORPORATION shall within 60 days after receipt approve the Specific Request, disapprove all or any portion of the Specific Request, or require