the NEW ASSOCIATION to prepare a revised Submission in accordance with § 12(e)(2). Until the CORPORATION has approved a Specific Request, the NEW ASSOCIATION may not implement the change in plans or deduct the unauthorized expense in determining Actual Yield, or increase Book Value by the amount of a properly capitalizable expense covered by the Specific Request.

(g) <u>Form of Submissions</u>. The forms of Exhibits A through H and any other submission with respect to Significant Covered Assets may be changed by the CORPORATION after consultation with the NEW ASSOCIATION.

(h) <u>Financing</u>. In its disposition of Significant Covered Assets, the NEW ASSOCIATION shall offer financing to interested third party purchasers, unless financing is otherwise available, on such terms and in accordance with such underwriting and credit standards as the NEW ASSOCIATION would ordinarily use in extending credit to purchasers of assets not subject to this Agreement and without assistance from the CORPORATION except as may otherwise be provided pursuant to § 1(q)(3) of this Agreement.

§ 13 <u>Other Covered Assets</u>. Unless otherwise permitted in writing by the CORPORATION, the material failure of the NEW ASSOCIATION to comply with the provisions of this § 13 with respect to any Covered Asset that is not a Significant Covered Asset ("Other Covered Asset") shall result in the disallowance of any related Debit to the Special Reserve Account, the disallowance of any adjustment of a related contribution or

payment by the CORPORATION, the disallowance of any deduction in determining Actual Yield, and the disallowance of the addition to the Book Value of such asset of any properly capitalized expense within the meaning of § 1(k)(2)(A) until, in the CORPORATION's judgment, such requirement is met or the CORPORATION otherwise permits:

(a) Appraisals. The NEW ASSOCIATION shall submit to the CORPORATION, upon its request, an independent appraisal from an appraiser acceptable to the CORPORATION with respect to any Other Covered Asset.

(b) Foreclosures. Prior to the Foreclosure of any instrument securing a loan that is or may become an Other Covered Asset, the NEW ASSOCIATION shall inspect and evaluate the security property to determine its recoverable value, taking into consideration all circumstances affecting marketability of title, including the existence of any mechanics' or materialmen's liens or other encumbrances on the security property.

(1) If, in the opinion of the NEW ASSOCIATION, the security property has recoverable value, the NEW ASSOCIATION shall bid as follows:

(A) If there are no other bidders, the NEW ASSOCIATION may bid any amount which, in the opinion of the NEW ASSOCIATION, will protect its interests and those of the CORPORATION and is in accordance with the management standard described in § 16(a). In no event, however, shall the amount of



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0163

the bid be in excess of the principal amount of the indebtedness secured by property immediately before Foreclosure, plus:

(i) All costs and expenses of Foreclosure;

(ii) Any real estate or other property taxes, assessments and hazard insurance premiums due but unpaid as of the date of Foreclosure;

(iii) Any accrued and unpaid interest on the principal amount of the indebtedness; and

(iv) Existing encumbrances such as paving or sewage liens.

(B) If there are other bidders, the NEW ASSOCIATION may bid an amount not in excess of the les r of recoverable value, appraised value if an appraisal has been required by the CORPORATION pursuant to § 13(a), and the amount provided in § 13(b)(1)(A) above.

(2) The NEW ASSOCIATION shall advise the CORPORATION monthly of all completed Foreclosures subject to this § 13, in each case citing the Book Value, recoverable value, appraised value if an appraisal has been required by the CORPORATION pursuant to § 13(a), and the amount of the successful bid. In addition, if the successful bid, whether by the NEW ASSOCIATION or another party, results in a deficiency, the NEW ASSOCIATION shall advise the CORPORATION concerning the likelihood of securing a judgment against the defaulting mortgagor.



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0164

(3) A deed in lieu of foreclosure may not be obtained and no consideration shall be paid to the mortgagor under such deed without the written consent of the CORPORATION.

(4) In the case of any instrument securing a nonmortgage loan that is or may become such a Covered Asset, the NEW ASSOCIATION shall follow such procedures and take such actions as the CORPORATION may reasonably request.

(c) <u>Disposition</u>. With respect to any such Covered Asset of which the NEW ASSOCIATION proposes to dispose, at least 45 days prior to the proposed disposition, the NEW ASSOCIATION shall provide to the CORPORATION a proposal substantially in the form of Exhibit I ("Disposition Proposal"). Within 30 days after receipt of a Disposition Proposal, the CORPORATION shall:

(1) Approve the proposed minimum sales price and terms of sale for the Covered Asset, which may then be sold at not less than such approved minimum sales price, upon the approved sales terms, without further notice to the CORPORATION; or

(2) Disapprove the proposed minimum sales price or the terms of sale for the Covered Asset and require the NEW ASSOCIATION to order an appraisal. Within 10 days of receipt of the appraisal, the CORPORATION shall establish a minimum sales price and the terms of sale. Thereafter, the ACQUIRING ASSOCIATION may sell such asset, at not less than the approved price and upon the approved sales terms, without further notice



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0165

to the CORPORATION. If a sales contract for the Covered Asset has not been accepted within 90 days from the date on which the CORPORATION approved the sales price, the NEW ASSOCIATION shall submit a revised Disposition Proposal and the CORPORATION thereafter shall advise the NEW ASSOCIATION in writing concerning a revised sales price or additional marketing efforts.

(3) Notwithstanding the provisions of § 13(c)(1) and (2) above, the NEW ASSOCIATION may dispose of any such Covered Asset without submitting a Disposition Proposal to the CORPORATION if

(A) The NEW ASSOCIATION has an appraisal of such asset and the CORPORATION has approved the appraisal of such asset;

(B) The NEW ASSOCIATION disposes of such asset for a contract purchase price of no less than 90 percent of the appraised value of such asset less ordinary and customary sales commissions and other costs; and

(C) The NEW ASSOCIATION has not incurred and will not incur any costs or expenses for the repair, rehabilitation or completion of such asset or any other expenses in connection with such asset that are capitalizable pursuant to § 1(k)(2)(A), or deductible in determining Actual Yield, and nothing else has occurred, including the passage of time, that would diminish the reliability of or invalidate the assumptions underlying the appraisal or in any way affect the appraised value of such asset.

(4) In the event the NEW ASSOCIATION receives an offer to purchase any Covered Asset subject to the provisions of § 13(c)(1) and (2), and the offer provides for the execution of the agreement to purchase such asset in less than 45 days, the NEW ASSOCIATION shall immediately notify the CORPORATION of such offer and provide a Disposition Proposal to the CORPORATION. The CORPORATION shall use its best efforts to approve or disapprove the Disposition Proposal so as to allow the NEW ASSOCIATION to meet the time frames proposed by the party making the offer.

(d) Financing. In its disposition of such Covered Assets, the NEW ASSOCIATION shall offer financing to interested third party purchasers on such terms and in accordance with such underwriting and credit standards as the NEW ASSOCIATION would ordinarily use in extending credit to purchasers of assets not subject to this Agreement and without assistance from the CORPORATION except as may otherwise be provided pursuant to § 1(q)(3) of this Agreement.

(e) Expenditures. With respect to any Other Covered Asset, the NEW ASSOCIATION shall not deduct in determining Actual Yield, or increase the Book Value of such an asset pursuant to § 1(k)(2)(A) for, any expenditure without first providing to the CORPORATION a proposal substantially in the form of and containing substantially the information specified in Exhibit J ("Expenditures Proposal"), unless (i) the aggregate amount of such expenditures do not exceed 10 percent of the Book

Value of the asset, (ii) such expenditure is for utilities, taxes, insurance premiums or homeowners' association dues and is reasonable in light of the Book Value of such asset, or (iii) an emergency exists, such as a deficiency of the asset that violates a provision of the sanitary, health, building, or police code of the municipality, county or state in which the asset is located or that affects its habitability, in which case the NEW ASSOCIATION may, without the CORPORATION's consent, expend such sums as may be necessary to correct or prevent such emergency. Within 30 days of receipt of an Expenditures Proposal, the CORPORATION will advise the NEW ASSOCIATION concerning the action it shall take with respect to each asset that appears on the schedule.

(f) Real Estate Listings. The CORPORATION shall have the right at any time to interview real estate agents, brokers, and others to whom listings have been given pursuant to this § 13. A representative of the NEW ASSOCIATION will be asked to be present at any such interview.

(g) Insurance. The NEW ASSOCIATION shall use its best efforts to cause each parcel of Real Estate Owned that is an Other Covered Asset and the property securing each Other Covered Asset to be insured against loss or damage by fire (extended coverage), flood, and such other hazards that may normally be encountered in its neighborhood and in accordance with § 571.4 of the Insurance Regulations. Where appropriate, all insurance contracts shall contain the standard mortgagee loss

payable clause in favor of the NEW ASSOCIATION. Any such premiums or expenses may be deducted in calculating Actual Yield with respect to such Other Covered Asset.

(h) Collection Efforts. With respect to any loan that is an Other Covered Asset, the NEW ASSOCIATION shall use its best efforts in undertaking any and all action directed by the CORPORATION to collect on such debt, including the institution and prosecution of legal action against the borrower, consistent with the requirements of § 14. Any costs and expenses incurred in this connection may be added to the Book Value of such loan, if such cost or expense is a properly capitalized expense within the meaning of § 1(k)(2)(A), or may be deducted in calculating Actual Yield with respect to such Other Covered Asset.

(i) Form of Submissions. The forms of Exhibits I and J and any other submission for any Other Covered Asset may be changed by the CORPORATION after consultation with the NEW ASSOCIATION.

(j) CORPORATION Approvals. Any permission or approval of the CORPORATION pursuant to this § 13 shall be effective only if made in writing.

§ 14 Litigation.

(a) Pending Litigation.

(1) Litigation Schedule. Within 60 days after the Effective Date, the NEW ASSOCIATION shall submit an analysis of the litigation to which the ACQUIRED ASSOCIATION was



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0169

a party immediately prior to the Effective Date which the NEW ASSOCIATION believes is significant and the reasons for its determination ("Litigation Analysis") along with a schedule ("Litigation Schedule") of all litigation to which the ACQUIRED ASSOCIATION was a party immediately prior to the Effective Date that could result in a Debit to the Special Reserve Account. The Litigation Schedule shall be substantially in the form of and shall contain substantially the information required by Exhibit K. The CORPORATION and the NEW ASSOCIATION shall consult in good faith regarding the Litigation Analysis and the Litigation Schedule to determine which matters shall be treated as significant litigation matters ("Significant Litigation") for purposes of this § 14. After reaching an agreement as to ..ich matters shall constitute Significant Litigation, the NEW ASSOCIATION and the CORPORATION shall agree upon a time period within which the NEW ASSOCIATION shall submit copies of all significant pleadings and dispositive motions relating to Significant Litigation.

(2) Imminent Proceedings. With respect to any Significant Litigation in which a trial, injunction hearing or other evidentiary hearing is scheduled to occur within 120 days after the Effective Date, the NEW ASSOCIATION shall submit a preliminary schedule substantially in the form of Exhibit K (with attachments) as soon as practicable and, in any event, prior to the scheduled trial, injunction hearing or other evidentiary hearing.

(3) Revisions. After submission, the NEW ASSOCIATION shall revise the Litigation Schedule required by this § 14(a) on a quarterly basis and shall submit such revised Schedules to the CORPORATION with any required attachments. Revised Litigation Schedules shall include all litigation filed by or against the NEW ASSOCIATION that could result in a Debit to the Special Reserve Account, a deduction in calculating Actual Yield or an increase in the Book Value of a Covered Asset.

(b) Litigation Plans and Budgets. Unless otherwise directed by the CORPORATION, within six months after the Effective Date (or such longer period as the CORPORATION in its sole discretion may authorize in writing), the NEW ASSOCIATION shall submit for each Significant Litigation matter a litigation plan and budget substantially in the form of and containing substantially the information specified in Exhibit L ("Significant Litigation Plan and Budget"). Unless otherwise directed by the CORPORATION, the NEW ASSOCIATION shall also submit, within the same time period, an Abbreviated Litigation Plan and Budget for litigation other than Significant Litigation. An Abbreviated Litigation Plan and Budget shall contain an estimate of probable liability or damages, a recommendation with respect to continued prosecution, defense or settlement and an estimate of legal expenses and other costs by month until resolution of the case. The form and content of a Significant Litigation Plan and Budget and an Abbreviated Litigation Plan and Budget (referred to collectively herein as "Litigation Plan and



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0171

Budget") may be changed by the CORPORATION after consultation with the NEW ASSOCIATION.

(c) Post-Effective Date Litigation. If, follow-ing the Effective Date, litigation is filed against the NEW ASSOCIATION or the ACQUIRER that could result in a Debit to the Special Reserve Account, a deduction in calculating Actual Yield or an increase in Book Value of a Covered Asset, the NEW ASSOCIATION shall promptly notify the CORPORATION in writing and, within 90 days after such filing, submit a Litigation Plan and Budget to the CORPORATION.

(d) Plaintiff Litigation. Before instituting any new action or filing any new Claim in court in an existing action with respect to a Claim which could result in a Debit or Credit to the Special Reserve Account, a deduction in calculating Actual Yield or an increase in the Book Value of a Covered Asset, the NEW ASSOCIATION, for itself or the ACQUIRER, shall submit to the CORPORATION a Litigation Plan and Budget.

(e) Authority Before Approval of Litigation Plans and Budgets. Within 60 days of receipt of any Litigation Plan and Budget, the CORPORATION shall approve such Litigation Plan and Budget or disapprove all or any portion of such Litiga-tion Plan and Budget and, if appropriate, require the NEW ASSOCIATION to submit a revised Litigation Plan and Budget in accordance with its instructions. With respect to litigation described in § 14(a), (c) and (d), until the CORPORATION has approved a Litigation Plan and Budget, the NEW ASSOCIATION and



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0172

the ACQUIRER shall exercise their best efforts to minimize the cost of such litigation. As such expenses are paid, the NEW ASSOCIATION may only debit the Special Reserve Account for those amounts which may properly be debited pursuant to § 3, deduct those amounts which may properly be deducted in calculating Actual Yield, and increase the Book Value of any asset by those amounts which may properly be capitalized pursuant to § 1(k)(2)(A) if the expenses so debited, deducted or capitalized are attributable to the minimum necessary expenses of such litigation. Until the CORPORATION has approved a Litigation Plan and Budget, the NEW ASSOCIATION shall not be entitled to debit the Special Reserve Account for, increase Book Value by, or deduct in the calculation of Actual Yield, the amount of any expenses with respect to any proposed legal action described in § 14(d).

(f) Authority Following Approval of Litigation Plans and Budgets. After the CORPORATION has approved a Litigation Plan and Budget, the NEW ASSOCIATION may, with respect to amounts attributable to expense items specified in the Litigation Plan and Budget, debit the Special Reserve Account for amounts which may properly be debited to the Special Reserve Account, or increase Book Value by such amounts as may be properly capitalized under § 1(k)(2)(A), or deduct such amounts as may be properly deductible in calculating Actual Yield as such amounts are paid, provided that in no event shall the aggregate expenses so debited, deducted or capitalized for such expense in the



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0173

Litigation Plan and Budget without the express prior written approval of the CORPORATION.

(g) Revised Litigation Plans and Budgets. The NEW ASSOCIATION shall submit to the CORPORATION for approval revised Litigation Plans and Budgets as necessary to keep the CORPORATION informed on a current basis of its plans concerning litigation. The NEW ASSOCIATION and the ACQUIRER shall not implement a revised Litigation Plan and Budget until the CORPORATION approves such Litigation Plan and Budget. The CORPORATION shall have the right to require from time to time submission of additional or revised Litigation Plans and Budgets and to require prompt submission of all information and documents reasonably within the control of the NEW ASSOCIATION, the ACQUIRER or their respective Affiliates that supports any Litigation Plan and Budget.

(h) CORPORATION's Authority as to Litigation. With respect to any litigation that could result in a Debit or Credit to the Special Reserve Account, or that could result in an increase in Book Value due to amounts properly capitalized pursuant to § 1(k)(2)(A), or that could affect the computation of Actual Yield, the CORPORATION shall have the right (1) to monitor and direct the defense or prosecution of the matter, (2) to defend against or to prosecute the matter with its own attorneys in the name of the NEW ASSOCIATION, the ACQUIRER or the CORPORATION, as the case may be, or (3) to require the NEW ASSOCIATION or the ACQUIRER to assign its right, title or

interest in such matter, any defense related to such matter (including any counterclaim or setoff), or the proceeds from such matter to the CORPORATION. The NEW ASSOCIATION and the ACQUIRER shall cooperate fully with the CORPORATION in such defense or prosecution, including the furnishing to the CORPORATION of all applicable books, records and other information in the possession or control of the NEW ASSOCIATION, the ACQUIRER or any of their respective Affiliates, agents or counsel. The NEW ASSOCIATION and the ACQUIRER shall not enter into any binding commitment with respect to the satisfaction, settlement, or compromise of any Claim without the prior written approval of the Office of General Counsel of the Bank Board unless such satisfaction, settlement, or compromise would involve payment by the NEW ASSOCIATION or the ACQUIRER of an amount not in excess of $50,000 or is entered into pursuant to an adjudication by a court of competent jurisdiction which, with the permission of the CORPORATION, the NEW ASSOCIATION or the ACQUIRER has not appealed.

(i) CORPORATION Approvals. Any permission or approval of the CORPORATION pursuant to this § 14 shall be effective only if made in writing.

(j) Form of Submissions. The form of Exhibits K and L and any other submissions for any litigation with respect to which compliance with this § 14 is required may be changed by the CORPORATION after consultation with the NEW ASSOCIATION.

(k) Foreclosures and Bankruptcy Actions. Notwithstanding anything else to the contrary in this § 14,

Foreclosures and bankruptcy actions shall be governed by the provisions of §§ 12 and 13 relating to Significant Covered Assets and Other Covered Assets unless, in the course of a Foreclosure or bankruptcy action, a counterclaim is filed against the NEW ASSOCIATION, in which case the NEW ASSOCIATION shall comply with the provisions of this § 14 regarding its course of conduct with respect to such Foreclosure or bankruptcy action.

(1) Attorneys' Fees for Work Performed by Attorneys Who are Employees of the NEW ASSOCIATION. For purposes of this Agreement, if the NEW ASSOCIATION or the ACQUIRER desires to handle a Claim or action, the cost of which may be debited to the Special Reserve Account, deducted as an expense in calculating Actual Yield, or added to Book Value as a properly capitalized expense pursuant to § 1(k)(2)(A), by using an attorney who is an employee of the NEW ASSOCIATION or the ACQUIRER or an Affiliate of the ACQUIRER ("in-house attorney"), and such use of an in-house attorney is otherwise approved by the CORPORATION to the extent contemplated by other provisions of this Agreement, the NEW ASSOCIATION or the ACQUIRER shall calculate its attorneys' fee expense as the product of (i) the number of hours actually expended by the in-house attorney on a matter covered by the CORPORATION's indemnification under this Agreement, and (ii) an hourly rate equal to 135 percent of the annual salary of the in-house attorney so utilized divided by 2,080, provided that such rate does not exceed fees chargeable by outside counsel to the NEW ASSOCIATION or the ACQUIRER and,

provided further that the CORPORATION shall not indemnify the NEW ASSOCIATION or the ACQUIRER for any in-house attorney expense incurred to supervise or oversee the handling of any Claim or action by an outside attorney. The payment rate herein provided shall be considered to compensate the NEW ASSOCIATION or the ACQUIRER fully for the services rendered by any in-house attorney.

§ 15 Reports, Records, Audits. The material failure of the NEW ASSOCIATION to comply with any of the following requirements shall result in the disallowance of any related Debit to the Special Reserve Account, the disallowance of any adjustment of a related contribution or payment by the CORPORATION, the disallowance of a deduction of any expense in calculating Actual Yield, and the disallowance of the addition to Book Value of any expense that would otherwise be properly capitalizable pursuant to § 1(k)(2)(A) until, in the CORPORATION's judgment, such requirement is met or the CORPORATION otherwise permits:

(a) Quarterly Reports. Within 45 days following the end of each Quarter during the term of this Agreement, the NEW ASSOCIATION shall furnish to the CORPORATION, in a format approved by the CORPORATION and supported by such data as, in the CORPORATION's judgment, may be necessary to verify the reporting, a report on the following items for such Quarter:

(1) Accounting. A statement of all Debits and Credits which the NEW ASSOCIATION has made to the Special Reserve Account and the net Debit or Credit balance of the Account, including, with respect to any Debit for the Guaranteed Yield Amount pursuant to § 3(a)(7) or the Deposit Spread Amount pursuant to § 3(a)(10), a statement of how the NEW ASSOCIATION calculated the aggregate Average Book Value of Covered Assets owned by the NEW ASSOCIATION during such Quarter upon which the Guaranteed Yield Amount was calculated and, with respect to any Debit for attorneys' and accountants' fees, the following documentation and such other documentation as the CORPORATION may request:

(A) Copies of itemized statements of charges received by the NEW ASSOCIATION or the ACQUIRER from each law firm and accounting firm, which statements shall specify (i) a description of each of the services performed by each individual attorney and accountant; (ii) the identity of the person who performed each service; (iii) the date on which each service was performed; (iv) the hourly rate charged for each service; and (v) the total number of hours billed for such services;

(B) Copies of any letters, contracts, or other documents that set forth the agreement between the NEW ASSOCIATION or the ACQUIRER and such law firms and accounting firms concerning the basis on which fees and other compensation



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0178

due such attorneys and accountants from the NEW ASSOCIATION or the ACQUIRER are to be computed;

(2) <u>Status Reports</u>. A status report in such format as the CORPORATION may specify after consultation with the NEW ASSOCIATION and the ACQUIRER on any current or potential Claims and litigation that may result in a Debit or Credit to the Special Reserve Account.

(3) <u>Significant Covered Asset Summaries and Litigation Summaries; Variances from Budgets</u>. Beginning as soon as practicable after the Effective Date but, in any event, not later than the first anniversary of the Effective Date, the NEW ASSOCIATION shall, within 30 days of the end of each three-month period during the 12-month period covered by a Property, Business or Collection Plan or a Litigation Plan and Budget, submit to the CORPORATION written reports substantially in the forms attached as Exhibit M ("Significant Covered Asset Summary") and N ("Litigation Summary"), stating for each item in the budget contained in such Property, Business or Collection Plan or Litigation Plan and Budget, the budgeted amounts and the actual amounts received or paid or incurred for each month of the three-month period. In the event any such actual amount of expense or revenue varies from the budgeted amount for such three-month period by 25 percent or more, the NEW ASSOCIATION shall include a written explanation therefor with the Significant Covered Asset Summary and Litigation Summary, and the NEW ASSOCIATION may request the CORPORATION's approval of a change in the budget or

the CORPORATION may require such a change as a result of such variance.

(b) Access to Books and Records. The NEW ASSOCIATION and the ACQUIRER shall cause to be made available to the CORPORATION, at such reasonable times and places as the CORPORATION may specify, all books, papers, records and information of any kind relating to any or all matters subject to the provisions of this Agreement, including any such materials or information in the possession or control of the NEW ASSOCIATION, the ACQUIRER or any of their respective Affiliates, subsidiaries, agents or counsel.

(c) Audits and Examinations. The CORPORATION may audit or examine the NEW ASSOCIATION, the ACQUIRER or any of their respective Affiliates or subsidiaries with respect to transactions affecting the implementation of this Agreement at any reasonable time or times chosen by the CORPORATION. Such audits shall be conducted by the CORPORATION at its own expense but, if requested by the CORPORATION, with the assistance of the NEW ASSOCIATION's or the ACQUIRER's personnel, whose salaries and expenses shall be paid by the NEW ASSOCIATION or the ACQUIRER, without reimbursement from the CORPORATION.

(d) Final Accounting. Within 90 days after the date this Agreement terminates, or such longer time as the CORPORATION may permit, the NEW ASSOCIATION shall render to the CORPORATION a final accounting, which shall include such information and be in such form as the CORPORATION shall request.



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0180

(e) Other Reports.

(1) The NEW ASSOCIATION shall submit an annual report to the CORPORATION, prepared by the NEW ASSOCIATION's independent auditors, in a form satisfactory to the CORPORATION, showing the total Tax Benefit Items available to the NEW ASSOCIATION, the total Tax Benefit Items, if any, utilized in the year covered by such report, and the calculation of the Net Tax Benefits, if any for such year. Such report shall be submitted, regardless of whether any Net Tax Benefits are realized by the NEW ASSOCIATION, on the date Net Tax Benefits, if any, are required to be credited to the Special Reserve Account pursuant to § 3(b)(5) of this Agreement.

(2) The NEW ASSOCIATION shall provide such other reports as the CORPORATION may reasonably require.

(f) CORPORATION Approvals. Any permission or approval of the CORPORATION pursuant to this § 15 shall be effective only if made in writing.

(g) Form of Submissions. The forms of Exhibits M and N and any other submissions required pursuant to this § 15 may be changed by the CORPORATION after consultation with the NEW ASSOCIATION.

§ 16 Covenants of the NEW ASSOCIATION and the ACQUIRER. The material failure of the NEW ASSOCIATION or the ACQUIRER to comply with any of the following covenants with respect to any asset or liability on the Books and Records or any Related Claim shall result in the disallowance of related Debits to the Special



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0181

Reserve Account, the disallowance of any adjustment of a related contribution or payment by the CORPORATION, the disallowance of the deduction of an expense in calculating Actual Yield, and the disallowance of the addition to Book Value of any expense that would otherwise be properly capitalizable pursuant to § 1(k)(2)(A):

(a) Management Standard. Subject to the provisions of this Agreement, the NEW ASSOCIATION shall administer and deal with all assets and liabilities on the Books and Records employing the higher of the standard of prudent business practice used by the NEW ASSOCIATION in administering its assets and liabilities not acquired from the ACQUIRED ASSOCIATION or the standard employed in the savings and loan industry generally in administering similar assets and liabilities. Subject to the provisions of this Agreement, the NEW ASSOCIATION and the ACQUIRER will endeavor to minimize losses and maximize gains and recoveries in the best interests of the NEW ASSOCIATION, the ACQUIRER and the CORPORATION.

(b) Management Services. The NEW ASSOCIATION shall provide, at its own expense (except as provided below with respect to Technical Assistance (defined below)), the executive and managerial resources, with adequate supporting staff, to develop, to review and to oversee the implementation of Significant Covered Asset Submissions in accordance with § 12, Disposition Proposals and Expenditure Proposals in accordance with § 13, Litigation Plans and Budgets in accordance with § 14

and all Reports and Summaries required by § 15 of this Agreement ("Management Services"). Management Services to be provided by the NEW ASSOCIATION pursuant to this § 16(b) include (1) initial evaluation of all Covered Assets and litigation, (2) performance of appropriate financial analysis of alternative courses of action for Covered Assets and litigation, (3) review and evaluation of appraisals of Covered Assets or of properties securing Covered Assets, (4) preparation of all submissions, plans, proposals, summaries and reports required by this Agreement, and (5) maintenance of a reporting, review and accounting system with adequate internal controls to monitor the management of Covered Assets and litigation, the incurrence of expenses and compliance with submissions, proposals and plans required by this Agreement.

With the prior written approval of the CORPORATION, the NEW ASSOCIATION may engage third parties (including the ACQUIRER and its Affiliates in accordance with applicable law) to provide technical assistance ("Technical Assistance") in connection with the performance of Management Services and the costs of such assistance, approved by the CORPORATION, may be deducted in calculating Actual Yield or added to the Book Value of the related asset pursuant to § 1(k)(2)(A) as a properly capitalized expense. Technical Assistance may include the services of marketing experts, property managers, brokers, appraisers and the like, but shall not include the general management, planning, analysis, review and oversight services to be supplied by the NEW

ASSOCIATION pursuant to its obligation to perform Management Services. With the prior written approval of the CORPORATION, Technical Assistance may also include the services of attorneys (including employees of the NEW ASSOCIATION or its Affiliates) engaged to prepare Significant Litigation Plans and Budgets in accordance with the requirements of § 14.

The NEW ASSOCIATION or its Affiliates, or the ACQUIRER or its Affiliates, shall not provide the following services for fees on the Covered Assets except pursuant to the limitations described in this section: (i) Property Management, (ii) Real Estate Brokerage, (iii) Leasing, (iv) Real Estate Development or Construction, and (v) Architecture and Engineering. The foregoing services may be performed only if (i) the NEW ASSOCIATION, the ACQUIRER or any of their respective Affiliates, as the case may be, is, as of the Effective Date, in the business of providing the particular service on the same type of properties in the same geographic markets, (ii) the fees and contract terms for such services are comparable, or better, in all material respects to those which the NEW ASSOCIATION, the ACQUIRER or any of their respective Affiliates, as the case may be, could or does obtain from unrelated parties, and (iii) except as otherwise agreed in writing by the CORPORATION, the NEW ASSOCIATION, the ACQUIRER and their respective Affiliates do not engage in performing such services with respect to more than 25% of the amount of the Covered Assets during any year, <u>provided</u> that the CORPORATION may direct the NEW ASSOCIATION, the ACQUIRER

and any of their respective Affiliates, as the case may be, to discontinue performance of any or all such services on any or all of the Covered Assets if the CORPORATION determines that such services are not being performed in accordance with the provisions of this Agreement. The fees for such services that are performed in accordance with the provisions of this Agreement may be deducted in calculating Actual Yield or added to the Book Value of the related asset pursuant to § 1(k)(2)(A) as a properly capitalized expense. The NEW ASSOCIATION and the ACQUIRER will supervise their contractors, agents, subsidiaries, Affiliates and staff to insure that high standards of performance are met with regard to services on the Covered Assets.

The NEW ASSOCIATION, the ACQUIRER and their respective Affiliates should market Covered Assets in such a manner as to provide broad market exposure to qualified buyers and to attempt to obtain multiple offers for the purchase of Covered Assets, except and to the extent a Business Plan approved by the CORPORATION pursuant to §§ 12, 13 or 14 provides for an alternative manner of disposition. Records should be maintained of offers, letters of intent or such other memoranda of negotiations as may be required to demonstrate to the CORPORATION that fair value is being received upon the Liquidation of Covered Assets.

(c) <u>Pursuit of Related Claims</u>.

(1) Subject to the requirements set forth in § 14, the NEW ASSOCIATION and the ACQUIRER shall pursue and,

where appropriate, file actions with respect to all potentially recoverable Related Claims which accrue to the NEW ASSOCIATION as successor in interest to the ACQUIRED ASSOCIATION, including, but not limited to, Claims under the appropriate fidelity bond(s) or insurance policy or policies of the ACQUIRED ASSOCIATION, whether discovered before or after the Effective Date.

(2) The NEW ASSOCIATION or the ACQUIRER shall notify the CORPORATION before pursuing any Related Claim which could result in a Debit or Credit to the Special Reserve Account. The NEW ASSOCIATION and the ACQUIRER agree to institute any legal action with respect to a Related Claim requested by the CORPORATION in connection with this Agreement. If the NEW ASSOCIATION or the ACQUIRER objects to any such request, it shall provide its reasons in writing to the CORPORATION. If after receipt of such statement, the CORPORATION does not withdraw its request, then the NEW ASSOCIATION or the ACQUIRER shall institute such action. The NEW ASSOCIATION and the ACQUIRER shall be indemnified by the CORPORATION for all losses resulting from, and the reasonable costs and expenses of, pursuing the action, excepting only losses arising from the NEW ASSOCIATION's or the ACQUIRER's negligence or lack of due diligence in pursuing or prosecuting the action.

(d) <u>Subsidiaries</u>.

(1) The NEW ASSOCIATION shall not, without the CORPORATION's prior written consent, cause or permit any Subsidiary to:

(A) declare a dividend or make a capital distribution of any nature whatsoever;

(B) Sell any of its assets for less than the book value of such asset reflected on the books and records of such Subsidiary, or encumber any such asset;

(C) Satisfy any liability for an amount greater than the amount provided for such purpose on the books and records of such Subsidiary;

(D) Acknowledge or accept as a liability of such Subsidiary as of the Effective Date any liability not reflected on the books and records of such Subsidiary as of the Effective Date;

(E) Apply any net cash received from the disposition of any of its assets to any use other than the payment of indebtedness or advances that are due and owing from such Subsidiary to the NEW ASSOCIATION; or

(F) Cause the voluntary bankruptcy of or other statutory reorganization proceeding to be filed for any Subsidiary.

(2) In the event the NEW ASSOCIATION takes or permits any action prohibited by the foregoing § 16(d)(1), the sole remedy of the CORPORATION shall be to prohibit increases to Book Value of properly capitalized expenses pursuant to § 1(k)(2)(A) or deduction of expenses in calculating Actual Yield and any or all Debits to the Special Reserve Account that relate to such asset or liability or the NEW ASSOCIATION's Investment in



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0187

the Subsidiary until such time as the NEW ASSOCIATION has corrected such violation.

(3) Upon the request of the CORPORATION, the NEW ASSOCIATION shall cause the voluntary bankruptcy of or other statutory reorganization proceeding to be filed for any Subsidiary, provided the financial condition of such Subsidiary permits such proceedings and, provided that the NEW ASSOCIATION does not determine within 30 days after such request is made that such proceeding is likely to have a material adverse effect on its business.

(4) Except as is otherwise provided in any Business Plan which has been approved by the CORPORATION, the NEW ASSOCIATION shall not sell or dispose of any Subsidiary or substantially all of its assets without the prior written approval of the CORPORATION if such sale could result in a Debit to the Special Reserve Account. With respect to any such proposed sale, the NEW ASSOCIATION shall offer the CORPORATION a right of first refusal and a reasonable time in which to exercise such right.

§ 17 Additional Covenants. The material failure of the NEW ASSOCIATION or the ACQUIRER to comply with any of the following covenants may, in the discretion of the CORPORATION, result in the disallowance of any further Debits to the Special Reserve Account, the disallowance of any further deductions when calculating Actual Yield, the disallowance of any further increases to Book Value pursuant to § 1(k)(2)(A) for properly



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0188

capitalized expenses, or the CORPORATION's pursuit against the NEW ASSOCIATION or the ACQUIRER of any other available remedy at law or equity:

(a) Disclosure of Agreement. Except as otherwise required by law, the NEW ASSOCIATION and the ACQUIRER shall not, without the prior written consent of the CORPORATION, disclose the terms of this Agreement, or the obligation of the CORPORATION to indemnify the NEW ASSOCIATION and the ACQUIRER against the Claims described in § 7, to any person, other than directors, employees, agents, attorneys or accountants of the NEW ASSOCIATION or the ACQUIRER.

(b) Compliance with Law. The NEW ASSOCIATION and the ACQUIRER will, and will cause all of their respective Affiliates and subsidiaries to, comply in all material respects with all applicable statutes, regulations and orders of, and any state, municipality or other political subdivision or any agency of the foregoing public units, in respect of the ownership of its properties and conduct of its business, including, without limitation, all applicable statutes, regulations, orders and restrictions relating to equal employment opportunities, employment retirement income security and environmental standards and controls; provided, however, that nothing contained in this § 17(b) shall require the NEW ASSOCIATION, the ACQUIRER or any of their respective Affiliates or subsidiaries to comply with any law so long as the validity or applicability of such law shall be contested in good faith.

(c) Tax Benefits. The NEW ASSOCIATION shall file its tax returns, including the filing of consolidated or separate returns, in such a manner as to maximize any tax benefits arising from the nature or treatment of assistance from the CORPORATION under this Agreement, that may result in (i) a Credit or affect the amount of any Debit to the Special Reserve Account, (ii) a payment to the CORPORATION, or (iii) a reduction in the loss incurred by the CORPORATION, provided that this covenant shall not be interpreted as requiring the NEW ASSOCIATION to increase its tax liability.

(d) Return of Promissory Notes Issued to the ACQUIRED ASSOCIATION. Within five business days after the Effective Date, the NEW ASSOCIATION shall deliver to the CORPORATION (i) all promissory notes of the CORPORATION that were issued by the CORPORATION to the ACQUIRED ASSOCIATION in exchange for which the ACQUIRED ASSOCIATION issued Income Capital Certificates to the CORPORATION, which certificates shall be cancelled by the CORPORATION upon receipt of such promissory notes, or (ii) if after a reasonable effort to find such promissory notes the NEW ASSOCIATION is unable to do so, a lost note affidavit to that effect.

§ 18 CORPORATION's Purchase of Covered Assets.

(a) At any time during the term of this Agreement, the CORPORATION shall have the right to purchase, at a price equal to Book Value and without recourse against the NEW ASSOCIATION, any Covered Asset that has not been Liquidated prior

to the NEW ASSOCIATION's receipt of the CORPORATION's notice that it shall exercise its right to purchase such Covered Asset. Any such purchase of a Covered Asset shall be deemed a Liquidation of such Covered Asset for purposes of this Agreement.

(b) If purchase occurs prior to the termination of this Agreement, the purchase price shall be debited to the Special Reserve Account as of the closing date. If the closing of a purchase occurs after the date this Agreement terminates, the purchase price shall be paid to the NEW ASSOCIATION by the CORPORATION in cash within 10 days following conveyance to the CORPORATION of the NEW ASSOCIATION's right, title and interest in such asset.

(c) In order to facilitate such sale to the CORPORATION, the NEW ASSOCIATION shall, at the CORPORATION's request:

(1) Execute and deliver such instruments of sale, grant, conveyance, or transfer and make endorsements without recourse against the NEW ASSOCIATION in such form and manner, and at such time, as the CORPORATION shall require; and

(2) Execute and deliver all such other instruments together with all insurance policies, title policies, and title certificates, which the NEW ASSOCIATION possesses, as shall be deemed necessary, in the opinion of the CORPORATION, to complete such sale, grant, conveyance, or transfer without recourse.



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0191

§ 19 Office Space, Personnel and Facilities for the CORPORATION.

(a) The NEW ASSOCIATION agrees to provide the CORPORATION, without charge and for the term of this Agreement, including any extensions thereto, adequate space, including vault space and furnishings, for the CORPORATION's use in connection with the transfers and transactions contemplated by this Agreement. Such space and furnishings shall be adequate to accommodate a full-time employee, contractor or designee of the CORPORATION to monitor the NEW ASSOCIATION's evaluation and management of the Covered Assets.

(b) The NEW ASSOCIATION also agrees to make available to the CORPORATION in connection with the transfers and transactions contemplated by this Agreement personnel of the NEW ASSOCIATION and such facilities of the NEW ASSOCIATION as may be useful to the CORPORATION, without charge.

(c) The rights of the CORPORATION under this § 19 may be exercised by a nominee or agent of the CORPORATION.

§ 20 Accounting Principles. Except as otherwise provided herein, any computations made for purposes of this Agreement shall be governed by generally accepted accounting principles as applied in the savings and loan industry, except that where such principles conflict with the terms of the Agreement, applicable regulations, or any resolution or action of the Bank Board, adopted or taken on or prior to the date hereof, approving or relating to the Transaction or to this Agreement,

then this Agreement, such regulations, or such resolution or action shall govern. In the case of any ambiguity in the interpretation or construction of any provision of this Agreement, such ambiguity shall be resolved in a manner consistent with such regulations and any such Bank Board resolution or action relating to the Transaction or to this Agreement. If there is a conflict between such regulations and any such Bank Board resolution or action relating to the Transaction or to this Agreement, the Bank Board's resolution or action shall govern. For purposes of this section, the governing regulations and accounting principles shall be those in effect on the Effective Date or as subsequently clarified or interpreted by the Bank Board or the Financial Accounting Standards Board ("FASB"), respectively, or any successor organization of the American Institute of Certified Public Accountants. Where there is a conflict between what is required by the FASB and the Bank Board, the Bank Board's interpretation shall govern.

§ 21 Representations and Warranties. All representations and warranties made by the NEW ASSOCIATION and the ACQUIRER in the Stock Purchase Agreement or otherwise in connection with the Transaction shall, as between the NEW ASSOCIATION or the ACQUIRER and the CORPORATION, also be deemed to have been made to and shall inure to the benefit of the CORPORATION. The CORPORATION shall not, however, have the right to terminate or repeal this Agreement because of any breach of any such warranty

or representation without the written consent of the NEW ASSOCIATION and the ACQUIRER, as appropriate.

§ 22 Notices.

(a) Any notice or other communication required or permitted under this Agreement, unless otherwise specifically provided for, shall be deemed given if sent by first class mail, postage prepaid, to a party at its address set forth below or at such other address as the party shall furnish in writing:

If to the ACQUIRER:

MICHIGAN NATIONAL CORPORATION
Attn: President
30665 Northwestern Highway
Farmington Hills, Michigan 48108

If to the NEW ASSOCIATION:

BEVERLY HILLS FEDERAL SAVINGS BANK
Attn: President
27271 Las Ramblas
Mission Viejo, California 92691

If to the CORPORATION:

FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION
Attn: Director, Financial Assistance Division
801 17th Street, N.W.
Washington, D.C. 20552

(b) Unless otherwise specifically provided for, if this Agreement requires that notice be given within a certain period of time, notice shall be deemed given as of the date of posting.

§ 23 Termination of Agreement.

(a) Except as otherwise specifically provided elsewhere in this Agreement, this Agreement shall terminate ten



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0194

years following the Effective Date or on such other date to which the parties or their successors agree in writing, providing that in the event a receiver is appointed for the purpose of liquidating the NEW ASSOCIATION, or the NEW ASSOCIATION ceases to be an institution the accounts of which are insured by the CORPORATION, this Agreement and all of the CORPORATION's obligations under it shall terminate upon the effective date of such occurrence.

(b) Notwithstanding termination of this Agreement as described in § 23(a) above, provided that the NEW ASSOCIATION and the ACQUIRER continue to observe after the termination date all covenants, agreements, reporting and other requirements set forth in this Agreement, including the requirements in §§ 12, 13, 14, 15, 16, 17 and 30, the CORPORATION shall indemnify the NEW ASSOCIATION and the ACQUIRER for the amount of (i) any items described in § 7(a)(1) and (2) to the extent described in § 7(a), including the reasonable costs and expenses of related litigation actually incurred and paid by the NEW ASSOCIATION and the ACQUIRER, provided that any such item is in litigation on the date this Agreement terminates, and (ii) the reasonable costs and expenses actually incurred and paid by the NEW ASSOCIATION and the ACQUIRER in the pursuit of a Related Claim pursuant to § 7(b), provided that any such Related Claim is in litigation on the date that this Agreement terminates and the CORPORATION approves in writing the pursuit of such Related Claim beyond the termination date, and provided that any recoveries by the NEW ASSOCIATION and the ACQUIRER on any Related Claim

described in § 7(b) shall be paid over to the CORPORATION, subject to the limitations of § 6(b), and provided that the obligations of the CORPORATION stated in this § 23(b) shall terminate as stated in the proviso contained in subsection (a) above.

§ 24 Rights and Forbearances. The rights, powers, and remedies given to the parties by this Agreement shall be in addition to all rights, powers, and remedies given by any applicable statute or rule of law. No forbearance, failure, or delay by any party in exercising or partially exercising any such right, power, or remedy shall operate as a waiver thereof or preclude its further exercise.

§ 25 Governing Law. To the extent that Federal law does not control, this Agreement and the parties' rights and obligations under it shall be governed by the law of the State of Michigan. Nothing in this Agreement shall require any unlawful action or inaction by any party to this Agreement.

§ 26 Entire Agreement, Severability.

(a) This Agreement, together with any interpretation or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties and supersedes all prior agreements and understandings of the parties in connection with it, excepting only the Stock Purchase Agreement and any resolutions or letters concerning the Transaction or this Agreement issued by the Bank Board or the CORPORATION in connection with the approval of the Transaction and this

Agreement, provided, however, that in the event of any conflict, variance or inconsistency between this Agreement and the Stock Purchase Agreement or any other agreement entered into by the NEW ASSOCIATION or the ACQUIRER in connection with the Transaction, the provisions of this Agreement shall govern and be binding on all parties insofar as the rights, privileges, duties, obligations and liabilities of the CORPORATION are concerned.

(b) If any provision of this Agreement is invalid or unenforceable, then all of the remaining provisions of this Agreement shall, to the extent possible, nevertheless remain in full force and effect and shall be binding upon the CORPORATION, the NEW ASSOCIATION and the ACQUIRER.

§ 27 Counterparts, Modifications, Headings.

(a) This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which shall constitute one and the same instrument, and any party may execute this Agreement by signing any such counterpart.

(b) No amendment or modification of this Agreement shall be binding unless executed in writing by the parties or their successors.

(c) Section headings are not to be considered part of this Agreement, are solely for convenience of reference, and shall not affect the meaning or interpretation of this Agreement or any of its provisions.

§ 28 Successors and Assigns. All the terms and provisions of this Agreement shall be binding upon and inure to the



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0197

benefit of the parties and their respective transferees, successors, and assigns, but this Agreement may not be assigned to any party nor may rights or obligations under it be transferred or delegated to or vested in any other party, through merger, consolidation, or otherwise, without the prior written consent of the CORPORATION.

§ 29 Sole Benefit. It is the intention of the parties that this Agreement, the assumption of obligations and statements or responsibilities under it, and all of its conditions and provisions are for the sole benefit of the parties hereto and for the benefit of no other person. Nothing expressed or referred to in this Agreement is intended or shall be construed to give any person other than the parties hereto any legal or equitable right, remedy, or claim under, or in respect to, this Agreement or any of its provisions.

§ 30 Continuing Cooperation. It is the purpose of this Agreement to provide a means by which the failure of the ACQUIRED ASSOCIATION may be prevented, the savers and other creditors of the ACQUIRED ASSOCIATION may be protected against losses, the thrift and financing needs of the communities in which the ACQUIRED ASSOCIATION's offices are located may be served, the NEW ASSOCIATION and the ACQUIRER may receive the benefits and assume the risks contracted for, and expense to the CORPORATION may be reduced. The parties therefore agree that they shall in good faith, and with their best efforts, cooperate with one another to

carry out the purposes of this Agreement as described in this section.

§ 31 Liquidity Assistance. In the event that the NEW ASSOCIATION cannot obtain deposits at the ELEVENTH DISTRICT COF or cannot obtain sufficient advances from the Bank secured by the Covered Assets and the Promissory Notes, and the NEW ASSOCIATION makes a written representation to the CORPORATION to either effect, the CORPORATION shall, within fifteen (15) days after receipt of a written request of the NEW ASSOCIATION, from time to time, make available such funds without interest ("Advances") to the NEW ASSOCIATION as are necessary, as demonstrated to the CORPORATION's satisfaction, for the sole purpose of paying deposit liabilities of the ACQUIRED ASSOCIATION reflected on the Books and Records, provided that this § 31 shall not apply if the NEW ASSOCIATION can borrow 90% of the outstanding balance of the Promissory Notes and in excess of 50% of the Book Value of the Covered Assets from the Bank at an interest rate not to exceed the ELEVENTH DISTRICT COF plus 100 basis points (computed on a de-compounded basis in the same manner as interest is computed pursuant to § 1(aa)), and provided further that at no time may the aggregate amount of all outstanding Advances exceed the unpaid principal balance of the Promissory Notes. If at any time the aggregate amount of all outstanding Advances exceeds the unpaid principal balance of the Promissory Notes, the NEW ASSOCIATION shall promptly repay to the CORPORATION such amount of the outstanding Advances such that after such repayment the

aggregate amount of all outstanding Advances shall be equal to or less than the unpaid principal balance of the Promissory Notes. If the NEW ASSOCIATION fails to fulfill such repayment obligation within thirty (30) days after the CORPORATION provides the NEW ASSOCIATION with written notice of the amount by which the aggregate amount of all outstanding Advances exceeds the unpaid principal balance of the Promissory Notes, such balance shall be reduced by such excess amount. Solely for purposes of determining the amount of quarterly interest payments due under the Promissory Notes, the unpaid principal balance of the Promissory Notes shall be deemed to be temporarily reduced by the aggregate amount of all outstanding Advances, and while Advances are outstanding, the quarterly interest payments due under the Promissory Notes shall be determined by subtracting from the amount of quarterly interest payments that would have been due if no Advances were outstanding, the amount equal to the product of the aggregate amount of all outstanding Advances times an interest rate equal to the ELEVENTH DISTRICT COF plus 100 basis points (computed on a de-compounded basis in the same manner as interest is computed pursuant to § 1(aa)).

§ 32. Book Value Adjustments. At the option of the NEW ASSOCIATION, at the time of the final accounting required pursuant to § 15(d), either (a) a Credit will be made to the Special Reserve Account in an amount equal to the Book Value



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0200

Adjustment (as defined herein) or (b) the NEW ASSOCIATION shall issue to the CORPORATION perpetual non-participating and non-voting preferred stock with a liquidation preference to the Common Stock in the amount of the Book Value Adjustment plus arrearages in dividends and a cumulative dividend on the issuance price equal to the interest rate payable on bonds issued by Financing Corporation, a federally-chartered corporation, or any other instrument mutually agreed upon by the CORPORATION and the NEW ASSOCIATION, as adjusted semi-annually, with dividends being payable semi-annually from legally available funds, as and when declared by the Board of Directors of the NEW ASSOCIATION ("FSLIC Preferred Stock"). The FSLIC Preferred Stock will be pari passu as to liquidation preference and dividends with any preferred stock of the NEW ASSOCIATION held by the ACQUIRER or an Affiliate of the ACQUIRER. The FSLIC Preferred Stock shall be subject to call in whole or in part of any time by the NEW ASSOCIATION at the issuance price per share plus arrearages in dividends. The terms of the FSLIC Preferred Stock are set forth in Exhibit O attached hereto.

For purposes hereof, the "Book Value Adjustment" shall be equal to 20% of the excess of the stockholder's equity of the NEW ASSOCIATION (excluding or after reduction for the stockholders' equity owned by unrelated third parties) as of December 31, 1998, computed in accordance with generally accepted accounting principles, over the lesser of (i) the aggregate Initial Capital and Additional Capital purchased by the ACQUIRER

and its Affiliates, less Withdrawals thereon, or (ii) the Net Investment Account of the ACQUIRER as of the fiscal year end of the ACQUIRER in 1998 (but not less than zero).

At its option, the NEW ASSOCIATION may terminate its obligations set forth in this § 32 by crediting to the Special Reserve Account an amount equal to $15 million plus interest accrued thereon from the Effective Date at the annual rate of 10% and compounded annually on each anniversary of the Effective Date.

§ 33 <u>World Loan Obligation</u>. During any Quarter that the Collateral Loan Agreement ("World Loan Agreement"), dated as of October 22, 1982, between Beverly Hills Savings and Loan Association, Beverly Hills, California, the ACQUIRED ASSOCIATION's predecessor, and World Savings and Loan Association, a Federal Savings and Loan Association, Oakland, California ("World"), is in effect, the NEW ASSOCIATION shall debit to the Special Reserve Account, pursuant to § 3(a)(18), the difference between the interest paid to World, pursuant to the World Agreement, during such Quarter and the interest payable on a fixed term deposit liability, offered by the NEW ASSOCIATION or any other FSLIC-insured institution mutually agreed upon by the CORPORATION and the NEW ASSOCIATION, with a term to maturity and other appropriate terms and conditions comparable to those set forth in the World Agreement. The NEW ASSOCIATION hereby agrees to take all actions, at the CORPORATION's direction, that the CORPORATION determines are necessary to reduce the NEW



CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER FMI001 0202

ASSOCIATION's, and the CORPORATION's, costs under the World Loan Agreement. The NEW ASSOCIATION shall debit to the Special Reserve Account, pursuant to § 3(a)(18), the amounts of all reasonable costs and expenses incurred by the NEW ASSOCIATION as a direct result of taking actions at the CORPORATION's direction pursuant to this § 33.

§ 34 Tax Ruling. The NEW ASSOCIATION and the ACQUIRER shall exercise their best efforts to obtain, at their own expense, a favorable tax ruling ("Favorable Tax Ruling") from the Internal Revenue Service providing (a) that the transaction entered in to on April 23, 1985, between the FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION as Receiver for Beverly Hills Savings and Loan Association, Beverly Hills, California, a stock s ings and loan association organized under the laws of the State of California, and Beverly Hills Savings, a Federal Savings and Loan Association, Beverly Hills, California a federally-chartered mutual savings and loan association (the "1985 Reorganization"), constitutes a reorganization within the meaning of §§ 368(a)(1)(G) and 368(a)(3)(D) of the Internal Revenue Code as then in effect ("(G) Reorganization"); or (b) that such 1985 Reorganization did not qualify as a (G) Reorganization, but did not have the effect of reducing the tax basis of any of the assets acquired by the ACQUIRED ASSOCIATION in the 1985 Reorganization. The request for the Favorable Tax Ruling shall be

subject to the prior approval in writing of the CORPORATION. Such request shall be filed with the Internal Revenue Service as soon as practicable after the Effective Date.

IN WITNESS WHEREOF, the parties have executed this Agreement by their duly authorized officers or agents.

Date: December 31, 1988

ATTEST:

By: Lawrence L. Fletcher

Its: Senior Vice President & Secretary

MICHIGAN NATIONAL CORPORATION

By: R. J. McGraw

Its: Chairman of the Board

Date: December 31, 1988

ATTEST:

By: Lawrence L. Fletcher

Its: Secretary

BEVERLY HILLS FEDERAL SAVINGS BANK

By: R. J. McGraw

Its: Chairman of the Board

Date: December 31, 1988

ATTEST:

By: Pamela Ward Port

Its: Assistant Secretary

FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION

By: Jeanne Howard

Its: Designee, Director, FAD

Exhibit A

TEN-YEAR PROMISSORY NOTE

December 31, 1988

Seven Hundred Ninety-Three Million, Nine Hundred Twenty-Seven Thousand Dollars

($793,927,000)

FOR VALUE RECEIVED, the undersigned, THE FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION ("MAKER"), hereby promises to pay to the order of BEVERLY HILLS SAVINGS, A FEDERAL SAVINGS AND LOAN ASSOCIATION ("ASSOCIATION"), a savings and loan association chartered under the laws of the United States and having its principal business office at 27271 Las Ramblas, Mission Viejo, California, or its registered assigns, as hereinafter provided (each of the ASSOCIATION or such registered assigns from time to time being sometimes hereafter called the "HOLDER"), at the principal business office of the ASSOCIATION, or at such other place as the HOLDER may from time to time in writing designate, on or before December 31, 1998 (as provided herein), in lawful money of the United States, the principal sum of Seven Hundred Ninety-Three Million, Nine Hundred Twenty-Seven Thousand Dollars ($793,927,000), together with interest on the unpaid principal balance of this Note outstanding from time to time from the date hereof until this Note is fully paid at the Interest Rate, as hereinafter defined.

From and after the date hereof, interest shall be paid on the outstanding principal balance of this Note in an amount calculated as provided below in consecutive quarterly

installments, commencing on the tenth day of April, 1989, and on the tenth day of each July, October, January and April thereafter through and including October 10, 1998 (each such date and the final installment date shall sometimes herein be called a "Payment Date"). There shall be one final installment payable on December 31, 1998, when the entire remaining principal balance of this Note and all accrued and unpaid interest thereon shall be due and payable. If any Payment Date shall fall on a Saturday, Sunday or holiday for the Federal government, the payment due on such Payment Date shall be made on the next immediate day that is not a Saturday, Sunday or holiday for the Federal government. All payments made by the MAKER pursuant to this Note shall be made by the wire transfer of immediately available funds. Interest hereunder due and payable on each Payment Date shall be calculated as of and shall accrue through the last day of the month immediately preceding each such Payment Date (each such quarterly period shall sometimes herein be called an "Payment Period"), except that for the Payment Date that is the final installment date, interest shall be calculated as of and shall accrue through the final installment date.

1. Determination of Interest Rate. As used herein, the term "Interest Rate" means, with respect to each Payment Period during the term hereof, the rate of interest determined through application of the following formula: (1 + Eleventh District COF + BASIS POINTS)$^{x}$ - 1. For the purposes of the formula, "Eleventh District COF" means the average cost of funds

expressed as a simple annualized rate of interest, as most recently reported by the Bank or, if the Bank ceases to report such rate, as provided by the Bank Board. BASIS POINTS means 200 basis points (2.00%) from December 31, 1988 until December 31, 1990; 100 basis points (1.00%) from December 31, 1990 until December 31, 1993; 75 basis points (0.75%) from December 31, 1993 until December 31, 1996; and 50 basis points (0.50%) from December 31, 1996 until December 31, 1998. For the first and last Payment Periods, x shall equal a fraction, the numerator of which is the number of days in such Payment Period and the denominator of which is 365. For all other Payment Periods, x shall equal .25.

2. Prepayment of Principal and Interest. If the Favorable Tax Ruling, as defined in § 34 of an Assistance Agreement ("Assistance Agreement") of even date herewith to be entered into by the MAKER, BEVERLY HILLS FEDERAL SAVINGS BANK, Beverly Hills, California ("NEW ASSOCIATION"), the ASSOCIATION's successor, and Michigan National Corporation, a Michigan corporation ("ACQUIRER"), is obtained by the NEW ASSOCIATION and the ACQUIRER, after December 31, 1989, the MAKER may, at its option, at any time or from time to time, prepay the unpaid principal balance of this Note, in whole or in part, without premium or penalty, upon 90 days prior written notice delivered to the HOLDER, provided that such prepayment shall be made together with accrued and unpaid interest on the principal amount so prepaid to the date of such prepayment, and provided further

that prior to such prepayment the MAKER shall have prepaid substantially all promissory notes issued by the MAKER in connection with the acquisition of savings and loan associations which at the time notice is given bear interest rates that are higher than the Interest Rate and which by their terms permit such prepayment. Until the time that the Favorable Tax Ruling is obtained by the NEW ASSOCIATION and the ACQUIRER, the unpaid principal balance of this Note may be prepaid in the manner set forth in the immediately preceding paragraph in accordance with the following schedule, which sets forth the maximum amount of the principal amount of this Note that may be prepaid as of the end of years indicated:

| Year | Percent of Principal Amount Prepayable |
|---|---|
| 1991 | 10 |
| 1992 | 23 |
| 1993 | 43 |
| 1994 | 57 |
| 1995 | 68 |
| 1996 | 76 |
| 1997 | 100 |
| 1998 | 100 |

3. Events of Default; Acceleration of Principal and Interest. If the MAKER shall fail to pay any principal or interest when due and payable hereunder and such failure shall continue for 15 days after written demand for such payment has been delivered to the MAKER by the HOLDER, or if the MAKER shall fail to observe and perform any of its covenants or agreements hereunder and such failure shall continue for 30 days after written notice thereof has been delivered to the MAKER by the

HOLDER, there shall be an Event of Default. If an Event of Default shall occur and be continuing for 5 days after the HOLDER has delivered written notice thereof to the MAKER, the HOLDER may by further written notice delivered to the MAKER declare the entire unpaid principal hereunder and all accrued and unpaid interest thereon to be immediately due and payable, whereupon the same shall forthwith become due and payable without any presentment or further demand or notice of any kind, all of which are hereby expressly waived by the MAKER.

4. Reduction of Interest Payments While Advances by the MAKER are Outstanding. If, pursuant to Section 31 of an Assistance Agreement of even date herewith to be entered into by the MAKER, BEVERLY HILLS FEDERAL SAVINGS BANK, Beverly Hil , California ("NEW ASSOCIATION"), the ASSOCIATION's successor, and Michigan National Corporation, a Michigan corporation ("Assistance Agreement"), the NEW ASSOCIATION obtains advances from the MAKER ("Advances"), solely for purposes of determining the amount of quarterly interest payments due under this Note, the unpaid principal balance of this Note shall be deemed to be temporarily reduced by the aggregate amount of all outstanding Advances. If during any Payment Period there are Advances outstanding, the quarterly interest payment due on the Payment Date for such Payment Period shall be determined by subtracting from the amount of the quarterly interest payment that would have been due on such Payment Date if no Advances were outstanding during such Payment Period, the amount equal to the sum of the

"Daily Interest Amount" for all days in such Payment Period. The Daily Interest Amount for each day during such Payment Period shall be equal to the product of the aggregate amount of Advances outstanding at the end of such day and the "Daily Interest Rate." The Daily Interest Rate shall equal a rate equal to (i) the rate determined for such Payment Period pursuant to Section 1 hereof, except that for purposes of this Section 4 BASIS POINTS shall mean 100 basis points (1.00%), divided by (ii) the number of days in such Payment Period. If the NEW ASSOCIATION shall fail to fulfill its obligation to repay Advances, as provided for in § 31 of the Assistance Agreement, the unpaid principal balance of this Note shall actually be reduced by the amount, and at the time, provided in § 31 of the Assistance Agreement.

5. Replacement of a Lost, Stolen, Destroyed, or Mutilated Note. Upon receipt of evidence reasonably satisfactory to the MAKER of the loss, theft, destruction, or mutilation of this Note and, in the case of any such loss, theft, or destruction, upon receipt of indemnity reasonably satisfactory to the MAKER, or, in the case of any such mutilation, upon surrender and cancellation of this Note, the MAKER will, at the HOLDER's expense, issue and deliver to the HOLDER, in lieu of or in exchange for such lost, stolen, destroyed, or mutilated Note, a new note of like tenor and having a principal amount and accrued interest thereon equal to the unpaid principal balance of this Note and the accrued and unpaid interest thereon, if any.

6. Exchange and Assignment of the Note. This Note shall be exchangeable at any time by the HOLDER for replacement notes in such denominations as the HOLDER may request, but in minimum denominations of $5,000,000, having an aggregate principal amount and accrued interest thereon equal to the unpaid principal balance hereof and the accrued and unpaid interest thereon, if any, at the time of such exchange. Such replacement notes shall be in substantially the form hereof. Upon the HOLDER's request and surrender of this Note, the MAKER shall promptly effect such an exchange and, at the HOLDER's expense, issue and deliver replacement notes to the HOLDER. Each such replacement note shall set forth the principal amount hereof and the accrued and unpaid interest thereon, if any.

The HOLDER may assign this Note, or any notes exchanged therefor, only with the written consent of the MAKER. Upon receipt of such consent, any such assignment shall be effected by delivering to the MAKER by registered mail or certified mail, return receipt requested, either a written instrument executed by the HOLDER and evidencing such assignment or a notarized true copy or true copies of this Note or such notes showing the HOLDER's endorsement thereof to such assignee. Upon receipt of such a written instrument or notarized true copy or copies and as of the date of such receipt, the MAKER shall register the assignee thereunder as the registered assign and HOLDER of the Note or notes so assigned. No assignment effected or attempted to be effected by any other means shall be valid or binding upon the MAKER.

The MAKER and its agents may deem and treat the HOLDER in whose name this Note, or any note or notes exchanged therefor, is registered as of the close of business of the fifteenth day next preceding the payment date for a payment of principal or interest hereunder or thereunder, or, if such fifteenth day is not a business day, the business day next preceding such fifteenth day, as the absolute owner hereof or thereof for the purpose of receiving such payment.

7. Delivery of Notices, etc. Wherever this Note provides for delivery or any payment, notice, or other document, such payment, notice, or document shall be sufficiently delivered, unless otherwise expressly provided herein, if it is mailed, first-class postage prepaid, not later than two days before such delivery is required to be accomplished and is addressed, if to the MAKER, to Director, Financial Assistance Division, Office of the Federal Savings and Loan Insurance Corporation, 801 17th Street, N.W., Washington, D.C. 20552, or, if to the HOLDER, to the address of such HOLDER as shown on the books of the MAKER, or to such other addresses as the MAKER or the HOLDER may designate by written notice delivered to each other.

8. Governing Law. This Note shall be governed by and construed in accordance with the substantive laws of the State of California except where such instruments are controlled by statutes, regulations, rulings, or interpretations of the Federal Government of the United States of America or any agency thereof.

9. Headings. The headings of the paragraphs of this Note are for convenience only and do not constitute a part of this Note.

IN WITNESS WHEREOF, the MAKER has caused this Note to be duly executed and sealed as of the date first above written.

ATTEST:

_______________________________
Assistant Secretary

Dated: December __, 1988

FEDERAL SAVINGS AND LOAN
INSURANCE CORPORATION

By: _______________________________
Designee, Director, FAD

Exhibits B - N
are standard

EXHIBIT O TO ASSISTANCE AGREEMENT

SUPPLEMENTARY SECTION TO THE FEDERAL STOCK CHARTER
OF BEVERLY HILLS FEDERAL SAVINGS BANK,
ESTABLISHING THE TERMS OF ITS ADJUSTABLE RATE
CUMULATIVE PREFERRED STOCK, SERIES A

1. Designation.

_________ (______) shares of the Preferred Stock of BEVERLY HILLS FEDERAL SAVINGS BANK, Beverly Hills, California ("Association"), are hereby constituted as a class of Preferred Stock with a par value of $50 per share and with a stated value of $50 per share, designated as Adjustable Rate Cumulative Preferred Stock, Series A (hereinafter called "Series A Preferred Stock"). The number of shares of Series A Preferred Stc may not be increased but may be decreased by a resolution duly adopted by the Association's Board of Directors, but not below the number of shares of Series A Preferred Stock then outstanding.

2. Dividends.

2.1 The holders of shares of Series A Preferred Stock shall be entitled to receive semi-annual cash dividends, when and as declared by the Association's Board of Directors out of funds legally available for the payment of cash dividends, taking into account, among other things, any applicable regulatory or contractual limitations imposed by the Federal Savings and Loan Insurance Corporation ("FSLIC"), for the period from the date of original issuance to and including March 31, 19__, and for each

dividend period commencing April 1 and October 1 in each year after March 31, 19__ and ending on and including the day next preceding the first day of the next dividend period, for so long as the Series A Preferred Stock shall remain outstanding (such period ending March 31, 19__, and each such other period being referred to herein as a "Dividend Period") at a rate per share applied to the stated value of the outstanding Series A Preferred Stock equal to the rate payable on bonds issued by Financing Corporation, or any other instrument mutually agreed upon by the Association and the holders of a majority of the outstanding shares of Series A Preferred Stock, as adjusted semi-annually. The amount of dividend per share payable on March 31, 19__ shall represent a prorated amount to cover the period from the date of original issue to the date of payment. The amount payable on March 31, 19__ and for any portion of a Dividend Period less than a full Dividend Period shall be computed on the basis of a 360-day year of twelve 30-day months and the actual number of days elapsed in the period for which dividends are payable. Dividends shall be payable on March 31 and September 30 of each year, commencing March 31, 19__, to holders of record on such respective dates, not exceeding 30 days preceding the respective payment dates therefor, as may be determined by the Association's Board of Directors in advance of such payment dates. Dividends must be declared for payment no later than 30 days following the last day of each Dividend Period. Dividends paid in arrears for any past Dividend Periods may be declared and paid at any time,

without reference to any regular dividend payment date, to holders of record on such date, not exceeding 30 days preceding the payment date therefor, as may be determined by the Association's Board of Directors.

2.2 No dividends shall be declared on any other series or class or classes of preferred stock of the Association ranking on a parity (as that term is defined in Section 7) with the Series A Preferred Stock as to dividends in respect of any dividend period, unless there shall likewise be or have been declared on all shares of Series A Preferred Stock at the time outstanding dividends for all Dividend Periods coinciding with or ending before such dividend period, ratably in proportion to the respective dividend rates fixed for all such other series or class or classes of preferred stock and the Series A Preferred Stock. Dividends shall be cumulative and will accrue cumulatively on each share of Series A Preferred Stock from the date of original issuance thereof and shall be deemed to accrue from day to day whether or not declared. Commencing March 31, 19__, any accrued but unpaid dividends shall be compounded monthly at the rate applicable to dividends during each whole or partial Dividend Period during which such dividends are in arrears.

2.3 If dividends at the rate set forth in Section 2.1 for any Dividend Period shall not have been declared and paid or set apart for payment on all outstanding shares of Series A Preferred Stock for such Dividend Period and all preceding Dividend Periods from and after the date of the original issuance

thereof, then, until the aggregate deficiency shall be declared and fully paid or set apart for payment, the Association shall not (a) declare or pay or set apart for payment any dividends or make any other distribution on the common stock of the Association (which stock as it exists immediately after issuance of the Series A Preferred Stock and any stock into which such common stock may be changed from time to time hereafter is herein referred to as "Common Stock") or any other capital stock of the Association ranking junior to the Series A Preferred Stock with respect to the payment of dividends or distribution of assets on liquidation, dissolution or winding up of the Association (which shall mean any liquidation, dissolution or winding up of the Association, whether voluntary or involuntary) (the Common Stock and such other stock being referred to herein as "Junior Stock"), other than dividends or distributions paid in shares of, or options, warrants or rights to subscribe for or purchase shares of, Junior Stock, or (b) make any payment on account of the purchase, redemption or other retirement of any Junior Stock.

3. Liquidation Preference.

3.1 In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Association, before any payment or distribution of the assets of the Association shall be made to or set apart for the holders of any Junior Stock, the holders of the shares of Series A Preferred Stock shall be entitled to receive the stated value thereof ($50 per

share) plus an amount equal to all dividends (whether or not earned or declared) accrued and unpaid thereon, as compounded, to the date of final distribution to such holders ("Liquidation Preference Amount"); but such holders shall not be entitled to any further payment. If, upon any liquidation, dissolution or winding up of the Association, the assets of the Association, or proceeds thereof, distributable among the holders of the shares of the Series A Preferred Stock shall be insufficient to pay in full the preferential amount aforesaid and liquidating payments on any other preferred stock ranking, as to liquidation, dissolution or winding up, on a parity (as that term is defined in Section 7) with the Series A Preferred Stock, then such assets, or the proceeds thereof, shall be distributed among the holders of Series A Preferred Stock and any such other preferred stock ratably in accordance with the respective amounts which would be payable on such shares of Series A Preferred Stock and any such other preferred stock if all amounts payable thereon were paid in full. For purposes of this Section 3, a consolidation or merger of the Association with or into one or more associations or other financial institutions shall not be deemed to be a liquidation, dissolution or winding up.

3.2 Subject to the rights of the holders of shares of any series or class or classes of capital stock ranking on a parity (as that term is defined in Section 7) with or prior to the Series A Preferred Stock upon liquidation, dissolution or winding up, upon any liquidation, dissolution or winding up of

the Association, after payment shall have been made in full to the holders of Series A Preferred Stock as provided in this Section 3, but not prior thereto, any Junior Stock shall, subject to the respective terms and provisions (if any) applying thereto, be entitled to receive any and all assets remaining to be paid or distributed, and the Series A Preferred Stock shall not be entitled to share therein.

4. Redemption.

4.1 The Series A Preferred Stock shall be redeemable at any time, in whole or in part, at the option of the Association, by paying therefor in cash a redemption price equal to the stated value thereof ($50 per share) plus an amount equal to all dividends (whether or not earned or declared) accrued and unpaid thereon, as compounded, to the date of redemption.

4.2 When the Association redeems shares of Series A Preferred Stock pursuant to Section 4.1, notice of such redemption shall be given by first class mail, postage prepaid, mailed not less than 30 nor more than 60 days prior to the redemption date, to each holder of record of the shares to be redeemed, at such holder's address as the same appears on the stock register of the Association. Each such notice shall state: (1) the redemption date; (2) the number of shares of Series A Preferred Stock to be redeemed and, if less than all the shares held by such holder are to be redeemed, the number of such shares to be redeemed from such holder; (3) the redemption price and the

manner in which such redemption price is to be paid and delivered; (4) the place or places where certificates for such shares are to be surrendered for payment of the redemption price; and (5) that dividends on the shares to be redeemed will cease to accrue on such redemption date. Notice having been mailed as aforesaid, from and after the redemption date (unless default shall be made by the Association in providing funds for the payment of the redemption price), dividends on the shares of Series A Preferred Stock so called for redemption shall cease to accrue, and said shares shall no longer be deemed to be outstanding, and all rights of the holders thereof as shareholders of the Association (except the right to receive from the Association the redemption price) shall cease. The Association's obligation to provide funds in accordance with the preceding sentence shall be deemed fulfilled if, on or before the redemption date, the Association shall deposit with a bank or trust company (which may be an affiliate of the Association), having an office or agency in the City of San Francisco, State of California, having capital and surplus of at least $50,000,000, or with any other such bank or trust company located in the continental United States as may be designated from time to time by the Association, funds necessary for such redemption, in trust, with irrevocable instructions that such funds be applied to the redemption of the shares of Series A Preferred Stock so called for redemption. Any interest accrued on such funds shall be paid to the Association from time to time. Any funds so

deposited and unclaimed at the end of two years from such redemption date shall be repaid or released to the Association, after which the holder or holders of such shares of Series A Preferred Stock so called for redemption shall look only to the Association for payment of the redemption price.

4.3 Upon surrender in accordance with said notice of the certificates for any shares redeemed pursuant to Section 4.1 (properly endorsed or assigned for transfer, if the Board of Directors of the Association shall so require and the notice shall so state), such shares shall be redeemed by the Association at the redemption price. If less than all the outstanding shares of Series A Preferred Stock are to be redeemed, shares to be redeemed shall be selected by the Association from outstanding shares of Series A Preferred Stock not previously called for redemption by lot or pro rata (as nearly as may be) or by any other method determinated by the Board of Directors of the Association in its sole discretion to be equitable.

4.4 In no event shall the Association redeem less than all the outstanding shares of Series A Preferred Stock pursuant to Section 4.1 unless full cumulative dividends, as compounded, shall have been paid or declared and set apart for payment upon all outstanding shares of Series A Preferred Stock for all past Dividend Periods.

4.5 Notwithstanding anything herein to the contrary, without the prior written waiver or approval of the FSLIC, the Association shall not redeem any shares of the Series A Preferred

Stock pursuant to this Section 4 if, after giving effect to such redemption, the Association would fail to meet its regulatory capital requirement under Section 563.13 of the Rules and Regulations of the FSLIC ("Insurance Regulations"), 12 C.F.R. § 563.13 (1988), as now or hereafter in effect, or any regulation directly or indirectly superseding said Section 563.13 as in effect on the date of redemption.

5. Shares to be Retired.

All shares of Series A Preferred Stock redeemed or purchased by the Association shall be retired and cancelled and shall be restored to the status of authorized but unissued shares of preferred stock, without designation as to class, and may thereafter be issued, but not as shares of Series A Preferred Stock.

6. Voting.

The Series A Preferred Stock shall have no voting rights.

7. Ranking.

7.1 Any series or class of capital stock of the Association shall be deemed to rank:

(a) prior to the Series A Preferred Stock as to dividends or as to distribution of assets upon liquidation, dissolution or winding up if the holders of such series or class shall be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding

up, as the case may be, in preference or priority to the holders of Series A Preferred Stock;

(b) on a parity with the Series A Preferred Stock as to dividends or as to distribution of assets upon liquidation, dissolution or winding up, whether or not the dividend rates, dividend payment dates or redemption or liquidation prices per share of such series or class of stock are different from those of the Series A Preferred Stock, if the holders of such series or class of capital stock and of the Series A Preferred Stock shall be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may be, in proportion to their respective dividend rates or liquidation prices, without preference or priority one over the other; and

(c) junior to the Series A Preferred Stock as to dividends or as to distribution of assets upon liquidation, dissolution or winding up, if the holders of the Series A Preferred Stock shall be entitled to the receipt of dividends or of amounts distributable upon liquidation, dissolution or winding up, as the case may be, in preference or priority to the holders of such series or class of capital stock.

7.2 The Common Stock of the Association shall be deemed to rank junior to the Series A Preferred Stock.

8. Antidilution.

8.1 So long as any Series A Preferred Stock shall remain outstanding, the Association shall not: increase the authorized number of shares of Series A Preferred Stock or authorize or create, or increase the authorized amount of, any class of stock ranking prior to or on a parity with the Series A

Preferred Stock as to dividends or as to distribution of assets upon liquidation, dissolution, or winding up; or authorize or create, or increase the authorized amount of, any class of stock or obligations convertible into or evidencing the right to purchase any class of stock ranking prior to or on a parity with the Series A Preferred Stock as to dividends or as to distribution of assets upon liquidation, dissolution, or winding up.

8.2 The prior written consent of holders of two-thirds of the outstanding shares of Series A Preferred Stock shall be required to authorize the Association to redeem or purchase any outstanding shares of Junior Stock, unless concurrently with such redemption or purchase the Association redeems or purchases and cancels shares of Series A Preferred Stock equal to the number of shares of Series A Preferred Stock outstanding immediately prior to such purchase, multiplied by a fraction the numerator of which is the number of shares of such Junior Stock to be purchased and the denominator of which is the total number of shares of such Junior Stock outstanding immediately prior to such redemption or purchase.

8.3 So long as any Series A Preferred Stock shall remain outstanding, the Association shall not issue any Junior Stock to any holder of five percent (5%) or more of the issued and outstanding Common Stock, or to any affiliated person with respect to the Association or any such holder of the Association's Common Stock (as defined in Section 561.29 of the Insurance Regulations, 12 C.F.R. § 561.29 (1988), except that, in

applying such definition to an affiliated person of any holder, "holder" shall be substituted for "insured institution" or "institution" in such definition), except: (a) pursuant to a subdivision of the Association's outstanding Common Stock into a greater number of shares; or (b) for a price not less than the Market Value of the amount of the shares to be purchased, received in cash by the Association. For purposes hereof, the Market Value of the amount of the shares to be issued shall be equal to the amount determined by multiplying the number of such shares times the average daily Closing Price, as hereinafter defined, of the Common Stock (or other Junior Stock concerned) for the 10 consecutive trading days ending on the fifteenth trading day prior to the date of issuance, provided, however, that if there is no such public trading market, Market Value of the shares shall mean that value of the shares to be issued (on the basis that such shares are being purchased by a willing buyer and sold by a willing seller) determined by a nationally recognized investment banking or consulting firm selected by the Board of Directors of the Association or as otherwise agreed to in writing by the FSLIC. Closing Price for each day shall mean the last reported sales price or, in case no such reported sale takes place on such day, the average of the closing bid and asked prices for such day, in each case on the principal national securities exchange on which the shares of the Common Stock (or other Junior Stock concerned) are listed or admitted to trading or, if not listed or admitted to trading, the average of the

closing bid and asked prices of the Common Stock (or other Junior Stock concerned) in the over-the-counter market as reported by NASDAQ or any comparable system or if not approved for quotation on NASDAQ or any comparable system, the average of the closing bid and asked prices as furnished by two members of the National Association of Securities Dealers, Inc., selected from time to time by the Association for that purpose.

8.4 So long as any Series A Preferred Stock shall remain outstanding, the prior written consent of holders of at least two-thirds of the outstanding shares of Series A Preferred Stock shall be required to:

(a) amend, alter or repeal any of the provisions of this Supplementary Section or any of the rights, preferences or powers of the outstanding Series A Preferred Stock fixed herein, so as adversely to affect the rights, preferences or powers of the Series A Preferred Stock or its holders;

(b) merge or consolidate with or into any other corporation or association, unless the corporation or association surviving or resulting from such merger or consolidation will have after such merger or consolidation no class of stock either authorized or outstanding ranking prior to or on a parity with the Series A Preferred Stock as to receipt of dividends or of amounts distributable upon liquidation, dissolution, or winding up except the same number of shares of Series A Preferred Stock with the same rights, preferences and powers as the Series A Preferred Stock of the Association authorized and outstanding immediately preceding such merger or consolidation, and unless each holder of Series A Preferred Stock at the time of such merger or consolidation and in

connection therewith shall continue to hold (in the case of a merger in which the Association is the surviving corporation or association) such holder's shares of Series A Preferred Stock, or (in the case of a consolidation or a merger of the Association into some other corporation or association) shall receive the same number of shares of Series A Preferred Stock, with the same rights, preferences and powers, of such resulting corporation or association; or

(c) amend or repeal any of the provisions of this Section 8.

9. Registration Rights.

So long as the FSLIC, or any successor in interest of the FSLIC, shall hold shares of Series A Preferred Stock:

(a) Within sixty days after receipt of a written request from the FSLIC that it desires and intends to sell or transfer shares of Series A Preferred Stock, under such circumstances that a public offering, within the meaning of Part 563g of the Insurance Regulations, 12 C.F.R. Part 563g (1988) ("Offering Regulations"), will be involved, the Association shall file an offering circular, and use its best efforts to cause such Offering Regulations, with reject to the requested offering and sale or other disposition of share of Series A Preferred Stock held by the FSLIC.

(b) The Association shall notify the FSLIC in writing not less than ninety days prior to filing an offering circular under the Offering Regulations with respect to any class or classes of the Association's stock, of the Association's intention so to file. If the FSLIC wishes to have any portion of its shares of Series A Preferred Stock included in such offering circular, it shall advise the Association in writing to that effect within twenty business days following receipt of such

notice from the Association pursuant to the preceding sentence, and the Association will thereupon include the number of shares indicated by the FSLIC under such offering circular.

(c) In connection with any offering under the provisions of Section 9(a) or (b), the Association shall indemnify and hold harmless the FSLIC against any losses, claims, damages or liabilities, joint or several, to which the FSLIC may become subject, insofar as such losses, claims, damages or liabilities (or action in respect thereof) arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in any preliminary or final offering circular, or any amendment or supplement thereto, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading; and the Association will reimburse the FSLIC for any legal or other expense reasonably incurred by the FSLIC in connection with investigating or defending any such loss, claim, damage, liability or action; provided, however, that the Association will not be liable in any case to the extent that any such loss, claim, damage or liability arises out of or is based upon an untrue statement or omission made in such preliminary or final offering circular or such amendment or supplement thereto in reliance upon any written information furnished by or on behalf of the FSLIC specifically for use in the preparation thereof. The FSLIC will indemnify and hold harmless the Association to the same extent as set forth in the immediately preceding sentence but only with reference to written information furnished by or on behalf of the FSLIC specifically for use in the preparation of such preliminary or final offering circular or such amendment or supplement thereto, and will reimburse the Association for any legal or other expenses reasonably incurred by the

Association in connection with investigating or defending any such loss, claim, damage, liability or action.