**Michigan National Corporation**

P.O. Box 2475
Farmington Hills, Michigan 48333-2475
Phone: (313) 626-8200
Direct Dial (810) 473-3243

FAX TRANSMISSION TO: (202) 898-8929 (13 pages sent)

July 14, 1994

Mr. James A. Meyer
Senior Resolution Specialist
Federal Deposit Insurance Corporation
550 17th Street N.W., Room F-376
Washington, D.C. 20429

Dear Jim:

We have carefully considered your fax to us dated July 11, 1994, which modified the terms of our June 17th proposal. Many of the proposed changes made by the FDIC are acceptable, however we take exception to some of the modifications. Attached is white paper which details the unacceptable changes, explains our rational for our position and, when possible, proposes an alternative solution.

As I discussed with Steve Lower, we viewed many of your modification as being quite significant. Joe and I are prepared to meet with you in Washington on Monday, July 18th. However, if after reading our response you believe that we are at a stalemate, then perhaps we should discuss the issues over the phone and save Michigan National the cost of the trip. I will telephone you on Friday, July 15th in the mid-afternoon to discuss our plans.

Best Regards,

Ernie

Ernest J. Antczak
First Vice President

PLAINTIFF'S EXHIBIT 11
PENGAD 800-631-6989



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER F CMI021 0028

# Michigan National's Response to the FDIC's July 11, 1994 Proposal to Terminate the Assistance Agreement

Shifts for 95 + 94, 50%

1) Interest
2) 01/IO Impact.

**ISSUE: SHARING OF REFUNDS FROM NOL CARRYBACKS ARISING FROM TAXABLE YEARS 1989, 1990 AND 1991**

## MNC PROPOSAL

MNC's proposal included a termination of the tax sharing portions of the Agreement as of December 31, 1993. Since the refunds related to carrybacks of NOL from 1989, 1990 and 1991, MNC's proposal intended (but did not explicitly state) that the refunds be included in the calculation of tax benefits for the taxable years in which the carryback was generated and furthermore, as provided in the Assistance Agreement, that the FDIC would be entitled to receive their applicable share of the refund within a reasonable period after MNC received the refund from the IRS.

## FDIC'S RESPONSE TO MNC'S PROPOSAL

The FDIC response specifically addresses their entitlement to share in the refund, but furthermore, requires that their share be increased to 50% of the "tax benefits" from the carryback if the refunds are received from the IRS after December 31, 1994.

Additionally, the FDIC proposes that they are entitled to receive an unspecified percentage of any interest received from the IRS on the refunds.

P Finally, the FDIC requires any that NOL not allowed to be carried back to be added to the post-1993 tax benefits. The response is silent as to impact of such add-back. Okay

## DISCUSSION

The MNC consolidated group incurred federal net operating losses in 1989, 1990 and 1991. The NOL is allocated to all members of the group which had a separate NOL in the tax year under §1502-79(a)(3) of the Income Tax Regulations. The portion of the NOL attributable to the non-IOBC members of the MNC group ($12.1 million for 1989, 13.7 million for 1990 and 2.2 million for 1991) was carried back against MNC consolidated 1986, 1987 and 1988 federal returns. The remainder of the NOL for those years is attributable to IOBC or its subsidiaries and can only be carried forward due to the SRLY limitation rules.

The amount of NOL carried-back must be reduced as a result of §13224 of the Revenue Reconciliation Bill of 1993, which disallows the deduction of covered asset losses that were not approved by the FSLIC prior to March 4, 1991. Furthermore, the IRS examination changes proposed for 1989 will reduce the amount of NOL attributable to non-IOBC members further reducing the NOL to be carried-back. Until the IRS completes its examination it is not possible to fully determine the impact on the carryback, however it is clear that the NOL carryback will be substantially less than the amount originally claimed.

MNC's acknowledges that the NOL carryback gives rise to an obligation to pay the FDIC an amount due to the FDIC under section 9 of the Assistance Agreement. MNC does not agree to increase the FDIC's share of the NOL carryback refund to 50% if the refund is received after December 31, 1994. MNC's position is based on the terms of the Assistance Agreement.

Section 9(d) of the Agreement provides that MNC computes its federal tax benefit for any given taxable year by comparing its actual federal tax liability for that tax year, with a hypothetical federal tax liability computed excluding certain defined tax benefit items. The difference between the actual federal tax liability and the hypothetical federal tax liability is then multiplied by the Applicable Percentage in effect for the year to arrive at the FDIC's share of tax benefits.

Under §9(k) of the Agreement, the actual tax liability for a given tax year is defined as the liability shown on the returns. Under §9(d)(2), the actual tax liability can be a negative number due to refunds made available by a carryback of NOL incurred for such taxable year.

MNC concludes from the above that tax benefits related to NOL carrybacks are computed using the Applicable Percentage in the year the NOL originated, not the year the refund was received.

Section 9(h) of the Agreement requires, that if the Agreement has terminated, MNC must pay the FDIC its share of tax benefits within 30 days of filing its tax returns. However, §9(h) further provides that tax benefits realized by way of carrybacks shall be paid to the FDIC "when ... the Consolidated Group receives its income tax refund from the Internal Revenue Service...."

Therefore, MNC acknowledges the FDIC's claim to receive an amount, yet to be determined, based on the refund to be received from the carryback of NOL from 1989, 1990 and 1991. The amount will be based on the applicable tax sharing percentage for those years, and will be paid to the FDIC within 30 days from the date the refund is received from the IRS.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CMI021 0030

With regards to the FDIC's proposal to receive a portion of the interest paid to MNC from the IRS on the carryback, there is no provision in the Agreement that entitles the FDIC to any portion of the interest paid by the IRS related to a refund due to an NOL carryback. Therefore we reject this concept.

Concerning the FDIC's proposal that any disallowed NOL carryback will increase post-1993 tax benefits, MNC believes that the concept is illogical. As noted above, the reduction will result from the loss of certain built-in deductions and a reduction in the separate company NOL of non-IOBC members of the MNC group. The reduction of the carryback also means a reduction in the total tax benefits for the taxable year, whether in the form of a carryback or carryfoward. To increase the carryfoward by the lost carryback artificially increases the total tax benefits realized in any taxable year. Therefore MNC rejects this concept.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CMI021 0031

Deal Breaker

**ISSUE: PRE-ACQUISITION TAX BENEFITS**

MNC PROPOSAL

MNC proposed a 50% reduction of pre-acquisition NOL carryforward at IOBC and subsidiaries as of December 31, 1993.

FDIC'S RESPONSE TO MNC'PROPOSAL

The FDIC proposes that pre-acquisition NOL carryforward and tax credits will be shared at a 50% rate as realized. Furthermore, in the event of a disposition of IOBC and/or its subsidiaries, the FDIC would retain its sharing rights.

DISCUSSION

MNC desires to completely terminate its relationship with the FDIC and therefore rejects the concept of on-going tax sharing. MNC's proposal was for a reduction of tax attributes through use of a TARP agreement, or other legally binding agreement. Furthermore, such agreement would eliminate the need for the FDIC to be concerned with the affiliation of IOBC or its subsidiaries.

MNC acknowledges that any pre-acquisition tax credits would also be subject to the reduction.

**ISSUE: REVIEW OF CALENDAR YEAR 1991, 1992 AND 1993 TAX SHARING COMPUTATIONS**

MNC PROPOSAL

MNC's proposal acknowledged the FDIC's right to review the computation of tax benefits for calendar years 1991 through 1993. However the proposal limited the FDIC's right to propose adjustments to the amount of tax sharing for those years. Specifically, the FDIC would not be allowed to raise any issues relating to (i) any subsidiary tax benefit, including the utilization of subsidiary NOL carryfowards, or (ii) tax benefits associated with bad debt reserves.

FDIC'S RESPONSE TO MNC'S PROPOSAL

The FDIC response does not limit their ability to propose adjustments relating to subsidiary tax benefits and only conditionally limits their rights with respect to bad debts reserve.

DISCUSSION

As discussed in the past, MNC's global settlement approach took into account both of these issues through December 31, 1993. If MNC were to agree to the FDIC's response, it would be double accounting for this item. Therefore, to maintain our global settlement approach, we must either reject the FDIC's response or accept it and then ask the FDIC for an additional cash settlement payable to MNC. It is our belief that rejecting the concept is more appropriate avenue to take.

Deal Breaker unless we want to share.

## ISSUE: RIGHTS WITH RESPECT TO § 13224 OF REVENUE RECONCILIATION BILL OF 1993

MNC PROPOSAL

MNC's proposal expressly reserved any and all rights, including breach of contract claims, with respect to the benefits of losses specifically covered by §13224.

FDIC'S RESPONSE TO MNC'S PROPOSAL

The FDIC response requires MNC/IOBC to relinquish any and all rights against the FDIC.

DISCUSSION

MNC is unwilling to relinquish its rights to seek relief from the FDIC, unless it is adequately compensated for its losses.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CMI021 0034

Why?

**ISSUE: SECTION 7 INDEMNIFICATIONS** (ID)

MNC PROPOSAL

MNC's proposal retained the indemnifications provisions of §7 of the Assistance Agreement.

FDIC'S RESPONSE TO MNC'S PROPOSAL

The FDIC response eliminated MNC's rights to any indemnification under §7.

DISCUSSION

Since the inception of discussions regarding termination of the Assistance Agreement in 1992, MNC has insisted that either the §7 indemnification remain in place or the FDIC compensate MNC for relinquishment of these rights. Because prior discussions regarding compensation for relinquishment were unproductive, MNC proposed the continuation of the indemnification. MNC will not entertain relinquishment of the §7 indemnification without adequate compensation.

**ISSUE: TAX INDEMNIFICATIONS**

MNC PROPOSAL

MNC's proposal retained the indemnifications of §9(j) and 9(l) of the Assistance Agreement. For all purposes, including for purposes of §9(j) and 9(l), MNC/IOBC shall be treated as having paid the FDIC 50% of the Net Tax Benefits associated with MNC's December 31, 1993 NOL and AMT Credit carryfowards.

FDIC'S RESPONSE TO MNC'S PROPOSAL

The FDIC agreed to the provision except:

- The FDIC proposed that §9(d) and 9(e) of the Assistance Agreement would continue to survive with regard to pre-acquisition NOL's and tax credit carryovers. Furthermore, §9(d) and 9(e) would survive for purposes of computing tax benefits associated with IOBC's bad debt tax reserve.
- With respect to any future payments, if any, made to IOBC pursuant to §9(j) or 9(l), such payment will be 63% of the amount otherwise required to be paid by the FDIC.
- Net Tax Benefits paid for 1994 are to be treated as having been paid to the FDIC at the Applicable Rate of 25%, all others are at the 50% rate.
- FDIC caps the amount of indemnification payable to MNC/IOBC for Net Tax Benefits under §9(j) to $13.4 million.

DISCUSSION

With regards to continued tax sharing for pre-acquisition NOL and tax credit carryfowards, MNC rejects the concept. See discussion regarding pre-acquisition carryfowards for further details and MNC's solution to this issue.

With regards to continued tax sharing for bad debt tax reserves, as stated elsewhere, MNC has taken this item into consideration in proposing its global settlement. MNC will not entertain any form of continued tax sharing for this item.

The 63% apparently represents an adjustment to compensate for the tax free nature of FDIC indemnification assistance. However, with

respect to tax and penalty indemnifications, there is no deduction to MNC for federal income taxes and therefore the assistance does not generate any "Tax Benefits" as defined in §9 of the Assistance Agreement. Hence, MNC/IOBC must be fully compensated to economically break-even. With respect to any indemnification payment related to interest costs or indemnification payments under §9(1), MNC/IOBC would be willing to accept 82.5% of what they would otherwise be entitled to, but only if under tax law such indemnification payment is not subject to regular federal tax.

MNC accepts the concept that the FDIC share of 1994 Tax Benefits are deemed to have been paid at the 25% Applicable Rate.

The $13.4 million cap on indemnifications under §9(j) is unacceptable to MNC. Through 1992, MNC/IOBC has paid the FSLIC/FDIC $24 million in tax sharing. The current estimate of 1993 tax sharing is an additional $5.5 million and in our global settlement we have credited to the FDIC's benefit $17.2 million for so-called subsidiary tax benefits and bad debt tax benefits. This amounts to $46.7 million of potentially recaptureable tax benefits before considering the future value of the December 31, 1993 carryfowards. In our meeting of last month, we agreed that the future value of the carryfoward amounted to $41.3 million, thereby increasing the potential indemnification to $88 million before considering interest and penalties. There is no cap on indemnifications under the Agreement.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CMI021 0037

**ISSUE: AMT NOL ISSUES**

MNC PROPOSAL

MNC's proposal relieved the FDIC of any tax indemnification requirements with respect to AMT, as long as AMT remained creditable.

FDIC'S RESPONSE TO MNC'S PROPOSAL

The FDIC agreed to the MNC proposal but adds two provisions:

1) MNC must provide verification that it lost the AMT issue fully; and

2) if MNC obtains a compromise on the issue, the FDIC is entitled to a refund of its ratable share of the AMT Credit issue which was not disallowed.

DISCUSSION

In computing tax benefits to be shared for 1989 through 1992, MNC computed its actual tax liability after deduction of pre-acquisition AMT NOL's. This method of computation increased tax benefits which MNC has already paid the FDIC. Since MNC proposes to waive any indemnification with respect to AMT, the FDIC is not entitled to any future AMT Credits created by disallowance of AMT NOL's, to do so would compensate the FDIC twice.

In computing tax benefits to be shared for 1993, MNC will compute its actual tax liability without deduction of pre-acquisition AMT NOL's. This method of computation decreased tax benefits which MNC will pay the FDIC. If the IRS allows the utilization of AMT NOL's, the impact would be a reduction in MNC's actual 1994 tax liability, however, the reduction would be fully offset by a dollar for dollar decrease in MNC's AMT Credit carryforward. Therefore the net impact to the FDIC is would be zero. For this reason we reject the concept offered by the FDIC in item 2 above. Furthermore, we see no reason why the FDIC should be notified of the outcome of the AMT issue, unless it directly impacts their sharing, which it does not so long as MNC agrees to the waiver it has proposed.



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER CMI021 0038

**ISSUE: CASH PAYMENT**

MNC PROPOSAL

Cash payments will be made for:

(1) the outstanding Promissory Note balance plus accrued interest,

(2) the normal settlement of the third quarter SRA balance, and

(3) tax sharing payment for 1993.

No additional cash payments are contemplated by this proposal.

FDIC'S RESPONSE TO MNC'S PROPOSAL

The FDIC modified the proposal by:

(1) Adding the phrase to item 2 above "(including the tax benefit for 1994 SRA and interest payments)" after the word "balance", and

(2) by substituting the following for the last sentence:

> "An additional cash payment to the FDIC of $8.6 million is contemplated by this proposal."

DISCUSSION

MNC proposes that the phrase added to item 2 read as follows:

> (including the special credit to the SRA to be made on September 30, 1994 for an amount equal to the sum of (A) 35% of the debits made to the SRA during 1994 under section 3(a)(2) and 3(a)(3) of the Assistance Agreement, and (B) 8.750% of the sum of (i) the interest earned on the Promissory Note for the period from January 1, 1994 to September 30, 1994, and (ii) the debits made to the SRA during 1994, other than those made under section 3(a)(2) and 3(a)(3), less credits made to the SRA under section 3(b)(1) of the Assistance Agreement).

With regards to the FDIC's proposal for MNC/IOBC to pay the FDIC

$8.6 million, MNC offers to pay the FDIC $2 million.