DRAFT -- 9/15/94

PM

THIS DRAFT IS SUBJECT TO FURTHER
REVIEW AND REVISION BY MNC AND THE FDIC

# TERMINATION AGREEMENT

BY AND AMONG

FEDERAL DEPOSIT INSURANCE CORPORATION,
AS MANAGER OF THE
FSLIC RESOLUTION FUND,

MICHIGAN NATIONAL CORPORATION

AND

INDEPENDENCE ONE BANK OF CALIFORNIA, FSB
BEVERLY HILLS, CALIFORNIA

SEPTEMBER 2_, 1994

PENGAD 800-631-6989 PLAINTIFF'S EXHIBIT 14

TABLE OF CONTENTS

Page

TERMINATION AGREEMENT....................................

RECITALS...............................................

AGREEMENT..............................................

ARTICLE 1 EXECUTION....................................
Section 1.1 Execution and Effectiveness........
Section 1.2 MNC Deliveries at Execution........

(a) Certificates Regarding Board Actions....
(b) Certificates Regarding Execution Authority..............................
(c) Opinions of Counsel.....................

Section 1.3 FDIC Deliveries at Execution.......

(a) Certificates Regarding Board Actions....
(b) Certificates Regarding Execution Authority..............................
(c) Opinions of Counsel.....................

ARTICLE 2 CLOSING PAYMENT, NOTE CANCELLATION, FINAL SRA PROCEDURES, SRLY AND REFUND PAYMENTS, AND TAX INDEMNIFICATIONS.......
Section 2.1....................................

(a) Closing Payment.........................
(b) Interest Adjustment.....................

Section 2.2 Note Cancellation..................

Section 2.3 Transfer of Litigation.............

(a) Transfer................................
(b) Costs and Indemnifications..............

Section 2.4 Final SRA Procedures...............

(a) Final Reports...........................
(b) 1993 Tax Sharing........................
(c) 1994 Tax Sharing........................
(d) SRA Debit...............................
(e) Final Report Payment....................

Page

Section 2.5 SRLY and Refund Payments...........

(a) Federal SRLY Payments...................
(b) California SRLY Payments................
(c) Payment of Federal SRLY Payment and State SRLY Payment.................
(d) Ordering Rule...........................
(e) Refunds from Carryback of 1989-1991 NOLs.........................

Section 2.6 Tax Indemnifications...............

(a) Definition of Adjustments and Permanent Adjustments...................
(b) Section 2.4(c) Adjustments..............
(c) Section 2.5 Adjustments.................
(d) Adjustments to 1989-1993 Indemnification Net Tax Benefits...............................

ARTICLE 3 TRANSFER OF LITIGATION...................

Section 3.1 Transferred Cases.................

ARTICLE 4 POST-CLOSING AUDIT.......................

Section 4.1 Generally.........................
Section 4.1 Final Payment.....................
Section 4.2 Post-Closing Audit Procedures......

ARTICLE 5 DISPUTE RESOLUTION.......................

Section 5.1 Disputes..........................
Section 5.2 Review Board......................

ARTICLE 6 CONDITIONS PRECEDENT TO CLOSING..........

Section 6.1 Conditions to Obligations of the FDIC Manager..................

(a) Certified Resolutions..................
(b) Incumbency Certificates................
(c) Legal Opinions.........................
(d) Proceedings............................
(e) Consents and Approvals.................
(f) Accuracy of Representations and Warranties; Performance................
(g) Financial Condition....................

Page

Section 6.2 Conditions to Obligations of Independence One and MNC...........

(a) Accuracy of Representations and Warranties; Performance................
(b) Proceedings..........................

Section 6.3 Conditions to Obligations of the FDIC Manager, Independence One and MNC............................

(a) OTS Approval...........................
(b) Closing Date...........................

ARTICLE 7 REPRESENTATIONS AND WARRANTIES...........

Section 7.1 Representations and Warranties of Independence One and MNC........

(a) Corporate Existence....................
(b) Due Authorization......................
(c) Binding Agreement......................
(d) Compliance with Law....................
(e) Compliance with Obligations...........
(f) Approvals and Consents................
(g) Litigation.............................
(h) Capital Compliance.....................
(i) Accuracy of Information................
(j) Independence One Ownership Structure...
(k) Tax Matters............................
(l) Environmental..........................

Section 7.2 Representations and Warranties of the FDIC Manager................

(a) Power and Authorization................
(b) Binding Agreement......................

ARTICLE 8 COVENANTS..............................

Section 8.1 Access to Books and Records........
Section 8.2 Further Assurances................
Section 8.3 Costs and Expenses................
Section 8.4 FDIC's OIG Matters................

(a) Maintenance of Records.................
(b) OIG Access to Books and Records........
(c) OIG Audits and Examinations............
(d) Other Rights...........................

Section 8.5 Tax Matters........................

Page

ARTICLE 9 RELEASE....................................

Section 9.1 Release by the FDIC Manager........
Section 9.2 Release by Independence One and MNC...........................
Section 9.3 Accord and Satisfaction............
Section 9.4 Rights to Enforce..................

ARTICLE 10 INDEMNIFICATIONS........................

Section 10.1 Indemnification by the FDIC Manager.........................

Section 10.2 Indemnification by Independence One and MNC.......................

ARTICLE 11 MISCELLANEOUS...........................

Section 11.1 Amendments........................
Section 11.2 Notices...........................
Section 11.3 Waiver............................
Section 11.4 Governing Law.....................
Section 11.5 Severability......................
Section 11.6 Successors and Assigns............
Section 11.7 Headings..........................
Section 11.8 Exhibits..........................
Section 11.9 Entire Agreement..................
Section 11.10 Third-Party Beneficiaries........
Section 11.11 Execution in Counterparts........
Section 11.12 Continuing Cooperation...........
Section 11.13 Joint and Several Liability of MNC and Independence One.......
Section 11.14 Nature of Payments...............

EXHIBITS

2.2 Resolution of Outstanding Issues Under Assistance Agreement...........................
2.4(a)(ii) 1991 Net Tax Benefits Calculation.........................
2.4(a)(iii) 1992 Net Tax Benefits Calculation.........................
2.4(a)(iv) 1993 Net Tax Benefits Calculation.........................

| | | Page |
|---|---|---|
| 2.4(f)(iv) | Illustration of Calculation of Net Payment SRLY AMT NOLs........ | |
| 3.1(a) | [Transferred Cases][1]................ | |
| 6.1(c)(i) | Form of Legal Opinion for Independence One.................... | |
| 6.1(c)(ii) | Form of Legal Opinion for MNC....... | |
| 6.1(f) | Certificate of Independence One and MNC as to Accuracy of Representations and Warranties and Performance......................... | |
| 7.1(k) | Tax Matters......................... | |
| 7.1(l) | Environmental Matters............... | |
| 10.1(a) | [Covered Cases][2].................... | |


1 This Exhibit will list the affirmative matters and any other litigation the FDIC wants to manage.

2 This Exhibit will include the defensive litigation and any other matters the FDIC doesn't want to manage.

## TERMINATION AGREEMENT

This TERMINATION AGREEMENT (which together with all Exhibits attached hereto is collectively called the "Agreement"), dated this 2__ day of September, 1994, is entered into by and among the Federal Deposit Insurance Corporation (the "FDIC") as Manager of the FSLIC Resolution Fund (the "FRF") (the FDIC as Manager of the FRF is herein called the "FDIC Manager"), Michigan National Corporation, a savings and loan holding company incorporated under the laws of the State of Michigan ("MNC"), and Independence One Bank of California, FSB (formerly named Beverly Hills Federal Savings Bank), Mission Viejo, California, a federally chartered stock savings bank wholly owned by MNC ("Independence One").

## RECITALS

The FRF is the transferee of the assets and liabilities of, and the legal successor-in-interest to, the Federal Savings and Loan Insurance Corporation (the "FSLIC"). The FDIC Manager, Independence One, and MNC desire to provide for (i) the early termination of substantial portions of the Assistance Agreement dated December 31, 1988, by and among the FSLIC, Independence One, and MNC (the "Assistance Agreement"), (ii) the settlement of certain disputes under the Assistance Agreement, and (iii) the prepayment of the Replacement

Promissory Note dated July 1, 1990, made by the FDIC Manager (the "Note") in the principal amount of Eight Hundred Eleven Million, Four Hundred Sixty-Five Thousand, Five Hundred Sixty-Eight Dollars ($811,465,568.00).

## AGREEMENT

In consideration of the mutual promises and covenants contained herein, and of other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and, notwithstanding anything to the contrary in the Assistance Agreement and any other related agreements, the parties hereto agree as follows:

## ARTICLE 1

## EXECUTION

**Section 1.1** Execution and Effectiveness. This Agreement is executed and effective as of this 2__ day of September, 1994.

**Section 1.2** MNC Deliveries at Execution. Simultaneously with the execution of this Agreement, MNC shall deliver to the FDIC Manager the following:

(a) Certificates Regarding Board Actions. Certificates from each of Independence One and MNC, signed by their respective corporate secretaries and

dated the date hereof, certifying that (i) its board of directors has duly adopted resolutions, copies of which shall be attached to such certificate, (A) approving the terms of this Agreement and authorizing the consummation of the transactions contemplated by this Agreement, and (B) authorizing an officer of it to execute and deliver this Agreement and all necessary ancillary documents; (ii) all of such resolutions are in full force and effect; and (iii) none of such resolutions has been amended or modified.

(b) Certificates Regarding Execution Authority. Certificates from each of Independence One and MNC, signed by their respective corporate secretaries and dated the date hereof, certifying as to each person executing this Agreement on behalf of Independence One and MNC, respectively, that (i) such person is an officer of Independence One or of MNC holding the office or offices specified therein; and (ii) the signature of each such person set forth on such certificate is his or her genuine signature.

(c) Opinions of Counsel. Signed opinions addressed to the FDIC Manager dated the date hereof and substantially in the form of Exhibits __________ hereto, with such changes as the FDIC Manager, or its legal counsel, may approve.

Section 1.3 <u>FDIC Deliveries at Execution</u>. Simultaneously with the execution of this Agreement, the FDIC shall deliver to MNC the following:

(a) <u>Certificates Regarding Board Actions</u>. Certificates from the FDIC Manager signed by its corporate secretary and dated the date hereof, certifying that (i) its board of directors has duly adopted resolutions, copies of which shall be attached to such certificate, (A) approving the terms of this Agreement and authorizing the consummation of the transactions contemplated by this Agreement, and (B) authorizing an officer of it to execute and deliver this Agreement and all necessary ancillary documents; (ii) all of such resolutions are in full force and effect; and (iii) none of such resolutions has been amended or modified.

(b) <u>Certificates Regarding Execution Authority</u>. Certificates from the FDIC Manager signed by its corporate secretary and dated the date hereof, certifying as to each person executing this Agreement on behalf of the FDIC that (i) such person is an officer of the FDIC holding the office or offices specified therein; and (ii) the signature of each such person set forth on such certificate is his or her genuine signature.

(c) Opinions of Counsel. Signed opinions addressed to Independence One and MNC dated the date hereof and substantially in the form of Exhibits ________ hereto, with such changes as Independence One and MNC, or their legal counsel, may approve.

ARTICLE 2

CLOSING PAYMENT, NOTE CANCELLATION, TRANSFER OF LITIGATION, FINAL SRA PROCEDURES, SRLY AND REFUND PAYMENTS, AND TAX INDEMNIFICATIONS

Section 2.1 (a) Closing Payment. On September 30, 1994, the FDIC Manager shall pay or cause to be paid to Independence One, by wire transfer in immediately available funds, [________________ ~~Dollars ($~~________________)] (the "Closing Payment"). The Closing Payment shall be [MNC to insert wire transfer instructions].

(b) Interest Adjustment. No later than November 10, 1994, the FDIC Manager shall pay or cause to be paid to Independence One, by wire transfer in immediately available funds an amount (the "Interest Adjustment") equal to the excess, if any, of --

notify 2 days prior to ? 11/8

(i) the amount of interest payable by the FDIC Manager on the Note for the quarter ending September 30, 1994, over

(ii) ______________ Dollars ($ ________ ).

The Interest Adjustment shall be ~~[MNC to insert wire transfer instructions]~~ wire transferred to Independence One in accordance with the instructions found in Section 2.1(a) of this Agreement.

Section 2.2 Note Cancellation. On September 30, 1994, upon receipt of the wire transfer described in Section 2.1(e), Independence One shall deliver to the FDIC Manager the original Note marked "Cancelled: Paid in Full."

Section 2.3 Transfer of Litigation.

(a) Transfer. Effective at the close of business of September 30, 1994, the FDIC Manager shall assume full responsibility for managing and conducting all proceedings relating to the litigation cases listed on Exhibit 2.3 hereto (the "Transferred Cases"). Immediately following September 30, 1994, ~~MNC~~ Independence One shall advise its outside counsel in writing of the FDIC's assumption of responsibility for managing the Transferred Cases, and shall direct such counsel to prepare those documents reasonably necessary to designate new counsel of record for the Transferred Cases. The FDIC Manager, MNC and Independence One shall cooperate in taking all steps reasonably necessary to transfer full responsibility for the Transferred Cases to the FDIC.

(b) Costs and Indemnifications. From and after September 30, 1994, the FDIC Manager shall pay all legal

fees and other expenses incurred in connection with the Transferred Cases after September 30, 1994. The FDIC Manager shall indemnify and hold harmless the Independence One Indemnities (as defined in Section __) from and against any and all claims, damages, losses, expenses, costs, deficiencies, penalties, liens, interest, fines, assessments, charges, compensation, obligations and liabilities of any kind or character whatsoever relating to the Transferred Cases.

Section 2.4 Final SRA Procedures.

(a) Final Reports.

(i) No later than November 15, 1994, Independence One shall provide the FDIC Manager with a copy of its 1993 California corporate tax return and with the report for 1993, of Deloitte & Touche required by Section 15(e)(1) of the Assistance Agreement.

(ii) No later than December 30, 1994, Independence One will file with the Dallas office of the FDIC Manager the quarterly report for the Special Reserve Account established pursuant to Section 3 of the Assistance Agreement (the "SRA") for the quarter ending September 30, 1994 (the "Final Report").

(iii) Except as otherwise specifically required by this Agreement, neither Independence

One nor MNC shall have any obligation to file with the FDIC Manager any further reports, records, audits, returns or other statements with respect to any matters that are the subject of the Assistance Agreement.

(b) **1993 Tax Sharing**. For purposes of the Final Report, Independence One shall make a credit to the SRA as of September 30, 1994, for the amount due to the FDIC Manager under Section 3(b)(5) and Article 9 of the Assistance Agreement with respect to taxable year 1993.

(c) **1994 Tax Sharing**. For purposes of the Final Report, Independence One shall make a credit to the SRA as of September 30, 1994, for an amount equal to the sum of the following:

(i) Thirty-five percent (35%) of the debits made to the SRA during 1994 to the extent such debits --

(A) are made pursuant to the provisions of Sections 3(a)(2) and (3) of the Assistance Agreement, and

(B) are deductible on the 1994 consolidated federal income tax return of affiliated group (within the meaning of ____________) of corporations of which MNC is the common parent ("the MNC Group");

(ii) Fifteen and five-sixteenths percent (15.3125%) of the interest earned on the Note for the period from January 1, 1994, through and including September 30, 1994; and

(iii) Fifteen and five-sixteenths percent (15.3125%) of the excess of --

(A) the costs, expenses and losses that are (I) incurred by Independence One in 1994, (II) debited to the SRA pursuant to the Assistance Agreement (other than pursuant to Sections 3(a)(2) and (3) thereof), and (III) deductible on the 1994 consolidated federal income tax return of the MNC Group, over

(B) the credits to the SRA made during 1994 pursuant to Section 3(b)(1) of the Assistance Agreement.

(d) <u>SRA Debit</u>. For purposes of the Final Report, Independence One shall make a debit to the SRA as of September 30, 1994, in an amount equal to ~~Four Million Five Hundred ____ Thousand ____ Dollars ($4,5__,___.00).~~ $4,556,925.

(e) <u>Final Report Payment</u>.

(i) If the Final Report reflects a net credit balance in the SRA, on December 30, 1994, Independence One shall pay or cause to be paid to



X

the FDIC Manager, by wire transfer in immediately available funds, the amount of such credit balance. No later than the close of business on December 27, 1994, the FDIC Manager shall provide Independence One with written wire transfer instructions indicating the account to which any payment required by this Section 2.4(e)(i) shall be transferred.

(ii) If the Final Report reflects a net debit balance in the SRA, on January 30, 1995, the FDIC Manager shall pay or cause to be paid to Independence One, by wire transfer in immediately available funds, the amount of such debit balance. The funds are to be wire transferred in accordance with the same instructions as provided in Section 2.1(c) of this agreement ~~No later than the close of business on January 25, 1995, Independence One shall provide the FDIC Manager with written wire transfer instructions indicating the account to which any payment required by this Section 2.4(e)(ii) shall be transferred.~~

Section 2.5 SRLY and Refund Payments.

(a) Federal SRLY Payments. For each taxable year beginning with 1994, Independence One shall pay to the FDIC Manager, at the time and in the manner specified in Section 2.5(c), an amount equal to the sum of the following (the "Federal SRLY Payment"):

(i) Fifty percent (50%) of the excess of --

(A) an amount equal to the tax that would be imposed under Section 11(b) of the Internal Revenue Code of 1986, as amended (the "Code"), or any successor provision, on the sum of (I) the taxable income of the MNC Group as reported on its original federal income tax return for the year, and (II) the amount of any net operating loss carryovers as of January 1, 1989, of Independence One or any of its subsidiaries (a "SRLY NOL") that is deducted on that year's federal income tax return, over

(B) an amount equal to the tax that would be imposed under Section 11(b) of the Code, or any successor provision, on the taxable income of the MNC Group as reported on its original federal income tax return for the year; and

(ii) Fifty percent (50%) of the amount of any tax credit carryovers as of January 1, 1989, of Independence One or any of its subsidiaries ("SRLY Tax Credits") that are claimed on that year's federal income tax return.

(b) California SRLY Payments. For each taxable year beginning with 1994, Independence One shall pay to

the FDIC Manager, at the time and in the manner specified in Section 2.5(c), an amount equal to the sum of the following (the "California SRLY Payment"):

(i) Fifty percent (50%) of the excess of --

(A) an amount equal to the tax that would be imposed under Section __ of the [Insert cite to CA. Revenue Code] (the "California Code"), or any successor provision, on the sum of (I) the taxable income of Independence One as reported on its original California income tax return for the year, and (II) the amount of any SRLY NOLs that is deducted on that year's federal income tax return, over

(B) an amount equal to the tax that would be imposed under Section ___ of the California Code, or any successor provision, on the taxable income of Independence One as reported on its original federal income tax return for the year; and

(ii) Fifty percent (50%) of the amount of any SRLY Tax Credits that are claimed on that year's California income tax return.

(c) **Payment of Federal SRLY Payment and State SRLY Payment**. Any amount owed to the FDIC Manager for

any taxable year (the "Subject Year") pursuant to Sections 2.5(a) or (b) shall be paid as follows:

(i) No later than thirty (30) days following the filing of a federal income tax return claiming a SRLY NOL deduction or SRLY Tax Credit described in Section 2.5(a), Independence One shall pay to the FDIC Manager an amount equal to the excess of --

(A) the Federal SRLY Payment for the Subject Year, over

(B) fifty percent (50%) of the federal AMT liability for the Subject Year;

(ii) No later than thirty (30) days following the filing of any subsequent year's federal income tax return claiming a credit for the federal AMT paid in the Subject Year, Independence One shall pay to the FDIC Manager an amount equal to fifty percent (50%) of the amount claimed as a credit for the federal AMT paid in the Subject Year,

(iii) No later than thirty (30) days following the filing of a California income tax return claiming a SRLY NOL deduction or SRLY Tax

---

1 [EA: We need to discuss this. Isn't it possible that the federal AMT paid in the Subject Year could exceed the Federal SRLY payment. If so, how does this work?]

Credit described in Section 2.5(b), Independence One shall pay to the FDIC Manager an amount equal to the excess of --

(A) the California SRLY Payment for the Subject Year, over

(B) fifty percent (50%) of the California AMT liability, if any, for the Subject Year; and

(iv) No later than thirty (30) days following the filing of any subsequent year's California income tax return claiming a credit for the California AMT paid in a Subject Year, Independence One shall pay to the FDIC Manager an amount equal to fifty percent (50%) of the amount claimed as a credit for the California AMT paid in the Subject Year, (B)

(d) Ordering Rule. For purposes of Section 2.5(c), federal and California AMT payments shall be treated as being utilized on a first-in first-out basis. For example, no AMT liability arising in 1994 will be allowed as a credit unless and until all AMT liability paid in 1993 and prior years have been utilized as credits.

(e) Refunds from Carryback of 1989-1991 NOLs. No later than thirty (30) days following the constructive receipt by MNC of any ~~tax~~ Federal Income Tax refunds

attributable to the carryback of net operating losses of the MNC Group arising in 1989, 1990 or 1991 to taxable years of the MNC Group ending prior to January 1, 1989 (a "Section 2.5(e) Refund"), Independence One shall pay or cause to be paid to the FDIC Manager an amount equal to twenty-five percent (25%) of any such Section 2.5(e) Refund (including interest paid by the Internal Revenue Service (the "IRS") thereon).

Section 2.6 Tax Indemnifications.

(a) Definition of Adjustments ~~and Permanent Adjustments~~. For purposes of this Agreement, "Adjustment" means any act (or failure to act) (including, but not limited to, any act or failure to act by a governmental agency, legislative body, judicial authority, administrative authority, or any other governmental or quasi-governmental agency) that has the effect of forever increasing or decreasing any taxable loss, deduction for expense, ~~debit, interest, costs~~, exclusion from taxable income, credit against tax liability, carryover, tax attribute or other similar item and with respect to which either MNC notifies the FDIC in writing that it has accepted such increase or decrease or no further appeal or challenge thereto is permitted by law. If the FDIC Manager requests in writing that MNC challenge (or continue to challenge) an Adjustment, MNC shall so act provided the FDIC Manager provides MNC with written assurances, satisfactory in form and content to MNC,

or Independence One

that it will indemnify and hold harmless MNC and its affiliates from and against any and all claims, damages, losses, expenses, costs, deficiencies, penalties, liens, interest, fines, assessments, charges, compensation, obligations and liabilities of any kind or character whatsoever relating to the challenge of the Adjustment.

(b) <u>Section 2.4(c) Adjustments</u>. If there is an Adjustment that ~~has the~~ effects ~~of increasing or decreasing the amount of any debit, interest, cost, expense, loss or credit described in Section 2.4(c)~~, payments shall be made between Independence One and the FDIC as follows:

(i) Independence One shall make a payment to the FDIC for an amount equal to the additional credit, if any, Independence One would have made to the SRA pursuant to Section 2.4(c) had such Adjustment been made on September 30, 1994, together with an appropriate portion of the interest, if any, actually or constructively received by Independence One from a governmental tax authority as a result of such Adjustment; and

(ii) the FDIC Manager shall make a payment to Independence One in an amount equal to the excess, if any, of the credit Independence One made to the SRA pursuant to Section 2.4(c) over the credit Independence One would have made had

such Adjustment been made on September 30, 1994, together with an appropriate portion of the interest, if any, actually or constructively paid by Independence One to a governmental tax authority as a result of such Adjustment.

Any payment from Independence One to the FDIC Manager pursuant to Section 2.6(b)(i) shall be made no later than thirty (30) days following the earlier of the date on which MNC accepts the Adjustment and the date on which no further appeal or challenge thereto is permitted by law. At the time any payment is made to the FDIC Manager pursuant to Section 2.6(b)(i), Independence One shall provide the FDIC Manager with a written explanation of the Adjustment and the calculation of the payment related thereto. Any payment from the FDIC Manager to Independence One pursuant to Section 2.6(b)(ii) shall be made no later than thirty (30) days following the date on which MNC delivers the notice of the relevant Adjustment to the FDIC Manager as required by Section 2.6(a), which notice shall contain a written explanation of the Adjustment and the calculation of the payment related thereto.

(c) Section 2.5 Adjustments. If there is an Adjustment that causes an increase or decrease in the amount of a Federal SRLY Payment, a California SRLY

Payment or a Section 2.5(e) Refund, payments shall be made between Independence One and the FDIC as follows:

(i) If the Adjustment causes an increase in the amount of a Federal SRLY Payment, a California SRLY Payment or a Section 2.5(e) Refund, Independence One shall make a payment to the FDIC Manager in an amount equal to the increase in payments Independence One previously would have made to the FDIC Manager pursuant to Section 2.5(c) or (e) and this Section 2.6(c) with respect to the affected Federal SRLY Payment, California SRLY Payment or Section 2.5(e) Refund had such Adjustment been made in the year in which the Federal SRLY Payment or California SRLY Payment arose, or the year in which the Section 2.5(e) Refund was constructively received, together with an appropriate portion of the interest, if any, actually or constructively received by Independence One from a governmental tax authority as a result of the Adjustment; thereafter, any future payments required pursuant to Section 2.5(c) with respect to an affected Federal SRLY Payment or California SRLY Payment shall be made based on the adjusted amount of such Payment; and

(ii) If the Adjustment causes a decrease in the amount of a Federal SRLY Payment, a California SRLY Payment or a Section 2.5(e) Refund, the FDIC Manager shall make a payment to Independence One in an amount equal to the excess of the payments Independence One previously made to the FDIC Manager pursuant to Section 2.5(c) or (e) and this Section 2.6(c) with respect to the affected Federal SRLY Payment, California SRLY Payment or Section 2.5(e) Refund, over the payments Independence One would have made had such Adjustment been made in the year in which the Federal SRLY Payment, California SRLY Payment or Section 2.5(e) Refund arose, together with an appropriate portion of the interest, if any, actually or constructively paid by Independence One to a governmental tax authority as a result of the Adjustment; thereafter, any future payments required pursuant to Section 2.5(c) with respect to the affected Federal SRLY Payment or California SRLY Payment shall be made based on the adjusted amount of such payment.

Any payment from Independence One to the FDIC Manager pursuant to Section 2.6(c)(i) shall be made no later than thirty (30) days following the earlier of the date on which MNC accepts the Adjustment and the date on

which no further appeal or challenge thereto is permitted by law. At the time any payment is made to the FDIC Manager pursuant to Section 2.6(c)(i), Independence One shall provide the FDIC Manager with a written explanation of the Adjustment and the calculation of the payment related thereto. Any payment from the FDIC Manager to Independence One pursuant to Section 2.6(c)(ii) shall be made no later than thirty (30) days following the date on which MNC delivers the notice of the relevant Adjustment to the FDIC Manager as required by Section 2.6(a), which notice shall contain a written explanation of the Adjustment and the calculation of the payment related thereto.

(d) <u>Adjustments to 1989-1993 Indemnification Net Tax Benefits</u>. If there is an adjustment that has the effect of permanently increasing or decreasing the amount of Indemnification Net Tax Benefits for the period 1989 through 1993 as calculated under Section 9(c) of the Assistance Agreement, payments shall be made between Independence One and the FDIC as follows:

(i) If the Adjustment causes a reduction in the amount of the items described in Section 9(a)(2) of the Assistance Agreement ("ITB Items"), the FDIC shall pay to Independence One --

(A) $340 for each $1,000 of reduction in the amount of ITB Items for the first $3,000,000 of such ITB Items, and

(B) $271.37 for each additional $1,000 of reduction in the amount of ITB Items;

provided, however, that the maximum amount payable by the FDIC pursuant to this Section 2.6(d) shall be $3,346,501 plus the amount of any payments made by Independence One to the FDIC Manager pursuant to Section 2.6(d)(ii), together with an appropriate portion of the interest, if any, actually or constructively paid by Independence One to a governmental tax authority as a result of such Adjustment; and

(ii) If the Adjustment causes an increase in the amount of ITB Items, Independence One shall pay to the FDIC an amount equal to $340 for each $1,000 increase in the amount of ITB Items, together with an appropriate portion of the interest, if any, actually or constructively received by Independence One from a governmental tax authority as a result of such Adjustment. Any payment from the FDIC Manager to Independence One pursuant to Section 2.6(d)(i) shall be made no later than thirty (30) days following the date

on which MNC delivers the notice of the relevant Adjustment to the FDIC Manager as required by Section 2.6(a), which notice shall contain a written explanation of the Adjustment and the calculation of the payment related thereto. Any payment from Independence One to the FDIC Manager pursuant to Section 2.6(d)(ii) shall be made no later than thirty (30) days following the earlier of the date on which MNC accepts the Adjustment and the date on which no further appeal or challenge thereto is permitted by law. At the time any payment is made to the FDIC Manager pursuant to Section 2.6(d)(ii), Independence One shall provide the FDIC Manager with a written explanation of the Adjustment and the calculation of the payment related thereto.

(e) <u>1989-1993 Subsidiary Tax Benefits</u>. If there is an Adjustment that has the effect of permanently increasing or decreasing the amount of "Subsidiary Tax Benefit Items," for federal income tax purposes only the FDIC Manager shall pay to Independence One $42.55 for each $1,000 reduction in the amount of Subsidiary Tax Benefit Items, and Independence One shall pay to the FDIC Manager $42.55 for each $1,000 increase in the amount of Subsidiary Tax Benefit Items, in either case together with an appropriate portion of the interest, if any, actually or constructively paid

(in the case of a reduction) or received (in the case of an increase) by Independence One to or from a governmental tax authority as a result of such Adjustment. The maximum amount of any payment (exclusive of interest) from the FDIC Manager to Independence One pursuant to this Section 2.6(e) shall not exceed the sum of $8,027,208 7 and any amount paid by Independence One to the FDIC Manager pursuant to this Section 2.6(e).

For purposes of this Agreement, Subsidiary Tax Benefits means: ~~[to be added by FA]~~. (a)

Any payment from the FDIC Manager to Independence One pursuant to Section 2.6~~(d)(i)~~ (e) shall be made no later than thirty (30) days following the date on which MNC delivers the notice of the relevant Adjustment to the FDIC Manager as required by Section 2.6(a), which notice shall contain a written explanation of the Adjustment and the calculation of the payment related thereto. Any payment from Independence One to the FDIC Manager pursuant to Section 2.6(e) shall be made no later than thirty (30) days following the earlier of the date on which MNC accepts the Adjustment and the date on which no further appeal or challenge thereto is permitted by law. At the time any payment is made to the FDIC Manager pursuant to Section 2.6(e), Independence One shall provide the FDIC Manager with a written

explanation of the Adjustment and the calculation of the payment related thereto.

(f) **Adjustments to 1989-1993 Other Tax Benefits Items.**

(i) The FDIC Manager, MNC and Independence One agree that the following items in the following amounts were properly accounted for under the terms of the Assistance Agreement as Tax Benefit Items for years 1989 through 1993 inclusive (and in this Agreement shall be referred to as "Other Tax Benefit Items"):

| Item | Amount |
|---|---|
| | |
| | |
| | |
| | |
| | |
| Total | $519,013,604 |

(ii) FDIC Payments. If there is an Adjustment that causes a permanent decrease in the amount of Other Tax Benefit Items, the FDIC shall make payments to Independence One consistent with the following schedule:

(A) $175.7 for each $1,000 permanent decrease in the amount of Other Tax Benefit Items, for the first $171,929,851.7 of such decreases;

(B) $57.225 for each additional $1,000 permanent decrease in the amount of Other

Tax Benefit Items, for the next $14,795,029 of such decreases, plus interest on such amount at the rate of fifteen percent (15%) compounded annually from September 30, 1994, until the date of payment, but in no event may the amount determined in this Section 2.6(f)(ii)(B) exceed $2,589,130;

(C) $65.80 for each additional $1,000 permanent decrease in the amount of Other Tax Benefit Items, for the next $38,164,897 of such decreases, plus interest on such amount at the rate of fifteen percent (15%) compounded annually from September 30, 1994, until the date of payment, but in no event may the amount determined in this Section 2.6(f)(ii)(C) exceed $6,678,857;

(D) $75.60 for each additional $1,000 permanent decrease in the amount of Other Tax Benefit Items, for the next $38,164,897 of such decreases, plus interest on such amount at the rate of fifteen percent (15%) compounded annually from September 30, 1994, until the date of payment, but in no event may the amount determined in this Section 2.6(f)(ii)(D) exceed $6,678,857;

(E) $86.975 for each additional $1,000 permanent decrease of Other Tax Benefit Items, for the next $40,307,754 of such decreases, plus interest on such amount at the rate of fifteen percent (15%) compounded annually from September 30, 1994, until the date of payment, but in no event may the amount determined in this Section 2.6(f)(ii)(E) exceed $7,053,857;

(F) $100.10 for each additional $1,000 permanent decrease in the amount of Other Tax Benefit Items, for the next $23,388,600 of such decreases, plus interest on such amount at the rate of fifteen percent (15%) compounded annually from September 30, 1994, until the date of payment, but in no event may the amount determined in this Section 2.6(f)(ii)(F) exceed $4,093,005; and

(G) $109.274 for each $1,000 permanent decrease in the amount of Other Tax Benefit Items, for the remaining $192,262,576 of such Other Tax Benefit Items.

(H) Any payment from the FDIC Manager required pursuant to Section 2.6(f)(ii) shall be made together with an appropriate portion of the interest, if any, actually or

constructively paid by Independence One to a governmental tax authority as a result of the Adjustment giving rise to the FDIC Manager to make such payment. The interest payment described in this Section 2.6(f)(ii)(H) shall not be subject to any caps set forth in Sections 2.6(f)(ii)(A) - (G).

(iii) <u>Timing of FDIC Payments</u>. Any payment from the FDIC Manager to Independence One pursuant to Section 2.6(f)(i) shall be made no later than thirty (30) days following the date on which MNC delivers the notice of the relevant Adjustment to the FDIC Manager as required by Section 2.6(a), which notice shall contain a written explanation of the Adjustment and the calculation of the payment related thereto, and, except for any payment pursuant to Section 2.6(f)(ii)(G), a statement that the conditions to such payment set forth in Section 2.6(f)(iv) have been satisfied.

(iv) <u>Conditions to FDIC Payments</u>.

(A) Payments required pursuant to Section 2.6(f)(ii)(A) shall be made as (I) the cumulative post-1993 federal taxable income of the MNC Group exceeds (II) the

excess of (1) $171,929,851, over (2) the amount of permanent decreases in Other Tax Benefit Items (but not in excess of $171,929,851).

(B) For each $2,333 of cumulative post-1993 federal taxable income of the MNC Group in excess of $171,929,851, the FDIC shall pay to Independence One the payment required pursuant to Sections 2.6(f)(ii)(B), (C), (D), (E) and (F) for each $1,000 of permanent decreases, in excess of $171,929,851 in the amount of Other Tax Benefit Items,

(v) Independence One Payment. If there is a permanent increase in the amount of the Other Tax Benefit Items, Independence One shall pay to the FDIC an amount equal to fifty percent (50%) of the tax benefits arising therefrom. Any payments required by this Section 2.6(f)(v) shall be made no later than thirty (30) days following the filing of ~~MNC Group's consolidated~~ Independence One's federal income tax return on which such items ~~generated tax benefits.~~ cause a reduction in the amount of tax liability which would have otherwise been due had the permanent increase not occurred.

(g) Interest Allocation. For purposes of Section 2.6, interest actually or constructively paid to or by a governmental tax authority as a result of an Adjustment will be allocated to a payment to or from the

FDIC Manager by [EA to insert methodology]. [Alternatively, this paragraph can be deleted and we can address this issue when and if it ever arises -- this is not the preferred approach, but it may be the only practical approach, given the overall complexity of the payments under Section 2.6.]

ARTICLE 3

RESERVE FOR BAD DEBTS

Not later than January 30, 1995, Independence One shall file with the Internal Revenue Service ("IRS") a request for permission to change its method of accounting for bad debts from the reserve method to the specific charge-off method beginning in calendar year 1995. At the time of such filing, Independence One shall provide a copy of the request to the FDIC Manager. If such request is granted, Independence One shall not file a request for permission, or otherwise seek, to return to the reserve method until the year after the year in which the net amount of any adjustments required by Section 481 of the Internal Revenue Code of 1986, as amended (the "Code") ~~to be taken into account by Independence One as a~~ resulting ~~of~~ from the change to the specific charge-off method has been fully taken into account. Independence One shall provide to the FDIC Manager a copy of any IRS approval or denial of such request within thirty (30) days after the receipt of

such approval or denial. If such request is not filed, or is denied, Independence One shall cause its reserve for bad debts to be reduced to zero over the same period and at least at the same rate that it would have been required to recapture its bad debt reserve as of January 1, 1995, had the request been approved.

## ARTICLE 4

## AUDIT BY FDIC MANAGER

**Section 4.1** **Generally.** The FDIC Manager or its designee shall complete by no later than September 30, 1995 any audit (the "Post-Closing Audit") of (a) all amounts credited or debited to the SRA from October 1, 1992, through and including September 30, 1994, including such amounts provided in the final quarterly report required to be filed by no later than ~~on~~ December 31, 1994 by Independence One ~~or MNC~~ for the quarter ending September 30, 1994 (the "Final SRA Report"), and (b) all payments by the FDIC Manager or its predecessor to Independence One pursuant to the Assistance Agreement and this Agreement from October 1, 1992, through and including the September 30, 1994. The Post-Closing Audit shall not include review or reconsideration of any of the items listed in Exhibit 4.1 (collectively, the "Resolved Items"), all of which have been fully resolved by the parties hereto ~~& or Capital Losses on Covered Assets~~

**Section 4.2** Final Payment. For purposes of this Article 4, "Final Payment" shall mean the amount, if any, which shall be paid by either the FDIC Manager to Independence One ~~or MNC~~ or by Independence One ~~or MNC~~ to the FDIC Manager, resulting from the Post-Closing Audit and determined in accordance with the following calculations: (i) the FDIC Manager shall pay to Independence One ~~or MNC~~ the amount, if any, by which (A) any net adjustment in Independence One's ~~or MNC's~~ favor agreed to by the parties hereto, exceeds (B) any net adjustment in the FDIC Manager's favor agreed to by the parties hereto, together with interest on such excess at the rate equal to the thirteen (13)-week U.S. Treasury Bill rate (the "Interest Rate") from and including September 30, 1994, to but excluding the date of such payment; or (ii) Independence One ~~or MNC~~ shall pay to the FDIC Manager the amount, if any, by which (A) any net adjustment in the FDIC Manager's favor agreed to by the parties hereto, exceeds (B) any net adjustment in Independence One's ~~or MNC's~~ favor agreed to by the parties hereto, together with interest on such excess at the Interest Rate from and including September 30, 1994, to but excluding the date of such payment. The Final Payment shall be made in immediately available funds no later than ~~ten (10)~~ thirty (30) days after the date the parties hereto agree as to the amount thereof.



x

**Section 4.3** Post-Closing Audit Procedures. The parties hereto agree that the Post-Closing Audit, and any adjustments as a result thereof, shall be conducted and determined in accordance with the following procedures:

(a) Until completion of the Post-Closing Audit, Independence One and MNC shall cause to be made available to the FDIC Manager or its designee, at such times as the FDIC Manager may reasonably request, all books, papers, records and information of any kind in the possession of Independence One and MNC relating to any and all matters within the scope of the Post-Closing Audit; provided, however, that neither Independence One nor MNC shall be required to make available to the FDIC Manager or its designee any information or documentation that is subject to the attorney-client, work-product or any similar privilege. Such materials shall be made available to the FDIC Manager or its designee at MNC's headquarters or such other location reasonably agreed to by Independence One or MNC.

(b) Within thirty (30) days after Independence One and/or MNC has received a copy of the final audit report resulting from the Post-Closing Audit (the "Final Audit Report") from the FDIC Manager, Independence One and MNC shall provide the FDIC Manager a written description of any items in the Final Audit Report with

which Independence One or MNC disagrees (the "FDIC Audit Disputed Items"). If Independence One or MNC fails to provide a written description (a "Dispute Notice") of any particular item in the Final Audit Report with which it disagrees within such thirty (30)-day period, Independence One and MNC forever waive their rights to dispute any such item.

(c) The FDIC Manager, Independence One and MNC shall attempt to resolve any FDIC Audit Disputed Items through the following mediation procedures: The FDIC Manager shall appoint a mediation representative and Independence One and MNC shall jointly appoint a mediation representative, each within ten (10) days after the date on which Independence One or MNC provides a Dispute Notice to the FDIC Manager. Within twenty (20) days after such appointment, such mediation representatives shall meet face-to-face and attempt to resolve any such FDIC Audit Disputed Items. If such FDIC Audit Disputed Items are not resolved at such meeting, such mediation representatives shall meet face-to-face a second time within ten (10) days of such first meeting and attempt again to resolve such FDIC Audit Disputed Items. Each such meeting shall be held in Washington, D.C., or such other location agreed to by the parties. If any such FDIC Audit Disputed Items have not been finally resolved after such second meeting,

they shall be forwarded to the FDIC's OIG to be considered as part of the FDIC OIG Audit (as defined below) and if pursued by the FDIC Manager after completion of the FDIC OIG Audit resolved in accordance with the procedures specified in Article 6 hereof. Each party shall bears all costs and expenses incurred by it in connection with the conduct of the foregoing mediation procedures. The mediation procedures described in this Section 4.3(c) shall not be public. In addition, except as may be required by law, each party and their mediation representatives shall strictly maintain the confidentiality of all issues, disputes, arguments, positions, interpretations, awards, determinations and decisions of any such proceeding, as well as all information, attachments, enclosures, exhibits, summaries, compilations, studies, analyses, notes, documents, statements, schedules and other similar items associated therewith. No resolution or other agreement resulting from the mediation procedures shall constitute precedent as regards any subsequent proceeding.

ARTICLE 5

FDIC'S OIG MATTERS

Section 5.1 Maintenance of Records. Independence One and MNC shall maintain, ~~for a period~~ of

~~not less than five (5) years from September 30, 1994,~~ all books, papers, records, and information of any kind relating to any and all matters subject to the Assistance Agreement, this Agreement, or both Agreements, including any such materials or information in the possession or control of Independence One or MNC or any of their affiliates, subsidiaries, ~~or agents~~ (including, but not limited to, tax returns and amended tax returns for any taxable years specified by the FDIC Manager or its designee), until at least September 30, 1999.

**Section 5.2** OIG Access to Books and Records. Independence One and MNC shall cause to be made available to the FDIC's OIG, at such reasonable times as the FDIC's OIG may specify, all books, papers, records, and information described in Section 5.1; provided, however, that neither Independence One nor MNC shall be required to make available to the FDIC's OIG any information or documentation that is subject to the attorney-client, work product or any similar privilege. Such materials shall be made available to the FDIC's OIC at MNC's headquarters or such other location reasonably agreed to by Independence One or MNC.

until such time in period in Section 5.1 OIG and MNC are not required to keep

**Section 5.3** OIG Audit. The FDIC's OIG may audit or examine Independence One, ~~MNC~~ or or any of ~~their~~ its and MNC respective affiliates or subsidiaries with respect to transactions affecting the implementation of the

Assistance Agreement, this Agreement, or both Agreements at any reasonable time or times chosen by the FDIC's OIG (the "FDIC OIG Audit"). Such FDIC OIG Audit shall be conducted by the FDIC's OIG at its own expense but, if requested by the FDIC's OIG, with the reasonable assistance of Independence One's or MNC's respective directors, officers, and employees, whose salaries and expenses shall be paid by Independence One or MNC without reimbursement from the FDIC. Any such audit shall be completed by no later than ___________.

**Section 5.4** Adjustments. In the event that the FDIC's OIG determines that any adjustments should be made with respect to any matters other than the Resolved Items, the FDIC Manager shall provide Independence One and MNC with a written notice (the "FDIC OIG Notice") specifying such proposed adjustments and the purported basis therefor within thirty (30) days after completion of the FDIC OIG Audit. If the FDIC Manager fails to provide such notice within such time period, it shall forever waive its right to any such adjustment. Within thirty (30) days after its receipt of the FDIC OIG Notice, either Independence One or MNC shall provide the FDIC Manager with a written notice specifying the matters set forth in the FDIC OIG Notice as to which it disagrees ("FDIC OIG Disputed Items"). If Independence One or MNC fails to provide such notice regarding any

such item within such time period, it shall forever waive its right to dispute any such item. Each FDIC OIG Disputed Item shall be resolved in accordance with Article 6 hereof.

**Section 5.5** Other Rights. Notwithstanding anything to the contrary in this Agreement, the FDIC's OIG is statutorily obligated and empowered to audit any matters that relate to or arise out of the provisions of this Agreement and the Assistance Agreement. Nothing in this Agreement shall be construed to prevent or impair the audit and investigative authority of the FDIC's OIG pursuant to the Inspector General Act of 1977, as amended.

## ARTICLE 6

## DISPUTE RESOLUTION

**Section 6.1** Disputes. Any disputes arising under this Agreement shall be resolved through the mediation procedures specified under Section 6.2 or, if necessary, by determination of an arbitrator (the "Arbitrator") appointed pursuant to Section 6.3 hereof. The resolution of any disputes by the Arbitrator under this Article 6 shall be specifically enforceable under applicable arbitration law. Independence One and MNC shall be deemed one party in proceedings under this Article 6. Subject to the Administrative Dispute

Resolution Act (Public Law 101-648), such dispute resolution shall be the exclusive remedy for any dispute, controversy, or claim between the parties hereto.

**Section 6.2 Mediation Procedures**

Prior to the submission of any dispute to the Arbitrator, the parties hereto shall attempt to resolve such disputes through the following mediation procedures: In the event any party hereto believes that it has a claim against any other party under this Agreement, the claiming party shall provide the other party with a written notice of such claim describing in reasonable detail the nature and amount of the claim and the purported basis therefor (a "Claim Notice"). Within ten (10) days after the date upon which a Claim Notice is delivered to any party hereunder, the FDIC Manager shall appoint a mediation representative and Independence One and MNC shall jointly appoint a mediation representative. Within twenty (20) days after such appointment, such mediation representatives shall meet face-to-face and attempt to resolve any such dispute. If such dispute is not resolved at such meeting, such mediation representatives shall meet face-to-face a second within ten (10) days at such first meeting and attempt again to resolve such dispute. Each such meeting shall be held in Washington, D.C. or such

other location agreed to by the parties. If any disputes have not been finally resolved after such second meeting, they shall be submitted to the Arbitrator in accordance with a procedure set forth in Section 6.3 hereof.

**Section 6.3** **Arbitrator.**

(a) The Arbitrator shall have such expertise as the parties to the dispute to be resolved by such Arbitrator agree is relevant. The Arbitrator shall be chosen jointly by the FDIC, Independence One and MNC and may be removed only by unanimous action of such parties. If the parties hereto are unable to agree upon the selection of the Arbitrator, they shall apply to the American Arbitration Association (the "AAA"), and the Arbitrator shall be appointed in accordance with the Commercial Arbitration Rules of the AAA.

(b) The resolution of a dispute pursuant to this Article 6 in shall be governed by the Commercial Arbitration Rules of the AAA to the extent that such Rules are not inconsistent with this Article 6. The Arbitrator may modify the procedures set forth in such Rules from time to time with the prior approval of the FDIC Manager, the Independence One and MNC. The place of such arbitration shall be Washington, D.C., or such other location agreed to by the parties.

(c) Within fifteen (15) days after the last to occur of the final written submissions of both parties, the presentation of witnesses, if any, and oral presentations, if any, the Arbitrator shall adopt the position of one of the parties and shall present to the parties a written statement of his or her determination regarding the dispute.

(d) The FDIC Manager will pay one half of fees and expenses of the Arbitrator and Independence One and/ or MNC shall pay the other half thereof.

(e) Each party will bear all costs and expenses incurred by it in connection with the conduct of the mediation procedures described in this Article 6 and the submission of any dispute to the Arbitrator.

(f) Any dispute resolution proceeding (including without limitation any mediation proceeding) held pursuant to this Article in shall not be public. In addition, except as may be required by law, each party, their respective mediation representatives and the Arbitrator shall strictly maintain the confidentiality of all issues, disputes, arguments, positions, interpretations, awards, determinations and decisions of any such proceeding, as well as all information, attachments, enclosures, exhibits, summaries, compilations, studies, analyses, notes, documents, statements, schedules and other similar items associated

therewith. No decision, interpretation, determination, analysis, statement, award or other pronouncement of the Arbitrator shall constitute precedent as regards any subsequent proceeding (whether or not such proceeding involves dispute resolution under this Article 6) nor shall any Arbitrator be bound to follow any decision, interpretation, determination, analysis, statement, award or other pronouncement rendered by any other Arbitrator or any other previous dispute resolution panel which may have convened in connection with a transaction involving other failed financial institutions or Federal assistance transactions.

## ARTICLE 7

## REPRESENTATIONS AND WARRANTIES

Section 7.1 Representations and Warranties of Independence One and MNC. To induce the FDIC Manager to enter into this Agreement and to consummate the transactions contemplated hereby, Independence One and MNC severally make the following representations and warranties (but only to the extent applicable to each party) to the FDIC Manager as of the date hereof, all of which shall survive the execution and delivery of this Agreement and the consummation of such transactions:

Section 7.1.1. Corporate Existence.

(a) Independence One is a Federally chartered stock savings bank duly organized, validly existing, and in good standing under the laws of the United States of America, with all requisite power and authority to (i) own and operate its properties and conduct its business as currently conducted by it, and (ii) engage in the activities and transactions described in and contemplated by this Agreement.

(b) MNC is a Michigan corporation duly organized, validly existing, and in good standing under the laws of the State of Michigan with all requisite power and authority to (i) own and operate its properties and conduct its business as now conducted by it and (ii) engage in the activities and transactions described in and contemplated by this Agreement.

Section 7.1.2. Due Authorization. Independence One and MNC each has full power and authority to execute, deliver, and perform this Agreement, and has taken all necessary action to authorize the execution, delivery, and performance of this Agreement in accordance with its terms.

Section 7.1.3. Binding Agreement. This Agreement has been duly authorized, executed, and delivered by Independence One and MNC and, when duly authorized, executed, and delivered by the FDIC Manager,

this Agreement shall constitute a legal, valid, and binding obligation of Independence One and MNC, enforceable against each of them in accordance with its terms except as such enforceability may be limited by (i) bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally, and (ii) general equitable principles (regardless of whether the issue of enforceability is considered in a proceeding in equity or at law).

Section 7.1.4. Independence One Ownership Structure. All of the outstanding capital stock of Independence One is owned by MNC.

Section 7.2 Representations and Warranties of the FDIC Manager. To induce Independence One and MNC to enter into this Agreement and to consummate the transactions contemplated hereby, the FDIC Manager hereby makes the following representations and warranties to Independence One and MNC as of the date hereof, all of which shall survive the execution and delivery of this Agreement and the consummation of such transactions:

Section 7.2.1. Power and Authorization. The FDIC Manager has full power and authority to execute, deliver, and perform this Agreement, and has taken all necessary action to authorize the execution, delivery

and performance of this Agreement in accordance with its terms.

Section 7.2.2. Binding Agreement. This Agreement has been duly authorized, executed, and delivered by the FDIC Manager, and upon the due authorization, execution, and delivery of this Agreement by Independence One and MNC, this Agreement shall be a legal, valid, and binding obligation of the FDIC Manager, enforceable against it in accordance with its terms except as such enforceability may be limited by (i) bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally, and (ii) general equitable principles (regardless of whether the issue of enforceability is considered in a proceeding in equity or at law).

Section 7.3 Nature of Payments. All payments provided for in this Agreement to be made by the FDIC Manager to Independence One or MNC represent either a prepayment, or a payment in lieu of, a fixed or contingent right to assistance provided for in the Assistance Agreement, and all payments provided for in this Agreement to be made by Independence One or MNC to the FDIC Manager represent a payment of net tax benefits or a repayment of other assistance provided for in the Assistance Agreement.

## ARTICLE 8

## COVENANTS

Section 8.1 Access to Books and Records. Independence One and MNC shall cause to be made available to the FDIC Manager or its designee, at such times and ~~places~~ as the FDIC Manager may reasonably specify, all books, papers, records, and information of any kind relating to any or all matters subject to the Assistance Agreement, this Agreement, or both Agreements, including any such materials or information in the possession or control of Independence One or MNC or any of their affiliates, subsidiaries, or ~~agents~~ (including, but not limited to, tax returns and amended tax returns for any taxable years specified by the FDIC Manager or its designee); provided, however, that neither Independence One nor MNC shall be required to make available to the FDIC Manager or its designee any information or documentation that is subject to the attorney-client, or work product or any similar privilege.

Section 8.2 Further Assurances. Each of the parties hereto shall promptly and duly cause to be taken, executed, acknowledged or delivered all such further acts, conveyances, documents, and assurances as any party hereto may from time to time reasonably request in order more effectively to carry out the

intent and purposes of this Agreement and the transactions contemplated hereby.

**Section 8.3** Costs and Expenses. Except to the extent otherwise specifically provided herein, each party hereto agrees to pay all costs and expenses incurred by it in connection with or incidental to the matters contained in this Agreement, including any fees and disbursements of attorneys, accountants, and investment banking consultants.

[**Section 8.4** **Tax Matters**. Neither MNC nor any of its subsidiaries shall take a position on any of its Tax Returns that is inconsistent with the provisions of Section 13224 of the Revenue Reconciliation Act of 1993, nor shall any such entity make any claim or file any cause of action against the United States of America or any agency or instrumentality thereof, including, but not limited to, the IRS, the FDIC and the OTS, relating in any way to such Section; provided, however, that if a court or other competent tribunal having jurisdiction over a similarly situated taxpayer determines in a final decision that such Section does not bar such similarly situated taxpayer from reflecting the losses referred to in such Section on its federal or state tax return, or that such similarly situated taxpayer is entitled to damages as a result of the enactment of such Section, MNC or any of its subsidiaries may take such action as

Is necessary to obtain the identical result and shall, within thirty (30) days after it receives any cash payments, or files a tax return upon which it realizes any tax benefit as a result of such action, pay fifty percent (50%) of the amount of such cash, including interest earned thereon, or tax benefit, including interest earned thereon, to the FDIC Manager.]

**Section 8.5.** __Capital Maintenance Agreement__. The FDIC Manager agrees not to oppose any application or other proposal made by MNC to the Office of Thrift Supervision to terminate, revise or amend the Capital Maintenance Agreement.

## ARTICLE 9

## RELEASE

**Section 9.1** __Release by the FDIC Manager__. The FDIC Manager (the "FDIC Releasor"), on its own behalf and on behalf of the FRF, hereby releases, acquits, and forever discharges, effective as of the Closing, each of Independence One, MNC, and their subsidiaries, officers, directors, employees and affiliates (and the respective successors, assigns, employees, agents, and representatives of all the foregoing) (collectively, the "Independence One Released Persons") from and against any and all actions and causes of action, suits, disputes, debts, accounts, promises, warranties,

damages, claims, proceedings, demands, and liabilities, of every kind and character, direct and indirect, known and unknown, in law or in equity, that such FDIC Releasor, the FRF or any of their respective predecessors, successors or assigns, now has, has had at any time heretofore, or hereafter may have against the Independence One Released Persons by reason of any act or omission whatsoever by any Independence One Released Person in connection with the negotiation, administration, execution, or performance by any Independence One Released Person of, or otherwise relating to or arising under, the Assistance Agreement or any other agreements related thereto (and no other agreements to which the FDIC Manager is a party); provided, however, that the release provided in this Section 9.1(i) is not intended to and shall not prevent any assertion of a claim with respect to any breach of this Agreement or any ancillary agreements or instruments executed and delivered by the parties or any of them in connection with the execution of this Agreement or thereafter; (ii) shall not limit the right of the FDIC Manager to bring any claim based on fraud, willful misrepresentation of a material fact, willful failure to disclose a material fact, or willful misconduct; and (iii) shall not limit the rights of the FDIC Manager to pursue adjustments based on its or the

FDIC OIG's audit of the SRA (other than adjustments relating to the Resolved Items) in accordance with Articles 4 and 6 hereof.

**Section 9.2** **Release by Independence One and MNC.** The Independence One Released Persons hereby release, hold harmless, acquit, and forever discharge each of the FDIC Manager and the FRF and their officers, directors, and employees (and the respective successors, assigns, employees, agents, and representatives of all the foregoing) (collectively, the "FDIC Released Persons") from and against any and all actions and causes of action, suits, disputes, debts, accounts, promises, warranties, damages, claims, proceedings, demands, and liabilities, of every kind and character, direct and indirect, known and unknown, in law or in equity, that such Independence One Released Persons now have, have had at any time heretofore, or hereafter may have against the FDIC Released Persons by reason of any act or omission whatsoever by any FDIC Released Persons in connection with the negotiation, administration, execution, or performance by any of the FDIC Released Persons of the Assistance Agreement or any other agreements related thereto; provided, however, that the release provided in this Section 9.2 (i) is not intended to and shall not prevent any assertion of a claim with respect to any breach of this Agreement or any ancillary

agreements or instruments executed and delivered by the parties or any of them in connection with the execution of this Agreement or thereafter; (ii) shall not limit the rights of Independence One or MNC to bring any claim based on fraud, willful misrepresentation of a material fact, willful failure to disclose a material fact, or willful misconduct; and (iii) shall not limit the rights of Independence One or MNC under Articles 4 or 6 of this Agreement.

**Section 9.3** **Accord and Satisfaction.** Except as otherwise specifically provided herein (including, without limitation, Sections 9.1(ii) and (iii) and Sections 9.2(ii) and (iii), performance by each party of its respective obligations under this Agreement shall effect a complete accord and satisfaction of any and all obligations and liabilities of such party under the Assistance Agreement and, thenceforth, such party shall be fully discharged from any obligation or liability of any kind in connection therewith, including, without limitation, any and all actions, causes of action, suits, debts, sums of money, bonds, covenants, agreements, promises, damages, judgments, claims, and demands whatsoever, known or unknown, suspected or unsuspected, at law or in equity.

**Section 9.4** **Rights to Enforce.** Notwithstanding the foregoing provisions of this Article 9, Independence

One, MNC, and the FDIC Manager shall retain their respective rights to enforce this Agreement.

Section 9.5 Termination of the Assistance Agreement. Effective as of the close of business on September 30, 1994, except as expressly provided in Articles 2 and 10 hereof, the Assistance Agreement and the obligations and rights of the parties thereunder shall terminate and thereafter be of no further force or effect.

ARTICLE 10

INDEMNIFICATIONS

The indemnification obligations of the FRF and FDIC Manager set forth in Section 7 of the Assistance Agreement shall continue in effect on and after the Closing Date as if the Assistance Agreement had not been terminated but shall be limited to (i) the Claims described on Exhibit 10.1 hereto and Claims that involve Environmental Losses (as such term is defined herein). For purposes of this Agreement, "Environmental Losses" shall mean any and all claims, damages, losses, expenses, costs, deficiencies, penalties, liens, interest, fines, assessments, charges, compensation, obligations and liabilities of any kind imposed or incurred by, or under or pursuant to Environmental Laws (as such term is defined herein), whether based on

negligence, strict liability or otherwise, under any theory or process of recovery or relief, at law or in equity, including restoration, abatement, investigative, testing, monitoring, personal injury, death and property damage costs, and reasonable attorneys' fees, court costs, and interest paid or accrued, related to the contamination of any property and the remediation thereof. For purposes of this Agreement, "Environmental Laws" shall mean any and all federal, state, or local laws (including common law), rules, regulations, orders, ordinances, writs, judgments, injunctions, decrees, or determinations in effect during the period of this Agreement relation to the protection of the environment, the release of any hazardous substances into the environment, the generation, management, transportation, storage, treatment and disposal of hazardous substances, or the pollution of air, soil, groundwater or surface water (including, without limitation, the Clear Air a Act, the Toxic Substance Control Act, the Clean Water Act, CERCLA, and the Resource Conservation Act, all as amended).

## ARTICLE 11

## MISCELLANEOUS

**Section 11.1 Amendments.** No amendment, modification, or waiver of any provision of this

Agreement, nor any consent to any departure therefrom by any party, shall in any event be effective unless the same shall be embodied in a writing signed by all parties hereto, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

**Section 11.2** Notices. Any notice, request, claim, demand, consent, approval, or other communication to any party hereto shall be deemed effective when received and shall be given in writing, and delivered in person against receipt therefor, or sent by certified mail, postage prepaid, to such party at its address set forth below (with copies as indicated below) or at such other address as such party shall hereafter furnish in writing to the other parties.

(a) If to Independence One:

Independence One Bank of California, FSB
c/o Michigan National Corporation
P.O. Box 9065
Farmington Hills, Michigan 48333-9065

Attn: Legal Division

(b) If to MNC:

Michigan National Corporation
P.O. Box 9065
Farmington Hills, Michigan 48333-9065

Attn: Larry Gladchun, Esq.
General Counsel and Senior
Vice President

With a copy to:

Ernest J. Antczak
Corporate Tax Director
Michigan National Corporation
P.O. Box 9065
Farmington Hills, Michigan 48333-9065

(c) If to the FDIC Manager:

Federal Deposit Insurance Corporation
Division of Resolutions
Assisted Acquisitions (FRF)
550 17th Street, N.W.
Washington, D.C. 20429

Attn: Assistant Director (FRF)

With copies to:

Federal Deposit Insurance Corporation
Legal Division
550 17th St., N.W.
Washington, D.C. 20429

Attn: Assistant General Counsel
(Resolutions)

Federal Deposit Insurance Corporation
Division of Resolutions
Assisted Acquisitions (FRF)
550 17th Street, N.W.
Washington, D.C. 20429

Attn: Chief, FRF Tax Unit

**Section 11.3** Waiver. No failure or delay on the part of any party to this Agreement in exercising any right, privilege, power, or remedy under this Agreement, and no course of dealing among the parties hereto, shall operate as a waiver of such right, privilege, power, or remedy; nor shall any single or partial exercise of any right, privilege, power, or remedy under this Agreement

preclude any other or further exercise of such right, privilege, power, or remedy. The rights, privileges, powers, and remedies available to the parties hereto are cumulative and not exclusive of any other rights, privileges, powers, or remedies provided by statute, at law, in equity, or otherwise. No notice to or demand on any party in any case shall entitle such party to any other or further notice or demand in any similar or other circumstances or constitute a waiver of the right of the party giving such notice or making such demand to take any other or further action in any circumstances without notice or demand.

**Section 11.4** Governing Law. To the extent federal law does not control, this Agreement and the rights and obligations hereunder shall be governed by and construed in accordance with the law of the State of Michigan.

**Section 11.5** Severability. Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under all applicable laws. However, in the event that any provision of this Agreement shall be held to be prohibited or invalid under any applicable law, or declared unenforceable, then all of the remaining provisions of this Agreement shall, to the fullest extent possible, remain in full force and effect and

shall be binding on the parties hereto; provided, however, that this Section 11.5 shall be of no force or effect if the exclusion of such provision or portion thereof shall render the remaining provisions of this Agreement incapable of observance or shall cause this Agreement as a whole to fail of its essential purpose.

**Section 11.6** Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, that this Agreement may not be assigned to any person or entity, nor may any rights or obligations under this Agreement be transferred or delegated to or vested in any other person or entity (other than by operation of law), without the prior written consent of the FDIC Manager. Accordingly, MNC and Independence One shall remain liable to the FDIC Manager for all obligations under this Agreement, unless the FDIC Manager has provided its prior written consent to the release of such parties.

**Section 11.7** Headings. The headings contained in this Agreement are for convenience only and shall not affect the construction of any provision of this Agreement.

**Section 11.8** Exhibits. All Exhibits attached hereto are an integral part of and hereby incorporated into this Agreement.

Section 11.9 Entire Agreement. This Agreement and the Exhibits hereto embody the entire agreement among the parties hereto relating to the subject matters herein, and supersede all prior agreements and understandings among the parties, oral or written, relating to such matters.

Section 11.10 Third-Party Beneficiaries. Except as expressly provided in this Agreement, no provision of this Agreement is intended to benefit, nor shall it benefit, any person other than the parties hereto.

Section 11.11 Execution in Counterparts. This Agreement may be executed in separate counterparts, each of which when executed and delivered shall be deemed to be an original, and all of which taken together shall constitute one and the same Agreement.

Section 11.12 Continuing Cooperation. The parties hereto agree that they shall exercise their reasonable judgment and act in good faith in performing their duties and responsibilities under this Agreement and they shall also in good faith, and with their best efforts, cooperate with one another to carry out the purposes of this Agreement.

Section 11.13 Joint and Several Liability of MNC and Independence One. Any obligation of Independence One or MNC to the FDIC Manager under this Agreement shall be the obligation of each of them and each shall

be jointly and severally liable to perform such obligation.

**Section 11.14. Late Payments.** In the event any payment due to any party under the terms of this Agreement is not made on or before the date specified by which such payment shall be made, interest shall accrue on that payment (including any interest included therein) at the Late Payment Rate, compounded _______. The Late Payment Rate is ___________.

[SIGNATURE PAGE FOLLOWS]

DRAFT - 9/05/94

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their duly authorized officers as of the day and year first above written.

INDEPENDENCE ONE BANK OF CALIFORNIA, FSB

By: ______________________
Name: ______________________
Title: ______________________

**MICHIGAN NATIONAL CORPORATION**

By: ______________________
Name: ______________________
Title: ______________________

**FEDERAL DEPOSIT INSURANCE CORPORATION, AS MANAGER OF THE FSLIC RESOLUTION FUND**

By: ______________________
Name: ______________________
Title: ______________________