No. 99-690C
(Senior Judge Bruggink)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

NATIONAL AUSTRALIA BANK, LTD.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S PRE-TRIAL BRIEF

---

STUART E. SCHIFFER
Deputy Assistant Attorney General

DAVID M. COHEN
Director

JEANNE E. DAVIDSON
Deputy Director

SCOTT D. AUSTIN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Classification Unit, 8th Floor
1100 L St., N.W.
Washington, D.C. 20530
Tele: (202) 616-0317
Fax: (202) 305-7643

Attorneys for Defendant

OF COUNSEL:

ELIZABETH A. HOLT
BRIAN A. MIZOGUCHI

January 25, 2007

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . 1

I. The Parties' Intent As Demonstrated By The History Of The Negotiations Of The Termination Agreement . . . . . . . . . . 5

A. The Flaw In The Tax Benefit Sharing Formula Of The Assistance Agreement And Negotiations Directed Toward Correcting The Flaw . . . . . . . . . . 5

B. The Parties Corrected The Flawed Formula By Reforming The Effect Of The Flaw In The Termination Agreement And Intentionally Electing Not To Use A Corrected Formula In The Termination Agreement . . . . . . . . . . 8

C. Negotiations Concerning What Ultimately Became Section 8.4 Of The Termination Agreement Centered Upon NAB's Right To Sue The Government For Enactment Of Section 13224, Not How The Recovery From Any Such Suit, If Successful, Would Be Shared . . . . . . . . . . 10

D. MNC Was Unwilling To Agree To Reformation Of The Flawed Tax Benefit Sharing Formula To The Extent It Was Set Forth In Early Drafts Of What Became Section 8.4 Of The Termination Agreement . . . . . . . . . . 13

E. The Parties' Intent In Drafting Section 8.4 . . . . . . . . . . 15

II. There Is No Evidence That The Parties Intended To Share Post-1994 Tax Benefits From A Section 13224 Lawsuit At Any Alternative Rate Other Than 50 Percent . . . . . . . . . . 19

A. NAB's Erroneous Theory That The "Government Completely Caved" In . . . . . 19

B. The Parties Both Thought About And Discussed Particular Sharing Percentages Relating To MNC's Section 13224 Recovery . . . . . . . . . . 23

C. MNC's Post-Termination Agreement Conduct Demonstrates That The Parties Agreed To 50/50 Tax Benefit Sharing With Respect To MNC's Recovery On Its Section 13224 Claim . . . . . . . . . . . . . . . . . 24

III. NAB Misreads The Deposition Testimony Of FDIC Witnesses . . . . . . . . . . . . . . . . . . . 25

IV. Reformation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## TABLE OF AUTHORITIES

**Page**

### CASES

Abraham v. Rockwell Int'l Corp.,
326 F.3d 1242 (Fed. Cir. 2003) . . . . . . . . . . 16

Beta Sys., Inc. v. United States,
838 F.2d 1179 (Fed. Cir. 1988) . . . . . . . . . . 4, 29

Bidlack v. Wheelabrator Corp.,
993 F.2d 603 (7th Cir. 1993) . . . . . . . . . . 18

Fed. Commc'n Comm'n v. Pottsville Broad. Co.,
309 U.S. 134 (1940) . . . . . . . . . . 20

Firestone Tire & Rubber Co. v. United States,
444 F.2d 547 (Ct. Cl. 1971) . . . . . . . . . . 4, 29

First Nationwide Bank v. United States,
48 Fed. Cl. 248 (2000) . . . . . . . . . . 18

Grill v. United States,
303 F.2d 922 (Ct. Cl. 1962) . . . . . . . . . . 25

Indiana Ins. Co. v. Pana Cmty. Unit Sch. Dist. No. 8,
314 F.3d 895 (7th Cir. 2002) . . . . . . . . . . 29

Nat'l Australia Bank v. United States,
452. F.3d 1321 (Fed.Cir. 2006) . . . . . . . . . . passim

Nat'l Australia Bank v. United States,
63 Fed. Cl. 352 (2004) . . . . . . . . . . 1, 5, 6

N. Helex Co. v. United States,
634 F.2d 557 (Ct. Cl. 1980) . . . . . . . . . . 20

Philippine Sugar Estates Dev. Co. v. Gov't of Philippine Islands,
247 U.S. 385, (1918) . . . . . . . . . . 29

Waring v. Comm'r of Internal Revenue,
412 F.2d 800 (3d Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**STATUTES**

Pub. L. 103-66, § 13224, 107 Stat. 312, 485 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**MISCELLANEOUS**

Restatement (Second) of Contracts, § 155, cmt. a (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Restatement (Second) of Contracts, § 166, cmt. a (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| NATIONAL AUSTRALIA BANK, LTD., Plaintiff, | ) | No. 99-690 C |
| v. | ) | (Senior Judge Bruggink) |
| THE UNITED STATES, Defendant. | ) | |

## DEFENDANT'S PRE-TRIAL BRIEF

## INTRODUCTION

Defendant, the United States, respectfully submits its pre-trial brief in advance of the trial scheduled to commence on February 5, 2007.

This Court correctly concluded, in its summary judgment decision, that the parties addressed the tax-sharing formula to be applied in the event Michigan National Corporation ("MNC")[1] sued the Government for damages arising from the enactment of Pub. L. 103-66, § 13224, 107 Stat. 312, 485 (1993) ("Guarini legislation") in section 8.4 of the Termination Agreement. Nat'l Australia Bank v. United States, 452 F.3d 1321, 1327-28 (Fed. Cir. 2006); PX 4; see Nat'l Australia Bank v. United States, 63 Fed. Cl. 352, 362 (2004).

However, the United States Court of Appeals for the Federal Circuit reversed this Court's conclusion that section 8.4 unambiguously provided for the sharing of tax benefits at a 75/25 ratio (75 percent for NAB; 25 percent for the Government) under all circumstances.

---

[1] National Australia Bank ("NAB") acquired MNC in February 1995 and, thus, became successor in interest and, through this Court's granting of a motion, became the plaintiff in this litigation.

Nat'l Australia Bank, 452 F.3d at 1328. The Federal Circuit concluded that "[a]lthough the Termination Agreement does contemplate use of the Assistance Agreement [75/25 percent] ratio in *some circumstances*, it also contemplates the use of a *different, unidentified ratio in other circumstances*." Id. at 1328 (emphasis added). Based upon its further conclusion that the Termination Agreement, on its face, "fails to conclusively establish what alternative ratio should be employed, or under what circumstances," id., the court held that section 8.4 was ambiguous and that the tax benefit sharing percentage issue should be remanded for consideration of extrinsic evidence to determine the true intention of the parties in drafting section 8.4, id. at 1328-29.

In its pre-trial brief, NAB remarkably makes no attempt to identify the *"different unidentified ratio"* the Federal Circuit held was contemplated in section 8.4 nor does it identify the *"other circumstances"* in which the *"different unidentified ratio"* was intended to apply. The Federal Circuit held that, in providing that any recovery from a section 13224 claim by MNC "shall not include the amount that would have accrued to the benefit of the FDIC Manager under the Assistance Agreement *or that would accrue to the benefit of the FDIC Manager under this Agreement*," (1) section 8.4 cannot be construed as if there was a period after the words "Assistance Agreement;" and (2) the words *"or that would accrue to the benefit of the FDIC Manager under this Agreement"* must have meaning in defining the reduction to NAB's section 13224 recovery. PX 4 at 0057-58 (emphasis added). Yet, contrary to the Federal Circuit's holding, NAB effectively places a period after the words "Assistance Agreement" and renders the "or that would accrue to the benefit of the FDIC Manager under this agreement" language of section 8.4 meaningless.

The extrinsic evidence demonstrates that the FDIC considered a correction to a flawed tax benefit sharing formula in the Assistance Agreement, so as to ensure the FDIC would share all tax benefits that MNC would realize in years after 1994 ("going forward") on a 50/50 basis, to be a "deal breaker" issue without which there would be no Termination Agreement. Viitala Dep. at 142; Lower Dep. at 89-91; see DX 18 at 1293. The parties intended to fix the flawed Assistance Agreement formula throughout the Termination Agreement, including in section 8.4. The extrinsic evidence makes it apparent that the circumstances in which section 8.4 contemplated the 75/25 percent flawed Assistance Agreement sharing ratio would apply were years prior to 1994 in which MNC obtained tax benefits as a result of its section 13224 claim. The "different, unidentified ratio" contemplated in section 8.4 was a 50/50 sharing ratio, and the "other circumstances" in which the parties intended that alternative sharing rate to apply were years after 1994 in which MNC would realize tax benefits resulting from its section 13224 claim. The extrinsic evidence also makes it evident that the section 8.4 language "or that would accrue to the benefit of the FDIC Manager under this Agreement" was a meaningful clause that was purposefully included in section 8.4.

Mr. Lars Viitala, an FDIC tax accountant with primary responsibility for the tax benefit sharing provisions negotiated in the Termination Agreement, summarized in his recent deposition testimony his understanding of the agreement the parties reached and what the parties' intentions were:

> Q: Now let me ask you this. Assuming that as part of any litigation, Michigan National required, recovered tax benefits, and I'm specifically referring to Guarini legislation tax benefits, they recovered tax benefits which were accrued in the years say 1991, how would the benefits be shared based upon your understanding and the intent of the Termination Agreement?

A: If they would have been realized in that year?

Q: Yes.

A: Then that would have been a 25/75 percent sharing year, so Michigan National would have received 75 percent of those benefits.

Q: And assuming that the benefits were ones that were realized in the year 1995, how would they have been shared?

A: That would have been shared on a 50/50 basis.

Q: And what provisions, again of the Termination Agreement, do you rely on for reaching that conclusion?

A: 8.4 where it states that the damages will be based on the Assistance Agreement or under the Termination Agreement.

Viitala Dep. at 145-46; see Meyer Dep. at 95-97 (the parties agreed in section 8.4 that sharing of MNC's section 13224 recovery was 50 percent for tax benefits realized in 1995 and later years and 75/25 sharing in earlier years); DX 64 (Antczak 9/19/02 Dep.) at 206 ("at the termination agreement we agreed that from some point forward it [tax benefit sharing] was 50 percent, it's clear to me that that was the case."); DX 49 (MNC 2001 valuation of its section 13224 claim utilizing a 50 percent tax benefit sharing rate).

It is a fundamental precept of common law that the intention of the parties to a contract controls its interpretation. Firestone Tire & Rubber Co. v. United States, 444 F.2d 547, 551, 195 Ct. Cl. 21, 30 (1971). Thus, the avowed purpose and primary function of the court is to ascertain the intent of the parties to a contract. Beta Sys., Inc. v. United States, 838 F.2d 1179, 1185 (Fed. Cir. 1988).

Under section 8.4, the parties intended to share tax benefits realized after 1994 at a 50 percent tax benefit sharing rate and tax benefits before 1994 at a 25 percent sharing rate;

therefore, that is how section 8.4 is appropriately interpreted. Since the Federal Circuit has affirmed this Court on the remaining issues raised in this case, this Court should order judgment against the United States in the amount of $17,054,381.[2]

## I. The Parties' Intent As Demonstrated By The History Of The Negotiations Of The Termination Agreement

### A. The Flaw In The Tax Benefit Sharing Formula Of The Assistance Agreement And Negotiations Directed Toward Correcting The Flaw

The Assistance Agreement, through sections 1(kk) and 9(f), was intended to provide that, at some point MNC would be required to increase its sharing of tax benefits with the FSLIC to 50 percent. E.g., DX 5, DX 8, DX 10, PX 2, PX 5, PX 7, DX 67 (Antczak 12/11/06 Dep.) at 24, 34; Meyer Dep. at 50-52. However, for all practical purposes, because of a flaw contained in the language in section 1(kk), a provision which measured MNC's return on its investment through calculation of a "Net Investment Account" and addressed the point at which the increased sharing would occur, it was *impossible* for the increase in tax benefit sharing to *ever* increase from 25 to 50 percent. E.g., PX 2, PX 7, DX 8, DX 10, DX 67 (Antczak 12/11/06 Dep.) at 24, 34; Meyer Dep. at 50-52.

To understand the parties' true intentions with respect to sharing of tax benefits if MNC was successful in its section 13224 claim, ultimately set forth in section 8.4, PX 4 at 0057-58, it

---

[2] The $17,054,381 figure is computed from calculations of plaintiff's expert, S.T.R. Revell, previously accepted by this Court for purposes of determining NAB's lost tax benefits. DX 55 at Attachment A; Nat'l Australia Bank, 63 Fed. Cl. at 355-60. Mr. Revell calculated that NAB lost tax benefits of $40,188,595 in years after 1994 and ($4,053,222) in years prior to 1994. DX 55 at Attachment A. Adjusting the post-1994 lost tax benefits for 50/50 sharing equals $20,094,297.50 in lost tax benefits. Adjusting the negative pre-1994 lost tax benefits for 75/25 sharing equals ($3,039,916.50) in lost tax benefits. Adding the time periods together equals $17,054,381 as NAB's appropriate damages award pursuant to the Federal Circuit's decision.

is essential to understand at the outset that: (1) the flaw in the tax benefit sharing provisions of the Assistance Agreement existed; (2) both parties recognized the existence of the flaw; (3) both parties agreed that, prior to 1994, the flaw had no effect upon the parties' intended agreement; and, (4) the Government viewed curing the effect of the flaw as a "deal breaker," meaning that, if the flaw was not cured, there could be no Termination Agreement.

Both this Court and the Federal Circuit acknowledged that the tax benefit sharing formula in the Assistance Agreement was flawed and that both parties recognized the existence of the flaw. 452 F.3d at 1327; 63 Fed. Cl. at 361 & n.23. Indeed, MNC communicated internally about the flaw, DX 5, and MNC advised the FDIC about the flaw, describing the flaw's result as "logically incorrect," DX 8, DX 10. The FDIC and MNC held discussions about the fact "that the Assistance Agreement mechanics were flawed and that the formula was incorrectly drafted so that tax benefits sharing would never go to 50 percent." Meyer Dep. at 51-52. The FDIC never advised MNC it believed the flawed language could be read in any manner that would *not* result in tax benefit sharing on a perpetual 75/25 basis. See DX 67 (Antczak 12/11/06 Dep.) at 35-36. The FDIC also acknowledged the existence of the flaw in internal correspondence. PX 2; PX 5; Meyer Dep. at 50-51.

Significantly, it was undisputed that the flaw was of no consequence to the parties' intended tax benefit sharing agreement during any year prior to 1994. In a September 20, 1994 internal memorandum to the FDIC's Committee on Loans, Liquidations and Purchases of Assets ("Committee"), James Meyer, seeking authorization to enter into a Termination Agreement with MNC on behalf of the FDIC, summarized the Assistance Agreement's flawed formula and noted that, prior to 1994, the flaw was of no consequence because MNC would not have been required

to share tax benefits at a 50 percent rate even if the tax benefit sharing provision had operated as intended by the parties:

> Staff has discovered that in the drafting of the provision in the Agreement for the Net Investment Account calculation, there were numerous mutual mistakes which have rendered the formula inoperative. If this provision is not reformed, the sharing of tax benefits will never increase to 50% . . . . This issue has not become a dispute, *because 1994 is the first year that tax benefits would be shared at the 50% level if the definition were reformed.* The tax benefit payment for 1994 will not be due until the fourth quarter of 1995.

PX 2 at 0080-81 (emphasis added). MNC agreed that, even if the Assistance Agreement tax benefit formula operated as intended, all tax benefit sharing prior to 1994 would have been on a 75/25 basis. DX 67 (Antczak 12/11/06 Dep.) at 44.

The FDIC considered it a priority to reform the Assistance Agreement's flawed tax benefit sharing formula in the Termination Agreement so that the sharing would conform with the parties' original intent. PX 7 at ¶ 14 (the FDIC "would not have settled for anything less than 50% because that was the amount to which we believed the FDIC was entitled"); Lower Dep. at 88-89; Viitala Dep. at 142. Indeed, the FDIC considered 50 percent tax benefit sharing as if the formula governing tax benefit sharing was reformed to be a "deal-breaker" issue that had to be provided for in any Termination Agreement. Lower Dep. at 88-91 ("[I[f I can use the term deal breaker, if we couldn't get to where we got our 50 percent sharing, which was always our belief the intent the agreement, the Assistance Agreement was, then this was not going to happen . . . . I don't recall that there was ever a discussion that we were going to get less than 50 percent going forward, the SRLYs, the Guarini recoveries, or anything."); Viitala Dep. at 142 (deal-breaker "that the FDIC needed to receive 50 percent tax sharing as if the tax, the formula governing sharing was corrected").

Consistent with Mr. Meyer's September 20, 1994 memorandum, in the negotiation of the Termination Agreement, the FDIC consistently took the position that tax benefits be shared on a 50/50 basis beginning with tax benefits realized in the year 1994. DX 18 at 1293 (term sheet indicating that one "open issue[]" with respect to the Termination Agreement negotiations is "[t]he year in which tax sharing switches from 75/25 to 50/50. FDIC proposes 1994, whereas MNC proposes 1995."); DX 67 (Antczak 12/11/06 Dep.) at 50-52. MNC, rather than opposing the FDIC's attempt to alter the effect of the Assistance Agreement's flawed formula, took the position in the Termination Agreement negotiations that tax benefits should be shared on a 50/50 basis beginning with the year 1995, rather than 1994. DX 18 at 1293; DX 67 (Antczak 12/11/06 Dep.) at 50-52.

### B. <u>The Parties Corrected The Flawed Formula By Reforming The Effect Of The Flaw In The Termination Agreement And Intentionally Electing Not To Use A Corrected Formula In The Termination Agreement</u>

From the beginning of negotiations of the Termination Agreement in the summer of 1994, the FDIC and MNC agreed to reform the Assistance Agreement's flawed tax benefit sharing formula. The reformation was not effectuated by rewriting in the Termination Agreement a corrected version of the formula. Instead, the parties revised the effect of the formula by including in the Termination Agreement substantive tax benefit sharing provisions at higher levels of sharing compared to the 75/25 sharing that was dictated by the literal terms of the flawed formula. Viitala Dep. at 93 ("The written language [of the tax benefit sharing formula] was not reformed, but in arriving at our settlement, the concept of the correction of the formula was reformed."); 94 (The flaw in the Assistance Agreement sharing formula "was corrected in the negotiation of the tax benefits sharing values."); 114 ("[i]n the application . . .

the formula was corrected as far as the tax sharing settlement underneath this agreement, so that for years 1994 forward, there was a 50/50 sharing of those tax benefits."); Lower Dep. at 43, 98.

As Mr. Viitala is expected to testify, MNC representatives advised him that, while MNC was willing to reform the substantive terms of the tax benefit sharing provisions by utilizing higher tax benefit sharing ratios in the Termination Agreement, it did not want to use a tax benefit sharing formula in the Termination Agreement to accomplish that goal. MNC explained to Mr. Viitala that it wanted uncomplicated tax benefit sharing and indemnification provisions so that, in the future, the parties would not be forced to deal with the interpretive issues that had proven problematic with the Assistance Agreement tax benefit sharing formula. The FDIC was comfortable with changing the effect of the flawed formula through a year-based allocation of higher tax benefit sharing rates, as opposed to utilizing a corrected formula, because "through the negotiation of the [Termination] agreement, that with the values being as if the formula was corrected, there were, there was no further reason to correct the formula." Viitala Dep. at 143-44.

The parties reached agreement to reform the flawed Assistance Agreement formula through the use of tax benefit sharing rates higher than the flawed formula would have provided – but nonetheless to rates the Assistance Agreement, if not flawed, intended – relatively early-on in the negotiations of the Termination Agreement. E.g., PX 12, PX 13, DX 28, DX 29. Of particular significance was a lump sum settlement the parties reached in the Termination Agreement of anticipated tax benefits from net operating losses ("NOLs") remaining on MNC's books as of the time of the Termination Agreement negotiations. PX 12, PX 13, DX 28, DX 29, PX 7 at ¶ 16, PX 4 at 0008 (section 2.1(a)(viii) of Termination Agreement). As Mr. Viitala will explain, this lump sum settlement, which included anticipated tax benefits from remaining NOLs

originating from pre-Guarini ( i.e., pre-March 1991) covered asset losses, was settled by, among other things, utilizing in the calculation a 50 percent tax benefit sharing rate. See PX 4 at 0008, PX 7 at ¶ 16. Section 2.5(a)(i) and 2.5(b)(i) of the Termination Agreement provided for MNC's payment of 50 percent tax benefit sharing for Separate Return Year Limitation ("SRLY") NOLs for taxable years beginning in 1994. PX 4; see PX 12, PX 13, DX 28, DX 29. Section 2.4(c)(iii) of the Termination Agreement, entitled "1994 Tax Sharing," provided for tax benefit sharing in the amount of 43.75 percent, a rate reduced from 50 percent sharing because "[t]he tax year 1994 was a transition year." PX 7 at ¶ 15 n.1; PX 4. In each case, but for the increased tax benefit sharing reflected in the Termination Agreement, the flawed Assistance Agreement formula would have provided for 75/25 sharing.

### C. Negotiations Concerning What Ultimately Became Section 8.4 Of The Termination Agreement Centered Upon NAB's Right To Sue The Government For Enactment Of Section 13224, Not How The Recovery From Any Such Suit, If Successful, Would Be Shared

The tax benefit sharing provisions pertinent to MNC's section 13224 claim – which ultimately were set forth in section 8.4 – played a secondary role in the negotiations for the Termination Agreement to the question of whether MNC would preserve its right to sue the Government for enactment of section 13224 and, if so, whether MNC would have the unfettered right to sue the Government or would only have so-called "tag-along" rights. In essence, if it was only allowed "tag-along" rights, MNC would not be able to bring its own section 13224 lawsuit against the United States, but, if another litigant succeeded with a section 13224 claim, MNC would be entitled to take such action as is necessary to obtain the identical result. PX 12 at 0053-54; Meyer Dep. at 43-44.

During the initial stages of the Termination Agreement negotiations, the Government sought to obtain MNC's agreement to waive its right to sue the Government for the enactment of section 13224. PX 11 at 0034; Viitala Dep. at 70 ("If we could attain that outcome, that would have been desirable."). On July 20, 1994, MNC's director of corporate taxes, Ernie Antczak, advised the FDIC that the question of "[w]aiver of MNC's right to claim damages for loss of tax benefits" arising from the enactment of section 13224 was an "open issue." DX 18. On August 17, 1994, MNC wrote a letter to the Securities and Exchange Commission ("SEC") advising that MNC and the FDIC were negotiating a Termination Agreement and MNC would be waiving any right to sue arising from enactment of section 13224. DX 22 at 1883-86; see DX 21. Similarly, at one point, MNC also advised the FDIC that it was willing to give up its right to sue the Government to complete the Termination Agreement and advised Mr. Meyer that it "agreed to give up their claim." Meyer Dep. at 40, 42; see Meyer Dep. at 17, 66. MNC explained that it was willing to give up any right to sue under section 13224 because it was preparing to sell the bank to an entity outside the United States and did not feel the existence of a suit against the United States would be helpful. Lower Dep. at 48. In his September 20, 1994, internal memorandum to the Committee, Mr. Meyer advised that MNC had agreed not to initiate a lawsuit against the Federal Government for enactment of section 13224. PX 2 at 0093; Viitala Dep. at 91.

Early drafts of the Termination Agreement reflect that MNC would be provided with "tag-along" rights, but not with an unfettered right to sue the Government for enactment of section 13224. PX 12, PX 13, DX 28, DX 30. Eventually, in the waning hours before the Termination Agreement was signed, MNC was able to negotiate the unfettered right to sue the United States (but not the FDIC) for enactment of the Guarini legislation. PX 4 at 0057-58.

Mr. Gladchun, one of MNC's negotiators for the Termination Agreement, has testified that NAB employed an undisclosed strategy of bringing up the issue of MNC's right to sue for enactment of section 13224 at the last moment of the negotiations. DX 69 (Gladchun 11/28/06 Dep.) at 51-52, 64-65. Mr. Gladchun believed this strategy would provide MNC with the opportunity to prevail upon the issue. Id. at 65.

NAB now claims that the Government "caved" in to MNC's demands to have the right to sue the Government for enactment of section 13224. NAB Br. at 27.[3] To the extent that MNC sought an unfettered right to sue the United States for enactment of section 13224, and the FDIC was initially resistant to agreeing to such a term in the Termination Agreement based upon its preference that MNC agree to waive its right to sue, NAB is technically correct – although invoking exaggeration – that the FDIC "caved" on this issue since the Termination Agreement clearly and unambiguously provides it with the right to sue the United States for enactment of section 13224.

In any event, whether the Government "caved in" to MNC's tactic to retain the right to sue the United States for enactment of section 13224 is unrelated to the issue of tax benefit sharing, i.e., what the parties intended when they agreed that MNC's recovery from a section 13224 lawsuit must be reduced by "the amount that would have accrued to the benefit of the FDIC Manager under the Assistance Agreement or that would accrue to the benefit of the FDIC Manager under this [Termination] Agreement." See 452 F.3d at 1327-28; PX 4 at 0057-58.

---

[3] Plaintiff National Australia Bank's Pre-Trial Brief is cited as "NAB Br. at ___."

**D. MNC Was Unwilling To Agree To Reformation Of The Flawed Tax Benefit Sharing Formula To The Extent It Was Set Forth In Early Drafts Of What Became Section 8.4 Of The Termination Agreement**

The initial drafts of the Termination Agreement – those that provided MNC with "tag-along" rights – provided that NAB would be required to pay the FDIC 50 percent of any cash payments or tax benefits it realized from claiming a post-Guarini covered asset loss deduction or obtained in damages. E.g., PX 12 at 0053-54 (section 8.5 entitled "Tax Matters"); PX 13 at 0321-22 (same); DX 28 at 1780-81 (same); DX 30 at 0674-75 (same).

MNC objected to this "flat across-the-board 50 percent" tax benefit sharing set forth in the draft predecessor section to section 8.4. Viitala Dep. at 113; see Viitala Dep. at 127. While acceptance or rejection of this 50/50 draft sharing provision was clearly secondary to MNC's concern about its underlying right to sue for enactment of section 13224 – whether unfettered or as a "tag-along"suit – it is hardly surprising that MNC was dissatisfied with this draft provision. Unlike the other specific tax benefit sharing provisions, and settlement amounts to which MNC had agreed elsewhere in the Termination Agreement, this draft provision provided for 50 percent tax benefit sharing for tax benefits enjoyed during years in which even a *reformed* Assistance Agreement tax formula would only have resulted in a 75/25 sharing rate.

Specifically, the section 8.4 predecessor tax benefit sharing draft provisions would have provided the FDIC (assuming MNC was successful in its section 13224 suit) with 50/50 tax benefit sharing for tax benefits obtained in years prior to 1994 despite the fact that a reformed Assistance Agreement formula would not have. This results from the fact that section 13224, as the Court is well aware, eliminated covered asset loss deductions retroactively to March 1991. Thus, assuming MNC was successful with its section 13224 suit, the result would be damages

stemming from lost deductions that potentially could have resulted in tax benefits to MNC during years prior to 1994 (as well as lost tax benefits in subsequent years). This was unlike the other tax benefit sharing provisions in the Termination Agreement to which MNC had agreed that were at higher sharing rates than 25 percent (primarily 50 percent), and the settlement of NOLs that the parties had negotiated as part of the Termination Agreement, because those increased sharing rates were only applicable to tax benefits that MNC would enjoy during years after 1993.

Accordingly, in a laundry list of "business issues" related to the negotiations of the Termination Agreement circulated to the MNC negotiating team, MNC set forth that, with respect to the "50/50 sharing of any tax benefit" in connection with the "§ 13224" issue, "*some* of award pertains to 25/75 years." DX 63 at 1928 (emphasis added); DX 67 (Antczak 12/11/06 Dep.) at 93, 95, 99. Similarly, in preparation for a September 8-9, 1994 negotiation session with representatives of the FDIC concerning the Termination Agreement, MNC wrote that, with respect to its section 13224 claim, "FDIC shares a max of 50 percent on tax benefits from any efforts." DX 25 at 1926. As Mr. Viitala explained with respect to MNC's rejection of "flat across-the-board 50 percent" sharing of proceeds from its Guarini claim, "if during a 25 percent/75 percent sharing period, 1989, 1990, '91, if they [MNC] would have been harmed by Guarini, they wanted to get their 75 percent share." Viitala Dep. at 113-14.

The Government's concern with correcting the flawed Assistance Agreement tax benefit sharing formula simply did not extend to those years in which, even if the formula had been correctly drafted, it would still have resulted in the FDIC obtaining a 25 percent tax benefit share. See Viitala Dep. at 114 ("If it was in a tax sharing period in which there was a 50/50 sharing as resolved in other terms of the agreement, then we wanted to receive our 50 percent share in those

years."). Accordingly, the Government ultimately was not opposed to modifying the sharing portion of what eventually became section 8.4 of the Termination Agreement to accommodate MNC's concern that it should not be required to share 50 percent of tax benefits realized in years prior to 1994 with the FDIC.

### E. The Parties' Intent In Drafting Section 8.4

Section 8.4 provides in pertinent part as follows:

> If MNC and Independence One assert a claim or claims ("Claims") against a party other than the FDIC Manager for damages and for refunds of federal and state taxes and/or for the redetermination of liability for federal and state taxes for the taxable years 1989 and thereafter, and such claims arise out of or relate to the enactment of [the Guarini legislation] or the application of the [the Guarini legislation] to MNC, then the amount of damages or refunds sought in such claims shall not include the amount that would have accrued to the benefit of the FDIC under the Assistance Agreement or that would accrue to the benefit of the FDIC Manager under this Agreement.

PX 4 at 0057-58 (section 8.4).

As the Federal Circuit held, the language of section 8.4 contemplates use of the Assistance Agreement's flawed formula "in some circumstances." 452 F.3d at 1328. The negotiating history makes clear, however, that those circumstances are limited to tax benefits realized in years in which both parties agreed it made no difference whether the formula was flawed or not, because, even if the formula operated as the parties had intended, there would have been 75/25 sharing, i.e., tax benefits obtained in years prior to 1994.

If the parties had intended 75/25 tax benefit sharing pursuant to the flawed formula of the Assistance Agreement in *all circumstances*, or to be applicable to damages attributable to tax benefits lost as a result of the enactment of section 13224 in *all years*, the clause in section 8.4

describing the amount of damages or refunds that MNC could seek in its section 13224 claim that "shall not [be] include[d]" in any recovery would have terminated after the words "the amount that would have accrued to the benefit of the FDIC Manger under the Assistance Agreement." Instead of ending at that point, section 8.4 goes on to list an alternative to 75/25 tax benefit sharing that "shall not [be] include[d]" in the damages sought in a damages claim under section 13224: "the amount that would accrue to the benefit of the FDIC Manager under this Agreement." PX 4 at 0057-58. Thus, to conclude that the parties intended the 75/25 tax benefit percent sharing of the flawed formula in all circumstances would render the words "the amount that would accrue to the benefit of the FDIC Manager under this Agreement" meaningless, contrary to the "general rule of contract interpretation that terms of a contract should not be interpreted so as to render them ineffective or superfluous." Abraham v. Rockwell Int'l Corp., 326 F.3d 1242, 1254 (Fed. Cir. 2003).

Accordingly, the Federal Circuit held that section 8.4 "contemplates the use of a different, unidentified ratio in other circumstances." 452 F.3d at 1328.

The negotiating history of the Termination Agreement makes clear that the "different, unidentified ratio" is 50 percent tax benefit sharing and the "other circumstances" are those years after 1994 in which MNC suffered damages as a result of the enactment of section 13224. That is precisely how the FDIC understood the Termination Agreement was intended to operate under the language of section 8.4. Viitala Dep. at 115-16, 127, 145-46; Meyer Dep. at 96-97; Lower Dep. at 88-89. Moreover, the conclusion that the parties intended to reduce MNC's damages recovered through a section 13224 suit by 50 percent for benefits attributable to years after 1994 is fully consistent with the other provisions of the Termination Agreement, because there is *no*

*provision* in the Termination Agreement where tax benefits after 1994 were shared at any rate less than 50 percent. Moreover, MNC's NOLs that existed on its books as of 1994 which were anticipated to be utilized in post-1994 years (included NOLs resulting from covered asset losses), and were subject to the 25 percent flawed tax benefit sharing formula in the Assistance Agreement but for the Termination Agreement, were settled based upon a sharing rate of 50 percent. PX 7 at ¶ 16. Indeed, as noted above, it was MNC's own negotiating position with respect to the Termination Agreement negotiations that tax benefits would be shared on a 50 percent sharing rate basis after 1994 (although the FDIC took the position that tax benefits should be shared on a 50 percent basis beginning in 1994). DX 18 at 1293; DX 67 (Antczak 12/11/06 Dep.) at 50-53.

The precise language utilized in section 8.4 indicates that the parties contemplated using the Assistance Agreement's flawed formula for tax benefits realized in years that the Assistance Agreement *was* applicable and the Termination Agreement for tax benefits that would be realized in the years when it - and not the Assistance Agreement - would be applicable. See Viitala Dep. at 115-16. Section 8.4, in the clause setting forth the amount that should not be included in the amount of damages or refunds MNC may seek in its section 13224 claim, uses the words "*would have accrued* to the benefit of the FDIC under the Assistance Agreement" when referring to the Assistance Agreement amount and the words "*would accrue* to the benefit of the FDIC Manager under this Agreement" when referring to the Termination Agreement. PX 4 at 0058 (emphasis added). Section 9.4 of the Termination Agreement provides that the Assistance Agreement terminates effective September 30, 1994 (the day after the Termination Agreement was signed). PX 4 at 0062. Thus, the use of language in the past tense (*"would have accrued"*), used in

reference to the Assistance Agreement, corroborates that the 75/25 tax benefit sharing contained in the Assistance Agreement's flawed formula was intended to be utilized for tax benefits realized only in years when the Assistance Agreement was applicable. On the other hand, the use of language in the future tense (*"would accrue"*), used in reference to the Termination Agreement, corroborates evidence establishing that the tax benefit sharing provisions contained throughout the Termination Agreement (50 percent sharing) were intended to be utilized for tax benefits realized in those years when the Termination Agreement was applicable (years after 1994).

NAB makes much of the fact that neither this Court, the Federal Circuit, nor we were able to identify a specific Termination Agreement provision which "conclusively establish[es] what alternative ratio should be employed, or under what circumstances." Nat'l Australia Bank, 452 F.3d at 1328; NAB Br. at 14. The absence of such a provision, however, is what caused the Federal Circuit to conclude that section 8.4 was ambiguous, because the presence of such a provision would have eliminated the ambiguity. See 452 F.3d at 1328. It is clear that the parties intended there to be an applicable alternative ratio because it makes no sense that the parties would have provided that MNC's recovery should be reduced by "the amount that would accrue to the benefit of the FDIC Manager under this Agreement" if they did not intend to provide that *some* amount would accrue to the benefit of the FDIC Manager under the Termination Agreement.

There is, accordingly, a "yawning void" in the Termination Agreement that needs to be filled. Bidlack v. Wheelabrator Corp., 993 F.2d 603, 608 (7th Cir. 1993); First Nationwide Bank v. United States, 48 Fed. Cl. 248, 263 (2000). The Federal Circuit has instructed that the void

should be filled based upon "the true intentions of the parties in drafting § 8.4." Nat'l Australia Bank, 452 F.3d at 1329. As we have demonstrated, the parties' true intentions were that MNC's recovery should be reduced by 50 percent for those tax benefits realized in years after 1994. That is how the "yawning void" should be filled.

## II. There Is No Evidence That The Parties Intended To Share Post- 1994 Tax Benefits From A Section 13224 Lawsuit At Any Alternative Rate Other Than 50 Percent

The Federal Circuit concluded that, although NAB had "eagerly embrace[d]" the portion of section 8.4 incorporating the 75/25 sharing ratio, it had offered "no plausible construction of the portion [of section 8.4's sharing provision] that expressly contemplates the use of some other ratio for amounts accruing to the benefit of the government under the Termination Agreement." 452 F.3d at 1328. In its pre-trial brief, NAB has once again failed to proffer any plausible explanation for why the relevant language in section 8.4, rather than ending with a period following the words "Assistance Agreement," goes on to provide that the amount of damages MNC may seek should not include the amount "that would accrue to the benefit of the FDIC Manager under this Agreement." PX 4 at 0058.

### A. NAB's Erroneous Theory That The "Government Completely Caved" In

NAB embraces, upon remand, the erroneous theory that the "Government completely caved" in, relying upon its conclusion that the FDIC agreed that any recovery by MNC in its section 13224 claim would be reduced by only 25 percent because Mr. Gladchun "viewed the language of § 8.4 as not putting any 'collar'" upon MNC's recovery. NAB Br. at 2, 27. NAB's theory is premised upon the fact that the language of section 8.4 was negotiated at "the proverbial eleventh hour" before the Termination Agreement was signed; predecessor drafts of section 8.4

provided for no unfettered right to bring a section 13224 claim and explicitly set forth a 50/50 sharing of any recovery, while section 8.4 ultimately provided for the unfettered right to sue and eliminated any specific reference to 50/50 sharing; and Mr. Gladchun's purported and undisclosed belief that MNC preserved everything it was entitled to under the Assistance Agreement. NAB Br. at 7, 10-11, 13. The problems with NAB's theory are multiple.

First, NAB's "caved in" theory is in fundamental conflict with the Federal Circuit's decision remanding the case to this Court. As we have noted, the Federal Circuit held that, as a matter of law, the Termination Agreement contemplated the use of the flawed 75/25 percent Assistance Agreement formula in "some circumstances" and a "different, unidentified ratio in other circumstances." 452 F.3d at 1328. NAB's theory is that the "different, unidentified ratio" that the Termination Agreement contemplated is not "different" at all but is the identical ratio as contained in the flawed Assistance Agreement. NAB's theory is also that the Assistance Agreement 75/25 sharing ratio was contemplated by the parties to apply not just in "some circumstances" but also in "other circumstances." This Court must reject NAB's argument because the Court is required to respect the mandate of the Federal Circuit. E.g., Fed. Commc'n Comm'n v. Pottsville Broad. Co., 309 U.S. 134, 140 (1940); N. Helex Co. v. United States, 634 F.2d 557, 560 (Ct. Cl. 1980).

Second, NAB's "caved in" theory does not comport with the language of section 8.4 regarding tax benefit sharing. If the Government "caved in" as NAB claims, there would have been, in the relevant provision of section 8.4, a period after the words "Assistance Agreement," and no subsequent reference to a recovery reduction for the amount that would accrue to the benefit of the FDIC under the Termination Agreement. NAB also fails to explain why, if the

parties' intent was to preserve things just as they were in the Assistance Agreement, section 8.4 explicitly contains a clause providing that MNC's recovery would be reduced by the amount that *"would accrue"* to the FDIC Manager under the Termination Agreement.[4]

Third, section 8.4 itself demonstrates that, when the Government agreed to "cave in," it was willing to utilize explicit terms acknowledging precisely what terms it had agreed to accept as demonstrated by that portion of section 8.4 addressing MNC's right to bring its section 13224 claim. The section 8.4 language permitting MNC to bring a section 13224 claim against the United States is clear and unambiguous. It would have been a simple matter to provide that the Assistance Agreement tax benefit sharing formula would be utilized in all circumstances to determine the amount by which MNC's section 13224 recovery would be reduced had that truly been the intent of the parties, which it was not.

Fourth, it could not have been the FDIC's intent to agree to across-the-board 75/25 percent sharing for MNC's section 13224 damages (or that the Assistance Agreement's flawed formula would apply at all times), because Mr. Meyer lacked the authority to agree to such a provision in the Termination Agreement. PX 5; Meyer Dep. at 142-44. Although he retained some flexibility to agree to deviations from the original agreement approved by the Committee, Mr. Meyer would have been required to go back to the Committee to obtain the Committee's approval before agreeing to share MNC's section 13224 recovery on an across-the-board 75/25 basis, because any such agreement would have constituted a major economic change from the

---

4 Mr. Gladchun's testimony that "[t]he terms of the [Assistance] agreement weren't being changed. Nothing was being done, period," DX 69 (Gladchun 11/28/06 Dep.) at 100-01; NAB Br. at 12, cannot be reconciled with either the language of section 8.4 or the Federal Circuit's decision.

proposed agreement he had submitted to the Committee and for which he had previously obtained approval. Meyer Dep. at 144. Of course, Mr. Meyer never went back to the Committee to obtain approval to agree to across-the-board 75/25 sharing of any recovery MNC might obtain from its section 13224 claim because he did not believe he had entered into any such agreement. In any event, Mr. Meyer never would have recommended to the Committee that the FDIC agree to share any recovery by MNC from a section 13224 suit on an across-the-board 75/25 basis. Id. at 142.

Fifth, NAB makes a completely unwarranted leap of logic when it concludes from the elimination of language setting forth an explicit 50/50 sharing of MNC's section 13224 claim from earlier drafts of the Termination Agreement that the parties intended that MNC's entire section 13224 recovery would be shared on a 75/25 basis pursuant to the flawed Assistance Agreement tax benefit sharing formula. As we have explained, the 50/50 sharing language of the predecessor drafts of section 13224 was altered to comply with the parties' recognition that MNC's section 13224 recovery should be reduced by only 25 percent in those years where it was agreed that 75/25 sharing would have applied even if the Assistance Agreement tax benefit sharing formula had not been flawed and had operated as originally intended.

NAB's analogous section 2.6(f)(vi) argument (NAB Br. at 9-10) fails for the same reason. Even assuming NAB is correct that, as a result of the purported linkage between section 8.4 and section 2.6(f)(vi), predecessor drafts of section 2.6(f)(vi) were changed to alter language that would have allowed for 50/50 sharing in the event of judicial action, it is an unwarranted leap of logic to conclude from that change that the parties intended to share MNC's section 13224 recovery on a 75/25 basis for tax benefits generated in all years. Instead, the purported change

would merely confirm the parties' intentions not to have across-the-board tax benefit sharing from a section 13224 recovery at a 50/50 rate, but, instead, to have tax benefit sharing at a 75/25 rate for pre-1994 years and at a 50/50 rate for post-1994 years.

Finally, the FDIC negotiators adamantly deny that the FDIC "caved in" and agreed to share all tax benefits from any recovery from a section 13224 action on a 75/25 basis as NAB claims. E.g., Meyer Dep. at 140-41; Viitala Dep. at 107-08, 144-45; Lower Dep. at 88-89.

### B. The Parties Both Thought About And Discussed Particular Sharing Percentages Relating To MNC's Section 13224 Recovery

NAB erroneously claims that "[o]ther than Michigan National's explicit rejection of 50% sharing, neither side thought about or discussed particular sharing percentages relating to a Guarini recovery." NAB Br. at 13. In fact, the opposite is true: the parties discussed that very topic among themselves and with each other and gave significant thought to what was a "deal breaker" issue to the FDIC. The parties specifically discussed the fact that, although MNC did not want an across-the-board 50 percent sharing of its section 13224 claim, the parties could, and did, agree that MNC would be entitled to receive the sharing percentage to which it would have been entitled had the flaw in the Assistance Agreement formula been corrected (in the event the Assistance Agreement was not terminated) or, under the Termination Agreement, with 50 percent sharing in years after 1994. Viitala Dep. at 127. Mr. Meyer, while unable to recall specifically whether *he* had a conversation on this subject with MNC, does specifically recall discussing the portion of section 8.4 addressing sharing with the FDIC's tax accountant, Mr. Viitala, from which he developed the following understanding as to what the parties had agreed to with respect to MNC's section 13224 claim:

> . . . when you take a look at the Assistance Agreement the way it was intended to work, the Assistance Agreement formulas, it was '95, . . . was the first full year where the benefits would have been shared 50 percent under the Assistance Agreement[] . . . and before then, it would have been . . . 25 percent. . . . [W]hen they went in and calculated what the net damages are [under section 8.4], it would have been reduced by 50 percent which was, would have been our share '95 going forward under a reformed Assistance Agreement. . . . [I]f there were additional tax benefits . . . generated from the Guarini [claim] in the years prior to '95 . . . they [MNC] needed the language of sharing 25 percent . . . .

Meyer Dep. at 95-97; see Meyer Dep. at 116 ("if the economic benefit that [MNC] got from . . . the winning of the Guarini claims was realized prior to 1995, they would have got . . . 75 percent of the benefit, and if it was after then, it would have been 50 percent of the benefit").

### C. MNC's Post-Termination Agreement Conduct Demonstrates That The Parties Agreed To 50/50 Tax Benefit Sharing With Respect To MNC's Recovery On Its Section 13224 Claim

The first occasion NAB had to address in writing its understanding of what the tax sharing arrangement was with respect to its section 13224 claim did not occur until the year 2001. NAB's response, drafted by the same director of corporate taxes, Ernie Antczak, who was primarily responsible for the tax benefit sharing provisions of the Termination Agreement in the negotiations, was unambiguous: there was 50 percent tax benefit sharing.

Specifically, Mr. Antczak, on behalf of MNC, utilized a 50 percent tax benefit sharing rate to compute the recovery amount in this litigation that MNC supplied to MNC's consultants for purposes of a dividend-in-kind valuation report and in its regulatory filing with the Office of Comptroller of the Currency regarding the dividend in kind. DX 49, DX 67 (Antczak 12/11/06 Dep.) at 106-08; see DX 46, 48, 50, 51, 52. MNC's original and amended 2001 Federal tax returns contain a valuation of this litigation, and the Federal income associated with the dividend in kind, premised upon a calculation utilizing a 50 percent sharing rate of tax benefits with the

FDIC.[5] DX 53, DX 54, DX 67 (Antczak 12/11/06 Dep.) at 127-34. The individual who signed both the original 2001 Federal tax return and the amended tax return is expected to testify that the 50 percent tax benefit sharing used in both returns was as accurate as possible. DX 70 (Eisenberg Dep.) at 12-13, 28.

Mr. Antczak's recording of a 50 percent sharing ratio for NAB's section 13224 claim in 2001 is consistent with his factual recollection a year later as to what the parties intended and understood with respect to tax benefit sharing as provided in the Termination Agreement:

> Q: Do you recall whether there was any dispute between Michigan National and FSLIC, or the FDIC, its successor, regarding their applicable percentage of sharing tax benefits?
>
> A: No. I only know that at the termination agreement we agreed that from some point forward it was 50 percent, it's clear to me that that was the case.
>
> Q: To the extent that there was any dispute prior to the termination agreement, would it have been settled in the termination agreement?
>
> A: Yes, that would have been my understanding.

DX 64 (Antczak 9/19/02 Dep.) at 206-07.

## III. NAB Misreads The Deposition Testimony Of FDIC Witnesses

NAB, in its pretrial brief, claims that the testimony proffered by Messrs. Meyer, Viitala, and Lower in their recent depositions presents "inconsistent" "theor[ies]." NAB Br. at 19. But the three FDIC witnesses – none of whom has yet to present direct testimony – have not offered any "theor[ies]" at all, only their factual recollections. And their factual recollections are

---

[5] MNC's tax returns constitute binding omissions. See, e.g., Grill v. United States, 303 F.2d 922, 926, 157 Ct. Cl. 804 (1962) (per curiam); Waring v. Comm'r of Internal Revenue, 412 F.2d 800, 801 (3d Cir. 1969) (per curiam).

consistent, particularly given their disparate roles in the negotiation of the Termination Agreement, the over 12 years of time that has elapsed since the Termination Agreement was signed, and the complexity of the tax benefit sharing issues involved.

All three FDIC witnesses unmistakably testified to having the same fundamental understanding of the sharing terms to which the parties reached agreement in the Termination Agreement with respect to NAB's section 13224 claim: 50/50 tax benefit sharing for years after 1994. Viitala Dep. at 126-28, 145-46; Meyer Dep. at 95-97, 140-41; Lower Dep. at 88-89.

In attempting to reconcile their recollection and understanding of the parties' agreement with their recollection of how the specific language of section 8.4 was derived, Mr. Viitala has the best recollection. Mr. Viitala, a former FDIC tax accountant, had primary responsibility for the tax benefit sharing provisions of the Termination Agreement for the FDIC and was the individual Mr. Meyer primarily relied upon in negotiating tax benefit sharing in the Termination Agreement. See Meyer Dep. at 131; Viitala Dep. at 86-87. Mr. Viitala specifically recalls conversations between the parties concerning the eventual language of section 8.4 and the parties' mutual understanding that MNC's section 13224 recovery would be based upon 50/50 sharing for post-1994 years when the Termination Agreement was in effect, consistent with other provisions in the Termination Agreement and a correction of the Assistance Agreement's flawed formula. Viitala Dep. at 126-27.

Mr. Meyer, although he cannot recall conversations between the parties about the specific language of section 8.4, does recall discussing, with individuals from the FDIC, especially Mr. Viitala, that the 50/50 language was dropped from predecessor drafts of section 8.4 to effectuate 50/50 tax benefit sharing in years after 1994 and 75/25 tax benefit sharing in earlier years. Meyer

Dep. at 94-100. Thus, the recollections of Mr. Meyer and Mr. Viitala are quite similar and certainly not inconsistent.

NAB's primary attempt to discredit Mr. Viitala is to argue that, if Mr. Viitala's recollection is correct, "it would have been very simple for the parties to specify that 25% sharing applied to Guarini recoveries realized prior to September 29, 1994 and 50% sharing applied to recoveries realized thereafter." NAB Br. at 25. But NAB cannot persuasively make this claim when it would have been an even simpler matter to have provided in section 8.4 for across-the-board 25 percent sharing as NAB claims the parties agreed. In any event, Mr. Viitala's recollection explains why the Termination Agreement is cross-referenced in section 8.4 while NAB's theory does not.[6]

With respect to Mr. Meyer, NAB elects to ignore Mr. Meyer's testimony that he understood that section 8.4 was intended to provide 50/50 tax benefit sharing in years after 1994 and attempts to distort other testimony Mr. Meyer proffered in which he references the possibility that a court might be required to "'infer a reformation of that messed-up [Assistance Agreement] formula.'" NAB Br. at 21. Mr. Meyer is not a lawyer. What he meant by this particular testimony, as he will explain at trial, is that he understood that, because the language in section 8.4 is vague, if a court were called upon to interpret what the parties agreed to in section 8.4 of the Termination Agreement, it would need to infer from the Termination Agreement that the parties had reached an agreement to reform the flaw in the formula in the Assistance Agreement. See Meyer Dep. at 115-16 (courts would need to infer reformation allowing for 50/50 tax benefit sharing in post-1994 years).

---

[6] Mr. Viitala agrees that "who ever wrote it [section 8.4] should have done a better job setting forth how much were shared in each year." Viitala Dep. at 128.

Mr. Lower, although he recalls that the parties agreed to share tax benefits derived from a section 13224 claim on a 50/50 basis "going forward" (Lower Dep. at 89), has no recollection of the changes to the language of section 8.4 that occurred in the last two days of negotiations. Lower Dep. at 86. Mr. Lower was Mr. Viitala's supervisor, and thus his knowledge is derived, to a large extent, from what he had been advised by Mr. Viitala. Lower Dep. at 17, 23. Although NAB makes much of Mr. Lower's inability to recall NAB's change of mind with respect to pursuit of its section 13224 claim (NAB Br. at 23), this is not particularly surprising because Mr. Lower was not concerned about whether NAB retained the right to sue since "I had one thing in mind, and that was our 50 percent of the tax benefits. . . . If they recovered them . . . we got 50 percent. . . . That was my area." Id. at 71. Thus, had it come to Mr. Lower's attention directly, or had Mr. Viitala reported to him, that the FDIC had agreed to alter the parties' agreement of sharing NAB's recovery from a section 13224 claim to 25 percent "going forward," rather than 50 percent, it is inconceivable Mr. Lower would not recall that. Mr. Lower's testimony accordingly confirms the testimony of Mr. Viitala and Mr. Meyer that the parties agreed to share tax benefits from a section 13224 claim at a 50/50 sharing ratio for years after 1994.[7]

## IV. Reformation

The Federal Circuit noted that:

> We have already concluded that the Termination Agreement is ambiguous and that, on remand, the Court of Federal Claims must

---

[7] NAB devotes considerable effort to describe what it refers to as the Government's "evolving" tax benefit sharing arguments. NAB Br. at 13. The Federal Circuit summarized our position on appeal as follows: "The government argues . . . that it was the intent of the parties in drafting that [Termination] agreement to set a fixed 50/50 ratio for sharing benefits accruing after 1994." 452 F.3d at 1327. Our position was premised upon the record before the court, which included Mr. Viitala's declaration setting forth that "[t]he third dispute regarding the FDIC's sharing percentage of the tax benefits was resolved in the Termination Agreement with the FDIC obtaining 50% of the tax benefits after 1994." PX 7 at ¶ 15 (footnote omitted).

> consider extrinsic evidence to determine the parties' intent in drafting the agreement. Such evidence is always admissible, in any case, to determine the need for reformation of an instrument . . . . On remand, the Court of Federal Claims must review all relevant evidence and consider whether the Termination Agreement is suitable for reformation to reflect the parties' intent.

452 F.3d at 1330.

As we have noted, because, under section 8.4, the parties intended to share tax benefits at a 50/50 sharing ratio in post-1994 years and at a 75/25 rate in pre-1994 years, the Termination Agreement should be interpreted in that manner. Firestone, 444 F.2d at 551; Beta Sys., 838 F.2d at 1185. Accordingly, if the Termination Agreement is interpreted consistent with the parties' intentions, there is no need to reach the question of whether reformation is necessary.

However, if the Court concludes that, although the parties agreed to and intended to share MNC's section 13224 recovery in that manner, they failed to express it correctly in writing in the Termination Agreement, reformation of the Termination Agreement to effect the parties' mutual intent is appropriate. Nat'l Australia Bank, 452 F.3d at 1329 ("An erroneous mutual belief about the contents of a written agreement is sufficient to constitute a 'mistake' for [reformation purposes]: reformation is available 'when the parties, having reached an agreement and having attempted to reduce it to writing, fail to express it correctly in the writing.'").[8]

Alternatively, to the extent that: (a) plaintiff maintains that it "knew" that the Termination Agreement executed by the parties provided it with a 75/25 percent sharing ratio of tax benefits based upon any section 13224 recovery; and (b) plaintiff was aware of a mistaken

---

[8] Citing Indiana Ins. Co. v. Pana Cmty. Unit Sch. Dist. No. 8, 314 F.3d 895, 903-04 (7th Cir. 2002) (quoting Restatement (Second) of Contracts, § 155, cmt. a (1981)); see also Philippine Sugar Estates Dev. Co. v. Gov't of Philippine Islands, 247 U.S. 385, 389 (1918) ("[I]t is well settled that courts of equity will reform a written contract where, owing to mutual mistake, the language used therein did not fully or accurately express the agreement and intention of the parties . . . .").

belief by the FDIC that it had agreed to obtain a 50 percent share of such tax benefits in years covered by the Termination Agreement, i.e., years after 1994, but said nothing to correct that mistaken belief, reformation is appropriate to construe or reform the agreement to be as defendant understood it to be. Rest. 2d Contr. § 166, Cmt. a ("The rule stated in this Section also applies to the case where only one party is mistaken and the other, although aware of the mistake, says nothing to correct it. In that case his non-disclosure is equivalent to an assertion that the writing is as the other understands it to be.").

## CONCLUSION

The evidence makes it apparent that the circumstances in which section 8.4 contemplated the 75/25 percent Assistance Agreement sharing ratio would apply were years prior to 1994 in which MNC realized tax benefits as a result of its section 13224 claim. The "different, unidentified ratio" contemplated in section 8.4 was a 50/50 sharing ratio, and the "other circumstances" in which the parties intended that alternative sharing rate was to apply were years after 1994 in which MNC would realize tax benefits resulting from its section 13224 claim. See Nat'l Australia Bank, 452 F.3d at 1328. Given the parties' intent, the Termination Agreement should be interpreted (or alternatively reformed) in this manner and judgment should be entered in the amount of $17,054,381 based upon the Federal Circuit's ruling.

Respectfully submitted,

STUART E. SCHIFFER
Deputy Assistant Attorney General

DAVID M. COHEN
Director

JEANNE E. DAVIDSON
Deputy Director

SCOTT D. AUSTIN
Trial Attorney
Commercial Litigation Branch
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, NW
Washington, D.C. 20530

Tel: (202) 616-0317
Fax: (202) 305-7643

OF COUNSEL:
ELIZABETH A. HOLT
BRIAN A. MIZOGUCHI
Trial Attorneys

January 25, 2007

CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of January, 2007, a copy of the foregoing "DEFENDANT'S PRE-TRIAL BRIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Scott D. Austin
Scott D. Austin